## UNITED STATE DISTRICT COURT
## DISTRICT OF MAINE

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   )
**JAROSLAV HORNOF, a resident and citizen**  )
**of the Czech Republic,**  )
**DAMIR KORDIC, a resident and citizen of**  )
**Croatia; and**  )
**LUKAS ZAK, a resident and citizen of the**  )    **CASE NO.:  2:19-cv-00198-JDL**
**Slovak Republic,**  )
 )
     *Plaintiffs,*  )
 )
**v.**  )
 )
**SHANE WALLER, a former employee of the**  )
**U.S. Department of Justice,**  )
**JOHN CASHMAN, an employee of the U.S.**  )
**Department of Justice,**  )
**RICHARD UDEL, an employee of the**  )
**Department of Justice,**  )
**MICHAEL A. FAZIO, Commander, First**  )
**Coast Guard District of the United States**  )
**Coast Guard,**  )
**MICHAEL BAROODY, Captain and**  )
**Commanding Officer, United States Coast**  )
**Guard, Sector Northern New England,**  )
**JON D. LAVALLEE, Lieutenant, First Coast**  )
**Guard District Legal Office,**  )
**MARK ROOT, Special Agent, United States**  )
**Coast Guard Investigative Service,**  )
**CHRISTY DOYLE, a Citizen of  Maine**  )
**employed by the United States Customs and**  )
**Border Protection,**  )
**SHANNON TRUE, a Citizen of Maine**  )
**employed by the United States Customs and**  )
**Border Protection,**  )
**The UNITED STATES DEPARTMENT of**  )
**JUSTICE,**  )
**The UNITED STATES COAST GUARD,**  )
**The UNITED STATES DEPARTMENT of**  )
**HOMELAND SECURITY; and**  )
**The UNITED STATES of AMERICA**  )
 )
     *Defendants.*  )
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   )

1

# **A M E N D E D**
# **C O M P L A I N T**

NOW COME Plaintiffs Jaroslav Hornof, Damir Kordic and Lukas Zak, through counsel, and, for their Complaint against the defendants, state as follows:

## INTRODUCTION

1.      The plaintiffs, each of whom was a foreign crewman, collectively discovered, stopped and reported high seas discharges of oily bilge water from a foreign vessel, the M/V MARGUERITA, that violated laws of her flag state, the Republic of Liberia, intended to implement MARPOL, a multi-national treaty to foster international cooperation and prevent high seas pollution.  The United States was the fourth country the vessel visited after the plaintiffs shut down and reported the illegal pollution.  Although the vessel's managers had twice reported the pollution to U.S. officials before the vessel arrived, the defendants, each of whom is an employee of the United States nevertheless claimed that they "discovered" the pollution after the vessel arrived.  Collectively, the defendants held the plaintiffs as what amounted to hostages so the defendants could collect large fines and personal glory for the good works the plaintiffs in fact accomplished long before arriving in the United States.  The defendants did so in accordance with their ongoing scheme to bypass the international cooperation MARPOL requires and to gain personal glory at the expense  -- and by violating the basic human rights – of foreign seafarers. The plaintiffs bring this action to collect damages caused them by the defendants' wrongful conduct.  That conduct has ended the marine career of each plaintiff.  They also seek declaratory and injunctive relief so that foreign crewmen will no longer be illegally detained in the United States without due process of law.  The defendants' scheme, which constitutes a form of piracy, and includes involuntary servitude and false imprisonment, includes the following components:

2

a.  The defendants and those acting in concert with them abuse the discretion granted immigration officials to detain aliens suspected of entering illegally or for an improper purpose in order to hold foreign crewmembers who are not suspected of violating any law; they do so to facilitate taking those crewmembers as involuntary servants and human collateral as described below;

b.  If immigration officials have formally admitted the crewmembers into the country, the defendants conspire to revoke that admission without notice or due process in order to facilitate the detention and seizure of the crewmen until they can be taken as human collateral and involuntary servants;

c.  The defendants refuse to acknowledge the crewmen as human beings with any rights; they insist to the contrary that the crewmen have no rights; the defendants insist on dealing only with the owners and operators of the vessel on which the crewmen arrived, treating the crewmen as the property of those vessel interests;

d.  The defendants routinely claim to be conducting only administrative inspections of vessels on which crewmen arrive when in fact they are investigating –and plan to hold the vessel and the crew for leverage in – potential criminal cases associated with events that may have occurred outside the United States; the defendants' practice is to hold the vessel and her crew to further those criminal investigations without securing any search or arrest warrants and without involving judicial process of any kind, even though the underlying events would not have (and did not) violate any U.S. law and did not occur in this country;

e.  The defendants plan to and do violate the provisions of MARPOL and the U.S. statute implementing MARPOL requiring that port states engage in only limited

investigation of foreign vessels carrying valid certificates issued by their flag states and requiring port states to refer suspected high seas incidents to the flag state for enforcement, the flag state being designated as the "Administration" under MARPOL;

f.  The defendants then assert liens on the foreign vessels for events suspected of occurring outside the United States, and claim the right to security for the release of the vessel to her owners, even though events occurring or suspected of occurring outside the United States would have violated only the law of the vessel's flag state;

g.  In addition to seeking a bond or other financial security for the payment of potential fines, the defendants insist the vessel interests pledge members of the vessel's crew as additional "bond or other surety";

h.  The defendants coerce the vessel owners to pledge as part of so-called "agreements on security" substantial numbers of a vessel's crew as human collateral for the vessel's release and the payment of fines; ledge substantial numbers of the vessel's crew as human collateral, without the crewmen's knowledge or consent;

i.  If the crewmembers object, the defendants contend they have no rights to due process in this country;

j.  The defendants and those acting in concert with them seek and claim the right and authority to "parole" the crewmen into this country involuntarily without explaining that the "parole" process is authorized by statute only to allow aliens who have *applied* but do not qualify for admission to be conditionally allowed entry into the United States; no statute or other authority allows the defendants involuntarily to

4

parole innocent foreign crewmembers ashore in this country against their will and without judicial or other process;

k.   The defendants seek to hold the foreign crewmen and to retain their services for as long as possible; to further that goal, they routinely prevent the crewmen from learning their rights; the defendants also actively seek to prohibit the crewmen from having the assistance of counsel who might help them assert their rights;

l.   By this scheme the defendants and those acting in concert with them have held innocent foreign seafarers for well over a year without ever providing them with any notice of their rights or any hearing and without providing consular notification to the nations of which the crewmen are citizens;

m.   When crewmen assert their rights, the defendants and those acting in concert with them file misleading and often perjurious affidavits and motions to arrest the crewmen as "material witnesses";

n.   The defendants include a collection of law enforcement officials who control prosecutorial decisions and are therefore confident that they will never be charged;

o.   Their purpose in carrying out the scheme is to recover large fines and gain personal glory; the defendants and those acting in concert with them regularly issue press releases boasting of their success; and

p.   To carry out their scheme the defendants and those acting in concert with them have created and posted at least one YouTube video advertising a "bounty" to crewmen who report to U.S. officials any discharges of oily waste from foreign vessels on the high seas, even though the officials know those discharges do not and would not violate U.S. law; the video and the defendants' other attempts to promote their

5

scheme never disclose that, as part of the scheme, the defendants will seek to detain in the United States without due process anyone reporting such an event and a substantial number of fellow crewmembers.

**PARTIES**

2.      Plaintiff Jaroslav Hornof is and at all times relevant was a citizen and resident of the Czech Republic.

3.      Plaintiff Damir Kordic is and at all times relevant was, a citizen and resident of Croatia.

4.      Plaintiff Lukas Zak is and at all times relevant was, a citizen and resident of the Slovak Republic.

5.      Defendant Shane Waller at relevant times was an employee of the U.S. Department of Justice and, on information and belief, orchestrated the violations of the plaintiffs' rights described in this Complaint.

6.      Defendant John Cashman is an employee of the U.S. Department of Justice and, on information and belief, participated in organizing and carrying out the violations of the plaintiffs' rights described in this Complaint.

7.      Defendant Richard Udel is a current or former employee of the Department of Justice.  He is and has been a leading architect of the plan to deprive foreign seafarers of their basic human rights, including by creating and posting a misleading YouTube video advertising a "bounty" for information leading to fines against vessel owners, but which does not mention that, to leverage those fines, he and his co-conspirators plan to hold crewmembers as human collateral and involuntary servants.

8.      Michael A. Fazio, upon information and belief, is a citizen of the Commonwealth of Massachusetts and an officer in the United States Coast Guard ("USCG" or "Coast Guard") with the title of Commander, First Coast Guard District.

9.      Defendant Michael Baroody, upon information and belief, is a citizen of the State of Maine and an officer in the Coast Guard with the title of Captain and Commanding Officer, USCG, Sector Northern New England.

10.     Defendant Jon D. Lavallee, upon information and belief, is a citizen of the Commonwealth of Massachusetts and an officer in the Coast Guard with the title of Lieutenant, First Coast Guard District Legal Office.

11.     Defendant Mark Root, upon information and belief, is a citizen of the State of Maine and is employed as a Special Agent with the United States Coast Guard Investigative Service ("CGIS"), the criminal division of the Coast Guard, and is currently assigned to the CGIS resident office in Portland, Maine.

12.     Defendant Christy Doyle, upon information and belief, is a citizen of the State of Maine and is employed by the United States Custom and Border Protection assigned to its office in South Portland, Maine.

13.     Defendant Shannon True, upon information and belief, is a citizen of the State of Maine and is employed by the United States Custom and Border Protection assigned to its office in South Portland, Maine.

### JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over this matter because Plaintiffs' claims arise out of the Constitution and laws of the United States.

15.     Additionally, the Court has subject matter jurisdiction over this matter because it is a dispute between citizens of foreign states and citizens of a State or States within the meaning of 28 U.S.C. § 1332(a)(2) and the claims exceed $75,000.00 exclusive of interest and costs.

16.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) in that the conduct of which the plaintiffs complain took place within this district.

### ADDITIONAL GENERALLY APPLICABLE ALLEGATIONS

17.     Each of the Plaintiffs had been crewmembers on the *M/V Marguerita*, a vessel of Liberian registry that was scheduled to and did arrive in the Port of Portland, Maine on July 7, 2017.

18.     Plaintiff Jaroslav Hornof was then the vessel's third engineer, a position within the ship's engine crew.

19.     Plaintiff Damir Kordic was working as what is known as an "oiler," a position within the ship's engine crew.

20.     Plaintiff Lukas Zak was working as what is known as a "wiper," a position within the ship's engine crew

21.     In May of 2017 Mr. Hornof signed onto the vessel as she transited the Panama Canal with cargo loaded in Brazil and destined for Vancouver, Canada.  Within days of boarding, Mr. Hornof determined that the vessel's then chief engineer was ordering the discharge overboard in international waters of oily bilge waters in violation of Liberian laws that implemented MARPOL.

22.     MARPOL is a series of international conventions to which both the United States and the Republic of Liberia are parties.  The conventions are designed to prevent pollution from vessels registered to signatories and to ensure the efficient handling of investigations related to

alleged pollution.  Under MARPOL, the nation with which a vessel is registered is the "Administration" for purposes of MARPOL enforcement.  Accordingly, Liberia is and was the "Administration" of and under MARPOL for all relevant purposes.

23.    When the chief engineer, after being confronted by Mr. Hornof, did not immediately cease the improper discharges, Mr. Hornof reported the matter to the then captain and to the company responsible for operating the vessel, known as "MST."  Initially, the chief engineer falsely denied to the captain and to MST that he ordered the improper discharge of oily bilge water, claiming instead that hoses that concerned Mr. Hornof were employed only to discharge clean condensation from the vessel's engine cooling system that was captured before entering the vessel's bilges.

24.    Within days of the reports and denials, the vessel arrived in Vancouver, Canada, where a new captain, Peter Demcak, was scheduled to and did sign onto the vessel as the new master and where the vessel's oily bilge waste was transferred ashore for disposal.  While the vessel was in Vancouver, Mr. Hornof met with a representative of MST to explain what he had observed.  The MST representative asked the new captain to gather evidence relevant to the reports and allegations Mr. Hornof had made.

25.    The M/V MARGUERITA left Vancouver on or about May 31 and headed back to Brazil via the Panama Canal.

26.    While at sea, Mr. Hornof confirmed to the new captain that the improper discharges had ceased, but Mr. Hornof also continued to organize, summarize and provide to the captain documentation proving his observations.  Mr. Hornof provided a written summary concerning the discharges and provided video evidence he had created depicting the makeshift system used for the discharges.

27.     The Captain provided the foregoing information to the owners and managers of the vessel, including MST.  By electronic correspondence included within **EXHIBIT A** attached hereto, MST in turn disclosed the matter to Liberian officials and employees of the United States.  The United States was notified because the vessel was scheduled to call on the Port of Portland, Maine after leaving Brazil and because MST had been fined and placed on probation for an unrelated pollution event in the Great Lakes.

28.     The notification to U.S. officials was against the recommendation of Mr. Hornof who (a) reasoned that the events had not occurred in the United States and violated only Liberian – not U.S. law – and (b) knew of the U.S. practice of holding foreign crewmembers who arrived on foreign vessels as human collateral in order to collect large fines for actual or suspected events that occurred outside the United States and did not violate U.S. law.  Mr. Hornof did not want to cause his fellow crewmen to be held in the United States, and he was concerned because his wife was expecting his second child and he had promised and wanted to be home for the birth expected in early November.

29.     The recipients of the electronic correspondence in Exhibit A included lawyers working with defendants Udel, Waller and Cashman.   The electronic correspondence documented (a) that the discharges had been reported by the vessel's "3rd Engineer," i.e., Mr. Hornof; (b) that the Third Engineer had submitted a written report concerning the incident; (c) that the flag state, i.e., the "MARPOL Administration," was investigating the matter and had requested relevant information, including the vessel's oil record book entries; (d) that the flag state was making arrangements to inspect the vessel, and (e) that MST or others associated with the vessel had made arrangements for an independent MARPOL inspection and audit upon the vessel's arrival in Brazil.

10

30.     None of the defendants and no other U.S. official requested additional information.  Because the U.S. officials chose not to coordinate with the MARPOL Administration or with MST's effort at voluntary disclosure and compliance, U.S. officials fell off the ongoing email exchanges concerning the ongoing investigations by vessel management and the Republic of Liberia. Plaintiffs believe and allege, however, that the defendants continued to have access to the information the vessel's managers were freely providing to any and all officials interested in the matter.  The shared information included the video evidence Mr. Hornof captured.  That evidence was provided to the vessel's managers electronically; the managers in turn provided the evidence to any and all regulatory officials who requested the information.

31.     The MARPOL audit was conducted between June 24 and 27 in Brazil.  Each of the plaintiffs cooperated to the full extent his cooperation was requested or useful.  In fact, each of the plaintiffs cooperated throughout any and all investigations of the improper discharges.

32.     The initial oral report from the independent auditor in Brazil confirmed information initially provided by Mr. Hornof.  Accordingly, and since the M/V MARGUERITA's next port of call was scheduled to be the Port of Portland, Maine, the following day, June 28, 2017, attorneys for the vessel's owners and managers wrote to defendants Baroody and Fazio at their respective offices explaining that the initial results of the audit confirmed the reports of improper discharges and that the full report would be provided once it was completed. The letter, a copy of which is attached hereto as **EXHIBIT B**, expressly stated that the vessel owners' attorneys stood "ready to promptly respond to any questions you may have."

33.     Neither defendant Fazio nor defendant Baroody nor any other defendant requested additional information.

34.     Based on subsequent communications and events and the fact that employees of the Department of Justice who worked in the same office as defendants Waller and Cashman had received the initial disclosures sent prior to the Brazilian audit, plaintiffs believe and allege that that defendants Waller and Cashman were aware of these disclosures.

35.     None of the defendants requested any follow-up information from anyone associated with the M/V MARGUERITA before her arrival in Maine, nor did they attempt to coordinate in any manner with the flag state, i.e., the Republic of Liberia, even though (a) the defendants knew that any discharges likely violated only Liberian law, (b) MARPOL requires deference by a port state in favor of the flag state (i.e., the "Administration" for purposes of MARPOL), and (c) the defendants knew that the flag state, i.e., the MARPOL "Administration," was investigating Mr. Hornof's reports and the evidence of improper discharges.  Instead of pursuing a dialogue with the official MARPOL Administration or any efficient method of confirming Mr. Hornof's reports, the defendants secretly conspired to disrupt the lives of the plaintiffs and other crew members and to violate their clear rights in order to leverage fines, reap personal glory and take credit for the candor and work already done by the plaintiffs by claiming falsely that the defendants "discovered" environmental violations that in fact had been reported, disclosed, proven, and *stopped* by the plaintiffs – and which no one was then attempting to conceal.

36.     Among the MARPOL provisions that describe the more limited role port states, such as the United States with respect to the M/V MARGUERITA, are expected to play under

MARPOL are Articles 6 and 7 of the 1973 convention, which provide in full as follows (with all

*emphasis* supplied):

### Article 6
*Detection of violations and enforcement of the Convention*

(1)     Parties to the Convention shall co-operate in the detection of violations and the enforcement of the provisions of the present Convention, using all appropriate and practicable measures of detection and environmental monitoring, adequate procedures for reporting and accumulation of evidence.

(2)     A ship to which the present Convention applies may, in any port or offshore terminal of a Party, be subject to inspection by officers appointed or authorized by that Party for the purpose of verifying whether the ship has discharged any harmful substances in violation of the provisions of the regulations.  *If an inspection indicates a violation of the Convention, a report shall be forwarded to the Administration for any appropriate action*.

(3)     Any Party shall furnish to the Administration evidence, if any, that the ship has discharged harmful substances or effluents continuing such substances in violation of the provisions of the regulations.  If it is practicable to do so, the competent authority of the former Party shall notify the master of the ship of the alleged violation.

(4)     *Upon receiving such evidence, the Administration so informed shall investigate the matter, and may request the other Party to furnish further or better evidence of the alleged contravention.  If the Administration is satisfied that sufficient evidence is available to enable proceedings to be brought in respect of the alleged violation, it shall cause such proceedings to be taken in accordance with its law as soon as possible*.  The Administration shall promptly inform the Party which has reported the alleged violation, as well as the Organization, of the action taken.

(5)     A Party may also inspect a ship to which the present Convention applies when it enters the ports or offshore terminals under its jurisdiction, if a request for an investigation is received from any Party together with sufficient evidence that the ship has discharged harmful substances or effluents containing such substances in any place.  The report of such investigation shall be sent to the Party requesting it and to the Administration so that the appropriate action may be taken under the present Convention.

### Article 7
*Undue delay to ships*

(1)     *All possible efforts shall be made to avoid a ship being unduly detained or delayed under articles 4, 5 or 6 of the present Convention.*

**(2)     *When a ship is unduly detained or delayed under articles 4, 5 or 6 of the present Convention, it shall be entitled to compensation for any loss or damage suffered.***

37.     Upon the vessel's arrival in Portland, Maine, Plaintiff Zak's contract of employment and the contracts of two other members of the crew expired.  In accordance with the terms of those contracts, the vessel's owners or managers were responsible for arranging flights home.

38.     Consistent with that obligation, the vessel's managers had made or caused to be made arrangements for those crew members, including Plaintiff Zak, to fly from the Portland International Jetport back to their homes, with the first flight (from Portland to Chicago) scheduled for 1:05 p.m. on July 8, 2017.

39.     Plaintiff Zak was 23 years old and lived with his parents and 14-year-old sister.

40.     He had completed part of his education at a maritime academy in his country and was planning to resume his college training in the fall.

41.     He had just completed his second voyage, which, at ten months, was unusually long.  That voyage followed a rest of only one month after Mr. Zak's initial voyage of eight months.  Accordingly, plaintiff Zak had been at sea for 18 of the 19 months prior to the ship's arrival in Portland, Maine.  He needed, deserved and was legally entitled to return home.  He was anxious to return to his native land, be reunited with his family, and resume his education.  He speaks only limited English.

42.     Airline tickets had been purchased for him, and flights originating from Portland were approved by the United States Customs and Border Protection (CBP).

43.     Plaintiffs Hornof and Kordic were serving on board the vessel under contracts yet to expire.  Each held valid passports with valid seaman's visas for entry into the United States.

14

Each rightly expected and was legally entitled to continue his service to and employment upon the vessel when it left the Port of Portland.

44.     Upon the vessel's arrival, each of the plaintiffs presented his documentation to the CBP inspectors who came aboard.

45.     Those CBP officials issued to each of the plaintiffs and every other member of the vessel's crew documents formally and officially granting their entry into the United States.  The three crew members who had completed their contracts, including plaintiff Zak, were each granted what are known as "D-2" visas or shore passes, formally granting each entry into the United States and approval to travel home on the scheduled flights, as reflected in the documents attached hereto as **EXHIBIT C**.

46.     At the same time, the CBP officials granted what are known as "D-1" visas or shore passes to plaintiffs Hornof and Kordic, formally granting their shore leave and entry into the United States while the vessel was in port.  As these plaintiffs were not at the end of their contracts, they rightly expected and were legally entitled to return to sea with the vessel to continue their professional careers as mariners.

47.     Mr. Kordic was an experienced mariner who has sailed the seas for many years as a well-respected engine room professional.  He is in his late 50s, and works diligently in demanding conditions even though he suffers from a leg condition that makes physical labor difficult.  For example, he is not able to walk even on level ground more than a few hundred yards, but he never complains and is highly regarded and dependable.

48.     Mr. Hornof was a fast-rising, highly regarded professional mariner.  Only 26 years of age, when the vessel arrived in Portland harbor he was already a talented engineer and a fine family man.  He lives with his family in Prague, Czech Republic.  When the M/V

MARGUERITA arrived in the Port of Portland, Mrs. Hornof was expecting the couple's second child, due at the start of November.  Mr. Hornof looked forward to completing his contract, being home to support his wife and for the birth of his second child and to continuing his progression through the ranks as an outstanding marine engineer.

49.     After the entire crew, including these plaintiffs, had received their valid shore passes (i.e., their D-1 and D-2 visas) on July 7, 2017 employees of the United States Coast Guard, starting at 2:00 p.m., began boarding the vessel.  At least thirteen Coast Guard employees, including Defendant Root and several others from the Coast Guard's criminal division (Coast Guard Investigative Service, or "CGIS"), came on board and began interrogating crewmembers, including plaintiffs, concerning the discharges that the vessel's owners and managers had disclosed long before the vessel's arrival.

50.     Plaintiffs were subjected to lengthy interrogations without any of their rights being explained.  Each of them cooperated fully and completely, and each would have done so regardless of the unfortunate heavy-handed tactics employed by the defendants and their colleagues.

51.     The defendants, including defendants Waller, Cashman, Lavallee, Root, Baroody, Fazio and others, conspired and planned for the boarding to be announced as (and to be falsely described as) a routine port state examination under MARPOL.  In fact, however, they intended to deprive the crewmembers of their liberty, literally taking them hostage, and holding them under a complex plan by which some defendants planned to (and did) generate (a) favorable publicity for themselves as supposed protectors of the environment who themselves "discovered" and put an end to pollution (even though the defendants knew or should have known the plaintiffs, led by Mr. Hornof, had discovered and terminated the improper discharges) and (b)

16

leverage for large criminal fines from the vessel's owners and managers for events that had occurred outside the United States.

52.     On July 8, 2017, CBP officials, including defendant True, or those acting at his direction, (and also acting in concert with the other defendants), boarded the vessel and illegally insisted that plaintiffs and all crewmembers return the valid papers granting their entry into the United States and approving the flights home of plaintiff Zak and the other two crew members whose contracts were expiring.  The vessel was formally detained and all members of the crew were detained onboard, as reflected in the documents included within **EXHIBIT C**.

53.     The detention was an illegal arrest and deprivation of the liberty of the plaintiffs. Neither the defendants nor any other government official made any effort to notify the plaintiffs' respective consulates, to explain their rights, to afford any due process, or to allow them access to counsel.  Plaintiffs were prohibited from leaving the vessel and were required to appear for attendance twice daily.

54.     Defendant True and the other defendants knew that revoking plaintiffs' entry and plaintiff Zak's permission to fly home was improper.  By statute, 8 U.S.C. §1282, immigration officers have discretion to revoke such entry only after a "proceeding" in which they determine that a crew member is not a "bona fide crewman" or that the crewmember "does not intend to depart."  The statute makes clear that the purpose of revocation in those circumstances is to facilitate the "removal" of aliens who are in this country improperly.  The defendants, on the other hand, knew the plaintiffs arrived lawfully and properly; and the defendants did not intend to "remove" the plaintiffs.  Instead, they planned to deprive the plaintiffs of their liberty without due process of law and to use them as leverage to secure large payments and favorable publicity, falsely contending that the defendants had accomplished what, in reality, the plaintiffs (and

particularly plaintiff Hornof) had accomplished – identifying, proving and terminating illegal discharges on the high seas that violated Liberian law – and only Liberian law.

55.     Defendants knew the plaintiffs were bona fide crewmembers, and they did not doubt and had no reason to doubt that they intended to depart as scheduled.  The defendants were not concerned that any of the plaintiffs might stay in the U.S. longer than permitted.  To the contrary, the defendants conspired to *force* the plaintiffs to remain in the United States involuntarily and against their will as part of their illegal scheme to leverage payments from the vessel's owner and manager for events that had occurred outside the United States and that the plaintiffs – not the defendants – had disclosed, proven and resolved.

56.     Plaintiffs and the entire crew were kept prisoners on the vessel, under guard and subject to twice-daily attendance-taking, until the afternoon of July 16, 2017.  The CBP employees who took attendance admitted that the procedure was highly unusual and unnecessary.  They conceded that the defendants had directed them to employ these unusual procedures and that they were perplexed by the defendants' actions.

57.     Between July 8 and July 16, through counsel, plaintiffs asked repeatedly why they and others were being detained.  Members of the conspiracy gave inconsistent answers. Defendant Lavallee asserted that the crew members were not in custody.  Defendant Doyle acknowledged that they were detained; she stated that she would not explain the detentions, but that defendant Lavallee could do so.  Defendant Lavallee and the other defendants refused to provide any explanation.

58.     On or about July 12 the vessel's managers received the detailed written report of the MARPOL audit that had been conducted in Brazil together with over 160 pages of exhibits. Within hours of receipt, the vessel's managers provided the defendants and their co-conspirators

a copy of the detailed report and exhibits.  The report documented the accuracy of the

information previously provided by the plaintiffs to anyone and everyone who inquired of them,

including the defendants.

59.     Also on July 12 or 13 a representative of the Republic of Liberia was on board the

vessel as part of the ongoing Liberian investigation as the "Administration" under MARPOL.

60.     Although it was thus clear that the brave actions of the plaintiffs, and of Mr.

Hornof in particular, had brought an end to the improper events and caused the vessel's owners

and managers and the MARPOL Administration to address the matter seriously and

cooperatively, the defendants decided they would continue to hold the plaintiffs, and the other

crewmembers, in their custody illegally, always for the purpose of generating publicity for

themselves and leveraging fines from the owner and manager of the vessel, by falsely claiming

the defendants (rather than these plaintiffs) had "discovered" and put an end to improper

discharges.

61.     While the plaintiffs were detained on the vessel, each of them, through counsel,

asked the defendants whether they or the U.S. government needed or wanted additional

information from the plaintiffs.  No such additional information was requested from plaintiffs

Zak or Kordic.  Defendants or representatives of the defendants did ask a few additional

questions of plaintiff Hornof, who answered all such questions without delay.  Each of the

plaintiffs was available to and did cooperate with the defendants, although each of them also

asserted he was being held and detained improperly.

62.     By Friday, July 14, 2017, one of the three crewmembers whose contract had

expired was told he would be allowed to return home.  However, the defendants continued to

insist that plaintiff Zak and a fellow crewmember whose contract had expired could not return

home or otherwise end their illegal detention and arrest.  Accordingly, plaintiff Zak and that other crewmember filed a joint petition for writs of habeas corpus in the United States District Court for the District of Maine and sent copies of the petition to defendants Waller and Chapman.

63.     Fearful that an Article III judge might grant plaintiff Zak the liberty to which he was legally entitled, the defendants avoided any hearing or conference on the petition (by avoiding the Court's communications) while accelerating coercive negotiations with the vessel's owner and manager designed to compel those entities to force the plaintiffs off the vessel and leave them behind as human collateral for the release of the vessel and as involuntary servants of the defendants and the United States Coast Guard.

64.     At the time, the vessel was being detained ostensibly for suspected violation of the U.S. law implementing MARPOL, known as the Act to Prevent Pollution from Ships ("APPS").  The defendants had no reason to believe and did not believe that the vessel had caused any pollution that violated APPS.  By its terms APPS applied to the vessel only while she was in the United States; and no improper discharge is or was believed or known by any party to have occurred in the United States.  Rather, the defendants were hoping to leverage a large fine or settlement by contending that the vessel had "presented" a false oil record book (ORB) or by creating evidence that crew members had been dishonest during the initial investigation on July 7 and 8, 2017 or, if those efforts failed, by contending that the mere possession of an incomplete ORB violated U.S law.

65.     In fact, however, the plaintiffs and the other crew members had been forthright, honest, candid and helpful at all times on and after July 7 and 8, and the oil record book had not been "presented" as if accurate.  Instead, when the Coast Guard requested the ORB, the captain

20

had pointed out that, as the vessel's managers requested, he had executed a corrective entry back

on June 19, 2017, after Mr. Hornof provided documentation of improper discharges in violation

of Liberian law.  The corrective entry provided in full as follows:

> ON JUNE 19, 2017, A TYPE-WRITTEN NOTE FROM A MEMBER OF THE
> ENGINEERING DEPARTMENT WAS RECEIVED BY THE VESSEL'S
> MANAGER IN ACCORDANCE WITH THE VESSEL'S SAFETY
> MANAGEMENT SYSTEM AND REPORTING REQUIREMENTS.  THE
> NOTE ALLEGED THAT THE HANDLING OF VESSEL'S BILGE WATER
> HAD NOT BEEN ACCURATELY MEMORIALIZED IN THE OIL RECORD
> BOOK.  THE MATTER IS UNDER INVESTIGATION AND HAS BEEN
> REPORTED TO THE VESSEL'S FLAG ADMINISTRATION AND
> CLASSIFICATION SOCIETY.  ONE OR MORE ENTRY(S) IN THE OIL
> RECORD BOOK MAY BE INACCURATE AND/OR MISSING AND THE
> CONTENTS OF THE BOOK SHOULD NOT BE RELIED UPON AT
> PRESENT.

66.      Although it was clear and well known to the defendants that these plaintiffs, and

Mr. Hornof in particular, had already put an end to the discharges that violated Liberian law, and

that the Republic of Liberia was investigating the matter, the defendants sought to coerce the

vessel's owners and managers into agreeing to leave the plaintiffs and other crewmembers

behind as potential leverage for large fines and to help the defendants garner publicity for their

false claims that they had "discovered" the improper discharges.

67.      APPS authorizes the Secretary of the Treasury to withhold permission for a vessel

to leave a port if there is "reasonable cause" to believe the vessel may be subject to a "fine or

civil penalty" under APPS unless the vessel owner posts "security or bond."

68.      About one hour before plaintiff Zak petitioned the Court for his freedom, the

defendants or their co-conspirators demanded that the vessel's owners and managers post bonds

totaling $10,000,000 and agree to extend the plaintiffs' and other crew members' employment

contracts without their consent and to leave the plaintiffs and those crew members behind in the

Portland area as human security for the release of the vessel.

69.     After plaintiff Zak filed his petition, the defendants dropped their monetary bond demand to $1,700,000, but continued to insist that the plaintiffs' employer (a) purport unilaterally to extend the expired employment contracts of plaintiff Zak and one other crewmember, (b) extend the (not yet expired) contracts of the plaintiffs and other crewmembers for as long as the defendants demanded, (c) leave the plaintiffs and certain other crew members behind in the United States and (d) direct them to assist the United States as instructed.

70.     The defendants and their co-conspirators had seized employment contracts from the vessel.  Accordingly, and as a matter of common sense and common knowledge, they knew that the plaintiffs' contracts did not allow the vessel's owners and managers or anyone else to extend those contracts without the plaintiffs' consent or to force the plaintiffs to remain in a foreign country or to provide services to any foreign power or officials.

71.     Although all of them knew the proposed agreement would violate the plaintiffs' rights, MST, the vessel's owner, and certain of defendants executed an Agreement on Security. The agreement was signed on behalf of certain of the defendants by Defendant Fazio.  It required the vessel's owner and managers to leave Plaintiffs and six other crewmembers in the Portland area and to continue to "employ" them for the purpose of providing "assistance" to the defendants for as long as the defendants wanted.  The agreement expressly provided that the vessel would not be allowed to leave unless and until the plaintiffs were forced off it.

72.     Plaintiffs were not parties to, and did not approve or consent to, the illegal agreement.

73.     On July 16, defendant Root took the plaintiffs and other crewmembers to the office of Custom and Border Protection for the purpose of having them involuntarily "paroled" into the United States.  None of the plaintiffs agreed or consented to being left behind in the

United States, nor did they agree to being placed on any form of parole.  The defendants knew they had no legal right to force the plaintiffs to remain in the United States or to be placed on "parole" here.

74.     Upon learning that plaintiffs sought the assistance of counsel during the illegal "parole" proceedings, Agent Root and others of the defendants postponed the process.  During the delay, the defendants devised a plan to prohibit any of the crewmembers from having the assistance of counsel as the defendants carried out their illegal "parole" scheme.

75.     Accordingly, when defendant Root then escorted the plaintiffs and fellow crew members to the CBP office, defendant Doyle insisted that the attorney for the plaintiffs could not enter.  Consequently, plaintiffs and the other crew members were "paroled" into the United States involuntarily and without the assistance of counsel and without any meaningful notice or explanation of what, if any, liberty or rights they had, how long the defendants would hold them in the United States, whether they had any right of appeal, or how they might secure their liberty.

76.     Although the defendants subsequently asserted that at the time plaintiffs were "paroled" into the United States, one or more of the defendants provided "consular notification," plaintiffs believe and allege no such notice was provided.  Plaintiffs have requested copies. None have been provided.

77.     To ensure that plaintiffs could not travel and would not attempt to go home – as each of the plaintiffs was legally entitled to do – defendant Root, acting in concert with all other defendants and with other conspirators, illegally confiscated each and every plaintiff's passport.

78.     The Agreement on Security provided that MST would retain the crewmembers' passports and implied that any crewmember would have access to his passport within three days of any request.  In fact, however, defendant Root confiscated at least nine crewmembers'

23

passports and retained them to perfect his and the defendants' control over, and "security interest" in, the crew members' persons and presence, including each of the plaintiffs.

79.     These facts demonstrate that the defendants combined, conspired, confederated, and agreed to, and that they did, (a) deprive the plaintiffs and other crewmembers of their liberty without due process, (b) subject them to involuntary servitude, and (c) violate international law and the basic human rights of the plaintiffs.

80.     As, but only when, each plaintiff employed judicial process to seek to gain his liberty, the defendants responded by filing *ex parte* applications for that plaintiff's arrest as a material witness.  Each such filing included false, fraudulent, misleading and dishonest assertions, always including a false affidavit signed by defendant Root intentionally misstating the basis and need for the arrest of the particular plaintiff.

81.     On July 16, seeking to moot plaintiff Zak's petition for his freedom, the defendants sought and secured an *ex parte* order for the Mr. Zak's arrest as a "material witness" to a supposed grand jury investigation.

82.     The application for the warrant was signed by Jon Chapman, an Assistant United States Attorney for the District of Maine, whom plaintiffs believe was not aware of or part of the defendants' plan illegally to deprive Mr. Zak of his rights.  Based on statements made by attorney Chapman and all available evidence, the plaintiffs believe and allege that the application and affidavit had been prepared by either or both of defendants Waller or Cashman.  Both of them worked closely with attorneys who had received the June 18 email that initially disclosed to the United States the pelagic discharges plaintiff Hornof had uncovered and terminated.  The supporting affidavit was signed by defendant Root, but plaintiffs believe and allege that it, too, was prepared by defendants Waller or Cashman or both of them.  As the defendants knew, the

24

application and supporting affidavit  were misleading, false and fraudulent in many respects, including the following:

a.  The application and the affidavit asserted that during the July 2017 port call in Portland Harbor the oil record book for the M/V MARGUERITA had been "presented" to the Coast Guard, implying that it had been held out as accurate.  In fact, however, the ORB had been turned over at the defendants' demand (precisely because of the plaintiffs had already caused the termination of the improper discharges and MST had disclosed the information and plaintiff Hornof's role in bringing them to an end), and when the ORB was turned over the Captain pointed out the corrective entry, which states that prior entries may not be reliable.

b.  The application stated that pollution events were suspected of having occurred in the United States whereas the defendants had no reason to believe, had never been told, and did not believe that any pollution had occurred in the U.S.; and none had.

c.  The affidavit stated that "all crimes alleged in this Affidavit took place within the United States," when in fact none of the pollution events described as illegal took place within the United States, and no described crime took place within the United States.

d.  The application and affidavit asserted that the July 7 boarding had been an administrative port-state MARPOL examination conducted "to determine [the vessel's] compliance with the Act to Prevent Pollution from Ships," when in fact that boarding was choreographed to confirm what the vessel managers and owners had already voluntarily disclosed in light of plaintiff Hornof's heroics, namely that pollution events were suspected to have occurred (and in fact occurred) outside the

United States; the application and supporting affidavit likewise were designed to and did make it appear – and fraudulently claimed – that the prior discharges were "discovered" by the defendants and others of their colleagues.

e.  The affidavit asserted that on July 7 crewmembers had "revealed" that discharges had occurred and how they occurred.  In fact, and as the defendants knew or should have known, how the discharges were arranged had been revealed initially by plaintiff Hornof and then by the other plaintiffs much earlier. Indeed, the defendants knew that information initially had been communicated to the defendants and their colleagues in the June 18 email referenced above.  The relevant information had also been provided by the crew and the vessel to the MARPOL Administration during its follow-up investigation in June, during the MARPOL audit in Brazil, and otherwise.

f.  The Application and the Affidavit intentionally misrepresented the applicable law. For example, the Application and the Affidavit each stated that U.S. law required the vessel to maintain an ORB "for not less than three years." The Affidavit cited as the regulation supposedly imposing that requirement 33 C.F.R. §151.25.  In fact, however, as the defendants knew and should have known, section 151.25(k), the only provision in the regulations that prescribes a requirement for the length of time an ORB must be maintained, provides in full as follows:  "The Oil Record Book ***for a U.S. ship*** shall be maintained on board for not less than three years."  As the defendants knew, the M/V MARGUERITA was not a "U.S. ship" and U.S. law imposes no requirement for the length of time any foreign vessel must maintain an ORB, even for events that occur in the United States.

g. Similarly, the Application and Affidavit were intended to and did create the impression that U.S. law governs the entries that must be made in an ORB even when a foreign-flagged vessel is outside the United States; whereas the defendants and their cohorts knew that this assertion was false and that the described regulations requiring various entries expressly apply to foreign-registered vessels, such as the M/V MARGUERITA, **_only_** while they are within the United States; the defendants knew or should have known that none of the events described in the affidavit and application but supposedly not recorded in the ORB occurred in this country.

h. The Affidavit and Application implied that MARPOL imposed legal requirements directly on ships, whereas the defendants knew that MARPOL is not what is known as a "self-executing" treaty, that it imposed no duties on individual vessels or their crews, and that, rather, MARPOL imposed duties on signatories to enact enabling legislation. MARPOL also provides that the signatory with which a particular vessel is registered is the "Administration" for MARPOL-related investigations and enforcement of events occurring on the high seas.

i. The Application states that "Coast Guard regulations prescribe that when a discharge that is greater than 15 ppm, or not made through proper oil separation equipment is made within 12 nautical miles of the nearest land of the United States, a detailed report must be made to the nearest Coast Guard Captain of the Port," but the defendants knew that there was no reason to believe (or to imply as they intentionally and falsely did) that any discharge had occurred within 12 nautical miles of the United States – and none had.

27

j.  The application and affidavit stated that a grand jury investigation was under way; in fact no such investigation was then under way.

k.  The application and affidavit misrepresented the nature of the boarding and investigation; for example, the Affidavit stated that "on or about July 7, 2017, within the jurisdiction of the United States, USCG Inspectors Peter Fransson, Christopher Bains, Christopher Copson, David Simonds, and Richard Yazbek boarded the M/V MARGUERITA to conduct a Port State Control examination while the vessel was moored at the Rolling Mills Terminal in Portland, ME."  In fact, however, the boarding was not a routine port state control inspection, but instead an extra-constitutional criminal investigation that involved no less than thirteen federal officials including special agents from the Coast Guard's criminal division, such as defendant Root.

l.  The Affidavit falsely states that "upon further inspection" the defendants discovered "no entries" addressing improper discharges.  Much to the contrary, when the defendants and their co-conspirators asked to see the ORB the captain had shown the defendants the corrective entry quoted above.

m.  The defendants, individually and acting in concert, willfully misrepresented the ORB and the laws governing the ORB and omitted any reference to the corrective entry, for the purpose of misrepresenting the facts and law, furthering their illegal scheme and ensuring that they would be able to hold plaintiff Zak and other crewmembers who might seek to gain their freedom.

n.  The application and supporting affidavit stated that the oil record book had been "presented" to the Coast Guard, intending to create the impression that ship's crew

had offered up the ORB as accurate and reliable; instead, and as the defendants knew, the defendants through their co-conspirators had asked to inspect the ORB and had been immediately told that the ORB was *not* reliable.

o. The application and affidavit withheld from the judicial officer the fact that plaintiff Zak had filed a petition for his liberty.

p. The application and affidavit falsely stated the defendants, including defendant Root, believed a subpoena would be insufficient to assure the plaintiff's appearance before the grand jury.  In fact, however, the defendants had coerced plaintiff Zak's employer into unilaterally "extending" his employment contract and, in effect, posting plaintiff Zak as "security" – or human collateral – for potential fines payable to the government; the Affidavit likewise withheld from the court the fact that the defendants had illegally seized plaintiff Zak's passport, thereby making his travel impossible.

83.     The magistrate ordered the arrest of plaintiff Zak and imposed a condition that he "surrender" his passport to the Coast Guard, which already had it.

84.     Over the following weeks, each of the other plaintiffs demanded the return of his illegally seized passport and requested disclosure concerning who had taken his passport and the legal basis for the confiscation of it.  The defendants, acting in concert, failed and refused at every turn to disclose the location and custody of the plaintiffs' passports and the basis on which the defendants had confiscated them.

85.     The next of the plaintiffs to take additional action to secure his liberty was Jaroslav Hornof.  Mr. Hornof's mother-in-law died on July 30, 2017.  Mr. Hornof's wife was then pregnant with their second child.  She was also her mother's only child and therefore

responsible for making funeral and related arrangements.  Mr. Hornof's wife was under great distress and pleaded with Mr. Hornof to do what was necessary to regain his liberty and attend to his family.

86.     Mr. Hornof, who had been extraordinarily cooperative with all investigations of the M/V MARGUERITA, including all investigations by the defendants and any other officials or employees of the United States, requested that the defendants and the government agree that he could travel home to be with his family.  When no such agreement was forthcoming, Mr. Hornof filed in this Court a motion seeking his liberty so that he could attend to his family, including his pregnant wife in her time of grief.

87.     On August 3, 2017 the defendants informally served a subpoena on Mr. Hornof to testify before a grand jury on August 9, 2017.

88.     Mr. Hornof agreed to appear pursuant to the informally served subpoena, and he did so.  When Mr. Hornof arrived, however, defendants Waller and Cashman falsely and fraudulently told him that although the grand jury had time that day to hear from other crew members, it did not have time to hear from Mr. Hornof.  The statement was a lie, designed to delay Mr. Hornof's testimony so that the defendants could falsely claim they needed to arrest him in order to obtain that testimony.

89.     Even before lying to him, defendants Waller and Cashman had already prepared an *ex parte* – or secret – application for Mr. Hornof's arrest together with a draft affidavit, and defendant Root had executed the affidavit.  The defendants filed that application and affidavit later that day, providing no notice of it to Mr. Hornof, even though they had just met with him and even though they knew that he had been cooperating and would continue to cooperate with any and all investigations of the matter.  The application included most of the same false

assertions and misleading omissions outlined above with respect to the application and supporting affidavit for a warrant to arrest Mr. Zak.  The application and affidavit also included other false and fraudulent assertions and material omissions, including, without limitation, the following:

    a.   The Application and affidavit affirmatively asserted that an arrest warrant was necessary to secure Mr. Hornof's appearance and testimony, even though the defendants knew that Mr. Hornof had already agreed to testify in response to a subpoena and even though the defendants had decided, for tactical reasons, to lie to Mr. Hornof and tell him the grand jury simply did not have time to hear his testimony.

    b.   The application and affidavit withheld information about the extent of Mr. Hornof's cooperation and his ongoing willingness to cooperate.

    c.   The fact that Mr. Hornof had agreed to and had appeared pursuant to a subpoena was omitted and the opposite impression was intentionally and falsely created.

    d.   The application asserted that the vessel's oil record book had been "presented" to the Coast Guard on July 7 for the purpose of creating the impression that ship's personnel had held the oil record book out as reliable.  Instead, the ship's owners and managers had disclosed even before the ship arrived that the ORB was not reliable, and the captain disclosed, when the defendants or their co-conspirators first requested the record book, that it was not reliable, expressly pointing out the corrective entry in the record book.

    e.   The application and affidavit stated that interviews of the engineering crew conducted after the boarding "revealed" that discharges had occurred and that crew members

"admitted" the discharges occurred; the assertions were expressly intended to mislead the Court into believing the so-called investigation orchestrated by the defendants had uncovered improper activity that the ship's managers and her crewmembers, including the plaintiffs, were trying to keep secret; instead, plaintiff Hornof was the person who uncovered the improper discharges, put a stop to them, and reported the improper activity to the ship's owners and managers and to any and all officials who inquired about them.

f.   The application and affidavit asserted that the engine crew had "illegally discharged untreated machinery bilge water into the ocean" intending to create (and in fact creating) the impression the defendants had evidence of one or more discharges that violated U.S. law; the defendants, however, have and had no reason to believe and did not believe that any discharge in violation of U.S. law had occurred – and none had. In order to intentionally and fraudulently create the false impression that illegal discharges violating U.S. law had occurred and been "discovered" by the defendants, defendant Root's affidavit asserted that "all crimes against the United States alleged in this Affidavit took place within the jurisdiction of the United States" and went on to describe supposed "illegal discharges," implying that such discharges occurred "within the District of Maine." The defendants, individually and collectively had and knew they had no evidence to support these false assertions. All defendants knew or should have no that these false and fraudulent assertions were planned and intended to carry out their illegal scheme.

g.   Similarly, the application and affidavit asserted that the defendants had reason to believe the vessel's crew had discharged untreated oil within the United States in

violation of the Clean Water Act; in fact the defendants had no information about any such discharge and did not believe any such discharge had occurred; and none had.

h.  The application and affidavit included detailed assertions with bogus legal citations designed to create the impression that U.S. law requires foreign-flagged ships that travel to the United States to make entries in their oil record books concerning events that occur outside the United States, whereas the cited regulations and statutes make clear that they either do not apply to foreign ships at all or apply while the ship is present in the United States;

i.  For example, defendant Root's affidavit described him as an experienced, highly trained Coast Guard "Special Agent," familiar with the law he purported to summarize, but he intentionally misrepresented that law.  Defendant Root's affidavit stated that under U.S. law the ship's oil record book "must be maintained onboard the vessel for not fewer than three years. . . ," citing "33 C.F.R. 151.25."  As alleged above, defendants Root, Waller and Cashman knew the only provision in section 151.25 that requires an ORB to be preserved for any particular period of time is section 151.25(k), which does not apply to foreign vessels *at all* and instead provides in full as follows:  "The Oil Record Book *for a U.S. ship* shall be maintained on board for not less than three years.  [*emphasis* supplied]"   In short, as the defendants knew, no U.S. law prescribes any period of time for which a foreign ship must retain an oil record book and intentionally sought to mislead the court in an *ex parte* proceeding.

j.  The application and affidavit similarly asserted that U.S. law required the vessel's personnel to make entries concerning events that the defendants knew or were

virtually certain happened outside the United States.  The defendants asserted in the affidavit and application that "APPS regulations require discharges" and certain other events involving oily bilge water "must be fully recorded, without delay, in the ORB by the person in charge of the operations," citing 33 C.F.R. §151.25(d).   But as the defendants knew, section 151.09 of the regulations, entitled "applicability" expressly provides that "section 151.25 appl[ies] to each ship that [like the M/V MARGUERITA] is operated under the authority of a country other than the United States [only] while in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States."  Contrary to the defendants' false assertions, no U.S. statute or regulation prescribes any entries that foreign vessels are required to make in their oil record books concerning events happening outside the United States.

k.   To further mislead the court concerning the applicability of certain APPS regulations, the affidavit stated those regulations apply to foreign vessels "operating in United States waters."  Together with other assertions in defendant Root's affidavit the assertion created the impression the regulations apply to vessels, such as the M/V MARGUERITA that occasionally come to the United States, but also apply while those vessels are outside the United States.  But the regulation cited for the misleading assertion actually clearly states that the regulations apply only "while [such] vessels [are] in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States."

l.   Although the affidavit disclosed that "attorneys for MST and the owner had written a letter" disclosing an "alleged" discharge, the assertions were designed to mislead the

court.  For example, the affidavit did not disclose that even before the attorney letter, MST had disclosed Mr. Hornof's report and provided detailed information about it to the MARPOL Administration and the U.S. government, and that the MARPOL Administration was investigating that matter.  The false assertions and others were intended to create the false impression that the defendants had "discovered" events the ship's owners and managers and the plaintiffs had sought to conceal, whereas the defendants knew the ship's owners and managers and plaintiff Hornof in particular had investigated the improper discharges, documented them, and terminated them. Plaintiff Hornof also in fact provided U.S. and other officials any and all cooperation or information they requested concerning the improper discharges that he, himself, had discovered and caused to stop.

m.  Again, the application and affidavit included many other false and misleading statements and willful omissions, including most of those summarized with respect to the applications for the arrests of other plaintiffs.

90.     An *ex parte* warrant for Mr. Hornof's arrest was granted and he surrendered to the United States Marshal.  He was arrested and booked, and his detention in the United States was prolonged.

91.     After the defendants refused to disclose the location of or return plaintiffs' illegally confiscated passports, plaintiff Kordic and others filed a motion in this Court for the return of his seized property.  The defendants opposed that motion, based on the disingenuous contention that Mr. Kordic "lack[ed] standing" to seek the return of his own passport.

92.     Although plaintiff Kordic was being held illegally and had agreed to testify voluntarily at the request of the government, the defendants then covertly applied for and obtained an *ex parte* warrant for his arrest.

93.     The secret application was prepared and filed by defendants Waller and Chapman with an affidavit prepared by them and executed subject to the penalties of perjury by defendant Root.  The applications and supporting affidavit were misleading, false and fraudulent in many respects, including, among others, the following:

    a.    The application asserted that during the July port call in Portland Harbor the oil record book for the M/V MARGUERITA had been "presented" to the Coast Guard, implying that it had been held out as accurate, when in fact the captain had pointed out the corrective entry, which states that prior entries may not be reliable;

    b.    The application stated that pollution events were suspected of having occurred in the United States and having violated the Clean Water Act, whereas the defendants had no reason to believe, had never been told, and did not believe that any pollution had occurred in the U.S.; and none had;

    c.    The application stated that crewmembers had "admitted" to the defendants and others working with them that the vessel had "discharge[d]" bilge water and asserted that "the investigation has revealed possible violations of [APPS and] the Clean Water Act. . .," implying that the investigation had revealed violations not disclosed in advance and that pollution had occurred in the United States, whereas the defendants knew those assertions were false, fraudulent and misleading.  The nature of the discharges had been disclosed to the defendants before the vessel

arrived in Portland and the defendants had no evidence of any discharge occurring in the United States or of any violation of the Clean Water Act.

d.  The affidavit falsely stated that "documents reviewed during the investigation showed that bypass activity occurred as recently as June 2, 2017."

e.  The affidavit stated that all alleged crimes occurred in the United States, while also asserting that "crew members have illegally discharged untreated machinery space bilge water into the ocean on multiple occasions," intending to imply that the discharges violated U.S. law; in fact, the defendants knew and believed no discharge in violation of U.S. law had occurred; but they wanted to convince the Court that some pollution events had violated U.S. law so that the Court would be more likely to order the arrest of plaintiff Kordic.

f.  The application and affidavit asserted that the July 7 boarding had been an administrative port-state MARPOL examination conducted "to determine [the vessel's] compliance with the Act to Prevent Pollution from Ships," when in fact that boarding was choreographed to confirm what the vessel's owners and managers had already voluntarily disclosed (after plaintiff Hornof disclosed to them and put an end to the discharges), namely that pollution events were suspected to have occurred, and in fact occurred, outside the United States; the application and supporting affidavit made it appear and falsely claimed that the discharges were "discovered" by the defendants.

g.  The affidavit asserted that on July 7 crewmembers had "revealed" that discharges had occurred and how they occurred.  In fact, and as the defendants knew or

should have known, how the discharges were arranged had been revealed by crewmembers and MST much earlier, as alleged above.

h.  The Application and the Affidavit intentionally misrepresented applicable law. For example, the Application and the Affidavit stated that U.S. law required the vessel to maintain an ORB "for not less than three years." The Affidavit cited as the regulation supposedly imposing that requirement 33 C.F.R. §151.25.  In fact, however, as the defendants knew and should have known, section 151.25(k), the only provision in the regulations that prescribes a requirement for the length of time an ORB must be maintained, provides in full as follows:  "The Oil Record Book ***for a U.S. ship*** shall be maintained on board for not less than three years." [*emphasis* supplied.]  As the defendants knew, the M/V Marguerita was not a "U.S. ship," and U.S. law imposes no requirement for the length of time it or any foreign vessel must maintain an ORB.

i.  Similarly, the Application and Affidavit were written to create the impression that U.S. regulations require certain entries that must be made in an ORB even when a foreign-flagged vessel is outside the United States; whereas the defendants and their cohorts knew that this assertion was false and that the described regulations requiring various entries expressly apply to foreign-registered vessels, such as the M/V Marguerita, ***only*** while they are within the United States.  The defendants knew or should have known that none of the events described and supposedly omitted from the ORB occurred in this country.

j.  The application and affidavit misrepresented the nature of the boarding and investigation.  For example, the Affidavit stated that "on or about July 7, 2017,

38

within the jurisdiction of the United States, USCG Inspectors Peter Fransson,

Christopher Bains, Christopher Copson, David Simonds, and Richard Yazbek

boarded the M/V MARGUERITA [sic] to conduct a Port State Control

examination while the vessel was moored at the Rolling Mills Terminal in

Portland, ME."  In fact, however, the boarding was not a routine port state control

inspection, but instead an extra-constitutional criminal investigation that involved

no less than thirteen federal officials including special agents from the Coast

Guard's criminal division, such as defendant Root.

k.      The application and affidavit included misleading assertions concerning the

nature and timing of MST's disclosure of vessel discharges, including the false

intimation that the first such disclosure to the United States government occurred

via a letter from "attorneys for the owner and operator" of the vessel "on June 28,

2017," whereas the defendants knew that prior to that letter the owner and

operator had made detailed disclosure of discharges to the government, to the

Administrator for purposes of MARPOL, and to other officials – and had pledged

full and complete cooperation, all as a result of the actions of the plaintiffs in

causing the discharges to be terminated and reported.

l.      The affidavit asserted that Mr. Kordic had made disclosures to company officials.

The assertion was intended to imply that those officials had withheld and were

withholding that information from the defendants and the United States; instead,

as the defendants well knew, full and complete cooperation had been provided

and Mr. Kordic and others remained available to provide ongoing cooperation.

94.     An *ex parte* warrant for the arrest of Mr. Kordic was granted, and he surrendered to the United States Marshal, was arrested and booked, and his detention in the United States was prolonged.

95.     After delays caused by the defendants and their co-conspirators, each of the plaintiffs eventually testified before the grand jury, but the defendants continued to hold each plaintiff in the United States and refused to allow any of them to return home until the Court finally ordered the government to allow them to return over the objection of the defendants and the United States.

96.     Specifically, during August 2017, over the government's objection, the United States District Court for the District of Maine ordered that after giving deposition testimony the government allow each of the plaintiffs to depart the country.  Each of the plaintiffs gave deposition testimony, but the defendants delayed returning their passports so that the defendants could serve on each plaintiff a subpoena purporting to require him to return to the United States to testify whenever the government's case against plaintiff's former employer went to trial, even though the government already had their testimony.

97.     Since they had already been forced to remain in this country for months and had already testified *twice*, and since the defendants knew the case would not go trial on the date on which the subpoena ordered the plaintiffs to appear,  the plaintiffs sought to have the subpoena quashed, but the government objected.  As a result, the plaintiffs were unable to sign contracts to return to sea, and each made arrangements to and did return to the United States to testify yet a third time.

98.     The revocation of plaintiffs' validly issued entry and their D-1 and D-2 visas or shore passes, the revocation of plaintiff Zak's permission to travel home, the confiscation of

plaintiffs' passports, their shipboard incarceration, the entry into a contract with plaintiffs'
employer purporting to extend indefinitely plaintiffs' employment without their consent,
requiring them to "assist" the Coast Guard and the defendants, expressly treating them as
"security" or human collateral for a potential "fine" and the plan to serve additional process upon
them as they finally gained their liberty were and are unauthorized by law.  Those actions and
goals were and are, instead, contrary to U.S. law.

99.     Prior to being formally arrested, each of the plaintiffs repeatedly asked defendants
and their agents to cite the authority for their actions, including their actions in detaining the
plaintiffs and confiscating their passports, but the defendants cited no such authority.

100.    Defendants' initial seizures of Plaintiffs were without a warrant and without
probable cause or even individualized suspicion that any of the plaintiffs was somehow involved
in criminal activity, and were unreasonable.

101.    Plaintiffs were never charged with a crime and, in fact, committed no offense
against the United States.

102.    Each of the defendants acting in concert deprived each plaintiff of his liberty
without due process of law.

103.    Defendants, acting in concert, ordered, authorized and/or participated in the
foregoing illegal actions, including the detention and arrest, actual and constructive, of each of
the plaintiffs without probable cause and without valid legal authority.

104.    As a direct and proximate result of the defendants' wrongful acts, each of
plaintiffs has been driven from his chosen maritime career.

105.    Each of plaintiffs has suffered substantial distress and emotional distress as a
direct and proximate result of the each of the defendants' wrongful actions.

106.    Each of the plaintiffs suffered loss of income, loss of earning capacity, and loss of enjoyment of life as a direct and proximate result of each of the defendants' wrongful actions.

### COUNT I
### (*BIVENS* CLAIM)

107.    Plaintiffs repeat all prior allegations.

108.    The actions of the individual defendants, acting under color of federal law, constituted clear violations of each plaintiff's right to be secure in his person, papers and effects against unreasonable search and seizure as guaranteed by the Fourth Amendment to the United States Constitution; a violation of his right to be free from deprivation of his liberty without due process of law as guaranteed by the Fifth Amendment to the Constitution; a deprivation of his right to the assistance of counsel as guaranteed by the Sixth Amendment to the Constitution; and a gross deprivation of his right not to be subjected to involuntary servitude or conveyed as "security" for claims or liens, as guaranteed by the Thirteenth Amendment to the Constitution and by various federal statutes.

109.    The aforesaid rights of Plaintiffs under the circumstances described herein were clearly established at the time of the aforesaid actions.

110.    Plaintiffs were afforded no procedural mechanism for the administrative review of their detention, the revocation of their D-1 or D-2 visas, or the other illegal acts set forth herein.

111.    Plaintiffs' right to bring their claim against Defendants has been recognized by the United States Supreme Court in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), and in a host of similar cases.

112.    Plaintiffs bring this claim because they have no other effective means to vindicate their rights.

42

113.    As a direct and proximate result of Defendants' unlawful actions, each plaintiff has suffered, and will continue to suffer, damage and injury, including but not limited to severe emotional distress, humiliation, loss of earning capacity, loss of wages and other income, loss of enjoyment of life, injury to reputation, injury to career, and other pecuniary and nonpecuniary losses, and all damages described in this Complaint.

114.    Defendants acted with malice, actual or implied.

WHEREFORE, each plaintiff demands judgment against Defendants John Cashman, Shane Waller, Michael A. Fazio, Michael Baroody, Jon D. Lavallee, Mark Root, Christy Doyle, and Shannon True, jointly and severally, for damages in such amounts as shall be shown at trial, including punitive damages, together with interest, costs, and attorneys' fees, and for such other and further relief as the Court deems just and proper.

## COUNT II
### (FEDERAL TORT CLAIMS ACT)

115.    Plaintiffs repeat and reallege the allegations set forth above with the same force and effect as if fully set forth herein.

116.    The actions of the individual defendants were taken within the course and scope of their employment and as agents of the United States and the agencies and departments that employed them, including the Department of Justice, the Department of Homeland Security, and the United States Coast Guard.

117.    Individual defendants were law enforcement officers of the United States government within the meaning of the Federal Tort Claims Act.

118.    Defendants arrested each of the Plaintiffs on July 7 or 8, 2017 without a warrant and without probable cause.

119.    Defendants intended to, and did in fact, confine Plaintiffs within boundaries fixed by the defendants.

120.    Plaintiffs were conscious of the confinement and harmed by it.

121.    At various times, including on July 14, 2017, the defendants, individually, collectively and as co-conspirators, conspired to and did subject the plaintiffs to involuntary servitude, without any of the plaintiffs having been convicted (or even charged) with any crime, (a) by coercing each plaintiff's employer to agree in writing (i) to treat and pledge each plaintiff and his employment contract as "security" for potential financial obligations, (ii) to purport to "extend" each plaintiff's employment contract without that plaintiff's consent and effectively assigning the employment contract to the defendants to provide services to them not within the scope of the original employment contract, and (b) by planning to and thereafter in fact (i) "paroling" each plaintiff into the United States and (ii) confiscating his passport so that he could not escape involuntary servitude and detention by the defendants and (iii) submitting false and fraudulent applications for secret arrest warrants if, as, and when any plaintiff sought judicial review of or relief from the defendants' illegal conduct.

122.    At certain times, including on July 16, the defendants conspired to and did "parole" the plaintiffs into the United States and seize their passports while preventing them from having the assistance of counsel or their native governments, all of which effectively prolonged the arrest of each plaintiff.

123.    Thereafter, including on July 17, the defendants conspired to and did prolong the plaintiffs' detention and frustrate each plaintiff's effort to secure judicial relief by filing a false, fraudulent, reckless and negligent ex parte application and affidavit for the arrest of each plaintiff.

124.    In obtaining and employing a warrant for the arrest of each plaintiff, the defendants used process in a manner not contemplated by the law and for an improper, ulterior motive, to plaintiffs' detriment and damage.

125.    Defendants intentionally, recklessly and negligently inflicted severe emotional distress or were certain or substantially certain that such distress would result from their conduct.

126.    Defendants' conduct was so extreme and outrageous as to exceed all possible bounds of decency.

127.    The defendants defamed each of the plaintiffs, including by making false statements about them that were defamatory per se.

128.    Defendants' actions proximately caused plaintiffs to suffer such severe emotional distress that no reasonable person could be expected to endure it.

129.    Defendants are liable to plaintiffs for false arrest, false imprisonment, abuse of process, misuse of process, and intentional infliction of emotional distress.

130.    As a direct and proximate result of each of the Defendants' unlawful acts and actions, each plaintiff has suffered, and will continue to suffer, damage and injury, including but not limited to severe emotional distress, humiliation, loss of earning capacity, loss of wages and other income, loss of enjoyment of life, injury to reputation, injury to career, and other pecuniary and nonpecuniary losses.

131.    Each of the Plaintiffs has presented his claim to the appropriate agency or agencies, which failed to respond.

WHEREFORE, each of the plaintiffs individually demands judgment against Defendant United States of America and against each of the defendants, jointly and severally, for damages in such amounts as shall be shown at trial, including punitive damages, together with interest,

costs, and attorneys' fees, and for such other and further relief as the Court deems just and proper.

**COUNT III**
**(CLAIM UNDER 33 U.S.C. §1904 AND 1910)**

132.    Plaintiffs repeat all prior allegations.

133.    Section 1904 of APPS, 33 U.S.C. §1904, provides that "a ship unreasonably detained or delayed by the Secretary acting under the authority of this Act is entitled to compensation for any loss or damage suffered thereby." That section should be construed to allow for recovery by a ship's crewmembers, especially where, as in this case, the defendants have conspired, in their own words, to "fold" the plaintiffs' rights and liberty into the ship's rights and liberty and to negotiate to hold and detain these human beings "as security," human collateral and substitute *res* for the release of the vessel.

134.    Both the vessel and these plaintiffs were unreasonably detained and delayed by the Secretary and by each of the defendants acting in concert with the other defendants and others.

135.    For all of the reasons alleged above, including (without limitation) the fact that the plaintiffs had fully and completely disclosed, caused the termination of, and cooperated with investigations of the improper discharges long before the vessel arrived in the United States, the detention of the vessel and the contemporaneous and subsequent (and illegal) detention of the plaintiffs as substitute security for the release of the vessel was "unreasonable" and unreasonably long.

136.    The plaintiffs suffered substantial damages, including loss of liberty, loss of the enjoyment of life, lost income, lost earning capacity and other damages, as a direct and proximate result of the said detentions of the vessel and of them as substitute security for her.

46

WHEREFORE, the plaintiffs demand judgment for an amount that is just and equitable under the premises, together with an award of their costs and, under section 1910, an award of their reasonable attorneys' fees.

<u>**COUNT IV**</u>
**DECLARATORY AND INJUNCTIVE RELIEF**

137.    Plaintiffs repeat all prior allegations.

138.    The defendants' actions of which the plaintiffs complain are part of defendants' ongoing plan and scheme to deprive foreign seafarers of their basic human rights and to win glory for the defendants.

139.    The defendants' ongoing illegal scheme continues, and the defendants and their colleagues continue to deprive foreign seafarers in custody without due process and in violation of their rights under the Fourth, Fifth and Six and Thirteenth Amendments.

140.    The defendants are carrying out a carefully crafted scheme in which they consciously seek to prevent any of the foreign seafarers whose rights are denied from securing judicial relief.

141.    Defendants and their confederates have contended, for example, that foreign seafarers who arrived in the United States lawfully and are not accused of breaking any law may be held in custody by the defendants indefinitely and with no due process whatsoever. Indeed defendants and their confederates contend that foreign crewmen in the circumstance of the plaintiffs "have no due process rights."

142.    These false assertions are part of a concerted effort by the defendants and their confederates to prevent judicial review of their illegal scheme.

143.    The defendants are engaged in an ongoing illegal effort to deny foreign seafarers of their basic human rights, believing that in each individual instance they avoid judicial review

47

by changing the supposed basis for each crewman's detention each time the crewman seeks judicial review.

144.    Although they have been driven from their maritime careers by the defendants' abuses and misconduct, the plaintiffs seek judicial relief so that they may consider returning to their careers as seafarers without risk that they will again be held as hostages, human collateral or involuntary servants in violation of their basic human rights, and so that other crewmen will not suffer as they have suffered.

145.    The claims and rights that are the focus of this Complaint are the object of an actual and continuing controversy, and the plaintiffs need to have the controversies resolved so that they may decide whether to return to their maritime careers and to protect the rights of their fellow seafarers.

WHEREFORE, plaintiffs pray that this Honorable Court will enter declaratory and injunctive relief as follows:

a.   Declaring that the defendants violated the rights of plaintiffs;

b.   Declaring that foreign seafarers lawfully arriving in the United States to deliver goods have due process rights, including the right to leave the United States and the right to liberty that cannot be deprived or denied without due process of law;

c.   Declaring that the plaintiffs as foreign seafarers had and that all foreign seafarers have the right not to be demanded or pledged as human collateral for the release of vessels liable in rem for fines or other amounts;

d.   Temporarily, preliminarily and permanently enjoining the defendants from holding the plaintiffs or other foreign crewmen lawfully arriving in the United States to detain

them or to prevent them from returning to the sea without due process of law or from

seizing their foreign passports without just cause, notice or due process;

e.  Temporarily, preliminarily and permanently enjoining the defendants from holding

the plaintiffs or other foreign crewmen as human collateral or substitute security for

the release of vessels liable in rem for fines or other debts; and

f.  Temporarily, preliminarily and permanently enjoining the defendants from holding

the plaintiffs or other foreign seafarers as suspects or potential suspects for prolonged

periods without securing warrants from a judicial officer.

## COUNT V
### CLAIM UNDER 18 U.S.C. §1595

146.   Plaintiffs repeat all prior allegations.

147.   The defendants, by their individual and collective actions, have violated and aided,

abetted and caused the violations of plaintiffs' rights protected and intended to be protected by

Chapter 77 of Title 18 of the United States Code, including as follows:

a.  By their actions alleged in detail above, the defendants, acting in concert, have

confiscated, removed, and possessed passports and other immigration documents

from foreign crewmen, including the plaintiffs, to prevent and restrict their liberty and

travel after the crewmen had been the victims of severe forms of trafficking in

persons (namely harboring and obtaining the said person for services through the use

of force, fraud and coercion), and aided and abetted such conduct, in violation of 18

U.S.C. §1592 and 18 U.S.C. §2;

b.  By their actions alleged in detail above, the defendants, acting in concert, have

knowingly and willfully treated foreign crewmen, including the plaintiffs, as

involuntary servants of the owners and managers of the vessel on which they arrive in

the United States and have taken such foreign crewmen, including the plaintiffs, into involuntary servitude and brought them into the United States to be so held, and aided and abetted such conduct, in violation of 18 U.S.C. §1584 and 18 U.S.C. §2;

c. By their actions alleged in detail above, the defendants, acting in concert, have held persons in a condition of peonage, including each of the plaintiffs, and have arrested persons, including the plaintiffs, with the intent and for the purpose of holding them in a condition of peonage, and have aided and abetted such conduct, in violation of 18 U.S.C. §1581 and 18 U.S.C. §2.

148. Defendants' conduct was intentional and outrageous.

149. Each of the plaintiffs was damaged as a direct and proximate result of each such violation. The plaintiffs' damages so caused included loss of personal liberty, loss of income, loss of earning capacity, emotional distress, loss of enjoyment of life.

WHEREFORE, each plaintiff demands judgment against each of the defendants, jointly and severally for an amount that is just and reasonable under the premises, including punitive damages, together with an award of interest, costs and reasonable attorneys' fees.

## COUNT VI
### VIOLATION OF 18 U.S.C. §1962

150. Plaintiffs repeat all prior allegations.

151. The defendants, collectively, have formed or have participated in an enterprise that operates at odds with United States law and principles and that in fact and law is engaged in a pattern of illegal racketeering activity within the meaning of 18 U.S.C. §1962(c).

152. The pattern of racketeering activity has included the following illegal actions:

a. By their actions alleged in detail above, the defendants, acting in concert, have confiscated, removed, and possessed passports and other immigration documents

from foreign crewmen, including the plaintiffs, to prevent and restrict their liberty and travel after the crewmen have been the victims of severe forms of trafficking in persons (namely harboring and obtaining the said person for services through the use of force, fraud and coercion), in violation of 18 U.S.C. §1592;

b.   By their actions alleged in detail above, the defendants, acting in concert, have knowingly and willfully treated foreign crewmen, including the plaintiffs, as involuntary servants of the owners and managers of the vessel on which they arrive in the United States and have taken such foreign crewmen, including the plaintiffs, into involuntary servitude and brought them into the United States to be so held in violation of 18 U.S.C. §1584; and

c.   By their actions alleged in detail above, the defendants, acting in concert, have held persons in a condition of peonage, including each of the plaintiffs, and have arrested persons, including the plaintiffs, with the intent and for the purpose of holding them in a condition of peonage in violation of 18 U.S.C. §1581.

153.   The defendants and their confederates have engaged in these wrongful acts repeatedly, and have consciously sought, including by threats, intimidation, and coercion, to prevent their victims, including the plaintiffs, from exercising their rights.

154.   By their pattern of illegal behavior, the defendants are driving from the maritime industry good and honorable seafarers.  Each of the plaintiffs, for example, has been driven from the industry as a result of his treatment at the defendants' hands and his fully justified fear that he might once again be held and treated by the defendants and their confederates as an involuntary servant, demanded as collateral for the release of vessels or held indefinitely as a servant of the defendants without his consent and in violation of his basic human rights.

51

155.   Many other seafarers currently or formerly held by the defendants and their confederates are now fearful of returning to the sea as crewmen, because the ongoing illegal conduct of the defendants and their enterprise subject innocent crewmen to being treated by defendants as peons and involuntary servants, first of the owners and managers of the vessels on which they serve, and then – once pledged as human collateral – as the involuntary servants of the defendants or the Coast Guard, in violation of the above criminal statutes, section 1962 and the Fourth, Fifth, Sixth, Eighth and Thirteenth Amendments to the United States Constitution.

156.   Each of the plaintiffs has suffered damages to his business and property within the meaning of 18 U.S.C. 1964 by reason of and as a direct and proximate result of the defendants' violations of section 1962.  Those injuries included the defendants' confiscation and seizure of the person of each plaintiff, the confiscation and seizure of the foreign passport of each plaintiff, the destruction of each plaintiff's business career as a seaman, and the seizure and forced amendment (without plaintiffs' consent) of their contracts of employment in which the plaintiffs have a recognized property interest.

157.   Defendants were at all relevant times associated with an enterprise the activities of which affected interstate or foreign commerce.

158.   Defendants acted in a personal capacity.

159.   Under 18 U.S.C. § 1964 the Court is authorized to enjoin activities and organizations such as those of the defendants.

WHEREFORE, each of the plaintiffs demand judgment against each of the individual defendants, jointly and severally, for three times the damages he sustained as a result of the defendants' violations of section 1962 as alleged above, together with interest, an award of costs and attorneys' fees and the following injunctive relief:

a.  Temporarily, preliminarily and permanently enjoining the defendants from holding the plaintiffs or other foreign crewmen lawfully arriving in the United States to detain them or to prevent them from returning to the sea without due process of law or from seizing their foreign passports without just cause, notice or due process;

b.  Temporarily, preliminarily and permanently enjoining the defendants from holding the plaintiffs or other foreign crewmen as human collateral or substitute security for the release of vessels liable in rem for fines or other debts; and

c.  Temporarily, preliminarily and permanently enjoining the defendants from violating section 1962 by carrying out any of the predicate offenses described and alleged herein.

DATED at Portland, Maine this 24th day of June, 2019.


/s/ Edward S. MacColl
Edward S. MacColl
Attorney for plaintiffs

/s/ Marshall J. Tinkle
Marshall J. Tinkle
Attorney for plaintiffs

THOMPSON, MACCOLL & BASS, LLC, P.A.
15 Monument Square, 4th Floor
P.O. Box 447
Portland, ME  04112-0447
(207) 774-7600