# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| JAROSLAV HORNOF, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   2:19-cv-00198-JDL |
| | ) |
| SHANE WALLER, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER ON MOTIONS TO DISMISS

Jaroslav Hornof, Damir Kordic, and Lucas Zak (collectively, the "Plaintiffs"), all former crew members of a foreign vessel known as the *M/V Marguerita*, bring this action against the United States, the United States Department of Justice, the United States Coast Guard, and the United States Department of Homeland Security (collectively, the "Government"), as well as nine federal officers (the "Individual Defendants").[1]  The Government moves to dismiss the Plaintiffs' First Amended Complaint under Fed. R. Civ. P. 12(b)(1) and (6) (ECF No. 23).[2]  Separately, the Individual Defendants move to dismiss the First Amended Complaint under Rule

---

[*] This opinion is **SEALED** until 5:00 p.m. on October 23, 2020, to give the parties an opportunity to notify the Court, by sealed filings, whether any portions of the opinion need to be redacted because of confidentiality restrictions.

[1] The Individual Defendants include three federal prosecutors, Attorneys Shane Waller, John Cashman, and Richard Udell; four United States Coast Guard officials, Commander Michael Fazio, Captain Michael Baroody, Lieutenant Jon Lavallee, and Special Agent Mark Root; and two United States Customs and Border Protection officials, Shannon True and Christy Doyle. The Plaintiffs name them in their individual capacities only.

[2] Originally, the Government's motion was characterized as a "motion to dismiss or, alternatively, for summary judgment." ECF No. 23. However, at oral argument, the Government agreed that the motion should be construed as a motion to dismiss. *See* ECF No. 60 at 8. Accordingly, I do not consider the Government's statement of material facts (ECF No. 24) in deciding this motion, and I deny the Government's motion for leave to file a supplemental statement of material fact (ECF No. 45) as moot.

12(b)(6) (ECF No. 21).  A hearing was held on the pending motions on February 13,
2020.  For the reasons that follow, the Government's motion to dismiss is granted in
part and denied in part, and the Individual Defendants' motion to dismiss is granted.

## I.  FACTUAL BACKGROUND

In short, the Plaintiffs allege that the Defendants unlawfully initiated an
investigation into the owner and operator of the *M/V Marguerita* for violating
international pollution laws when the vessel arrived in Portland in July of 2017, and
that they unlawfully detained the Plaintiffs as "human collateral" to secure potential
fines against the vessel, in exchange for the vessel's release.  ECF No. 3 ¶ 1(d)-(h).
The Plaintiffs also allege that the Government then sought fraudulent and pretextual
material witness warrants against them to conceal the unlawful nature of and basis
for their detention.  As demonstrated by the narrative set forth below, the underlying
facts of this case are complex.

I treat the facts alleged in the First Amended Complaint as true for purposes
of ruling on the motions to dismiss.  *See Gordo-González v. United States*, 873 F.3d
32, 35 (1st Cir. 2017); *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 52-53 (1st
Cir. 2013).  Additionally, because certain of the Plaintiffs' allegations relate to and
arise out of prior judicial proceedings, I take judicial notice of the records from those
proceedings in deciding the motions to dismiss.[3]

---

[3] In ruling on a motion to dismiss, a court may rely on documents other than the complaint if they
are "official public records," such as court records, or "documents sufficiently referred to in the
complaint." *Squeri v. Mount Ida Coll.*, 954 F.3d 56, 66 (1st Cir. 2020) (quoting *Freeman v. Town of
Hudson*, 714 F.3d 29, 36 (1st Cir. 2013); *see also Freeman*, 714 F.3d 29, 36 (describing the scope of
extrinsic documents that may be considered on a motion to dismiss).  Because I take judicial notice of
the court records in the prior related judicial proceedings, including the transcripts of hearings in those
proceedings, there is no need for those records to be filed on the docket of this case.  Accordingly, the
Government's motion for leave to file transcripts (ECF No. 51) is denied as moot.

## A.  Hornof's Whistleblowing Activity

The First Amended Complaint alleges the following facts.  In May 2017, Hornof, an engineer aboard the *M/V Marguerita*, discovered that the vessel's chief engineer had discharged oily bilge water into the ocean in violation of the International Convention for the Prevention of Pollution from Ships ("MARPOL"), an international treaty regarding pollution on the high seas.  Hornof reported the discharges to the then-captain of the vessel as well as to the vessel's operator, MST Mineralien Schiffarht Spedition und Transport GmbH ("MST").  A new captain was assigned to the vessel, and a corrective entry was executed in the vessel's oil record book, indicating that prior entries may have been inaccurate and that the matter was under investigation.  Hornof then prepared a written report about the discharges, which was relayed to MST representatives.  MST provided the report to officials in Liberia, the vessel's flag state, and arranged for the vessel to undergo an independent MARPOL audit.

At the time, MST was on probation in the United States for a previous, unrelated pollution event.  Pursuant to its probation conditions, MST notified several United States officials—including lawyers who worked with Attorneys Udell, Waller, and Cashman—of Hornof's report.  Liberian officials notified the same U.S. officials that they had opened an investigation into the incident.  Additionally, once the MARPOL audit was completed, attorneys for MST communicated the audit results to Michael Baroody, the Captain and Commanding Officer for the Coast Guard's Northern New England Sector, and Michael Fazio, the Commander for the First

Coast Guard District.   None of the Defendants responded to any of these communications, nor did any other United States official.

## B.     The Plaintiffs' Arrival in the United States

When the *Marguerita* arrived in Portland on July 7, 2017, Customs and Border Protection ("CBP") officials came onboard and granted the crew members, including the Plaintiffs, entry into the United States.[4]   For the crew members who remained under contract to serve on the vessel, including Hornof and Kordic, CBP officials granted D-1 visas, which are also known as "shore passes."   For those crew members whose contracts had expired, including Zak, CBP officials granted D-2 visas, giving them permission to travel home on scheduled flights.

Later that day, at least thirteen Coast Guard officials, including Special Agent Root, came onboard and questioned the crew members at length about the alleged unlawful discharges of oily bilge water that Hornof had reported.   The next day, CBP officials, including True, again boarded the *Marguerita* and revoked all of the crew members' visas, at which point the vessel and its crew were formally detained.   The Plaintiffs remained detained onboard, subject to twice-daily attendance checks and unaware of the reason for their detention, until July 16.

---

[4]  None of the Plaintiffs are citizens or residents of the United States.  Hornof is a citizen and resident of the Czech Republic, Kordic is a citizen and resident of Croatia, and Zak is a citizen and resident of the Slovak Republic.

C.     **The Security Agreement**

On July 13, the United States asserted in writing its belief that the *Marguerita* and its owner and operator[5] were liable for monetary penalties because the vessel had violated MARPOL and the federal law implementing it, the Act to Prevent Pollution from Ships, 33 U.S.C.A. §§ 1901–1915 ("APPS").  Pursuant to 33 U.S.C.A. § 1908 and 46 U.S.C.A. § 60105 (West 2020), the Department of Homeland Security withheld the vessel's departure clearance until the vessel provided security for the potential monetary penalties.  In order to secure the vessel's release, the vessel's owner and operator entered into a Security Agreement with the United States, acting through Commander Fazio.  *See* 33 U.S.C.A. § 1908(e).

Among other things, the Security Agreement provided that the vessel would be permitted to depart from Portland only if it left the Plaintiffs and certain other crew members behind.  The Plaintiffs were not parties to the Security Agreement, and the First Amended Complaint alleges that they did not consent to it.  The Security Agreement stated that it was not "binding on non-parties" and recognized that the vessel owner and operator could not exercise "complete control" over its crew members.  *In re Material Witness Jaroslav Hornof*, No. 2:17-mj-00174-JHR, ECF No. 5-4 ¶¶ 5, 7 (D. Me. Aug. 7, 2017).  But it also purported to require the Plaintiffs and other crew members to remain in the District of Maine after the vessel's departure.  To facilitate compliance with this provision, the vessel owner and operator agreed to

---

[5] MST was the *Marguerita*'s operator; its owner, at all relevant times, was Reederei MS "Marguerita" GmbH & Co. Geschlossene Investment KG, an entity that appears to be somehow linked to MST. Nothing about the two entities' relationship is relevant to the motion to dismiss, so for simplicity's sake, I refer to them collectively as "the vessel's owner and operator."

continue paying the Plaintiffs and other crew members' wages indefinitely, even if their employment contracts had already expired, until the United States "advise[d] that their presence" in the District of Maine was "no longer necessary." *Id.* ¶ 3(c). The First Amended Complaint alleges that the Security Agreement thus effectively assigned the Plaintiffs' contracts to the United States as security for any monetary penalties that would ultimately be levied against the vessel for its alleged violations of federal law and thereby treated the Plaintiffs as "human collateral." ECF No. 3 ¶ 1(h).

Additionally, the Security Agreement required the vessel owner and operator to provide hotel lodging, a daily meal allowance, health care, and reasonable transportation to the Plaintiffs and other crew members while they remained in the United States. The Security Agreement further provided that the vessel owner and operator would request the Plaintiffs and other crew members' passports and advise the United States if any crew member either refused to surrender his passport or requested that his passport be returned to him. The First Amended Complaint does not state whether the vessel's owner or operator ever made such a request.

## D.   The Plaintiffs' Parole into the United States

The First Amended Complaint alleges that on July 16, 2017, after the Security Agreement was executed, Special Agent Root took the Plaintiffs and other crew members to the office of Customs and Border Protection, where the Plaintiffs were paroled into the United States without their consent.[6]  The First Amended Complaint

---

[6]  Parole is a temporary status that can be granted to non-citizen applicants for admission to the United States on a discretionary, case-by-case basis for "urgent humanitarian reasons" or to promote

further alleges that Special Agent Root and Defendant Doyle conspired to deprive the Plaintiffs of assistance of counsel during this process and refused to either explain the Plaintiffs' rights to them or notify the Plaintiffs' respective consulates of their parole status in the United States. The First Amended Complaint alleges that, at some point during or after this process, Special Agent Root confiscated the Plaintiffs' passports.

**E.      Judicial Proceedings Relating to the Plaintiffs' Alleged Detention**

**1.      The Plaintiffs' Requests for Release and Subsequent Arrests**

Each of the Plaintiffs sought permission from the Court to return home: Zak filed a petition for a writ of habeas corpus, Hornof moved for discharge from constructive detention, and Kordic and Hornof jointly moved for return of their visas and passports so that they could leave the United States and return home. The Government responded to each of these requests for relief by seeking and securing warrants to arrest each of the Plaintiffs as material witnesses in an ongoing grand jury proceeding targeting the vessel owner and operator.

Each of the Plaintiffs was subsequently arrested and released on a $10,000 unsecured bond. As conditions of release, the Plaintiffs were ordered to submit to supervision by United States Probation and Pretrial Services, to surrender their passports to the United States Coast Guard, to remain in the District of Maine, and to comply with temporary parole conditions set by Immigration and Customs

---

a "significant public benefit." 8 U.S.C.A. § 1182(d)(5)(A) (West 2020). Certain immigration officials may parole certain "arriving aliens" into the United States "under such terms and conditions . . . as [they] may deem appropriate." 8 C.F.R. § 212.5(c) (West 2020).

Enforcement.  After their bond hearings, the Plaintiffs returned to the hotel where they had been residing pursuant to the Security Agreement.

### 2.    The Plaintiffs' Motions Challenging the Arrest Warrants

The Plaintiffs challenged the material witness warrants and argued that their arrests had been unlawful under the material witness statute, 18 U.S.C.A. § 3144 (West 2020), because (1) the Government's investigation into MST was beyond its jurisdiction, rendering all arrests made in furtherance of that investigation unlawful, and (2) the Government had misrepresented that arrests were necessary to secure the Plaintiffs' testimony when in fact the Plaintiffs had promised to cooperate with the Government and testify against MST and the vessel's owner.  The Plaintiffs further asserted that their initial questioning and detention, the revocation of their visas, the confiscation of their passports, and the Security Agreement violated several provisions of the United States Constitution, tainting the arrest warrants and justifying their dismissal.

In the alternative, the Plaintiffs moved to be deposed immediately so that they could satisfy the purpose of the material witness warrants and return to their home countries.  The Plaintiffs' motions were consolidated for a hearing held before United States Magistrate Judge John H. Rich III on August 24, 2017.

### 3.    The August 24, 2017 Hearing and Subsequent Memorandum Decision

By the date of the August 24th hearing before the Magistrate Judge, each of the Plaintiffs had already testified before the grand jury, and the grand jury had returned an indictment against the vessel owner and operator for several offenses

related to the alleged discharges of oily bilge water on the high seas. However, the Government asserted that the Plaintiffs remained subject to the material witness warrants because their testimony was material to the trial of the vessel owner and operator.

At the hearing, the Plaintiffs, through their attorney, indicated that they were "reserving their rights to be immediately released and dissolve the warrants," but that "as a practical matter," their immediate goal was to "get an order for a prompt deposition" of each of them so that they could all return home as quickly as possible. *In re Material Witness Jaroslav Hornof*, No. 2:17-mj-00174-JHR-1, ECF No. 31 at 52 (D. Me. Jan. 17, 2020). The Plaintiffs agreed to the Magistrate Judge's characterization of their requests for depositions as "alternative" claims for relief that could be resolved without reaching their claims implicating the lawfulness of the warrants or other events leading up to the hearing. *Id.* at 51; *see also id.* at 36−37.

The Magistrate Judge found that the Plaintiffs were detained within the meaning of the material witness statute, 18 U.S.C.A. § 3144, and therefore that they had standing to move for depositions pursuant to Fed. R. Crim. P. 15(a)(2). Without opining on the lawfulness of that detention, the Magistrate Judge ordered that the Plaintiffs be deposed within thirty days, following which they would be permitted to depart the United States. Because the Plaintiffs had sought depositions as an "alternative" ground for relief, the Magistrate Judge deemed the Plaintiffs' claims about unlawful conduct by the Government to be moot.

Pursuant to the Magistrate Judge's order, the Plaintiffs were deposed on September 11 and 12, 2017, in connection with the vessel owner and operator's trial.

On September 14, 2017, the Magistrate Judge ordered that the Plaintiffs be released and that their passports be returned to them.  On the same day, as they were preparing to depart, the Plaintiffs were served with trial subpoenas.  The Plaintiffs moved to quash the subpoenas as unnecessary and unlawful.  The Magistrate Judge denied the motion without prejudice because of uncertainty regarding the eventual trial date.  The First Amended Complaint alleges that the subpoenas required the Plaintiffs to return to the United States for the trial of the vessel owner and operator and thereby rendered the Plaintiffs unable to sign future employment contracts to return to sea.[7]

## F.    Criminal Proceedings Against the Vessel's Owner and Operator

The indictment against the vessel owner and operator charged them with nine counts of violating federal law.  The first eight counts alleged that the vessel owner and operator violated the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C.A. §§ 1901−1915, and the ninth count charged the vessel owner and operator with obstruction of justice.  After the Plaintiffs' depositions were taken, the owner and operator moved to dismiss the APPS charges, asserting that the United States lacked jurisdiction to prosecute the conduct alleged in the indictment because no violation of the laws of the United States had occurred, an argument the Plaintiffs had made in their motions challenging the material witness warrants.  In an order dated January 22, 2018, United States District Judge Nancy Torresen rejected this argument, holding that the first eight counts of the indictment sufficiently alleged violations of United States law, regardless of whether the alleged discharge of oily bilge water and

---

[7]  The Plaintiffs left the United States on September 14, 2017.

the initial concealment of it in the vessel's oil record book had occurred on the high seas. Accordingly, the motion to dismiss was denied.

On November 2, 2018, the vessel operator pleaded guilty to one count of violating the APPS and one count of obstruction of justice. All other counts of the indictment were dismissed. The vessel operator was sentenced to a term of probation of four years and ordered to pay a fine in the amount of $3,200,000: $500,000 for the APPS violation and $2,700,000 for the obstruction of justice charge. The Plaintiffs then moved for an award of fees under 33 U.S.C.A. § 1908(a), which provides that up to half of any fine imposed for an APPS violation may be paid to persons who gave the Government information leading to the conviction. Judge Torresen granted the Plaintiffs' motion and awarded $225,000 to Hornof and $12,500 each to Zak and Kordic.

## II.  PROCEDURAL HISTORY AND LEGAL FRAMEWORK

On May 6, 2019, the Plaintiffs filed this civil action against the Government and the Individual Defendants, asserting a variety of claims for which they seek damages as well as injunctive and declaratory relief. The gist of the complaint is that the Defendants initiated proceedings against the *Marguerita* under the APPS, despite knowing that no probable cause supported the prosecution, because they believed that a conviction under the APPS would generate large fines for the Government and "personal glory" for the Individual Defendants. The Plaintiffs further allege that they were detained as "human collateral" for the prospective fines under the security agreement, and that the Defendants sought fraudulent and pretextual material witness warrants against them to justify their unlawful

detention and to conceal the real basis for both their detention and the underlying prosecution: the Defendants' desire to extort large sums of money from the vessel owners.

The First Amended Complaint contains six Counts.  Four of those six Counts are against all the Defendants: those Counts make claims under the Federal Tort Claims Act, 28 U.S.C.A. § 1346 (West 2020) (Count Two); the Act to Prevent Pollution from Ships, 33 U.S.C.A. §§ 1901-1915 (West 2020) (Count Three); and the federal criminal statutes against peonage, involuntary servitude, and human trafficking, *see* 18 U.S.C.A. §§ 1581, 1584, 1592, and 1595 (West 2020) (Count Five), as well as a claim for declaratory and injunctive relief related to all Counts (Count Four).  Counts One and Six involve claims against only the Individual Defendants: Count One for constitutional violations under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), and Count Six for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. §§ 1961–1968 (West 2020).

The Government has moved to dismiss all of the Counts against it (Counts Two, Three, Four, and Five) pursuant to Fed. R. Civ. P. 12(b)(1), arguing that it retains sovereign immunity for all the claims against it and, therefore, this Court lacks subject matter jurisdiction.  *See Valentin v. Hospital Bella Vista*, 254 F.3d 358, 362-63 (1st Cir. 2001).  The Government also moves to dismiss the Counts against it pursuant to Rule 12(b)(6).  The Individual Defendants, for their part, move to dismiss all counts against them on 12(b)(6) grounds.

To navigate this thicket, I proceed in the following manner: First, I address the substantive Counts against all the Defendants (that is, Counts Two, Three, and Five)

before turning to the Counts against the Individual Defendants only (Counts One and Six) and then, finally, addressing the Plaintiffs' request for declaratory and injunctive relief (Count Four).  Before delving into the particulars of each Count, I set forth the legal standards governing my analysis; I also take the opportunity to sketch the law governing the Individual Defendants' defense of qualified immunity, which they assert with regard to multiple Counts.

## A.   Legal Standard

To survive a motion to dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1), the plaintiff must "make clear the grounds on which the court may exercise jurisdiction." *Johansen v. United States*, 506 F.3d 65, 68 (1st Cir. 2007). If the plaintiff "fails to demonstrate a basis for jurisdiction," the motion to dismiss for lack of subject-matter jurisdiction must be granted.  *Id.*  Where, as here, a motion to dismiss under Rule 12(b)(1) is based solely on the complaint, courts accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Gordo-González*, 873 F.3d at 35.  In other words, "[t]he pleading standard for satisfying the factual predicates for proving jurisdiction is the same as applies under Rule 12(b)(6)."  *Id.* (quoting *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326−27 (1st Cir. 2016)).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Rodríguez–Reyes*, 711 F.3d at 53 (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012)).  Courts apply a two-pronged approach in resolving a motion to dismiss under Rule 12(b)(6).  *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d

1, 12 (1st Cir. 2011).  First, courts must identify and disregard statements in the complaint that merely offer legal conclusions couched as factual allegations.  *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Second, courts "must determine whether the remaining factual content allows a reasonable inference that the defendant is liable for the misconduct alleged." *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013) (quotation marks and citation omitted).  Determining the plausibility of a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 53 (quoting *Iqbal*, 556 U.S. at 679).

**B.  Qualified Immunity as to the Individual Defendants**

The Individual Defendants contend that they are entitled to qualified immunity on all Counts against them.  "The qualified immunity doctrine protects federal . . . officials from civil liability in the performance of 'discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Martinez-Rodriguez v. Guevara*, 597 F.3d 414, 419 (1st Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)) (alteration omitted).  The qualified immunity inquiry involves a "two-part test: '(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation.'" *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) (quoting *Rocket Learning, Inc. v. Rivera-Sánchez*, 715 F.3d 1, 8 (1st Cir. 2013)).  "Courts need not engage in the first inquiry

and may choose, in their discretion, to go directly to the second." *Id.* (citing *Eves v. LePage*, 927 F.3d 575, 584 (1st Cir. 2019)).

"The 'clearly established' inquiry itself has two elements." *Id.* (quoting *MacDonald v. Town of Eastham*, 745 F.3d 8, 12 (1st Cir. 2014)). "First, the plaintiff must identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to signal to a reasonable officer that particular conduct would violate a constitutional right." *Morse v. Cloutier*, 869 F.3d 16, 23 (1st Cir. 2017) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). Second, the court must determine "whether a reasonable officer in the defendant's position would have known that his conduct violated the established rule." *Id.* (citing *Wilson v. City of Boston*, 421 F.3d 45, 57−58 (1st Cir. 2005)).

## III.  DISCUSSION

Having outlined the legal framework, I turn to an analysis of each Count, beginning with the Counts involving claims against all Defendants, as discussed above.

### A.    Count Two: The Federal Tort Claims Act

Count Two asserts claims for false arrest, false imprisonment, abuse of process, and intentional infliction of emotional distress ("IIED") against all Defendants under

the Federal Tort Claims Act ("FTCA"), 28 U.S.C.A. § 1346.[8]   The FTCA provides that

federal courts:

> shall have exclusive jurisdiction of civil actions on claims against the
> United States, for money damages . . . for injury or loss of property, or
> personal injury or death caused by the negligent or wrongful act or
> omission of any employee of the Government . . . under circumstances
> where the United States, if a private person, would be liable to the
> claimant in accordance with the law of the place where the act or
> omission occurred.

28 U.S.C.A. § 1346(b)(1).   As counsel for the Plaintiffs conceded at oral argument,

claims under the FTCA may only be brought against the United States.   *See ITT Fed.*

*Servs. Corp. v. Anduze Montaño*, 474 F.3d 32, 34 (1st Cir. 2007) (citing 28 U.S.C.A.

§§ 1346(b), 2674, 2679); ECF No. 60 at 27.   Accordingly, Count Two is dismissed as to

all Defendants other than the United States.   The Government contends that Count

Two should also be dismissed as to the United States for lack of jurisdiction and

failure to state a claim.   I address each of the Plaintiffs' claims under the FTCA in

turn.

### 1.      False Arrest and False Imprisonment

Count Two asserts claims of false arrest and false imprisonment based on the

Plaintiffs' alleged detention onboard the ship, the restrictions allegedly placed on

their liberty after they were paroled into the United States, and their arrests as

material witnesses.   The Government contends that the Plaintiffs' claims of false

---

[8] The First Amended Complaint also contains one allegation that the Defendants "defamed" the
Plaintiffs.   ECF No. 3 ¶ 127.   To the extent that the Plaintiffs intend to assert a defamation claim
under Count Two, this Court lacks jurisdiction to decide it.   The FTCA does not waive sovereign
immunity for claims of libel or slander, which include defamation claims.   *See* 28 U.S.C.A. § 2680(h)
(West 2020); *Aversa v. United States*, 99 F.3d 1200, 1207, 1213 (1st Cir. 1996) (noting that "claims
arising from libel and slander" are not within the FTCA's jurisdictional exception); *accord Vincent v.
United States*, No. 2:14-CV-00238-JAW, 2015 WL 4092842, at *3–4 (D. Me. July 7, 2015).

arrest and false imprisonment should be dismissed for lack of subject-matter jurisdiction because sovereign immunity shields the United States from those claims. In the alternative, the Government asserts that the Plaintiffs' claims of false imprisonment and false arrest are barred by issue preclusion. Failing that, the Government argues that the claims for false arrest and false imprisonment should be dismissed for failure to state a claim. I consider the Government's jurisdictional arguments first.

### a.  Sovereign Immunity

Federal courts lack subject-matter jurisdiction over claims asserted against the United States unless the United States has waived sovereign immunity with respect to those claims. *See Villanueva v. United States*, 662 F.3d 124, 126 (1st Cir. 2011) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)). The FTCA "waives the sovereign immunity of the United States with respect to certain torts committed by federal employees acting within the scope of their employment." *Gordo-González*, 873 F.3d at 35 (citing *Bolduc v. United States*, 402 F.3d 50, 55 (1st Cir. 2005)). But "the FTCA's waiver of sovereign immunity is narrowed by exceptions." *Evans v. United States*, 876 F.3d 375, 380 (1st Cir. 2017). "One such exception, commonly called the discretionary function exception, bars liability for claims 'based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" *Id.* (quoting 28 U.S.C. § 2680(a)). Thus, if a plaintiff's FTCA claims are based on conduct involving "the exercise of discretion in furtherance

of public policy goals," those claims "are foreclosed by the discretionary function exception." *Id.* at 380-81 (quoting *United States v. Gaubert*, 499 U.S. 315, 334 (1991)).

The Government argues that the Plaintiffs' false arrest and false imprisonment claims are barred by the discretionary function exception because they primarily challenge government officials' discretionary conduct during a law enforcement investigation. The Plaintiffs respond that, notwithstanding the discretionary function exception, their claims for false arrest and imprisonment are expressly permitted by the FTCA's law enforcement proviso, which waives sovereign immunity as to "any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" based on "acts or omissions of investigative or law enforcement officers of the United States Government." 28 U.S.C.A. § 2680(h).

The relationship between the discretionary function exception and the law enforcement proviso is not clear, and the Circuit Courts are divided on the question of whether the discretionary function exception can bar liability for the enumerated torts arising from the conduct of law enforcement officers, for which the FTCA would otherwise waive immunity pursuant to the law enforcement proviso. The Second, Fourth, Fifth, Seventh, Ninth, and D.C. Circuits have held that the law enforcement proviso "does not negate the discretionary function exception" and, thus, that the United States retains sovereign immunity for torts arising from at least some discretionary functions exercised by law enforcement officers, although those Circuits apply different standards to synthesize the two provisions. *Joiner v. United States*, 955 F.3d 399, 406 (5th Cir. 2020). *Compare, e.g.*, *Campos v. United States*, 888 F.3d

18

724, 731 (5th Cir. 2018) ("Neither the discretionary function exception nor the law enforcement proviso 'exist[s] independently of the other nor does one predominate over the other.'" (quoting *Sutton v. United States*, 819 F.2d 1289, 1295 (5th Cir. 1987))) *with Linder v. United States*, 937 F.3d 1087, 1089 (7th Cir. 2019) ("[D]iscretionary acts by law-enforcement personnel remain outside the FTCA by virtue of § 2680(a), even though the proviso allows other . . . suits."). By contrast, the Eleventh Circuit has held that "sovereign immunity does not bar a claim that falls within the [law enforcement proviso], regardless of whether the acts giving rise to it involve a discretionary function." *Nguyen v. United States*, 556 F.3d 1244, 1256−57 (11th Cir. 2009). The First Circuit has not considered the issue. It is unclear whether, in the First Circuit, the FTCA's discretionary function exception applies to tort claims arising out of the conduct of law enforcement officers. Even if the discretionary function exception applies, however, "[i]t is elementary that the discretionary function exception does not . . . shield conduct that transgresses the Constitution." *Limone v. United States*, 579 F.3d 79, 101 (1st Cir. 2009). Because the Plaintiffs' FTCA claims are predicated on allegations that the Defendants' conduct violated, among other things, the Fourth Amendment—allegations that, as I describe in greater detail below, pass 12(b)(6) muster—I conclude that the discretionary function exception does not bar the Plaintiffs' claims of false arrest and false imprisonment under the FTCA. Accordingly, I turn to the Government's second argument, that the judicial proceedings involving the Plaintiffs before the Magistrate Judge preclude the Plaintiffs from relitigating the validity of their detention.

### b.    Issue Preclusion

The Government points out, correctly, that the Plaintiffs now reassert many of the same allegations and arguments they originally raised in support of their motions challenging the material witness warrants.   In particular, the First Amended Complaint contends that the Plaintiffs' detention and the circumstances surrounding the same violated their rights under the Fourth, Fifth, Sixth, and Thirteenth Amendments.   Because all of these contentions were raised before the Magistrate Judge, the Government asserts that the Plaintiffs are precluded from raising them again in this action under the doctrine of issue preclusion, which is also known as collateral estoppel.   A party invoking issue preclusion based upon a previous federal court judgment must show, among other things, that "the prior court decided that issue in a final judgment."  *Vargas-Colón v. Fundación Damas, Inc.*, 864 F.3d 14, 26 (1st Cir. 2017) (quoting *Robb Evans & Assocs., LLC v. United States*, 850 F.3d 24, 32 (1st Cir. 2017)).

The Government cannot meet this burden.   In the material witness proceedings, the Plaintiffs argued for two alternative forms of relief.   First, they sought immediate release on the grounds that their detention was unlawful. Alternatively, they requested that their depositions be taken pursuant to the material witness statute, 18 U.S.C.A. § 3144, and Fed. R. Crim. P. 15, so that they could promptly satisfy the purpose of the material witness warrants and return home. The Plaintiffs indicated that they would not press their arguments about the lawfulness of their detention if the Magistrate Judge granted them alternative relief in the form of an order requiring prompt depositions.  The Magistrate Judge did just

that.  He found that the Plaintiffs were "detained" within the meaning of the material witness statute and ordered that the Government take the Plaintiffs' depositions and release them from detention within 30 days.  The Magistrate Judge did not address the lawfulness of the Plaintiffs' detention.  Ultimately, the Plaintiffs' claims for immediate release were denied as moot.  Because the Magistrate Judge's order did not decide the issues presented by the FTCA claims, issue preclusion does not prevent the Plaintiffs from raising them now.

Having determined that the Plaintiffs' false arrest and false imprisonment claims are not barred by issue preclusion, I now address the Government's argument these claims should be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

### c.      Failure to State a Claim

In order to establish a tort claim of false arrest and false imprisonment under Maine law, "the authority upon which [the plaintiff] is confined must be unlawful." *Santoni v. Potter*, 369 F.3d 594, 603 (1st Cir. 2004) (quoting *Nadeau v. State*, 395 A.2d 107, 116 (Me. 1978)).  Thus, a plaintiff can establish a false arrest by showing that the arrest was unauthorized by statute or that the arrest violated the Fourth Amendment.  *See, e.g.*, *id.* (finding no basis for liability for false arrest or false imprisonment where plaintiff was arrested and confined upon valid state law authority).  The Plaintiffs assert claims of false arrest and false imprisonment based on their alleged detention both before and after the material witness warrants were issued.

### i.      The Alleged Pre-Warrant Detention

The Plaintiffs first contend that they were unlawfully detained before the material witness warrants were issued.  This contention is based on the alleged fact that the Plaintiffs were detained without probable cause on the ship from July 7 until July 16, 2017, and that they were involuntarily paroled into the United States and required to remain in the United States against their will under the Security Agreement.

The Government does not meaningfully address whether the Plaintiffs' allegations of pre-warrant detention plausibly state a claim for false arrest and false imprisonment.  For example, the Government and the Individual Defendants both argue that the Plaintiffs were not seized until the material witness warrants were issued, but they do not explain this argument further or provide any authority supporting it.  The Government simply stated at oral argument that the Plaintiffs were in the United States "voluntarily" before they were formally arrested.  ECF No. 60 at 6.  However, the Amended Complaint specifically alleges that the Plaintiffs were present in the United States involuntarily, and I must treat this allegation as true on a motion to dismiss.

The Government further contends that even if the Plaintiffs were detained before the warrants were issued, their detention was lawful because it was authorized by three separate statutes.  The Government first points to the material witness statute, which provides, in relevant part:

> If it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by

22

> subpoena, a judicial officer may order the arrest of the person and treat
> the person in accordance with the provisions of section 3142 of this title.

18 U.S.C.A. § 3144. But the text of the material witness statute does not provide for the warrantless arrest of material witnesses. Rather, the material witness statute permits arrests upon an "order" by a "judicial officer" if "it appears from an affidavit filed by a party that the testimony of a person is material" and "that it may become impracticable to secure the presence of the person by subpoena." *Id.* Thus, the plain text of the statute suggests that warrants are necessary to justify the detention of material witnesses. Although the Government argues that "warrants were not immediately necessary," ECF No. 43 at 8, it again does not develop this argument or provide supporting authority. Instead, the Government rests on its contention that the Magistrate Judge decided this issue during the material witness proceedings. However, as I have already explained, the Magistrate Judge did not decide issues relating to the lawfulness of the Plaintiffs' detention. Therefore, I am not persuaded that the Plaintiffs' alleged pre-warrant detention was lawful under the material witness statute.

The Government next points to 19 U.S.C.A. § 1581(a), which provides that Customs and Border Protection officials may "stop," "board," and "search" vessels and may "use all necessary force to compel compliance." The Plaintiffs respond that 19 U.S.C.A. § 1581(a) could not have authorized their alleged detention onboard the ship from July 7 to July 16, 2017, because there was no ongoing "search" of the vessel that would have necessitated a use of "force" against the crew members for that entire time period. The Amended Complaint does not specifically detail the movements and

activities of CBP officials during the Plaintiffs' alleged detention onboard the ship, but it is reasonable to infer that the officials' search of the vessel did not span nine continuous days.  Because I must draw all reasonable inferences in the Plaintiffs' favor on a motion to dismiss, I am not persuaded by the Government's argument that the full length of the Plaintiffs' alleged detention onboard the ship was authorized by 19 U.S.C.A. § 1581.[9]

The Government also relies on 14 U.S.C.A. § 522, which permits the Coast Guard to "make inquiries, examinations, . . . seizures, and arrests . . . for the prevention, detection, and suppression of violations" of federal law and to make arrests when "it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person."  But statutes authorizing Coast Guard officers to make arrests do not exempt those officers from the Fourth Amendment's prohibition on unreasonable seizures.  *See United States v. Cardona-Sandoval*, 6 F.3d 15, 23 (1st Cir. 1993); *cf. Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 259 (1st Cir. 2003) (refusing to adopt an interpretation of the Coast Guard's statutory authority that would run afoul of the Fourth Amendment).  Thus, even if 14 U.S.C.A. § 522 or some other statute authorized the Plaintiffs' alleged pre-warrant detention, the question remains whether such detention violated the Fourth Amendment's prohibition on unreasonable seizures.

---

[9] The Amended Complaint also asserts that the Plaintiffs' pre-warrant detention, both on and off the ship, was achieved through unlawful means, namely, the revocation of their visas without due process. The parties' memoranda do not address whether the Plaintiffs' alleged pre-warrant detention in fact resulted from the revocation of their visas.  Nor do they address the lawfulness of the alleged visa revocation or of the Plaintiffs' alleged pre-warrant detention under the relevant immigration laws, including the parole statute, 8 U.S.C.A. § 1182(d)(5), and the statute governing conditional visas for foreign crew members, 8 U.S.C.A. § 1282 (West 2020).  Accordingly, I do not decide this issue.

24

The Government does not cite any Fourth Amendment caselaw or otherwise address the reasonableness of the Plaintiffs' alleged pre-warrant detention under the Fourth Amendment. To the extent that the Government intends to argue that the statutory authority it relies on is coextensive with the Fourth Amendment, it does not provide any authority supporting this argument. The Government, as the moving party, "bears the burden of demonstrating that the complaint fails to state a claim." *Franchini v. Bangor Publ'g Co.*, 383 F. Supp. 3d 50, 55 (D. Me. 2019) (citing *Lamprey v. Wells Fargo Home Mortg.*, No. 2:16-cv-00570-JDL, 2017 WL 3470570, at *2 (D. Me. Aug. 11, 2017)). Because the Government has not provided "any authority at all" supporting its position that the Plaintiffs' alleged pre-warrant detention was reasonable under the Fourth Amendment, it has not satisfied this burden. *Filler v. Hancock Cty.*, No. 1:15-cv-00048-JAW, 2016 WL 335858, at *26 (D. Me. Jan. 27, 2016). Accordingly, the Government's motion to dismiss is denied with respect to the Plaintiffs' claims that they were falsely arrested and falsely imprisoned before the material witness warrants were issued.

### ii.     The Material Witness Warrants

The Plaintiffs also challenge the lawfulness of their detention pursuant to the material witness warrants because, they assert, those warrants were invalid. *See Santoni*, 369 F.3d at 603. The Government contends that the Plaintiffs were lawfully arrested under the material witness statute. As explained above, the material witness statute permits the detention of a witness only upon a showing that (1) the witness's testimony is material, and (2) it may become impracticable to secure the presence of the witness by subpoena. *See* 18 U.S.C.A. § 3144. These requirements

are sometimes referred to as the "materiality prong" and the "impracticability prong." *See, e.g.*, *United States v. Awadallah*, 349 F.3d 42, 76 (2d Cir. 2003) (Straub, J., concurring).

The warrant affidavits signed by Special Agent Root indicated that each of the Plaintiffs were eyewitnesses to or participants in the vessel's alleged violations of federal law and stated that they would be "able to corroborate and provide other relevant and probative information" relating to the ongoing grand jury investigation targeting the vessel owner and operator. Thus, the warrant affidavits facially established that the Plaintiffs' testimony was material in the criminal proceedings against the vessel owner and operator.

The warrant affidavits further stated that the Plaintiffs were foreign citizens who would "not be subject to compulsory process" if they were allowed to return to their home countries. Ordinarily, foreign citizenship and residence are sufficient to establish the impracticability prong of the material witness statute because "the government's subpoena power [is] basically ineffectual" in foreign countries. *United States v. Matus-Zayas*, 655 F.3d 1092, 1099–1100 (9th Cir. 2011) (quotation marks omitted). Thus, the warrant affidavits facially established that it may have become impracticable to secure the Plaintiffs' presence by subpoena. Because the affidavits satisfied both the materiality and impracticability prongs, the material witness warrants were facially valid.

Nevertheless, the Plaintiffs argue that their arrests pursuant to the material witness warrants violated the Fourth Amendment, and were therefore unlawful for false arrest purposes, *see Santoni*, 369 F.3d at 603, because the material witness

warrant applications and supporting affidavits intentionally misrepresented and omitted material facts. The Fourth Amendment is violated if an application for an arrest warrant or the supporting affidavit intentionally or recklessly misrepresents or omits material facts. *See Burke v. Town of Walpole*, 405 F.3d 66, 81 (1st Cir. 2005) (citing *Forest v. Pawtucket Police Dep't*, 377 F.3d 52, 58 (1st Cir. 2004)). Misrepresentations or omissions violate the Fourth Amendment only if they are material to the magistrate judge's probable cause determination. *Id.* at 82 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). In order to determine the materiality of the misstatements and omissions, a court must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the corrected warrant affidavit would establish probable cause." *Id.* (internal quotation marks omitted) (quoting *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000)).

The Plaintiffs identify several categories of alleged misrepresentations and omissions in the warrant applications. First, the Plaintiffs allege that the warrant applications and affidavits intentionally misrepresented that the *Marguerita* had violated federal law by discharging pollutants in or within twelve nautical miles of the United States and by failing to maintain an accurate oil record book, when in fact the vessel had not violated any federal law. Because the Plaintiffs assert that the criminal proceedings against the vessel were unlawful, they argue that the material witness warrants were invalid. However, Judge Torresen rejected the vessel owner and operator's arguments that the vessel had not violated any federal law during the criminal proceedings, and the vessel operator was ultimately convicted of two federal

crimes.[10]   Thus, the alleged misrepresentations regarding the vessel owner and

operator's conduct and the applicable federal laws do not invalidate the Plaintiffs'

material witness warrants.[11]

Second, the Amended Complaint alleges that the material witness warrant

applications and supporting affidavits intentionally omitted details about the amount

of evidence the Government possessed against the vessel owner and operator.

Specifically, the Amended Complaint alleges that the vessel owner and operator had

voluntarily disclosed the nature and extent of the vessel's unlawful discharges and

"had pledged full and complete cooperation" with the Government's investigation.

ECF No. 3 ¶ 93(k).   The Amended Complaint further alleges that the Plaintiffs had

fully cooperated with the Government's requests for information.   The Plaintiffs

---

[10]  Of course, as the Government argues, the lawfulness of the predicate criminal proceeding is not
an element of the material witness statute, and an unlawful criminal proceeding may not necessarily
invalidate an otherwise lawful material witness warrant.  Here, however, the Plaintiffs were allegedly
subjected to lengthy detention and questioning prior to the issuance of the material witness warrants,
and the lawfulness of that alleged pre-warrant detention and questioning may well depend on the
lawfulness of the investigation into the vessel.  Thus, if the underlying investigation were unlawful
and the material witness warrant applications relied on information learned from the Plaintiffs during
the alleged pre-warrant detention and questioning, the validity of the warrants themselves could be
called into question under the fruit of the poisonous tree doctrine: At least one Court of Appeals has
stated that information unlawfully obtained from a person should be excised from a warrant
application and affidavit when determining the validity of a warrant for that person's arrest as a
material witness.  *Awadallah*, 349 F.3d at 68–69.  However, I need not address this issue because the
investigation and prosecution of the vessel owner and operator were lawful, as noted above.  Even if
this were not so, the Plaintiffs admit that all relevant information was already known or at least
readily available to the Government through an independent, lawful source—the vessel's voluntary
disclosures, which were made prior to the Plaintiffs' alleged pre-warrant detention and questioning.
This admission offsets any potential concerns about the actual source of the information in the warrant
applications and affidavit.

Furthermore, I do not address the Government's argument that collateral estoppel precludes the
Plaintiffs from relitigating the lawfulness of the criminal prosecution against the *Marguerita*'s owner
and operator.  *Cf. Heck v. Humphrey*, 512 U.S. 477, 487 (1994).  Rather, I simply am not persuaded
that there are any grounds to reconsider Judge Torresen's well-reasoned decision in that case.

[11] To the extent that the Plaintiffs argue that the warrants were unlawful because they were
pretextual, the "alleged pretextual use" of a material witness warrant does not state a claim for a
Fourth Amendment violation.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011).

assert that the amount of evidence in the Government's possession "cast[s] doubt on the 'need' to arrest [them] as material witnesses."  ECF No. 31 at 8.  Thus, the Plaintiffs suggest that the Magistrate Judge would not have found their testimony material in the criminal proceedings against the vessel owner and operator if the warrant applications had specifically described the other evidence in the Government's possession.

However, even if these alleged omissions had been included, the Plaintiffs' testimony would have been material to the criminal proceeding because it corroborated the Government's documentary evidence against the vessel owner and operator.  In the criminal proceeding against the vessel operator, Judge Torresen found that Hornof's cooperation was "key" to obtaining the vessel operator's conviction and that Kordic and Zak's testimony "provided important corroboration" of Hornof's account.  *United States v. MST Mineralien Schiffarht Spedition und Transport GMBH*, No. 2:17-cr-00117-NT, ECF No. 192 (D. Me. Feb. 19, 2019).  Indeed, the Plaintiffs themselves have asserted that their testimony was "vital" to the prosecution and conviction of the vessel operator.  *In re United States v. MST Mineralien Schiffarht Spedition und Transport GMBH*, No. 2:18-mc-00127-NT, ECF No. 1 ¶¶ 11, 19 (D. Me. May 4, 2018).  Thus, the alleged omissions regarding the nature and extent of evidence already in the Government's possession do not invalidate the material witness warrants.

Finally, the Amended Complaint alleges that the material witness warrant applications and supporting affidavits intentionally omitted the details of the Security Agreement and the confiscation of the Plaintiffs' passports when they were

paroled into the United States.  The Plaintiffs assert that these details, if included, would have established that they were already detained in the United States and therefore that it would not have been impracticable to secure their presence by subpoena.

The Government responds that these alleged omissions were not material to the Magistrate Judge's determination of impracticability because each of the Plaintiffs had expressed an intent to leave the United States, establishing that their presence would likely become impracticable to secure by subpoena.  Notably, this information was also omitted from the warrant applications.  Even if it had been included, the Amended Complaint alleges that the Plaintiffs were unable to act freely on their intent to leave the United States because Special Agent Root had confiscated their passports.  Indeed, the Plaintiffs only expressed their intent to leave the United States by filing a habeas petition and several motions with the Court, arguing that they were unlawfully detained in the United States and seeking to be released so that they could return to their home countries.  Taking the allegations in the First Amended Complaint as true, I conclude that the Plaintiffs were unable to evade subpoenas by leaving the United States when the Government sought material witness warrants against them, which would have undermined the impracticability determination had that information been included in the warrant applications.

The Government suggests that the mere filing of the habeas petition and the other motions seeking release satisfies the impracticability prong of the material witness statute.  But if the Plaintiffs' alleged pre-warrant detention was lawful, as the Government contends, then the Plaintiffs would not have prevailed on their

motions seeking release, and they would have remained in the United States without their passports and subject to subpoena. Thus, the Government's assertions of impracticability depend on the lawfulness of the Plaintiffs' alleged pre-warrant detention. Because the Government's motion to dismiss is denied with respect to the Plaintiffs' claims that they were falsely arrested and falsely imprisoned before the material witness warrants were issued, the Government's motion to dismiss is also denied with respect to the Plaintiffs' claims that they were falsely arrested and falsely imprisoned pursuant to the material witness warrants.[12]

### 2.   Abuse of Process

In addition to the false arrest and false imprisonment claims discussed above, Count Two also asserts a claim for abuse of process. Although the factual underpinnings of this claim are not specifically outlined in the First Amended Complaint, it appears to be based on the Plaintiffs' allegations that Attorneys Waller and Cashman filed fraudulent warrant applications and that Special Agent Root signed fraudulent affidavits in support of the same. The Government argues that the Plaintiffs' claim for abuse of process should be dismissed for lack of subject-matter jurisdiction on sovereign immunity grounds.

Abuse of process claims asserted against the United States are generally barred because they do not fall within the scope of the FTCA's limited waiver of

---

[12] Although the Plaintiffs also argue that the warrant applications misrepresented the impracticability of securing the Plaintiffs' presence by subpoena by failing to indicate that the Plaintiffs had promised to appear in person before the grand jury and to return to the United States as needed to testify at trial, this argument is unpersuasive. As noted above, foreign residency and citizenship ordinarily satisfy the impracticability prong because a subpoena by the United States is "basically ineffectual" in foreign countries. *Matus-Zayas*, 655 F.3d at 1099−1100. The Plaintiffs' alleged promises to appear do not bear on the legal effect of subpoenas served in foreign countries and therefore do not negate the Magistrate Judge's finding of impracticability.

sovereign immunity.  *See* 28 U.S.C.A. § 2680(h).  However, pursuant to the law enforcement proviso discussed above, abuse of process claims are permitted if they arise out of the conduct of "investigative or law enforcement officers of the United States Government."  *Id*.  The Plaintiffs' abuse of process claim appears to arise out of the conduct of Attorneys Waller and Cashman, who are both federal prosecutors, as well as the conduct of Special Agent Root, who is an officer of the Coast Guard's criminal division.  Prosecutors are not "investigative or law enforcement officers" under § 2680(h).  *See Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014) (citing *Limone*, 579 F.3d at 88−89, and *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994)).  Thus, sovereign immunity bars the Plaintiffs' abuse of process claim to the extent it is based on the conduct of Attorneys Waller, Cashman, and Udell, or any other federal prosecutor.

Special Agent Root, by contrast, is plainly an "investigative or law enforcement officer" under § 2680(h).  Thus, the law enforcement proviso contained in § 2680(h) expressly allows the Plaintiffs' abuse of process claim to the extent that it is based on Special Agent Root's conduct.[13]

### 3.    Intentional Infliction of Emotional Distress

Finally, Count Two asserts a claim for IIED under the FTCA.  Although the basis for the IIED claim is not spelled out in the First Amended Complaint, the Plaintiffs clarify that the IIED claim arises out of their prolonged detention.  The

---

[13]  Because the Government did not assert that the Amended Complaint fails to state a claim for abuse of process in its motion to dismiss, I do not address the merits of the Plaintiffs' abuse of process claim.

Government contends that this claim, too, should be dismissed for lack of jurisdiction on sovereign immunity grounds.

As explained above, the FTCA's law enforcement proviso waives sovereign immunity with respect to claims "arising . . . out of" certain intentional torts, including false arrest, false imprisonment, and abuse of process, if they are committed by "investigative or law enforcement officers of the United States Government." 28 U.S.C.A. § 2680(h). The First Circuit has held that § 2680(h) is broad enough to encompass some IIED claims. [14] *Limone*, 579 F.3d at 92. However, IIED claims only fall within the scope of § 2680(h) if they "rest[] on proof of" a false arrest, false imprisonment, abuse of process, or another "specifically enumerated tort." *Id.* If a plaintiff fails to establish an element of the enumerated tort, then his IIED claim does not "arise[] out of" that tort for purposes of § 2680(h), even if it is based on the same conduct that gave rise to the enumerated tort claim. *Id.* at 92–93. Thus, whether an IIED claim arises out of a false imprisonment or false arrest for purposes of § 2680(h) is a "fact-sensitive, case-specific inquiry." *Id.* at 92.

Applying this First Circuit precedent, I conclude that if the Plaintiffs can establish either that they were falsely arrested and imprisoned or that Special Agent Root committed an abuse of process, the Court has jurisdiction to decide their IIED claim under the law enforcement proviso contained in § 2680(h), to the extent that their IIED claim arises out of the same conduct as their false arrest, false

---

[14] Although the First Circuit's decision in *Limone* interpreted the language of a previous version of § 2680(h) that was in effect before the law enforcement proviso was enacted, its logic applies equally to the law enforcement proviso because the language of the proviso is identical to the statutory language at issue in *Limone* in all relevant respects.

imprisonment, or abuse of process claims. Because the Government has not established that the Plaintiffs' false arrest, false imprisonment, and abuse of process claims are meritless, as discussed above, the Plaintiffs' IIED claim cannot be dismissed for lack of jurisdiction at this stage. Accordingly, the Government's motion to dismiss is denied with respect to the IIED claim asserted in Count Two.[15]

### 4.    Conclusion as to Count Two

For the reasons explained above, Count Two of the Amended Complaint is dismissed with respect to all Defendants other than the United States. As to the United States, the abuse of process claim asserted in Count Two is dismissed to the extent that it arises out of the alleged conduct of federal prosecutors. All other claims asserted in Count Two survive the Government's motion to dismiss.

## B.    Count Three: The Act to Prevent Pollution from Ships

Count Three asserts claims under two provisions of the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C.A. §§ 1904(h) and 1910. I address each provision in turn.

### 1.    Section 1904(h)

Under § 1904(h), "[a] ship unreasonably detained or delayed" pursuant to the APPS "is entitled to compensation for any loss or damage suffered thereby." The First Amended Complaint alleges that the actions taken by the Defendants to enforce the APPS against the vessel owner and operator caused the Plaintiffs to be "unreasonably detained or delayed." ECF No. 3 ¶ 134. However, because the Plaintiffs plainly do

---

[15] Because the Government did not assert that the Amended Complaint fails to state a claim for IIED in its motion to dismiss, I do not address the merits of the Plaintiffs' IIED claim.

not constitute a "ship," which is defined under § 1901(a)(12) as "a vessel of any type whatsoever," I conclude that § 1904(h) does not provide the Plaintiffs a remedy for the alleged detention and delay they personally suffered.  Indeed, the APPS defines "person" separately from "ship," indicating that § 1904(h) was not intended to apply to persons such as the Plaintiffs.  *Compare id.* § 1901(a)(10), *with id.* § 1901(a)(12).

The Plaintiffs concede that the plain text of § 1904(h) does not grant them a remedy.  *See* ECF No. 31 at 10.  Nevertheless, the Plaintiffs contend that the word "ship" should be construed to include them because they were treated as synonymous with "ship" by the Security Agreement, which allegedly required them to remain in the United States as surety for the ship's release.  But courts may not disregard the plain terms of a statute "based on some extratextual consideration."  *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1749 (2020); *see also id.* at 1737.  Thus, I conclude that the First Amended Complaint fails to state a claim under § 1904(h).  Accordingly, the claim under § 1904(h) asserted in Count Three is dismissed as to all Defendants.

### 2.    Section 1910

Count Three also asserts claims under § 1910(a), which provides that "any person having an interest which is, or can be, adversely affected" may bring an action against (1) "any person alleged to be in violation of" the APPS; (2) the Secretary of Homeland Security, if the Secretary has allegedly failed to perform any non-discretionary act or duty under the APPS; (3) the Administrator of the Environmental Protection Agency, if the Administrator fails to perform any non-discretionary act or

duty under the APPS; or (4) the Secretary of Homeland Security,[16] if the Secretary has failed to "take action under section 1908(e)," which prescribes the circumstances under which a ship's departure clearance may be refused, revoked, or granted.[17]  33 U.S.C.A. § 1910(a).

### a.    Claims Against the Government Defendants

To the extent that the Plaintiffs intend to assert claims against the Government under § 1910, the First Amended Complaint fails to state a claim for relief.  Section 1910(a) only permits suits against two Government entities: the Administrator of the Environmental Protection Agency and the Secretary of Homeland Security.  *See* 33 U.S.C.A. § 1910(a)(2)−(4); *see also* 33 U.S.C.A. § 1901(a)(1) (defining "person" for purposes of the APPS).  Although the First Amended Complaint does not name the Administrator of the Environmental Protection Agency as a defendant, it does name the Department of Homeland Security as a defendant. Assuming that the Department of Homeland Security is the functional equivalent of the Secretary of Homeland Security for purposes of suits under § 1910(a), such suits are permitted only when they are based on the Secretary's alleged failure to act.  *See id.* § 1910(a)(2), (a)(4).  The Plaintiffs' claims under § 1910 do not challenge any failure

---

[16] The text of § 1910(a)(4) applies to the Secretary of the Treasury.  However, since the APPS was enacted, the duties discussed in § 1910(a)(4) have been reassigned to the Secretary of Homeland Security.  *See Angelex Ltd. v. United States*, 123 F. Supp. 3d 66, 70 n.2 (D.D.C. 2015) (citing *Monarch Shipping Co. v. United States*, No. 13-80661-CIV, 2013 WL 5741836, at *5 n.4 (S.D. Fla. Aug. 15, 2013)).

[17] Section 1910(b)(1) further requires that plaintiffs must provide notice, in writing and under oath, to "the alleged violator, the Secretary concerned or the Administrator, and the Attorney General" more than sixty days before commencing an action under § 1910(a).  The First Amended Complaint contains no allegations that the Plaintiffs have satisfied this written notice requirement.  However, because the Defendants do not object under § 1910(b)(1), I focus on whether the First Amended Complaint states a plausible claim for relief under § 1910(a).

to act by the Secretary, the Department, or any other Government entity.   By contrast, the Plaintiffs' APPS claims revolve around two affirmative acts: the detention of the vessel and the execution of the Security Agreement.   Thus, I conclude that the First Amended Complaint fails to state a claim against the Government under § 1910(a).   Accordingly, any claims under § 1910 asserted in Count Three are dismissed as to the Government.

### b.   Claims Against the Individual Defendants

The First Amended Complaint does not specify the Defendants against whom the Plaintiffs assert their APPS claims.   The Individual Defendants argue that the Plaintiffs' APPS claims lie "solely against the United States," because any suit against an officer under the APPS would lie against that officer in his official capacity only.   ECF No. 21 at 1 n.1.   However, § 1910(a)(1) explicitly provides that individuals may bring suit against "any person alleged to be in violation" of the APPS or its regulations, which suggests that individual-capacity claims against officers may be available.   Further, the Individual Defendants' motion to dismiss acknowledges that the First Amended Complaint names them in their individual capacities only.   *See* ECF No. 21 at 1.   It is well established that a plaintiff "may sue a governmental officer in her individual capacity for alleged wrongs committed by the officer in her official capacity." *Powell v. Alexander*, 391 F.3d 1, 23-24 (1st Cir. 2004) (alterations omitted) (quoting *Price v. Akaka*, 928 F.2d 824, 828 (9th Cir. 1990)).   "It simply 'does not follow that every time a public official acts under color of state law, the suit must of necessity be one against the official in his or her official capacity.'" *Id.* at 24 (quoting *Melo v. Hafer,* 912 F.2d 628, 636 (3d Cir. 1990)).   Because the Individual Defendants do not

provide any persuasive explanation or authority for their argument that § 1910 does not permit an individual-capacity suit, I proceed to analyze whether the First Amended Complaint states a plausible claim for relief against them under § 1910(a)(1), subject to the limitations imposed by the doctrine of qualified immunity for these individual-capacity claims.[18]

I turn, therefore, to whether facts alleged in the First Amended Complaint are sufficient to support a predicate violation underlying the Plaintiffs' claim under § 1910(a)(1). The majority of the allegations under the APPS discuss § 1904(h), which, as mentioned above, provides that a ship "unreasonably detained or delayed" pursuant to the APPS is "entitled to any loss or damage suffered thereby." Whether an unreasonable detention or delay of a ship constitutes a "violation" of the APPS for purposes of § 1910(a)(1) is a matter of first impression.[19] On the one hand, because § 1904(h) is a remedy provision, its terms are not technically violated when a ship is unreasonably detained or delayed. Thus, the text of § 1904(h) suggests that a ship's unreasonable detention or delay is not a predicate "violation" of the APPS for purposes of § 1910(a)(1). On the other hand, the provision of a remedy for unreasonable detention or delay implies that such detention or delay would violate

---

[18] Although the First Circuit has not specifically held that qualified immunity protects federal officials who are sued under the APPS, "numerous courts have held that the doctrine of qualified immunity provides a defense to . . . federal statutory causes of action" other than 42 U.S.C. § 1983. *Gonzalez v. Otero*, 172 F. Supp. 3d 477, 508-09 (D.P.R. 2016); *see Gonzalez v. Lee Cty. Housing*, 161 F.3d 1290, 1300 n.34 (11th Cir. 1998) (collecting cases); *see also Bartolomeo v. Plymouth Cty. House of Corr.*, 2000 WL 1164261, at *1 (1st Cir. 2000) (per curiam) (concluding, without deciding, that qualified immunity was available in ADA suit).

[19] One district court recently observed that, for purposes of jurisdiction, § 1910 "seems . . . to be an authorization for four different kinds of actions, none of which are at issue" in a suit for compensation for unreasonable detention or delay under § 1904(h). *Nederland Shipping Corp. v. United States*, No. 19-1302-RGA, 2020 WL 1989166, at *6 (D. Del. Apr. 27, 2020), *appeal docketed*, No. 20-2269 (3d Cir. July 7, 2020). However, the court did not directly address the question presented here.

the APPS.  But I need not decide this issue.  In the absence of clearly established law on point, the Individual Defendants are entitled to qualified immunity on the Plaintiffs' claims under the APPS to the extent they are predicated on an alleged violation of § 1904(h).

In their response to the Government's motion to dismiss, the Plaintiffs suggest that their § 1910(a)(1) claim is based on the Individual Defendants' alleged violation of § 1908(e), which permits the Secretary of Homeland Security to require "the filing of a bond or other surety satisfactory to the Secretary" before granting departure clearance to a ship that is reasonably detained for suspected APPS violations.  The Plaintiffs contend that the "bond or other surety" referred to in § 1908(e) was not intended to include crew members, and thus that the Individual Defendants violated § 1908(e) by treating them as a "surety" under the Security Agreement.  ECF No. 31 at 10−11.

However, the First Amended Complaint does not specifically allege any violation of § 1908(e).  Even if it did, the Plaintiffs cannot establish that the Individual Defendants violated § 1908(e).  As the Fourth Circuit concluded in *Angelex Ltd. v. United States*, § 1908(e) "grants the Coast Guard broad discretion to . . . dictate the terms of any bond that it may accept." 723 F.3d 500, 507 (4th Cir. 2013).  Furthermore, "the language of § 1908(e) does not provide any 'judicially manageable standards' by which to review" the conditions of release demanded by the Coast Guard.  *Id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  "Congress did not 'outline (even in the broadest brushstrokes) the parameters for what form or amount a bond or other surety should take.'"  *Id.* (quoting *Giuseppe Bottiglieri Shipping Co.*

*v. United States*, 843 F. Supp. 2d 1241, 1248 (S.D. Ala. 2012)).  Because the terms of a surety agreement are not substantively reviewable under § 1908(e), *see id.* at 506−09, it cannot be said that the Individual Defendants violated § 1908(e) by negotiating the Security Agreement or acting in accordance with it.[20]

Because I have determined that the First Amended Complaint does not allege any clearly established violations of the APPS by the Individual Defendants, I conclude the Individual Defendants are entitled to qualified immunity on the Plaintiffs' claims under § 1910(a)(1).  Accordingly, any claims under § 1910 asserted in Count Three are dismissed as to the Individual Defendants.

## C.   Count Five: Peonage, Involuntary Servitude, and Human Trafficking

Count Five asserts claims against all Defendants for violations of 18 U.S.C.A. §§ 1581, 1584, and 1592, pursuant to the civil remedy provision in 18 U.S.C.A. § 1595. Section 1581(a) prohibits holding any person in a condition of peonage or arresting any person "with the intent of placing him in . . . a condition of peonage."  The Supreme Court has defined "peonage" as "a status or condition of compulsory service, based upon the indebtedness of the peon to the master."  *Pollock v. Williams*, 322 U.S. 4, 9 (1944) (quoting *Clyatt v. United States*, 197 U.S. 207, 215 (1905)).  Section 1584(a) prohibits "knowingly and willfully hold[ing]" a person "to involuntary servitude."

---

[20] This does not mean that the terms of a surety agreement are absolutely shielded from judicial review.  The reasonableness of the Coast Guard's actions under § 1908(e) are subject to substantive review under § 1904(h), the APPS's "after-the-fact damages remedy."  *Angelex*, 723 F.3d at 508−509. However, I have already determined that the Plaintiffs are not proper plaintiffs under § 1904(h) and that the Individual Defendants are entitled to qualified immunity on any suit under § 1910(a)(1) that is predicated on an alleged violation of § 1904(h).  Accordingly, I do not reach the question of whether the terms of the Security Agreement were substantively reasonable.

"Involuntary servitude" includes "the compulsion of services by the use or threatened use of physical or legal coercion."[21] *United States v. Kozminski*, 487 U.S. 931, 948 (1988).  Further, as relevant here, § 1592(a) prohibits knowingly removing, confiscating, or possessing "any actual or purported passport or other immigration document . . . of another person" either "in the course of" violating § 1581 or § 1584 or "with intent to violate" the same.  If any of these sections is violated, § 1595(a) provides that the individual victim may bring a civil action against the perpetrator or anyone who knowingly benefits from the violation.

### 1.    Claims Against the Government Defendants

To the extent that Count Five makes a claim against the Government under § 1595, rather than only the Individual Defendants,[22] the Government asserts that it retains sovereign immunity for that claim.  Because sovereign immunity is "jurisdictional in nature," *Villanueva*, 662 F.3d at 126, I address it first.  Again, "absent a waiver, sovereign immunity . . . shields the United States from suit."  *Id.* A waiver of sovereign immunity must be "unequivocally expressed in statutory text."

---

[21] Another related statute, 18 U.S.C.A. § 1589 (West 2020), prohibits "forced labor," which the First Circuit has found to be a "species of involuntary servitude."  *United States v. Bradley*, 390 F.3d 145, 156 (1st Cir. 2004) (emphasis omitted)*, vacated on other grounds sub nom. Bradley v. United States*, 545 U.S. 1101 (2005).  "Forced labor" includes labor compelled by physical coercion as well as "by means of the abuse or threatened abuse of law or legal process" or "by means of any scheme, plan, or pattern intended to cause [a] person to believe" that he would suffer serious harm or physical restraint if he did not perform such labor.  18 U.S.C.A. § 1589(a)(1)–(4).  Congress added the prohibition on forced labor in response to the definition of "involuntary servitude" announced in *Kozminski*, which it found to be unduly narrow.  *Bradley*, 390 F.3d at 150.  Although the Plaintiffs do not explicitly rely on § 1589, they do invoke it by referring to the "abuse of law or legal process."

[22] The text of Count Five is addressed to "each of the defendants" and does not differentiate between the Government and Individual Defendants, and the Plaintiffs' responses to the Defendant's motions to dismiss do not clarify the issue.  I address the Government's argument in the interest of completeness.

*Marina Bay Realty Tr. LLC v. United States*, 407 F.3d 418, 422 (1st Cir. 2005)

(quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)).  The text of § 1595(a) provides that:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C.A. § 1595(a).  Because the statutory text authorizes civil actions only against

perpetrators or knowing beneficiaries of violations and does not mention the United

States, I conclude that § 1595(a) does not "unequivocally express" a waiver of

sovereign immunity.  *Marina Bay*, 407 F.3d at 422.  Accordingly, Count Five is

dismissed as to the Government.

### 2.    Claims Against the Individual Defendants

The Individual Defendants assert that they are entitled to qualified immunity

on the Plaintiffs' claims under §§ 1581, 1584, 1592, and 1595.[23]  Again, "[c]ourts need

not engage in the first" part of the qualified immunity test "and may choose, in their

discretion, to go directly to the second"—that is, the "clearly established" prong.

*Penate*, 944 F.3d at 366 (citing *Eves*, 927 F.3d 575, 584 (1st Cir. 2019)) (quotation

marks omitted).  I exercise that discretion here.

The core of the Plaintiffs' claims under §§ 1581 and 1584 is that the Security

Agreement and their subsequent parole and arrests placed them in a condition of

---

[23] As I have previously mentioned in discussing the availability of qualified immunity on the Plaintiffs' claims under the APPS, although the First Circuit has not specifically addressed whether government officials are entitled to qualified immunity for alleged violations of these provisions, other courts have found that qualified immunity is available in these circumstances, and the Plaintiffs do not suggest otherwise.  *See McCullough v. Finley*, 907 F.3d 1324, 1332-33 (11th Cir. 2018) (applying qualified immunity doctrine to claims under 18 U.S.C.A. § 1595); *Gonzalez*, 172 F. Supp. 3d at 508-09.

involuntary servitude and peonage.  Specifically, the Plaintiffs contend that they were subjected to involuntary servitude because they were forced to answer federal officials' questions and to testify in grand jury proceedings and depositions.  They argue that this amounted to peonage because their physical presence in the United States, which was necessary to their testimony, was compelled as collateral for the vessel's debts.  Indeed, the Security Agreement, which purported to require the Plaintiffs to remain in the United States, "constitute[d] surety satisfactory . . . for the release of the Vessel."  *In re Material Witness Jaroslav Hornof*, No. 2:17-mj-00174-JHR, ECF No. 5-4 at 2 (D. Me. Aug. 7, 2017).

The Plaintiffs have not identified any cases holding that providing information to law enforcement officials in connection with a criminal investigation or testifying in a criminal proceeding constitutes labor or service for purposes of § 1581 or § 1584. Nor have they cited to any authority suggesting that the compelled testimony of a non-citizen in United States courts constitutes "involuntary servitude" under § 1584 or any related statute.  Further, no court has held that a contract such as the Security Agreement places crew members in a condition of peonage under § 1581.  Thus, I conclude that the First Amended Complaint fails to allege any clearly established violation of §§ 1581, 1584, or 1592 by the Individual Defendants. *See Morse*, 869 F.3d at 23.  Accordingly, the Individual Defendants are entitled to qualified immunity, and Count Five is dismissed as to them.[24]

---

[24] Because I conclude that the Individual Defendants are entitled to qualified immunity for the reasons discussed above, I do not address their additional arguments that they are absolutely immune from suit under § 1595(a), that the First Amended Complaint fails to sufficiently allege indebtedness under § 1581, or that the First Amended Complaint fails to sufficiently allege coercion under § 1584.

### D.    Count One: *Bivens* Claims

Count One of the First Amended Complaint asserts claims against the Individual Defendants for violations of the Plaintiffs' Fourth, Fifth, Sixth, and Thirteenth Amendment rights under *Bivens*.  "A *Bivens* claim is an implied cause of action for civil damages against federal officials" for constitutional violations.  *Pagán-González v. Moreno*, 919 F.3d 582, 586 n.1 (1st Cir. 2019).  As the Supreme Court explained in *Ziglar v. Abbasi*, *Bivens* remedies have been "approved" in only three contexts: (1) in *Bivens* itself*,* 403 U.S. at 388, for a Fourth Amendment claim asserted against law enforcement officers for handcuffing a man in his own home without a warrant; (2) in *Davis v. Passman*, 442 U.S. 228 (1979), for a Fifth Amendment sex discrimination claim against a Congressman for firing his female secretary; and (3) in *Carlson v. Green*, 446 U.S. 14 (1980), for an Eighth Amendment claim against prison officials for failing to provide an inmate with medical care.[25]  137 S. Ct. 1843, 1854-55 (2017).  Courts considering whether to recognize an implied cause of action under *Bivens* in "new context[s]" should proceed with caution because it is generally the role of Congress, not the courts, to provide for a damages remedy.  *Id.* at 1857 (quoting *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)).  Extensions of *Bivens* are "disfavored," *id.* (quoting *Iqbal*, 556 U.S. at 675), and "a *Bivens* remedy will not be available" in cases presenting new contexts "if there are 'special factors counselling hesitation,'" *id.* (quoting *Carlson*, 446 U.S. at 18).

---

[25] The Plaintiffs assert that the Supreme Court recognized a *Bivens* remedy in a fourth context in *al-Kidd*, because the Court reached the merits of the plaintiff's *Bivens* claim challenging his detention under the material witness statute.  However, *al-Kidd* did not directly address the appropriateness of a *Bivens* remedy, and the Supreme Court clarified more recently in *Abbasi* that it has only approved of a *Bivens* remedy on three occasions, not including *al-Kidd*.  *See Abbasi*, 137 S.Ct. at 1855.

The Individual Defendants argue that Count One should be dismissed because this case presents a "new context" for a *Bivens* claim and "special factors counsel[] hesitation" in allowing a *Bivens* remedy here.   *Id.*

### 1.    New Context

To present a "new context," a case need only differ in some "meaningful way" from the three *Bivens* cases discussed above.   *Abbasi*, 137 S. Ct. at 1859.   Even differences that are "small, at least in practical terms," can indicate a "new context." *Id.* at 1865.   "[A] case can present a new context for *Bivens* purposes if it implicates a different constitutional right; if judicial precedents provide a less meaningful guide for official conduct; . . . if there are potential special factors that were not considered in previous *Bivens* cases," if it implicates a "new category of defendants," or if there were "alternative remedies" available to the plaintiffs.   *Id.* at 1857, 1865.   "[T]he rank of the officers involved; . . . the generality or specificity of the official action; . . . the statutory or other legal mandate under which the officer was operating; [and] the risk of disruptive intrusion by the Judiciary into the functioning of other branches" could also justify the conclusion that a case presents a "new context."   *Id.* at 1860.

The Plaintiffs assert that this case does not present a new context because it involves arrests unsupported by probable cause and therefore "does not differ meaningfully [from] *Bivens* itself."   ECF No. 30 at 3.   However, the plaintiff in *Bivens* challenged a warrantless arrest in a narcotics investigation.   403 U.S. at 389.   The Plaintiffs, by contrast, challenge their detention on board a foreign vessel, the restraints on their freedom upon entering the country, and the veracity of the warrants supporting their arrests as material witnesses—none of which were at issue

in *Bivens*.  Further, while the plaintiff in *Bivens* asserted only a Fourth Amendment claim, *see id.*, the Plaintiffs also assert claims under the Fifth, Sixth, and Thirteenth Amendments.

Additionally, the identity of the Individual Defendants strongly suggests that this case presents a new context.  Four of the Individual Defendants are Coast Guard officials, who are members of the military and thus generally not subject to liability under *Bivens*.  *See Abbasi*, 137 S. Ct. at 1859 (discussing *Chappell v. Wallace*, 42 U.S. 296 (1983)).  Three are prosecutors, who have never been recognized by the Supreme Court as proper defendants under *Bivens*.  And two Defendants are Customs and Border Protection officials, a category of defendants potentially implicating immigration and national security concerns, even if such concerns are not the focus of the dispute here.[26]  Thus, viewing this case as a whole, it is likely that "judicial precedents provide a less meaningful guide for official conduct" under the present circumstances than in an ordinary law enforcement situation such as the narcotics investigation at issue in *Bivens*.  *Id.* at 1864.  Accordingly, I conclude that this case presents a "new context" in all respects, which triggers a "special factors" analysis. *Id.* at 1865.

---

[26] The Individual Defendants also suggest that the identity of the Plaintiffs—non-citizen crew members of a foreign vessel—supports finding that this case presents a new context.  Recently, the Supreme Court declined to extend *Bivens* to a cross-border shooting in which a federal official on United States land shot and killed a Mexican citizen on foreign land.  *Hernandez v. Mesa*, 140 S. Ct. 735 (2020).  In that case, although the Court did not hold that non-citizens are categorically precluded from asserting *Bivens* claims, it noted that "the potential effect on foreign relations" is a factor counseling hesitation in *Bivens* cases, because "[t]he political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns."  *Id.* at 744 (quoting *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1403 (2018)).

## 2.      Special Factors Counseling Hesitation

Under the "special factors" analysis in *Abbasi*, the Court stated that "a *Bivens* action is not 'a proper vehicle for altering an entity's policy'" or challenging the "formulation and implementation of a general policy." *Id.* at 1860. The Court also recognized the availability of alternative remedies, including habeas relief, as a special factor. *Id.* at 1862−63. This case involves both of these special factors. The first is present because the Plaintiffs challenge the Coast Guard's policy of executing security agreements that cause crew members to remain in the United States in exchange for the release of a vessel, as well as the Individual Defendants' implementation of that policy. The second special factor is also present because there were additional remedies available to the Plaintiffs, including habeas relief, motions challenging their arrest warrants, and APPS awards arising out of the criminal proceeding. Indeed, the Plaintiffs have pursued each of these alternative remedies, suggesting that a *Bivens* remedy is unnecessary.

The Plaintiffs assert that habeas is not an adequate alternative remedy because it cannot compensate petitioners. But *Abbasi* forecloses this argument by specifically recognizing habeas relief as an alternative. *See id.* at 1863, 1865. The Plaintiffs further assert that habeas relief did not serve as an adequate alternative here because, during their detention, it did not actually lead to a decision on their claim that the Defendants obtained the material witness warrants by fraud. However, Zak was free to raise the arguments relating to the alleged fraud in the habeas proceeding, and the other Plaintiffs were free to do the same in their motions challenging the material witness warrants before the Magistrate Judge. Indeed, the

Plaintiffs raised substantially similar fraud claims in both the habeas proceeding and the proceedings related to the warrants, but they ultimately chose not to press these claims, opting instead to focus on their request for prompt depositions. Thus, even assuming that the adequacy of alternative remedies is relevant to the "special factors" analysis, I am not persuaded that the alternative remedies available to the Plaintiffs were inadequate.

Because I have determined that this case would extend *Bivens* to a new context and that special factors counsel hesitation, I conclude that a *Bivens* remedy is not available to the Plaintiffs.[27]  Accordingly, Count One is dismissed.

## E.   Count Six: The Racketeer Influenced and Corrupt Organizations Act

Count Six asserts that the Individual Defendants participated in an enterprise that engaged in a pattern of illegal racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C.A. § 1962(c).  Thus, in order to state a RICO claim, "a plaintiff must allege: (1) conduct, (2) of an enterprise, (3) through either a pattern of racketeering activity . . . or a single collection of an unlawful debt." *Home Orthopedics Corp. v. Rodríguez*, 781 F.3d 521, 528 (1st Cir. 2015) (internal quotation marks and alterations omitted). The plaintiff must also allege that he suffered "an economic injury" caused by "the

---

[27] Because I conclude that a *Bivens* remedy is unavailable in this context, I need not and do not address the Individual Defendants' arguments that they are entitled to qualified or absolute immunity on this claim.

defendant's racketeering conduct," *In re Celexa & Lexapro Marketing & Sales Practices Litig.*, 915 F.3d 1, 8, 12 (1st Cir. 2019), because only a person "injured in his business or property by reason of" a RICO violation may bring a civil action under RICO pursuant to 18 U.S.C.A. § 1964(c).

### 1.    Racketeering Activity

The allegations of "racketeering activity" in Count Six are based solely on the claims of peonage, involuntary servitude, and human trafficking asserted in Count Five.  ECF No. 3 ¶ 152; *see* 18 U.S.C.A. § 1961(1)(B) (defining "racketeering activity" to include "any act which is indictable under" 18 U.S.C.A. §§ 1581-1592).   Because I have determined that the Individual Defendants are entitled to qualified immunity with respect to those claims, I conclude that qualified immunity shields the Individual Defendants from RICO liability as well.  *See, e.g.*, *Cullinan v. Abramson*, 128 F.3d 301, 312 (6th Cir. 1997) (holding that qualified immunity protected city officials from RICO claim); *Gonzalez*, 172 F. Supp. 3d 477, 508-09 (D.P.R. 2016).

### 2.    Injury to Business or Property

The First Amended Complaint also fails to state a claim under RICO because it does not sufficiently allege that the Individual Defendants' conduct caused the Plaintiffs to suffer an injury to "business or property," as required by § 1964(c).  The Plaintiffs contend that the First Amended Complaint satisfies this requirement for several reasons.  First, they assert that the First Amended Complaint sufficiently alleges an injury to business or property because they "were confined to the Portland area for months against their will."  ECF No. 30 at 9.  But alleged confinement is not itself an economic loss.  *See Zareas v. Bared-San Martin*, 209 F. App'x 1, 2 (1st Cir.

2006) (per curiam) (explaining that "claims for personal injuries . . . are not 'business or property' and are not cognizable under RICO"); *Evans v. City of Chicago*, 434 F.3d 916, 927 (7th Cir. 2006) (characterizing a claim of false imprisonment as a personal injury claim for RICO purposes). Further, the Security Agreement required that the Plaintiffs continue to receive their wages, a daily meal allowance, and health care during their time in the United States. Thus, I conclude that the Plaintiffs' alleged confinement does not constitute an injury to "business or property" under § 1964(c).

The Plaintiffs also suggest that their alleged confinement caused them to suffer economic loss because their fear of being subjected to such detention again has driven them from their maritime careers. But economic losses, including loss of income, that derive from a plaintiff's personal injuries "do[] not constitute a cognizable injury to 'business or property' within the meaning of § 1964(c)." *Evans*, 434 F.3d at 927; *see Anderson v. R.J. Reynolds Tobacco Co.*, No. Civ.A. 99-11382-GAO, 1999 WL 33944684, at *2 (D. Mass. Sept. 20, 1999) (collecting authorities).

Further, the Plaintiffs argue that they suffered an injury to their property interests because Special Agent Root confiscated their passports and because the Security Agreement effectively seized and forcibly amended their employment contracts. Even assuming that the Plaintiffs had property interests in their passports and employment contracts, a complaint must allege a "concrete financial loss and not mere injury to a valuable intangible property interest" in order to meet RICO's economic injury requirement. *Crimson Galeria Ltd. P'ship v. Healthy Pharms, Inc.*, 337 F. Supp. 3d 20, 37–38 (D. Mass. 2018) (quoting *Maio v. Aetna*, 221 F.3d 472, 483 (3d Cir. 2000)). The Plaintiffs have not asserted any specific pecuniary loss as a result

of either the alleged seizure of their passports or the alleged seizure and amendment of their employment contracts.  *See id.*  Because confinement alone does not satisfy RICO's economic injury requirement, I conclude that the alleged injury to the Plaintiffs' interests in their passports and employment contracts also do not constitute injury to "business or property" under § 1964(c).

Finally, the Plaintiffs assert that the Individual Defendants' conduct injured their business and property interests by depriving them of employment opportunities after they returned to their home countries.  Specifically, the Plaintiffs contend that certain of the Individual Defendants served them with trial subpoenas, which required them to return to the United States for the trial of the vessel owner and operator and therefore prevented them from signing contracts to return to sea.  Assuming without deciding that such a loss of opportunity constitutes an injury to "business or property" under § 1964(c), *but see Evans*, 434 F.3d at 927, the alleged loss was caused by the service of trial subpoenas, not by the Defendants' conduct that the Plaintiffs have alleged to be racketeering activity.  Thus, even if the Individual Defendants' conduct could be deemed "racketeering activity," the Plaintiffs' alleged loss of employment opportunities would not support a civil RICO claim under § 1964(c), because that loss was not caused by the conduct that the Plaintiffs have argued constituted "racketeering activity."  *See Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992) (explaining that both but-for and proximate causation are required to establish a § 1964(c) claim).

The facts alleged in the First Amended Complaint are insufficient to support any of the Defendants' theories of injury to "business or property" as required by §

1964(c).  Thus,  I conclude that Count Six fails to state a claim under RICO and that the Individual Defendants are entitled to qualified immunity as to Count Six. Accordingly, Count Six is dismissed.[28]

### F.    Count Four: Declaratory and Injunctive Relief

Count Four seeks declaratory and injunctive relief for the alleged violations contained in Counts One, Two, Three, Five, and Six.  Because declaratory and injunctive relief are remedies rather than independent causes of action, they cannot be requested or established separately from liability on some other cause of action. *See Payton v. Wells Fargo Bank, N.A.*, Civil Action No. 12-11540-DJC, 2013 WL 782601, at *6 (D. Mass. Feb. 28, 2013) (citing *Diamond Phoenix Corp. v. Small*, No. 05-79-P-H, 2005 WL 1530264, at *4 (D. Me. June 28, 2005)); *accord Linton v. N.Y. Life Ins. & Annuity Corp.*, 392 F. Supp. 2d 39, 41 (D. Mass. 2005).  Accordingly, Count Four is dismissed as a stand-alone claim.

Of course, the Plaintiffs may still be entitled to declaratory relief if they ultimately prevail on any of their claims.[29]  The Government moves to dismiss the Plaintiffs' request for declaratory relief on the grounds that it would be "superfluous." ECF No. 23 at 24.  However, "federal courts retain substantial discretion in deciding

---

[28] Because I conclude that Count Six fails to state a claim for the reasons explained above, I do not address the Individual Defendants' additional arguments that they are absolutely immune from RICO liability, that the First Amended Complaint fails to sufficiently allege a RICO enterprise, and that the First Amended Complaint fails to sufficiently allege each Individual Defendant's personal participation in a RICO violation.

[29] Because, as I have already explained, I have resolved Counts 3, 5, and 6 against the Individual Defendants based on the "clearly established" prong of qualified immunity, I did not reach the question of whether the conduct underlying those claims was actually unlawful.  However, to the extent that the Plaintiffs seek declaratory relief on these Counts against the Individual Defendants, "there is no basis for suing a government official for declaratory . . . relief in his or her individual or personal capacity." *Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 19 (D.D.C. 2007); *see also Felt v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989).

whether to grant declaratory relief." *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 39 (1st Cir. 2006) (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 534 (1st Cir. 1995)).  "[T]he discretion to grant declaratory relief is to be exercised with great circumspection . . . when a request for relief threatens to drag a federal court prematurely into constitutional issues that are freighted with uncertainty." *Igartúa-De La Rosa v. United States*, 417 F.3d 145, 149 (1st Cir. 2005) (quoting *Ernst & Young*, 45 F.3d at 535).  Because the parties have not sufficiently addressed the constitutional questions raised by the Plaintiffs' claims in Count Two, and because the record has not been developed by discovery, I decline to act on the Plaintiffs' request for declaratory relief at this stage.

The Plaintiffs' request for injunctive relief, by contrast, must be dismissed for lack of standing.  "To have standing to pursue injunctive relief, a plaintiff must 'establish a real and immediate threat' resulting in 'a sufficient likelihood that [s]he will again be wronged in a similar way.'" *Gray v. Cummings*, 917 F.3d 1, 19 (1st Cir. 2019) (alteration in original) (quoting *Am. Postal Workers Union v. Frank*, 968 F.2d 1373, 1376 (1st Cir. 1992)).  "Past injury, in and of itself," does not suffice.  *Id.*  The Amended Complaint does not allege any facts suggesting that the Plaintiffs are likely to be detained in the United States in connection with a pollution event again.  To the contrary, it alleges that the Plaintiffs "have been driven from their maritime careers."  ECF No. 3 ¶ 144.  Because the Amended Complaint does not allege that the Plaintiffs face a real and immediate threat of similar future harm, the Plaintiffs lack standing to pursue injunctive relief.

## IV. CONCLUSION

For the reasons explained above, it is **ORDERED** that the Government's motion to dismiss (ECF No. 23) is **DENIED IN PART**, with respect to:

- the false arrest, false imprisonment, and IIED claims asserted against the United States in Count Two;

- the abuse of process claim asserted against the United States in Count Two, to the extent that it arises out of the alleged conduct of Special Agent Root; and

- the Plaintiffs' request for declaratory relief on these surviving claims.

The Government's motion is **GRANTED IN PART**, with respect to all other claims asserted against the Government in the Amended Complaint, as well as the Plaintiffs' request for injunctive relief.  It is further **ORDERED** that the Individual Defendants' motion to dismiss (ECF No. 21) is **GRANTED**. Additionally, as noted above, the Government has agreed that its motion (ECF No. 23) should not be construed as a motion for summary judgment.  Accordingly, it is **ORDERED** that the Government's motion for leave to file a supplemental statement of fact (ECF No. 45) and the Government's motion for leave to file transcripts (ECF No. 51) are **DENIED AS MOOT**.


**SO ORDERED.**

**Dated this 20th day of October, 2020.**

                                      **/s/ JON D. LEVY**
                                **CHIEF U.S. DISTRICT JUDGE**