## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| JAROSLAV HORNOF, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | No. 2:19-CV-198-JDL |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Defendant.* | ) | |

### UNITED STATES' MOTION FOR SUMMARY JUDGMENT
### AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 56, Local Rule 56, and the Court's Order and Report of Conference, ECF No. 150, the United States of America respectfully moves for summary judgment on all remaining claims asserted by Plaintiffs Jaroslav Hornof, Damir Kordic, and Lucas Zak. The government submits that the undisputed facts make it impossible for Plaintiffs to satisfy key elements of the tort claims that they assert and that summary judgment in the United States' favor is appropriate.

### BACKGROUND

**I.     MST's "Voluntary" Disclosure**

In July 2017, Plaintiffs Jaroslav Hornof, Damir Kordic, and Lucas Zak were employed by German ship management company MST Mineralien Schiffarht Spedition Und Transport GmbH (MST) aboard the commercial cargo vessel *M/V Marguerita*. JSOF, ¶¶ 1-2. They worked in the ship's engine room, JSOF, ¶ 1:

- Kordic, an oiler, had a six-month contract that began on April 11, 2017, and would expire in mid-October. JSOF, ¶¶ 11-12; USSOF, ¶ 10. He was neither a U.S. citizen, nor a legal resident of the United States. USSOF, ¶ 14.

- Zak was a wiper. JSOF, ¶ 6. His contract started on September 17, 2016, ostensibly for six months, but it had been extended which is why he remained on the vessel in July 2017.

JSOF, ¶¶ 6-7.  Zak was scheduled to conclude his service on the *M/V Marguerita* on July 8, 2017, in the Port of Portland and depart the United States by plane.  JSOF, ¶ 8.  Like Kordic, Zak was neither a U.S. citizen, nor a legal resident of the United States.  USSOF, ¶ 8.

- Hornof joined the engine department on May 12, 2017, as a third assistant engineer.  JSOF, ¶ 4.  His contract specified a "[p]eriod of employment" of "4 months (-1)."  USSOF, ¶ 3.  He had previously served on other MST ships, including the *M/V Tanja* in 2016, the *M/V Yulia* in 2015, the *M/V Anette* in 2014, and the *M/V Nina-Marie* in 2013.  USSOF, ¶ 4.  Hornof and Zak knew each other from their having worked together on the *M/V Yulia*.  USSOF, ¶ 6.  Like the other two, Hornof was neither a U.S. citizen, nor a legal resident of the United States. USSOF, ¶ 1.

Large vessels such as the *Marguerita* generate oily waste when bilge water in the ship's machinery spaces mixes with oil that leaks from the engine and other machinery, lubrication, and fuel systems.  USSOF, ¶ 16.  Before oil-contaminated bilge water can be safely released into the sea, it must be collected, stored, and processed to remove the oil and other contaminants.  USSOF, ¶ 17.  This is accomplished using a device known as an Oil-Water Separator (OWS).  *Id.*  The Act to Prevent Pollution from Ships (APPS), requires that all disposals or transfers of machinery space bilge water be recorded in the vessel's Oil Record Book (ORB).  33 U.S.C. § 1908(a); USSOF, ¶ 18.

When Hornof joined the *Marguerita*, he learned that its chief engineer was directing the engine room crew to dispose of untreated, oil-contaminated bilge waste from the vessel directly into the ocean.  USSOF, ¶ 19.  The chief engineer, a Croatian national named Anton Barbarovic, had implemented a system of pumps, modified piping, and flexible hoses that were used to route oily bilge water from the Bilge Water Holding Tank into the Grey Water Sewage Holding Tank.  USSOF, ¶ 20.  The contaminated waste was emptied directly into the ocean, circumventing the OWS.  *Id.*  These transfers and discharges were not recorded in the vessel's ORB, but instead entries were falsified to conceal the activity.  USSOF, ¶ 21.  The inaccurate ORB violated APPS each time the *Marguerita* entered our Nation's waters.  JSOF, ¶ 82.

Zak shared with Hornof that the bilge tank's contents were being discharged overboard without filtration through the ship's pollution control equipment.  USSOF, ¶ 22.  Hornof examined the piping and hoses, collected samples from the tanks involved, questioned the junior employees involved in the operation, reviewed engine room records, and made video recordings of the operation.  JSOF, ¶ 17.  On May 22, 2017, Hornof confronted the chief engineer about the improper bilge waste disposal.  JSOF, ¶ 19; USSOF, ¶ 23.  Barbarovic replied that he had done this for years and knew what he was doing.  USSOF, ¶ 24.  Barbarovic continued to direct his crew to dispose of the bilge waste improperly.  *Id.*  Hornof reported the activity to the vessel's master.  JSOF, ¶ 21.  On May 24, 2017, the master sided with the chief engineer and told Hornof that everything was "absolutely correct and everything is recorded in [the] oil record book."  USSOF, ¶ 25.  Frustrated, Hornof went over the master's head and reported the conduct to an MST superintendent.  JSOF, ¶ 23.

On June 19, 2017, MST's corporate compliance officer notified the United States government that:

> [e]arlier today, Monday, June 19, 2017, in accordance with shipboard reporting requirements, MST Mineralien Schiffahrt Spedition und Transport GmbH received an unsigned, one-paragraph type-written note from the Third Engineer alleging that the vessel's Chief Engineer had not accurately recorded the handling of vessel's bilge water in the Oil Record Book.  As of this time, incomplete information has been received concerning the suspicious conduct and a comprehensive investigation into the incident has been initiated by the vessel's Owner and Manager.

USSOF, ¶ 26.  The notification advised that Compliance Systems, Inc. would be conducting a third-party audit, that a copy of the auditor's report and findings would be provided once available, and MST "will update and/or amend this initial report as additional facts and information becomes known."[1]  USSOF, ¶ 27.

---

[1] MST was on probation following its conviction one year earlier in the District of Minnesota of a similar

3

MST provided the video footage and other evidence to Compliance Systems, but not to the United States Government. USSOF, ¶ 30. Compliance Systems conducted its audit from June 24-26, 2017, while the ship was in Beleem, Brazil. USSOF, ¶ 29. Barbarovic admitted to auditors that he intentionally discharged bilge waste overboard through the gray water system as recently as June 2, 2017. JSOF, ¶ 33; USSOF, ¶ 31. At this time, the *Marguerita* would have been en route from British Columbia to Vila Do Conde, Brazil via the Panama Canal, off of the west coast of Canada and the United States. USSOF, ¶ 32.

On June 28, 2017, MST lawyer George Chalos sent a letter to the United States Coast Guard, characterized as a "Voluntary Disclosure," which advised that in late May the master of the *Marguerita* had been alerted by a crewmember of "*an* alleged incident involving possible *unrecorded* discharge(s) of bilge water." USSOF, ¶ 36. The letter stated that "an appropriate entry . . . to fully, accurately and contemporaneously memorialize the situation" had been made in the vessel's ORB. *Id.* It referenced the Compliance Systems' audit, confirmed that "[p]reliminary findings . . . seem to corroborate (at least in part) some the allegations [sic] learned from the Third Engineer," and stated that a more complete report would be provided.[2] *Id.*

## II.   The *M/V Marguerita*'s July 2017 Port Call in Portland, Maine and the U.S. Coast Guard's Port State Control Examination

When the Marguerita arrived in Portland on July 7, 2017, JSOF, ¶ 37, the crew was initially "detained on board the vessel," *i.e.*, they could not disembark until an immigration officer

---

crime on the Great Lakes. USSOF, ¶ 28. Its probation included an Environmental Compliance Plan that required both the third-party audit and notification to the United States government of the allegations involving the *Marguerita*. *Id.*

[2] In some instances, the Coast Guard or Department of Justice will decline to pursue violations that are self-disclosed and satisfactorily addressed by the self-reporting entity. USSOF, ¶ 36 n.1. In this case, the agencies ultimately determined that MST's disclosure did not fully comport with the Coast Guard's voluntary disclosure policy. *Id.*

permitted them to land.   8 C.F.R. § 252.1(a).   Officials from the U.S. Customs and Border Protection (CBP) agency boarded the vessel shortly after its arrival.   JSOF, ¶ 38.   CBP granted crewmembers, including the plaintiffs, landing privileges via CBP Form I-95s, also known as shore passes.   JSOF, ¶ 39.   Hornof and Kordic were issued D-1 shore passes, permitting temporary shore leave.   8 C.F.R. § 252.1(d); JSOF, ¶¶ 40, 42.   Zak, whose contract was drawing to a close, received a D-2 shore pass, which allows a foreign crewmember to temporarily land for the purpose of leaving the country on a different vessel or via another means of transportation, such as by air. 8 C.F.R. § 252.1(d); JSOF, ¶¶ 41-42.

At approximately 1:45 p.m., four uniformed U.S. Coast Guard inspectors boarded the *Marguerita* to perform a Port State Control Examination.   USSOF, ¶ 38.   At the time, CBP personnel were wrapping up paperwork.   USSOF, ¶ 39.   The master and ship's agent had been advised that the vessel's departure clearance would be withheld pending completion of the Coast Guard's examination.   *Id.*   The inspectors proceeded with their examination, which included inspection of the vessel's ORB.   USSOF, ¶ 40.   A June 19, 2017 entry stated:

> On June 19, 2017, a type-written note from a member of the engineering department was received by the vessel's manager in accordance with the vessel's safety management system and reporting requirements.   The note alleged that the handling of vessel's bilge water had not been accurately memorialized in the Oil Record Book.   The matter is under investigation and has been reported to the Vessel's Flag Administration and Classification Society.   One or more entry(s) in the Oil Record Book may be inaccurate and/or missing and the contents of the book should not be relied on at present.

JSOF, ¶ 45.

Based on the boarding team's findings, the Coast Guard elected to perform a more detailed inspection, referred to as an expanded MARPOL examination.   USSOF, ¶ 41.   Additional federal personnel, including a member of the Coast Guard Investigative Service, boarded and participated. USSOF, ¶ 42.

The master advised inspectors that Matthew Long of Compliance Systems had conducted an audit and provided Long's contact information, however, when they contacted Mr. Long, he declined to discuss the matter, referring them to Attorney George Chalos.  USSOF, ¶¶ 43-44.

The master also made Hornof available to the inspectors, who interviewed him on Friday, July 7, 2017.  JSOF, ¶ 46; USSOF, ¶ 45.  Hornof explained that he had learned from Zak that the chief engineer was directing the crew to circumvent the OWS.  USSOF, ¶ 45.  He told them that on May 22, 2017, he had recorded video footage of this operation on his personal tablet, and he shared his video with them.  JSOF, ¶ 48.  Hornof also located the pump and hoses used in the operation and gave these items to the Coast Guard.  JSOF, ¶ 50.

On the evening of July 7, 2017, the Coast Guard Captain of the Port notified the CBP Area Port Director that Coast Guard marine inspectors had boarded the *Marguerita* and, in the course of their inspection, developed probable cause to believe that criminal violations had occurred. USSOF, ¶ 47.  The Coast Guard requested that CBP place a customs hold on vessel and crew. JSOF, ¶ 51.  CBP complied.  JSOF, ¶ 53; USSOF, ¶ 48.

CBP officials revoked the crew's shore passes on July 8, 2012.  USSOF, ¶ 48.  To effect revocation, CBP replaced Plaintiffs' Form I-95s with new ones stating that "[p]ermission to land temporarily at all U.S. ports is refused."  *Id.*  The new Form I-95s also had an "M" denoted for type, JSOF, ¶ 56, which stands for "mala fide," as opposed to "bona fide."[3]  JSOF, ¶ 61.  Upon revoking the shore passes, CBP provided the shipping agent, Chase Leavitt, with a CBP Form I-259 (Notice to Detain, Remove, or Present Alien), which provided notice that the crew was to be

---

[3] CBP defines mala fide as "[b]ad faith, the exact opposite of bona fide."  USSOF, ¶ 50.  CBP designates a crewman as "mala fide" when there is potential risk associated with his presence in the United States. USSOF, ¶ 51.  Here, CBP considered the crew to be mala fide because of the potential that each could be a witness or target of the Coast Guard's ongoing investigation, which raises a question as to whether the crew was acting in good faith.  USSOF, ¶¶ 52-53.

detained onboard the vessel.   JSOF, ¶¶ 57-58.   Each crew member's visa classification was designated as "DOB(M)," which stands for "detained on board (male fide)," JSOF, ¶¶ 59-61, meaning that the crew was remanded to the vessel.   USSOF, ¶ 49.

Revocation of the shore passes put the crew in nearly the same position that they were in when the vessel originally called.   USSOF, ¶ 54.   As before, they could move about the vessel as they wished, but they could not disembark.   *Id.*   In addition, they had to muster twice a day. USSOF, ¶ 55.   While onboard a vessel, crew member passports are typically held by the ship's master.   That was true here, and the practice continued.   USSOF, ¶ 57.

The Coast Guard's expanded examination lasted several days.   USSOF, ¶ 58.   Inspectors collected oil samples, which would reveal oil in valves where graywater is discharged, a place where oil should never be found.   USSOF, ¶ 59.   On July 12, 2017, the Coast Guard referred the matter to the U.S. Department of Justice for potential prosecution.   USSOF, ¶ 60.   The same day, Compliance Systems provided a copy of its audit report to MST and the government.   USSOF, ¶ 61.   Activities related to the Coast Guard's inspection, investigation, and collection of evidence from the ship continued through July 15, 2017.   USSOF, ¶ 62.   At all times, the Coast Guard was respectful, courteous, and friendly.   USSOF, ¶ 63.   They never threatened, yelled at, touched, physically assaulted, or forcibly restrained Plaintiffs.   *Id.*

The Coast Guard negotiated a surety agreement ("Agreement on Security") with the *Marguerita's* owner and operator, which allowed the vessel to leave the United States' waters while the investigation proceeded.[4]   USSOF, ¶ 64.   The Agreement also identified crewmembers who were witnesses to the events under investigation.   USSOF, ¶ 65.   MST agreed to ask that these

---

[4] Title 33, U.S. Code, Section 1908(e) authorizes the Coast Guard to keep a vessel in port during an investigation and criminal prosecution, so that the United States does not lose jurisdiction in the criminal case, and so that prosecutors have access to necessary evidence and witnesses.   Obviously, it would be fatal to the government's criminal case were the vessel permitted to sail away with the evidence against it.

employee-witnesses to remain in Portland to support the investigation. *Id.* MST was to continue their employment, by paying their salaries and benefits, and provided them with lodging, a per diem allowance, and medical benefits. *Id.* In effect, MST released the witnesses from their shipboard duties, but kept them on the payroll at the government's request so as to gain release of the vessel.

The Agreement also provided that MST was to ask crewmember witnesses to surrender their passports. USSOF, ¶ 66. If any witness refused or requested return of their passport, the government was to be advised. *Id.*; USSOF, ¶ 70. MST concurred in this, and the Agreement on Security was executed on July 14, 2017. JSOF, ¶ 63.

On July 8, 2017, Attorney Edward MacColl boarded and advised the Coast Guard that he was representing the ship's owner and operator, as well as its insurance underwriter. USSOF, ¶ 72. Later in the day, a Coast Guard attorney sought clarification as to exactly who Attorney MacColl was representing. USSOF, ¶ 73. He responded that he had "been asked by Mr. Chalos and the ship's owners and managers to assist Mr. Chalos in representing the vessel interests and her crew." *Id.* On July 13, 2017, the MST's local agent, the Chase Leavitt firm in Portland, advised CBP officials that "the *Marguerita* crew are being represented by local P&I lawyers Thompson MacColl" who "would like to be copied in or contacted with any aspects regarding crew movement." USSOF, ¶ 74. CBP requested that Attorney MacColl provide forms G-28 for each individual he was representing. USSOF, ¶ 75. On July 13, 2017, Attorney MacColl submitted two forms only, one for Zak and another for a crewmember-witness not party to this case. *Id.* On July 16, 2017, Mr. MacColl clarified that he had "been formally retained and appointed by the company to represent all nine crewmembers as part of the company's perceived obligation to them." USSOF, ¶ 76.

MST did not indicate to the Coast Guard or the prosecutors that any of the identified employee-witnesses had declined its request, pursuant to the surety agreement, to remain in Maine or surrender his passport for safekeeping.  USSOF, ¶ 77.  However, on July 14, 2017, Zak, whose contract with MST was at an end, petitioned for a writ of habeas corpus, prompting the Coast Guard and DOJ prosecutors to conclude that he was unwilling to remain in Portland to assist with the investigation.  USSOF, ¶ 78.  Prosecutors promptly sought and received a material witness warrant for Zak from the Court on July 17, 2017.  USSOF, ¶ 79.  Zak was arraigned and released, subject to certain conditions, one of which was that his passport be surrendered to the custody of the Coast Guard.  USSOF, ¶ 80.

The crewmember witnesses, including Zak, were paroled into the United States, and the *Marguerita* departed.  USSOF, ¶ 81.  They were not United States citizens, and their C1/D visas did not authorize them to stay in the country other than for brief port calls.  *Id.*  If the witnesses were to remain in the United States to cooperate in the investigation and potential prosecution, it was incumbent on the United States government to grant them an appropriate immigration status. *Id.*  To do so, the Coast Guard Investigative Service (CGIS) applied to the Immigration and Customs Enforcement (ICE) agency for Significant Public Benefit Parole (SPBP) for each.  *Id.* Because ICE requires fourteen days to review, research, verify, document and issue a SPBP request, CGIS applied to CBP to issue a temporary (or "emergency") parole.  USSOF, ¶ 83.

CBP issued temporary paroles on July 16, 2017, expressly conditioning its grant of parole on a provision that required CGIS to hold the parolees' passports.  USSOF, ¶¶ 84, 89.  Chase Leavitt arranged for transportation to get the crewmember witnesses to the CBP office, where they were paroled.  USSOF, ¶ 85.  As with the issuance of their shore passes upon the *Marguerita*'s initial arrival in port in Portland, the issuance of the plaintiffs' temporary parole documents was

an administrative process.  USSOF, ¶ 86.  CBP completed forms, took the witnesses' fingerprints, and gave them documentation of their parole status.  *Id.*  The master who had held the crew's passports on the vessel gave them to CBP officials, who in turn handed them to CGIS Special Agent Mark Root.  USSOF, ¶ 87.

When processing was complete, plaintiffs went to a local hotel, where they would reside for about two months.  USSOF, ¶ 85.  During their stay at the hotel, CGIS checked on them once a day.  USSOF, ¶ 91.  Otherwise, they were free to move about the State.  USSOF, ¶ 92.

## III. The Grand Jury Investigation and Criminal Prosecution of the *M/V Marguerita*'s Owner and Operator

The criminal investigation proceeded apace.  Plaintiffs testified before the Grand Jury on August 9 and August 22, 2017.  USSOF, ¶ 102.  MST was indicted on August 22, 2017, and charged with multiple violations of APPS, 33 U.S.C. § 1908(a), as well as one count of Obstruction of Justice, 18 U.S.C. § 1519.  JSOF, ¶¶ 80-81.

Hornof was initially willing to cooperate with the criminal investigation, however, on July 30, 2017, his wife's mother died.  USSOF, ¶ 94.  On August 3, 2017, his counsel sought assurance that Hornof's participation in the investigation would be concluded by October 1.  USSOF, ¶¶ 95-96.  On August 5, this too changed, and the government was advised that Hornof preferred to leave immediately.  JSOF, ¶ 74.  As Hornof's presence was no longer voluntary, prosecutors sought and received a material witness warrant for his arrest on August 9, 2017.  USSOF, ¶ 99.  Similarly, a material witness warrant for Kordic was issued August 21, 2017, after he too requested return of his passport.  USSOF, ¶ 100.  Conditions of release for Hornof and Kordic included a requirement that their passports be surrendered to the custody of the Coast Guard.  USSOF, ¶ 101.

Plaintiffs challenged the material witness warrants.  JSOF, ¶ 84.  After accepting briefing

and hearing argument, Magistrate Judge John Rich III ordered that they be deposed within thirty days, after which they could depart the United States.  JSOF, ¶ 85.  Plaintiffs were deposed on September 11 and 12, 2017, and they left on September 14.  JSOF, ¶¶ 86-87.

## IV.    Events Following Plaintiffs' Departure from the United States

Plaintiffs returned to Maine to testify at trial in May 2018, but this proved unnecessary. JSOF, ¶ 88.  On the eve of trial, MST agreed to plead guilty to Obstruction of Justice—the most serious count—pursuant to a plea agreement.  USSOF, ¶ 109.  Plaintiffs filed pleadings contending that they were victims of MST's crimes, and they objected to the plea agreement, because without a guilty plea to an APPS count they were not eligible for whistleblower awards.  USSOF, ¶ 110. This caused the Court to reject the proposed plea deal.  JSOF, ¶ 91.

Prosecutors and MST went back to the drawing board, and on November 2, 2018, MST pleaded guilty to one count of violating APPS and one count of obstruction of justice.  JSOF, ¶ 92. All other counts of the indictment were dismissed.  *Id.*  The Court imposed a $3,200,000 fine and a four-year term of probation, a condition of which included yet another Environmental Compliance Plan.  USSOF, ¶ 112.  $500,000 of the criminal fine was imposed for the APPS violation, leaving the remaining $2,700,000 to rest on the obstruction of justice charge.  USSOF, ¶ 113.

Plaintiffs moved the Court to award a portion of the fine to the plaintiffs, pursuant to the APPS award provision, and Plaintiffs' counsel sought permission to retain 15 percent of the any award as compensation for his legal representation (over and above any sum that MST or its underwriters might have paid him).  USSOF, ¶ 114.  The government objected to the award. USSOF, ¶ 132.  While prosecutors acknowledged that the plaintiffs had cooperated with the prosecution in many ways, other aspects of their conduct had diminished the utility of their

assistance, to the point of jeopardizing the viability of the entire case.  *Id.*  Nonetheless, over the government's objection, the Court awarded Hornof $250,000, while Kordic and Zak each received $12,500.  USSOF, ¶ 134.  In addition, Hornof received a "whistleblower gratification" from MST in the amount of $20,000.  USSOF, ¶ 135.

## V.      Procedural Posture of the Instant Lawsuit

On May 6, 2019, Plaintiffs filed this lawsuit against the United States and numerous government officials individually.  The individual defendants moved to dismiss, ECF No. 21, and the government moved to dismiss or for summary judgment.  ECF No. 23.  On October 20, 2020, the Court granted the individual defendants' motion.  ECF No. 61 (Order on Motions to Dismiss), at 54.  The government's motion was granted in part and denied in Part.  *Id*.  The remaining claims include:  the false arrest, false imprisonment, and IIED claims asserted against the United States in Count Two; the abuse of process claim asserted against the United States in Count Two, to the extent that it arises out of the alleged conduct of Special Agent Root; and Plaintiffs' request for declaratory relief on these surviving claims.  *Id*.

## DISCUSSION

## I.      Federal Officials Are Required to Enforce the Act to Prevent Pollution from Ships

The United States is signatory to the International Convention for the Prevention of Pollution from Ships (MARPOL), 1340 U.N.T.S. 62, 184 (1983), a multilateral international treaty that imposes strict pollution controls upon vessels engaged in international trade.  Congress implemented MARPOL by passing the Act to Prevent Pollution from Ships (APPS).  33 U.S.C. §§ 1901-15.  APPS states that the Secretary of Homeland Security "shall administer and enforce" the treaty, as well as statutes and regulations designed to preserve the marine environment.  33 U.S.C. § 1903(a).  *See also* 33 C.F.R. Subchapter O, pt. 151, subpart A (Coast Guard implementing regulations).  It provides that "[u]pon receipt of evidence that a violation has occurred, the

Secretary shall cause the matter to be investigated." 33 U.S.C. § 1907(b). "Upon completion of the investigation, the Secretary shall take the action required by the MARPOL Protocol . . . and whatever further action he considers appropriate under the circumstances. *Id*.

Plaintiffs' participation in the underlying investigation and later prosecution was critical. As plaintiffs recognize, "Mr. Hornof provided information that was vital to the government's case." USSOF, ¶ 116. "Mr. Zak, a junior engine room employee, disclosed to him ongoing improper discharges on the high seas." USSOF, ¶ 117. "Mr Hornof . . . observed the vessel's chief engineer direct the arranging of pipes and hoses to discharge oily bilge water through the vessel's so-called gray water system." USSOF, ¶ 118. Hornof "confronted the chief engineer, told the chief engineer he was violating the laws implementing the international anti-pollution treaties known as MARPOL, and that he must stop." USSOF, ¶ 119. "When the chief engineer persisted, Mr. Hornof reported the misconduct to the captain and to MST, the ship's manager and one of the defendants in this case." USSOF, ¶ 120. "He videotaped the improper discharges and took samples." USSOF, ¶ 121. Concerned the captain's response might be insufficient, "Mr. Hornof continued to confront the chief engineer and took additional video recordings." USSOF, ¶ 122. Without a doubt, plaintiffs were essential witnesses.

Plaintiffs' obligation to testify was unaffected by their status as aliens. In *Hurtado v. United States*, 410 U.S. 578, 579 (1973), for example, "petitioners, citizens of Mexico, entered the United States illegally. To assure their presence as material witnesses at the trials of those accused of illegally bringing them into this country, they were required to post bond . . . . Unable to make bail, they were incarcerated." The *Hurtado* material witnesses were made to testify because "it is clearly recognized that the giving of testimony and the attendance upon court or grand jury in order to testify are public duties which *every person within the jurisdiction of the Government is bound*

13

*to perform upon being properly summoned . . . ."* *Blair v. United States*, 250 U.S. 273, 281 (1919) (emphasis added). Plaintiffs in this case were likewise in our jurisdiction.

All three came to the United States of their own volition, as crewmembers on an ocean-going commercial cargo vessel. They had witnessed environmental crimes that had occurred onboard at the vessel at the chief engineer's direction. The United States sought their assistance as witnesses in the investigation and prosecution of their employer, MST, a foreign shipping corporation with a history of such criminal activity. Essentially, Plaintiffs faced a choice between electing to do so voluntarily or insisting that the government seek material witness warrants. (Had the Court denied the requests for warrants, the prosecution would have been stymied. But that did not happen as warrants were eventually issued for all three plaintiffs.)

## II. While the Federal Tort Claims Act Waives Sovereign Immunity, It Remains Subject to Exceptions

Sovereign immunity is jurisdictional in nature. *Fed. Deposit Ins. Co. v. Meyer*, 510 U.S. 471, 475 (1994).[5] Plaintiffs' remaining tort claims are brought under the Federal Tort Claims Act. 28 U.S.C. §§ 1346(b), 2671-80. The FTCA authorizes suits against the United States for damages "caused by the negligent or wrongful act or omission of any employee of the Government." 28 U.S.C. §§ 1346(b)(1). This waiver is, however, subject to certain qualifications, as discussed below.

### A. Constitutional Claims Are Not Cognizable Under the FTCA

---

[5] *See also Reyes-Colon v. United States*, 974 F.3d 56, 58 (1st Cir. 2020) (a lack of subject-matter jurisdiction basically means a court is without authority to decide a case); *Limone v. United States*, 579 F.3d 79, 88 (1st Cir. 2009) ("Federal courts lack jurisdiction over tort actions against the United States except insofar as the sovereign has consented to be sued."). The Federal Tort Claims Act waives sovereign immunity – subject to certain exceptions – for certain tort claims against the United States. *See Soto-Cintron on behalf of A.S.M. v. United States*, 901 F.3d 29, 33 (1st Cir. 2018) (FTCA provides a "limited congressional waiver of the sovereign immunity of the United States for tortious acts and omissions committed by federal employees acting within the scope of their employment.").

The FTCA does not waive sovereign immunity for constitutional violations. *Meyer*, 510 U.S. at 477-78. *See also Hernandez v. United States*, 939 F.3d 191, 205 (2d Cir. 2019) ("The FTCA 'has not waived [the Government's] sovereign immunity with respect to claims that its employees have committed constitutional torts' under the federal constitution.") (citation omitted); *Tapia-Tapia v. Potter*, 322 F.3d 742, 745-46 (1st Cir. 2006) (sovereign immunity bars claims against the United States for alleged constitutional violations); *Washington v. Drug Enforcement Admin*., 183 F.3d 868, 873-74 (8th Cir. 1999) (no private cause of action under the FTCA for DEA agents' constitutional violations who searched a residence because constitutional torts are not cognizable under the FTCA); Calderon-Lopez, 303 F. Supp. 2d 212, 220 (D.P.R. 2018) ("The FTCA, however, is an improper basis for the constitutional tort claims."); *Miller v. District of Columbia*, 39 F. Supp. 3d 308, 312-13 (D.D.C. 2018) (no waiver of sovereign immunity where the U.S. Constitution provides the source of liability); *Omran v. United States*, No. 14-13881, 2015 WL 1523587, at *8 (D. Mass. Mar. 31, 2015) ("*Bivens* is the method by which constitutional tort claims are brought, while claims for negligence and certain intentional (but not constitutional) torts are brought under the FTCA."). By its terms, the FTCA "does not extend or apply to a civil action against an employee of the Government . . . brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2). For this reason, the Eleventh Circuit recently held, "the FTCA addresses violations of state law by federal employees, not federal constitutional claims." *Shivers v. United States,* 1 F.4th 924, 928 (11th Cir. 2021). The Second Circuit has opined that "[t]he FTCA 'has not waived [the Government's] sovereign immunity with respect to claims that its employees have committed constitutional torts' under the federal constitution." *Hernandez v. United States*, 939 F.3d 191, 205 (2d Cir. 2019). Similarly, the First Circuit rejected an appellant's argument that his constitutional claims swept more broadly than did his claim under a federal

statute.  *See Tapia-Tapia v. Potter*, 322 F.3d 742, 745-46 (1st Cir. 2006) ("appellant's constitutional claims are still foreclosed.").

That said, as discussed below, the government's conduct in this case violated neither Maine state tort law nor Plaintiffs' Fourth Amendment rights.  The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  Fourth Amendment rights fall along a continuum. They do not apply to searches and seizures of aliens in international waters.  *United States v. Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir. 2008) (quoting *United States v. Bravo*, 489 F.3d 1, 8 (1st Cir. 2007)); *see also United States v. Verdugo-Urquidez,* 494 U.S. 259, 274-75 (1990). However, once an alien has come into the United States and "developed substantial connections with this country," he receives constitutional protections.  *Verdugo-Urquidez*, 493 U.S. at 271. Whether an alien has developed substantial connections with the United States depends, in part, on if the alien's presence in this country is voluntary.  *Id*. at 272-73 (finding defendants "lawful but involuntary" presence in the United States is not the sort to indicate substantial connections).

"The Fourth Amendment is not, of course, a guarantee against all searches and seizures, but only against unreasonable searches and seizures."  *United States v. Sharpe*, 470 U.S. 675, 682 (1985).  Moreover, Consent to the government's action is one exception to the Fourth Amendment requirements of both a warrant and probable cause.  *See*, *e.g*., *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (consensual search falls within the exception); *United States v. Meléndez*, 301 F.3d 27, 32 (1st Cir. 2002) (same).

## B.     Discretionary Function Exception

Another limitation placed on the FTCA's general waiver of sovereign immunity is the discretionary function exception.  *See* 28 U.S.C. § 2680(a), *Kelly v. United States*, 924 F.2d 355,

16

360 (1st Cir. 1991) ("When a claim is covered by the discretionary function exception, it must be dismissed for lack of subject matter jurisdiction.").  That exception applies to "any claim . . . based on the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  *Magee v. United States*, 121 F.3d 1, 4 (1st Cir. 1997) (quoting 28 U.S.C. § 2680(a)).

Conduct is not discretionary if the United States Constitution or a federal statute, regulation or policy specifically proscribes the challenged course of action taken by a government employee. *Limone*, 579 F.3d at 101 ("It is elementary that the discretionary function exception does not immunize the government from liability for actions proscribed by federal statute or regulation . . . Nor does it shield conduct that transgresses the Constitution.").  Apart from that, even discretion that is exercised in a negligent manner does not render the discretionary function exception inapplicable. *See Attallah v. United States*, 955 F.2d 776, 784 n.13 (1st Cir. 1992).

As the United States argued in its earlier motion to dismiss, the discretionary function exception generally shields decisions concerning the manner and reach of an investigation or prosecution.  ECF No. 23 at 18-20.  The Court in its Order on Motions to Dismiss observed that "[t]he relationship between the discretionary function exception and the law enforcement proviso is not clear, and the Circuit Courts are divided on the question of whether the discretionary function exception can bar liability for the enumerated torts arising from the conduct of law enforcement officers, for which the FTCA would otherwise waive immunity pursuant to the law enforcement proviso." ECF No. 61 at 18.  "The First Circuit has not considered the issue.  It is unclear whether, in the First Circuit, the FTCA's discretionary function exception applies to tort claims arising out of the conduct of law enforcement officers." *Id*. at 19.

The United States respectfully submits that the Court need not reach the discretionary function exception because the United States did not act negligently, nor did it commit any manner of intentional tort. Each of the involved agencies was fulfilling its proper role. The Coast Guard had an obligation to investigate evidence of an environmental crime, CBP had to keep track of the crew member-witnesses who were paroled into the country, and DOJ had to obtain admissible evidence to enforce the law. In the areas of maritime law enforcement, immigration, and criminal prosecution, the powers of CPB, Coast Guard, and DOJ, respectively, are at their zenith. *See*, *e.g.*, *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 495 (2015) (finding that while judicial review of administrative action is the norm in our legal system, the scope of the review can be narrow when the law gives an agency discretion); *Angelex Ltd. v. United States*, 272 F. Supp. 3d 64, 76 (D.D.C. 2017), *aff'd*, 907 F.3d 612 (D.C. Cir. 2018) ("To be sure, Congress gave DHS and the Coast Guard wide discretion in setting the conditions for reinstating a vessel's departure clearance, and that feature is significant in assessing the proper standard for review.").

## C.     Intentional Tort Exception and Law Enforcement Proviso

For the most part, the FTCA excepts intentional torts from its waiver of sovereign immunity. *See* 28 U.S.C. § 2680(h); *Escalera-Salgado v. United States*, 911 F.3d 38, 40 (1st Cir. 2018) ("In general, the FTCA does not waive sovereign immunity for intentional torts . . . ."). Notwithstanding the general rule, certain intentional tort claims may proceed against the United States if enumerated in the FTCA and if based on the actions or omissions of federal law enforcement officers. *See* 28 U.S.C. § 2680(h) (allowing claims for an intentional tort involving assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution if committed by an investigative or law enforcement officer). "For the purpose of [applying Section 2680(h)], 'investigative or law enforcement officer' means any officer of the United States who is

empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id. See also Escalera-Salgado*, 911 F.3d at 40 (discussing this provision); *Abreu-Guzman v. Ford*, 241 F.3d 69, 75 (1st Cir. 2001) (quoting 28 U.S.C. § 2680(h)); *Soto-Cintron*, 901 F.3d at 33.

## IV.   The Undisputed Facts Make It Impossible for Plaintiffs to Satisfy Key Elements of the Tort Claims They Assert

"Under the FTCA, we look to 'law of the place' where the alleged wrongful actions occurred." *Gonzalez Rucci v. U.S. I.N.S.*, 405 F.3d 45, 49 (1st Cir. 2005) (citing *Rodriguez v. United States*, 54 F.3d 41, 44 (1st Cir. 1995); *Soto-Cintron on behalf of A.S.M. v. United States*, 901 F.3d at 33 (citing *Diaz-Nieves v. United States* 858 F.3d 678, 683 (1st Cir. 2017)) ("We look to local law to determine whether the government is liable for its agents' allegedly tortious conduct."). "Because the alleged tortious conduct took place in Maine, we look to Maine tort law in determining the defendant's liability under the FTCA." *Santoni v. Potter*, 369 F.3d 594, 603 (1st Cir. 2004) (citing 28 U.S.C. § 1346(b)(1)). Because "the FTCA has never been interpreted to impose free-standing liability on the federal government for unspecified and unattributed conduct that do not fall under recognized categories of torts," *Kennedy v. Town of Billerica*, 617 F.3d 520, 533 (1st Cir. 2010), the Court and the parties must focus on the elements of the remaining proviso tort claims under Maine law.

### A.   False Arrest and Imprisonment Claims

The elements of false arrest and false imprisonment are so closely related that they can be addressed together.[6]   The elements of a false arrest claim are generally as follows: "(1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3)

---

[6] "The terms 'false arrest' and 'false imprisonment' are virtually synonymous and are sometimes considered the same tort.  A false arrest is one means of committing a false imprisonment, and every false arrest has, at its core, a false imprisonment."  35 C.J.S., *False Imprisonment* § 3 (1999).

the *plaintiff did not consent to the confinement*; and (4) the defendant had no privilege to cause the confinement." *Borlawsky v. Town of Windam*, No. CV-99-426, 2004 WL 1433634, at *4 (Me. Super. Mar. 30, 2004) (emphasis added). "False imprisonment involves the unlawful detention or restraint of an individual against his will." *Nadeau v. State of Maine*, 395 A.2d 107, 116 (1978) (citing *Palmer v. Maine Central R.R. Co.*, 42 A. 800 (1899)). For a claim of false arrest or false imprisonment to succeed, "the authority upon which [P]laintiff is confined must be unlawful." *Santoni v. Potter*, 369 F.3d 594, (1st Cir. 2004) (citing *Nadeau*, 395 A.2d at 116).

Plaintiffs focus primarily on three distinct actions that they claim rendered them falsely arrested and imprisoned: (1) being remanded to the vessel by CBP; (2) being detained in the United States pursuant to material witness warrants; and (3) the extension of special public benefit parole to permit their presence in the United States by CBP and ICE. In all instances, the United States government officials' actions were limited to reasonable, proper executions of their official duties pursuant to valid federal law.

### 1. Plaintiffs' Remand to the Vessel

In the absence of any reason to believe they were anything other than ordinary crewmen, CBP issued landing permits or shore passes to the *Marguerita* crew, including the plaintiffs, on July 7, 2017. When advised that the Coast Guard had developed probable cause to believe that the crew had been violating APPS, and that some or all of the crewmembers were potential perpetrators or witnesses to criminal activity, CBP revoked the crew's landing privileges. Both actions were reasonable and appropriate exercises of the discretion extended to the agency by Congress. *See* 8 U.S.C. § 1282 and 8 C.F.R. § 252.1.

Foreign nationals do not have a right to be admitted into the United States. *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). To be admitted or permitted to enter the

country is a privilege granted by the United States.  *Id.*  "Such privilege is granted to an alien only upon such terms as the United States shall prescribe."  *Id.*  In this vein, regulation provides that "[w]hen a vessel arrives in the United States, all persons employed on board "shall be detained on board the vessel . . . by the master or agent of such vessel . . . until admitted or otherwise permitted to land by an officer. . ."  8 C.F.R. § 252.1(a).

As a result, there is no guarantee that a foreign crewman will be permitted to land in the United States.   "The immigration officer in his discretion may grant an alien crewman authorization to land temporarily" for "shore leave" or "for the purpose of departing" through another means of transportation.  *Id.* at § 252.1(a); *see also* 8 U.S.C. § 1282(a).  "Wide discretion" is vested in "the immigration authorities as to the issuance and revocation of [landing] permits."  *Savelis v. Vlachos*, 248 F.2d 729, 730 n.1 (4th Cir. 1957); *see generally*, 8 U.S.C. § 1282, 8 C.F.R. § 252.1, CBP Vessel Inspection Guide (July 2012) at 24 (https://www.cbp.gov/sites/default/files/documents/vessel_guide_4.pdf ) ("[a] CBP officer may revoke a crew member's conditional landing permit at any time subsequent to the initial inspection.").  Just as authorization to land temporarily can be granted, it can be revoked.

Under 8 U.S.C. § 1282(b), "any immigration officer may, in his discretion, if he determines that an alien is not a bona fide crewman, or does not intend to depart on the vessel or aircraft which brought him, revoke the conditional permit to land . . . ."  The immigration officer may "classify a seaman as mala fide on the basis of a previous deportation or for other reasons which he feels remove the seaman from the bona fide classification.  S. Rep. No. 1515, 81st Cong.2d Sess. at 552.  Assessing whether the seaman is "serving in good faith" figures prominently in such a determination.  *See id.* at 551-52.  *See also* 8 U.S.C. 1282(a) (citing 8 U.S.C. 1101(a)(15)(D) (defining "alien crewman" as one "serving in good faith.").

When the Coast Guard requested a customs hold on the vessel, CBP came to understand that among the crew were persons who were potential participants in, or witnesses to, potential federal criminal violations.  CBP exercised its valid statutory discretion to grant and revoke Plaintiffs' shore passes.  The fact that the vessel was engaged in criminal activity called into question whether its crew was serving in good faith.  CBP reasonably designated the crew as mala fide and revoked their shore passes.  Because revocation of Plaintiffs' landing permits was lawful, there is no basis on which to impose liability for false imprisonment or arrest.  *Cf. The Santos Maru*, 84 F.2d 482, 483 (5th Cir. 1936) (master had authority not only to keep alien passenger aboard vessel, but confined within the vessel, when immigration officer exercised authority to deny passenger the privilege of shore leave).

Upon revocation of the landing permits, the crew was remanded to the vessel and to the custody of its master.  They were placed in the same "detention status" as when they arrived, before they received permission to go ashore.  Plaintiffs were free to move about the vessel, to work, and to engage in the activities of their everyday life aboard, however, they did have to attend musters twice a day.

Plaintiffs remained onboard for about a week, which was necessary and reasonable under these particular circumstances.  *See United States v. Troise*, 796 F.2d 310, 313 (9th Cir. 1986) (finding that detaining a vessel and not permitting its crew to leave until the inspection was complete did not constitute a seizure for purposes of the fourth amendment, though for a much shorter period).  During this time, Coast Guard port state control officers inspected the vessel's engine room and its engineering systems, collected oil samples, imaged computer hard-drives, copied documents, and interviewed crew members.  They reviewed these materials and made copies for the criminal defendants.  The fact that Coast Guard personnel were not present on the

22

vessel at all times does not mean that they were not working diligently.

### 2.     Off of the Ship, but Before Arrest

So long as each Plaintiff agreed to cooperate with the United States government by voluntarily remaining in the District of Maine to testify, there was no need for the prosecutors to seek material witness warrants for their arrest.  Conversely, as each plaintiff-witness indicated he was no longer willing to assent to his employer's request that he remain in the jurisdiction as a witness, government prosecutors sought material witness warrants for each.  In so doing, the prosecutors accurately represented to the Court that no other means was available by which to secure the witnesses' presence at trial.

Hornof and Kordic initially assented to remain in MST's employment in Portland to assist with the investigation.  Zak, on the other hand, did not.  Both Hornof and Kordic later changed their minds and sought return of their passports and to depart the United States before testifying at the criminal trial of MST, at which point the prosecution sought and obtained material witness warrants for each of them too.  The timing as to when particular warrants were sought turned on Plaintiffs' communications to prosecutors.

There was no danger that Plaintiffs might fall into a limbo status, during which time their passports were held by the government without a means to request their return because the Agreement on Security provided a clear mechanism to request the return of a passport:

> 5. The United States agrees that the Owner and Operator cannot exercise complete control over the ship's officers and crewmembers of the Vessel and therefore Owner's and Operator's obligations in respect to ensuring any ship's officer or crewmember of the Vessel remains within or returns to the jurisdictions of the U.S. District Court - District of Maine, shall be limited to:
>
> (a) *requesting such ship's officers and crewmembers of the Vessel to surrender their passports* to the Owner or Operator for safe keeping;
>
> (b) *requesting such ship's officers and crewmembers of the Vessel to remain within the jurisdiction of the U. S. District Court - District of Maine,*

23

(c) providing such ship's officers and crewmembers of the Vessel with reasonable lodging, a meal allowance and health care coverage as provided in this Agreement; and

(d) providing such ship's officers and crewmembers of the Vessel with reasonable transportation within the jurisdictions of the U. S. District Court - District of Maine, including transportation to all meetings with their attorneys and law enforcement personnel.

*If such a ship's officer or crewmember refuses to surrender his passport to Owner or Operator, then Owner and Operator shall immediately provide actual notice to the United States*, through both its attorney responsible for the pending criminal investigation as well as Lieutenant J.D. Lavallee.  *If at any time any such ship's officer or crewmember requests the return of his passport by Owner and/or Operator, then Owner and/or Operator shall provide actual notice to the United States*, through both its attorney responsible for the pending criminal investigation, as well as Lieutenant J.D. Lavallee, at least 72 hours before returning the passport to the ship's officer or crewmember.

Regarding such ship's officers and crewmembers of the Vessel, Owner and Operator shall have no further responsibility or obligations to the United States other than those stated herein, except as otherwise provided by law or regulation.

6.  The obligations of the Owner and Operator set forth herein with respect to the specifically aforementioned ship's officers and crewmembers of the Vessel are subject to all rights of each ship's officer and crewmember as may be asserted by the ship's officer or crewmember or by any attorney working on his behalf.

7.  Nothing in this Agreement is to be deemed as binding on non-parties to this Agreement.  In particular, for each ship's officer and crewmember who may be served with a federal Grand Jury, subpoena, or trial subpoena or material witness warrant and who is required to remain within the jurisdictions of the U. S. District Court of Maine, their rights pursuant to 18 U.S.C. § 3144, [Fed.] R. Crim. P. Rule 15 and other federal laws are specifically preserved.

USSOF, ¶ 70.

The Coast Guard generally relies on a vessel operator's representations concerning the willingness of its crew to participate in an investigation or inspection such as this one. They specifically relied on that provision in this case. As Captain Michael Fazio, U.S. Coast Guard explained, "[A]fter identifying [witness] crewmembers we engage in a consensual agreement with the vessel owner and it is understood that the vessel owner will have the consent of the parties so

24

that we can negotiate on their behalf to get them benefits to stay in the country."  USSOF, ¶ 71. Should they not agree, "the issue would be handed to the Department of Justice [whether to] seek material witness warrants and that would be up to the judge."  *Id*.

The Coast Guard's reliance is reasonable, particularly when, as here, counsel for the crew has participated in many APPS cases and is well familiar with Agreements on Security.  Plaintiffs, through counsel, knew how to ask for the passports back, but in the case of Hornof and Kordic, did not, for a period of time, do so.  Consent to the government's action is an exception to the Fourth Amendment requirements of both a warrant and probable cause.  *See*, *e.g*., *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (consensual search falls within the exception); *United States v. Meléndez*, 301 F.3d 27, 32 (1st Cir. 2002) (same).  Hornof and Kordic's consent to remain in the United States satisfies any Fourth Amendment concerns associated with the time that preceded issuance of material warrants for them.  When each Plaintiff at a different time no longer consented to remain in the United States, material witness warrants were sought and obtained.

Specifically, on August 3, 2017, counsel for Hornof advised the criminal prosecutors that Hornof's mother-in-law had died and sought assurance that his participation in the investigation would be concluded by October 1.  USSOF, 95-96.  Two days later, this changed.  On August 5, Attorney MacColl advised that Hornof preferred to depart the United States at the earliest possible time.  JSOF, ¶ 74.  On August 6, 2017, Attorney MacColl emailed Mr. Chapman, writing:  "Please arrange for the return of Mr. Hornof's passport to him or to me."  USSOF, ¶ 97.  Prosecutors sought and received a material witness warrant for Hornof by August 9.  USSOF, ¶ 99.

Kordic's arrest as a material witness was similarly triggered by an email from Attorney MacColl to Prosecutor John Cashman on Friday, August 18, 2017.  USSOF, ¶ 100.  Prosecutors expeditiously sought and received a material witness warrant for Kordic.  *Id.*

### 3.      Plaintiffs' Parole into the United States

Parole is not a formal admission into the United States.  8 U.S.C. § 1182(d)(5)(A).  It is not intended to affect an alien's status.  *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958).  Parole is merely a temporary measure that allows a person's presence in the United States for a specific period and purpose.  *See* 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. §§ 212.5, 253.1(g).  "[E]ven though physically in the country, [a parolee] is not regarded as having 'entered' and thus has not acquired the full protection of the Constitution." *United States ex rel. Kordic v. Esperdy*, 386 F.2d 232, 235 (2d Cir. 1967).

Parole into the United States can be granted to non-citizens on a "case-by-case basis for urgent humanitarian reasons or significant public benefits."  8 U.S.C. § 1182(d)(5)(A).  It is a discretionary process.  *Id.*; *see also* 8 U.S.C. § 253.1(g).  Certain immigration officials may grant alien applicants parole "under such terms and conditions . . .  as [the official] may deem appropriate."[7]  8 U.S.C. § 212.5(c).  Those officials may, for example, "require reasonable assurances that the alien will appear at all hearings and/or depart the United States when required to do so." *Id.* at 212.5(d).

Plaintiffs' Significant Public Benefit Parole was not designed to secure their presence in the United States.  It simply gave them an immigration status that allowed them to be here.  As discussed above, the plaintiffs' presence in the United States came about by virtue of their assent to the joint request of the United States government and their employer, MST, that they remain to assist with the criminal investigation, or by their arrest pursuant to material witness warrants.

There were, however, conditions on parole, one being that that Plaintiffs' passports would

---

[7] "An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this Act as an applicant for admission."  8 U.S.C. § 1225(a)(1).

26

be held by CGIS.  The absence of their passport made it difficult for Plaintiffs to travel internationally, however, it did not confine them to any particular space or location, or even to within the District of Maine.  It was an appropriate exercise of the discretion afforded CBP and ICE officials, as well as an inherently reasonable measure to ensure accountability for foreign nationals who were to be present in the United States for an undetermined period of time with no immigration status.

Here, CBP granted temporary parole of Plaintiffs, in part, on the condition that the Coast Guard hold Plaintiffs' passports, which was not unreasonable.  In a prior criminal case similar to this one, two targets obtained their passports and absconded:

> In February 2010, a foreign-flagged vessel, *M/V Margit Gorthon*, was inspected by the Coast Guard in the port of Eastport, Maine and a criminal investigation was opened by the Department of Justice in conjunction with the United States Attorney's Office for the District of Maine.  Ten members of the crew were paroled into the United States through the Port of Portland as witnesses to suspected crimes committed onboard the vessel.  The passports were initially held by the Coast Guard, but upon demand for their return, the passports were provided to the vessel agent.  Unbeknownst to the Government, and contrary to the provisions of the Surety Agreement, the passports were returned to the crewmembers and two of them, the Chief Engineer and the Second Engineer, departed the District of Maine and [their] whereabouts remain unknown.  These facts underscore the reasonableness of conditioning parole, in certain circumstances, on the law enforcement agency retaining the passports.

*See* USSOF, ¶ 89.

This incident underscores the reasonableness of conditioning parole on the Coast Guard holding Plaintiffs' passports.  The reasonableness of the condition is further illustrated by the fact that the Court elected to impose an identical condition when it issued the material witness warrants, which required that they remain within the District of Maine.  Accordingly, Plaintiffs cannot meet the burden of establishing false imprisonment or arrest.  The Coast Guard lawfully held Plaintiffs' passports in keeping with CBP's terms and conditions of the parole that allowed Plaintiffs'

presence in the United States.  The parole, moreover, was a lawful administrative action granted in the discretion of immigration officials.

### 4.    Plaintiffs' Arrests as Material Witnesses

Plaintiffs' detentions as material witnesses under 18 U.S.C. § 3144 were conditionally privileged as a matter of law.  *See*, *e.g.*, *Diaz-Nieves v. United States*, 858 F.3d 678, 685 (1st Cir. 2017).  In other words, the material witness warrants were lawful exercises of valid authority.  *See Nadeau*, 395 A.2d at 116 ("[f]alse imprisonment involves the *unlawful* detention or restraint of an individual against his will.") (emphasis added).

Nonetheless, Plaintiffs allege that the applications and affidavits in support of their arrests as material witnesses were false.  Specifically, Plaintiffs: (1) contend the crimes to which they were witnesses are not in fact crimes under United States law; (2) dispute that the knowledge and evidence they possessed was indeed material; and (3) dispute that it was impracticable to secure their presence without material witness warrants.  Stated another way, they contend that the affidavit incorrectly alleged that the material witness warrants were the only means of securing their presence as witnesses.  ECF No. 61 at 27-30.

Their first argument rests on the flawed contention that the United States, as a port state, is not legally entitled to enforce APPS for violations occurring in its waters, but must, instead, refer the matter to the vessel's flag-state (here, Liberia) for redress.  As the Court noted in its earlier order, this is incorrect.[8]  ECF No. 61 at 27-28.  As the Court also previously noted, their testimony

---

[8] *See United States v. Vastardis*, 19 F.4th 573, 584 (3d Cir. 2021) ("MARPOL . . . vests concurrent jurisdiction to port states over conduct in their ports or waters."); *United States v. Pena*, 684 F.3d 1137, 1147 (11th Cir. 2012) ("Pursuant to Article 4 of MARPOL, the United States shares concurrent jurisdiction with the Flag State over MARPOL violations occurring on foreign-flagged ships in U.S. ports."); *United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 308 (2d Cir. 2009) ("Because the failure to maintain the ORB occurred in U.S. waters, there was no obligation to let the flag state prosecute the violation."); *United States v. Jho*, 534 F.3d 398, 409–10 (5th Cir. 2008)

was "material to the criminal proceeding" and their cooperation was in fact "key."  ECF No. 61 at

29.  Finally, the material witness applications also accurately alleged that it was (or had become)

"impracticable to secure their presence" without the warrants.  ECF No. 61 at 29-30.  As discussed

above, unless plaintiffs were to agree to remain in the jurisdiction voluntarily, the government had

no way to secure their appearance and testimony at trial.  So long as each Plaintiff agreed to

cooperate with the United States government by voluntarily remaining in the District of Maine to

testify, there was no need for the prosecutors to seek material witness warrants for their arrest.

Conversely, however, as each plaintiff-witness indicated he was no longer willing to assent to his

employer's request that he remain in the jurisdiction as a witness, the government prosecutors

sought material witness warrants for each.  In so doing, the prosecutors accurately represented to

the Court that no other means was available by which to secure the witnesses' presence at trial.

Finally, the rights of a material witness must be balanced against those of a criminal

defendant.  The First Circuit has interpreted the U.S. Constitution's Confrontation Clause to

mandate that the government use all reasonable means to prevent a present witness from becoming

an absent witness.  Should the government fail, a criminal defendant should not pay the price.  *See*

*United States v. Mann*, 590 F.2d 361, 368 (1st Cir. 1978); *United States v. Burden*, 934 F.3d 675,

156 (D.C. Cir. 2019) ("We hold that the duty to use reasonable means to procure a witness's

presence at trial includes the duty to use reasonable efforts to prevent a witness from becoming

---

("APPS indicates Congressional willingness to criminalize knowing violations of MARPOL, the APPS, and APPS regulations committed by foreign-flagged ships while in United States' ports and navigable waters."); *United States v. Sanford Ltd.*, 880 F. Supp. 2d 9, 17 (D.D.C. 2012) ("The merchant ship of one country voluntarily entering the territorial limits of another subjects herself to the jurisdiction of the latter.  The jurisdiction attaches in virtue of her presence, just as with other objects within those limits.  During her stay she is entitled to the protection of the laws of that place and correlatively is bound to yield obedience to them.") (quoting *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 124 (1923)).

absent in the first place."); *United States v. French*, 2014 WL 34802, at *3 (D. Me. Jan. 6, 2014) ("legal problems associated with detaining a witness who has not been charged with a crime are problems of the government's own making").

**B. Abuse of Process Claims**

The elements necessary to sustain an abuse of process claim under Maine law include: "'1) a use of the process in a manner not proper in the regular conduct of the proceedings and, 2) the existence of an ulterior motive.'" *Grace v. Yarnall*, 346 F. Supp. 2d 222, 224 (D. Me. 2004) (quoting *Nadeau*, 395 A.2d at 117); *Simon v. Navon*, 71 F.3d 9, 15 (1st Cir. 1995) ("The two basic elements of abuse of process are a bad motive, and the use of a legal process for an improper, collateral objective."). Plaintiffs cannot prove either element.

The abuse of process claim in this matter is limited to the allegation that Special Agent Root signed fraudulent affidavits in support of the prosecution's warrant applications. *See* ECF No. 61 (Order on Mots. to Dismiss) at 31-32. Simply put, the affidavits were used properly, *i.e.*, to help the prosecution win its motions for material witness warrants. *See Bradbury v. GMAC Mortg., LLC*, 780 F. Supp. 2d 108, 112 (D. Me. 2011) (use of allegedly false certifications and affidavits in support of summary judgment motions were used to win lawsuit, which is a proper use of the documents).

Likewise, the ulterior motive requirement cannot be satisfied. There is simply no evidence that Special Agent Root signed the affidavits for any purpose other than assisting the prosecution in acquiring material witness warrants to ensure Plaintiffs were available to testify before a grand jury or at trial. There is no allegation here that process was used as a club to extort or coerce anything from Plaintiffs. Because no use was made of the process beyond carrying it through to its lawful conclusion, i.e., obtaining Plaintiffs' testimony, Plaintiffs do not state a valid claim for

abuse of process.

### C.  Intentional Infliction of Emotional Distress Claims

Under Maine state law, the tort of intentional infliction of emotion distress has four elements.  *Lyman v. Huber*, 10 A.3d 707, 711 (Me. 2010).  First, the defendant must intentionally or recklessly inflict severe emotional distress or be certain or substantially certain that such distress would result from its conduct.  *Id*.  Second, the defendant's conduct must be so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community.  *Id*.  Third, the defendant's actions must be the cause the plaintiff's emotional distress.  *Id*.  Finally, the emotional distress suffered must be so severe that no reasonable person could be expected to endure it.  *Id*.

Here, Plaintiffs may not have wished to be in the United States for nine weeks, but surely the government's actions are not the sort of extreme and outrageous conduct that exceeds the bounds of decency and rises to the level of being called "atrocious" and "utterly intolerable." Material witnesses have been kept in custody in some instances.  *Cf. United States v. Nai*, 949 F. Supp. 42, 46 (D. Mass. 1996) ("Presently, these five material witnesses for the Government are being held at the Plymouth House of Correction under the same conditions as would a defendant who has been detained at that facility pending trial.").  This is not that kind of case.

Here they resided in a hotel and continued to receive wages and benefits.  Zak found his hotel room to be nicer than his regular accommodations on the ship and that residing on the hotel was easier than performing his regular work duties on the *Marguerita*.  Hornof arrived back in his native Czech Republic on roughly the same date that his four-month contract would have concluded.  Plaintiff Kordic returned to his home in Croatia before his contract on the *Marguerita* expired.  Had Hornof and Kordic not been material witnesses, they would instead have been

31

working on the ship, and no evidence indicates that their circumstances spending the summer at a Scarborough hotel were appreciably worse or less tolerable than those on the ship.

### D.   Declaratory Relief on the Surviving FTCA Claims

Declaratory relief is not an independent cause of action, but a remedy, and as such, it can only be requested or established in connection with liability on some other cause of action. *See Payton v. Wells Fargo Bank, N.A.*, Civil Action No. 12-11540-DJC, 2013 WL 782601, at *6 (D. Mass. Feb. 28, 2013) (citing *Diamond Phoenix Corp. v. Small*, No. 05-79-P-H, 2005 WL 1530264, at *4 (D. Me. June 28, 2005)); *accord Linton v. N.Y. Life Ins. & Annuity Corp.*, 392 F. Supp. 2d 39, 41 (D. Mass. 2005). Presuming that Plaintiffs are unable to prevail on their FTCA claims, they are likewise not entitled to declaratory relief.

## CONCLUSION

Plaintiffs were at all times treated fairly and decently by federal officials. The United States does not mean to suggest that there was no hardship involved, but as Judge Torresen observed "[t]hese gentlemen are asserting harms that could be asserted by any witness":

> [M]uch of the harm asserted by Mr. Hornof and Messrs. Zak and Kordic came in their treatment as material witnesses. And certainly for Mr. Hornof he paints a compelling picture of being kept from his pregnant wife at a time when her mother had just died. Those harms, however, flowed from the decision to hold him as a material witness. And if I view the inconveniencing of a witness as a proximate harm to a defendant's conduct, I am opening a very wide door. Most people can assert some harm to themselves from having to be a witness. It runs the gamut: Anxiety, stress, loss of work, canceled vacations, and in the case of some material witnesses, incarceration. But that does not mean these people are victims, they are witnesses. . . . These gentlemen are asserting the harms that could be asserted by any witness.

USSOF, ¶ 133.

Because there is no genuine issue of material fact that would enable Plaintiffs to establish any or the claims set forth in their Amended Complaint, the United States is entitled to summary

judgment on all of Plaintiffs' remaining claims.

Dated:  July 20, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DARCIE N. McELWEE
United States Attorney

JOHN G. OSBORN
Assistant United States Attorney
United States Attorney's Office
District of Maine
100 Middle Street
East Tower, 6th Floor
Portland, Maine 04101
(207) 780-3257
john.osborn2@usdoj.gov

*/s/ Michael A. DiLauro*
MICHAEL A. DiLAURO
Senior Admiralty Counsel
KALYNN E. HUGHES
Trial Attorney
MALINDA R. LAWRENCE
Trial Attorney
Aviation & Admiralty Litigation
Torts Branch, Civil Division
U.S. Department of Justice
(overnight courier)
175 N St., N.E., Ste. 8.1815
Washington, D.C. 20002
(mailing)
P.O. Box 14271
Washington D.C. 20044-4271
Telephone: (202) 616-4047/4060
Facsimile: (202) 616-4159
michael.dilauro@usdoj.gov
kalynn.e.hughes@usdoj.gov
malinda.r.lawrence@usdoj.gov
*Counsel for Defendant United States*