# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   )
**JAROSLAV HORNOF, et al.**   )
  )
    *Plaintiffs,*   )
  )
**v.**   )     **CASE NO.: 2:19-cv-00198-JDL**
  )
**UNITED STATES OF AMERICA, et al.**   )
  )
    *Defendants.*   )
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   )

## PLAINTIFFS' OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, WITH INCORPORATED MEMORANDUM OF LAW

NOW COME plaintiffs, Jaroslav Hornof, Damir Kordic and Lucas Zac, and object to Defendant's Motion for Summary Judgment.  Plaintiffs rely on the pleadings, the accompanying Declaration of Jaroslav Hornof, Damir Kordic, Lukas Zac, Bruce M. Merrill, George M. Chalos, and Elaine Akers with exhibits thereto; the Joint Stipulations of Fact (ECF No. 151), the Stipulated Record with exhibits (ECF No. 152), and certain other materials submitted by the parties, all as referenced in the accompanying Response to Defendant's Statement of Facts and Plaintiff's Additional Statement of Material Facts.

## FACTUAL BACKGROUND

The relevant facts are set forth in Plaintiffs' Response to Defendant's Statement of Facts and Additional Statement of Material Facts, incorporated herein, and summarized as follows:

Shortly after boarding the M/V MARGUERITA, a Liberian-flagged cargo ship, asThird Engineer, Plaintiff Hornof (a 25-year-old Czech citizen) discovered the Chief Engineer was ordering the discharge of oily bilge waters in international waters in violation of Liberian laws implementing the conventions known as MARPOL.  He documented the problem and reported it

to the ship operator ("MST"), which launched an investigation and reported the suspected discharges to Liberian and U.S. authorities.[1] *See* Plaintiffs' Additional Statement of Material Facts ("ASMF"), ¶¶ 1-8; Joint Stipulations of Fact ("JSF"), ¶¶ 15-36.

After a detailed MARPOL audit in Brazil by an American firm confirmed Hornof's report, the vessel preliminarily disclosed the results, promising the U.S. the auditor's full report upon its completion.  The vessel made a port call, as expected, in Portland Maine on July 7, 2017.  Besides Mr. Hornof, the engine crew then included Plaintiffs Zak (a 22-year-old Slovakian citizen) and Kordic (an older Croatian citizen) (but not the Chief Engineer, who had earlier disembarked).  Mr. Zak's vessel contract had expired; MST had made arrangements for him to fly home from the Portland Jetport.  CBP officials boarded the vessel, duly issued Zak a "D-2" permit enabling him to go to the jetport, and issued "D-1" shore passes to Hornof and Kordic, admitting them to the country.  *See* ASMF ¶¶ 10-20; JSF ¶¶ 5-10, 37-43.

As planned a throng of Coast Guard officials then boarded the vessel seriatim, pretended to have "discovered" the previously reported information and began questioning Plaintiffs and other crewmembers concerning the discharges, falsely causing Hornof and others to believe the discharges had not been disclosed.  The next day, CBP officials, acting in concert with the Coast Guard, revoked the shore passes for the entire crew, on the undisclosed but supposed ground that they were all "mala fide" crewmen.  Plaintiffs (and all onboard) were, in fact, bona fide crewmen who had done nothing wrong.  Nevertheless, they were placed under guard, were mustered for the taking of attendance twice daily, and were prohibited from leaving the vessel for any reason. Officials announced that the vessel could not leave, on the ground that it was suspected of having violated the Act to Prevent Pollution at Sea ("APPS"), the federal statute implementing

---

[1] U.S. officials were notified pursuant to an Environmental Compliance Plan that had earlier been imposed on MST. Liberia asked follow up questions and requested and received additional documentation.

MARPOL for certain U.S. ships and for foreign ships only for conduct in U.S. waters, even though all of the improper discharges (and all the entries in the ship's record book concerning those discharges) had taken place on the high seas.[2]  *See* ASMF ¶¶ 21-29; JSF ¶¶ 51-61.  The government contended the ship was itself liable for any fines and therefore could not depart until "bond or other surety" was posted to ensure payment of fines under 33 U.S.C. §1908.

By July 16, the ship's owner and operator capitulated to demands that it post a mult-million dollar bond, but also require nine crewmen, including Plaintiffs, to disembark and indefinitely remain in the District of Maine at MST's expense.  The vessel interests were obliged to sign the officials' "Agreement on Security" memorializing these requirements.  Plaintiffs were not parties to this agreement and never consented to it or to being detained in the United States.  Against their will, they were forced off the ship, their passports were confiscated (in violation of their rights *and* the Agreement on Security), they were involuntarily "paroled" into the United States, and taken to a Scarborough hotel, where they were confined for the next two months and subjected to daily monitoring.[3]  ASMF ¶¶ 30-41, 63; JSF ¶¶ 62-67.

Although the government argues the agreement was drafted to imply that MST had secured or would secure Plaintiffs' consent, the government officials knew perfectly well no such consent was provided.  MST never represented that the crewmembers consented.  Instead, MST's counsel protested that the government's "interference with the rights and liberties of at least nine (9) crewmembers" was "grossly unreasonable and out-of-bounds."  ASMF ¶¶ 42-44.  He specifically stated that the crew was "DETAINED" by the government, and he cautioned,

---

[2] The Marpol Administration, the Republic of Liberia, was conducting and continued to conduct its own investigation; it participated in approving the vessel's actions to clean its tanks and lines, but also protested our government's actions in detaining the ship. ASMF ¶¶ 9, 47.

[3] Plaintiffs were prohibited from leaving the state.  Though technically they could leave the hotel, with no passports, little command of English, no vehicle, no friends or family in this country, and subjected to daily monitoring, they were for all practical purposes confined to the immediate vicinity of the hotel.  ASMF ¶¶ 64-66.

"Please do not go to court and argue that they are in Portland voluntarily.  It is not true." ASMF ¶ 44.

Plaintiffs consistently objected to the deprivation of their rights, while also consistently agreeing to cooperate and cooperating with the Government's requests for information and testimony.  Mr. Hornof particularly needed to leave after his mother-in-law died on July 30, 2017, and his grieving, pregnant wife begged for his immediate return.  Plaintiffs asked consistently why they were being detained, the basis for confiscating their passports, and when they would be allowed their liberty.  The government officials refused all their entreaties.  *See* ASMF ¶¶ 46-55, 57, 59, 61-69.

Each Plaintiff, in desperation, filed court process to protect his rights.  Sometime after each Plaintiff had did so, but before his filing could be acted upon, the government officials sought and obtained an ex parte material witness arrest warrant.  The warrants were based on affidavits that were highly misleading – and sometimes simply false – both as to why that Plaintiff's testimony was needed and why his arrest was necessary to preserve that testimony. Upon plaintiff's further petitioning and over the government's objection, the Court ordered that the government take Plaintiffs' depositions quickly and then release them.  In the meantime, however, the Government's outrageous conduct caused Plaintiffs to suffer severe emotional distress and other damages.  *See* ASMF ¶¶ 50, 54-84, JSF ¶ 64, 68, 74-79, 85-87.   None of the plaintiffs has yet returned to sea.  Our government ended their careers.  *Id*.

## ARGUMENT

### 1.  Summary judgment is precluded for the reasons explained by the Court in its order of October 20, 2020.

This is Defendant's second motion for summary judgment on Plaintiffs' claims.

4

On October 29, 2019, Defendant filed its Motion to Dismiss or, Alternatively, for Summary Judgment (ECF No. 23), submitting a 107-paragraph statement of material facts (ECF No. 24). Plaintiffs objected that the summary judgment motion was procedurally improper.  Defendant nevertheless insisted it was entitled to summary judgment (ECF Nos. 37, 38, 45, 50, 51, 54). Only during the April 14, 2020, motion hearing did it effectively withdraw its summary judgment request (ECF Nos. 60 at 8 & 61 at 1 n.2).

However, the motion to dismiss and motion for summary judgment relied on the same contentions, which Defendant now reiterates. In both instances, Defendant primarily argued that Plaintiffs' tort claims must fail because as a matter of law (a) all claims fall within the "discretionary function" exception and (b) the government acted lawfully.[4]

The Court rejected these arguments, explaining that Plaintiffs' well-pleaded allegations indicated that Defendant's conduct "violated, among other things, the Fourth Amendment" (ECF No. 61 at 19, PageID# 778); that it is "elementary that the Discretionary Function Exception does not . . . shield conduct that transgresses the Constitution" (*id., quoting Limone v. United States,* 579 F.3d 79, 101 (1st Cir. 2009)); that Defendant's contention that Plaintiffs' pre-warrant detention was "voluntary" was rebutted by Plaintiffs' assertion that it was involuntary (*id.* at 22, PageID# 781); that arrest warrants were necessary to lawfully detain them (*id.* at 22, PageID# 782); that the vessel search did not justify the forcible detention of Plaintiffs for nine straight days (*id.* at 23-24, PageID# 782-83); that even if a statute authorized the Coast Guard to make arrests, it would not sanction violations of the Fourth Amendment (*id.* at 24-25, PageID# 783-84); that material omissions in the warrant applications and affidavits were sufficient to violate the Fourth Amendment (*id.* at 26-27, 29-31, PageID# 785-86, 788-90); that Plaintiffs had

---

[4] Defendant advanced some other arguments, all rejected, which it does not appear to be trying to resuscitate now, including issue preclusion.

asserted a viable claim for abuse of process based on the conduct of the affiant, Special Agent Root (*id.* at 31-32, PageID# 790-91); and that they have a viable claim for intentional infliction of emotional distress based on the same conduct underlying the false arrest and abuse of process claims (*id.* at 32-34, PageID# 791-93).

The Court's analysis of these same issues fully applies now.  The only distinction is that instead of examining the allegations of the Amended Complaint, the Court must look at evidentiary material relied upon by Plaintiffs.  Each of the material allegations in the complaint is properly supported by evidence in the record, including six affidavits, and the parties' Joint Stipulations of Fact.  Therefore, even if the government had offered competent competing evidence (at which the Government failed spectacularly), summary judgment would have to be denied.  *See Kelley v. Correctional Medical Services, Inc.,* 707 F.3d 108, 118 (1st Cir. 2013).

2. **Defendant's failure to support its allegations with competent evidence precludes summary judgment.**

In summary judgment proceedings, a party "must proffer *admissible* evidence that could be accepted by a rational trier of fact as sufficient to establish the necessary proposition." *Gomez- Gonzalez v. Rural Opportunities, Inc.,* 626 F.3d 664, 662 n. 3 (1st Cir. 2010) (emphasis supplied).  Yet Defendant has failed to support its statement of material facts with citations to admissible evidence.  As discussed in Plaintiff's Response to Defendant's Statement of Facts, at least 53 paragraphs should be stricken because the underlying materials have not been authenticated and no foundation has been laid for their admissibility.[5]  Courts have consistently held that "documents which have not had a proper foundation laid to authenticate them cannot

---

[5] In fact, *every* statement in Defendant's Statement of Facts relied solely on documents that have not been authenticated.  Nevertheless, to the extent these unauthenticated materials consist of copies of court records or deposition transcripts with which Plaintiffs' counsel is familiar, Plaintiffs have refrained from objecting to them on that basis.

support a motion for summary judgment." *Canada v. Blain's Helicopters, Inc.,* 831 F.2d 920, 925 (9th Cir. 1990). "Documentary evidence for which a proper foundation has not been laid cannot support a summary judgment motion, even if the documents in question are highly probative of a central and essential issue in the case." *Ashker v. Horizon Offshore Contractors, Inc.,* No. 00-30642, 2000 U.S. App. LEXIS 39007, *7 (5th Cir. Nov. 30, 2000), quoting 11 J. Moore, Moore's Federal Practice § 56.14[2][c] (3d ed.).

At least forty paragraphs in the Statement of Facts rely on inadmissible hearsay or are otherwise inadmissible and could not be considered even if authentication had been provided. At least, sixteen paragraphs simply lack support in the cited material. This misleading practice is worse than failing to provide citations at all. The Court "may disregard any statement of fact not supported by a specific citation" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Cookson v. City of Lewiston,* 2013 U.S. Dist. LEXIS 35595, *4 (D. Me. Feb. 7, 2013); *Capalvo v. Kris-Way Truck Leasing, Inc.,* 821 F. Supp. 2d 397, 400 (D. Me. 2011); D. Me. Loc. R. 56(f).

Once all these improper statements are disregarded, practically nothing of substance remains of Defendant's Statement of Facts. *See Zagklara v. Sprague Energy Corp.,* No. 2:10-cv-445, 2012 U.S. Dist. LEXIS 120274, *27-28 (D. Me. July 2, 2012) (only facts *properly* put before the court in the statement of material facts "may be considered in ruling on a motion for summary judgment"). For this reason alone, the Court should deny the motion for summary judgment.

**3. Summary Judgment should be denied on Plaintiffs' false arrest/ false imprisonment claims.**

The Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*., provides a limited waiver of the sovereign immunity of the United States for torts committed by federal employees acting within the scope of their employment. *Santoni v. Potter,* F.3d 594, 602 (1st Cir. 2004). Under the

FTCA, the United States may be civilly liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The statute specifically allows claims for certain torts, including false imprisonment, false arrest, and abuse of process, arising out of "acts or omissions of investigative or law enforcement officers of the United States Government." *Id.,* § 2680(h) (the "law enforcement proviso").[6] "Investigative or law enforcement officer" is broadly defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.* Defendant does not contest that the Coast Guard and CBP officials who interfered with Plaintiffs' freedom were investigative or law enforcement officers within the meaning of the statute.

The scope of the torts in the law enforcement proviso is governed by state law. *See Federal Deposit Insurance Corp. v. Mayer,* 510 U.S. 471, 478, 114 S. Ct. 596, 127 L. Ed. 2d 308 (1994). In Maine, as elsewhere, the elements of a false arrest claim are: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the defendant had no privilege to cause the confinement." *Vorlawsky v. Town of Windham,* No. CV-99-426, 2004 Me. Super. LEXIS 125, *12-13 (Me. Super. Ct., Cum. Cty., Mar. 26, 2004), quoting *Calero-Colon v. Betancourt-Labron,* 68 F.3d 1, 8 (1st Cir. 1998) (citing Restatement (Second) of Torts § 35, 118 cmt. b (1965)).

Similarly, false imprisonment in Maine occurs when an actor, without authority, "(1) intends to, and does in fact, confine another, (2) within boundaries fixed by the actor, and (3) the victim is conscious of the confinement and is harmed by it." *Smith v. Heritage Salmon, Inc.,* 180

---

[6] Claims of intentional infliction of emotional distress are also generally allowed. *See Limone v. United States,* 579 F.3d 79, 92 (1st Cir. 2009).

F. Supp. 2d 208, 220 (D. Me. 2002).  "Confinement can be effectuated by physical force, explicit or implicit threats of physical force, or even 'unspecified means of "duress."'"  *Id.*

Defendant does not seriously contest that its law enforcement officers intended to confine Plaintiffs, that they did confine them, or that Plaintiffs were conscious of the confinement. Rather, it argues the officers had legal authority to confine Plaintiffs.  It claims its agents acted lawfully in revoking Plaintiffs' entry and passes and confining them (a) on the vessel from July 8 through July 16, 2017, without warrants; (b) on U.S. soil without warrants from July 16, 2017 until arrest warrants were obtained as late as (in Plaintiff Kordic's case) August 21, 2017; and (c) on U.S. soil after *ex parte* arrest warrants had been procured by false and misleading affidavits.

Defendant starts with the premise that its agents were investigating a U.S. crime and then suggests that whatever it did to Plaintiffs was a necessary part of that investigation.  Of course, even if the investigation were authorized, it does not follow that everything done to a potential witness is lawful.  But even Defendant's initial premise is mistaken.

> **a.**     **The investigation and detention of the vessel was not authorized because no U.S. crime was involved.**

Defendant asserts that the vessel violated APPS but is deliberately vague about the details.  In fact, the vessel did not arguably violate any requirement set forth in the statute. None of the discharges from the vessel could have violated APPS because they all occurred on the high seas.  By its express terms APPS applies to any foreign vessels only while in our country.  33 U.S.C. § 1902(a)(2).  For the same reason, the vessel could not be charged with failing to make accurate entries in its oil record book (ORB) at the time of each discharge, as the entries were likewise made on the high seas.

Instead, what the vessel owner and operator were charged with was violating a Coast Guard regulation that states: "The master or other person having charge of a ship required to

keep an Oil Record Book shall be responsible for the maintenance of such record."  33 CFR § 151.25(j).  This subsection appears in a regulation addressing ORB requirements for U.S. vessels.  *See id*., § 151.25(h) and (l).  In recent years, however, government attorneys have proposed that this regulation means that whenever a foreign ship enters a U.S. port with an inaccurate or incomplete ORB (*i.e.,* one that fails to fully account for discharges on the high seas), the vessel interests have violated this regulation by failing to "maintain" the record book while in U.S. waters.

Though some courts (including this Court) have accepted this argument, it is respectfully submitted that none of them has considered the regulation in its historical context and in relation to the underlying statute and international treaties.  Space and length limitations preclude a through elaboration of the history; but to briefly summarize:

The ORB regulations had their origin in requirements under the Oil Pollution Act of 1961, Pub. L. No. 87-167, 75 Stat. 402 ("OPA'61"), which implemented the International Convention for Prevention of Pollution of the Sea by Oil, 1954.  Section 9 of OPA'61 required that there "shall be carried on every [U.S.-flagged] ship an oil record book."  Section 9 imposed civil and misdemeanor penalties for false entries in the ORB *on U.S.-flagged ships only.*  No penalties were prescribed or authorized with respect to foreign ships' records.  Instead, Section 11(b) required reference to the State Department for action under Article X of the 1954 convention.  Article X prescribed flag-state enforcement.  *See* **Exhibit A**.  This article is virtually identical, with only stylistic changes, to Article 6, sections (3) and (4) of the subsequent treaties known as MARPOL.

When the Coast Guard carried those earlier regulations forward into the APPS

regulations, it explained they were intended to "serve to reduce the amount of oil discharged into the sea *by U.S. oceangoing ships, wherever located, and by foreign ships **within the navigable waters of the United States."** 48 Fed. Reg. 45704 (emphasis supplied), attached hereto as **EXHIBIT B**.

The APPS, and the regulations thereunder, are intended to implement MARPOL. *See* 33 U.S.C. §§ 1901(a)(5), 1902, 1903(a), 1909. The relevant MARPOL regulation says nothing about the "maintenance" of an ORB; rather it states that vessels of a certain size "shall be provided with an Oil Record Book." *See* Regulation 17 of Annex I, attached hereto as **EXHIBIT C**. The discrepant language used in section 151.25(j) of the APPS regulations was, as noted, simply a result of carrying over language from the previous marine pollution regime. The regulation was not intended to apply to ORB entries made on foreign vessels with respect to high-seas discharges. To the contrary, it is expressly stated that the regulations "through [section] 151.25 apply… [to foreign vessels only] while in the navigable waters of the United States or while at a U.S. port." 33 CFR § 151.09(a)(5). Every required entry in the ORB must be made "without delay," *id.,* § 151.25(h), and there is no further duty under the regulations to make entries or corrections when a vessel arrives at a U.S. port. Hence, any improper entry made on the high seas cannot be viewed as a continuing offense. *See United States v. Fafalios,* 817 F.3d 155, 160-61 (5th Cir. 2016) (record book impropriety "is not a continuing offense").

Congress was aware when it ratified MARPOL and passed the APPS that under MARPOL the United States could not assert jurisdiction over foreign vessel's high-seas violations. MARPOL declares that "with respect to a ship entitled to fly a flag of any State, the Administration [*i.e.*, MARPOL enforcement authority] is the Government of that State." MARPOL,'73, Article 2(5), 12 I.L.M. at 1321, attached hereto as Exhibit D. Moreover, "any

11

violation of the requirements of the Convention shall be prohibited and sanctions shall be established therefor under the law of the Administration of the ship concerned [that is, the flag state] *wherever the violation occurs." Id.,* Article 4(1), 12 I.L.M. at 1322 (Exhibit D) (emphasis supplied).  Every flag state that is a party to MARPOL (including Liberia) essentially pledges that if it is informed of a MARPOL violation "and is satisfied that sufficient evidence is available to enable proceedings to be brought in respect to the alleged violation it shall cause such proceedings to be taken as soon as possible, in accordance with its law." *Id.*  As for other nations that are not the flag state, they may prohibit only MARPOL violations that occur "within the jurisdiction of [that] Party." *Id.*  If violations occur in a port state, that state may either cause proceedings to be taken in accordance with its laws or refer the matter to the Administration.  *Id.,* Article 4(2), 12 I.L.M. at 1322 (**Exhibit D**).

When MARPOL was presented for ratification, E.P.A. Executive Director Russell Train testified that the United States had "strongly urged a provision whereby port States would have been authorized to prosecute with respect to foreign ships in their ports for violations committed on the high seas, [but] this concept was rejected … ."  Hearing Before Committee on Commerce, United States Senate, Nov. 14, 1973, *reprinted in* 1973 IMCO Conference on Marine Pollution from Ships, p. 6 (**Exhibit E**).  Referring to MARPOL's dispute resolution provisions, the E.P.A. director further explained:

> [I]f a ship of another country commits a violation which we know about on the high seas and enters our jurisdiction, we as port State, but non-flag State, cannot prosecute that vessel for the violation outside of our jurisdiction.  However, we can report it to the flag State itself and if the flag State fails to take remedial action, then we have a cause which we can bring to bear through this mandatory dispute settlement process.

*Id.* at 7.  In recognition of these limitations, Congress specified that the laws and regulations implementing MARPOL applied to non-U.S. ships only "while in the navigable waters of the United States."  19 U.S.C. § 1902(a)(2).

Nevertheless, in a bid to expand its criminal jurisdiction in defiance of this carefully negotiated international compact, the Government has lately seized on the language of section 151.25(j) to render any foreign vessel stopping at a U.S. port with an inaccurate ORB criminally liable in the U.S.A. for failing to "maintain" the ORB while in American waters – and the government regularly detains innocent foreign crewmen at the targets' expense to facilitate its prosecution and gain leverage.  This is not what the regulation says, nor is the practice (especially of detaining innocent foreign crewmembers) what MARPOL or APPS contemplated.  *If* the regulation *did* say that, it would be *ultra vires*.  APPS authorizes the Secretary only to "prescribe any necessary or desired regulations to *carry out* the provisions of the MARPOL Protocol Annex IV to the Antarctic Protocol, or this Act" -- not to subvert them.  19 U.S.C. § 1903(a) (emphasis supplied).  The regulation would substantially change the balance of international enforcement power under both MARPOL and APPS.

This departure from MARPOL is grave.  Because a violation of any regulation under APPS is deemed a class D felony, *see* 33 U.S.C. § 1908(a), and because each stop at a U.S. port is deemed a separate violation, the punishment for the "crime" of possessing an ORB that fails to have an accurate account of high-seas bilge water handling while temporarily in U.S. waters will almost invariably be much greater than any penalty for the high-seas discharge.  In this case, for example, the Coast Guard initially demanded bonds totaling ten million dollars for the release of the vessel -- one million dollars for each U.S. port call believed to have been made while the rogue engineer was on the vessel.  By contrast, MARPOL requires flag states to authorize and

impose sufficient sanctions to deter violations, but it does not require criminal sanctions.  Thus, the enforcement mechanism for improper record- keeping on the high seas is radically shifted from the flag state to the port state -- at least whenever this country is the port state.[7]  And in this case the MARPOL Administration concluded that prosecution and detention of the vessel was inappropriate.  Officials of this port state, however, supplanted that decision, holding nine innocent crewmembers as human "surety" in the process.

The government's interpretation of its own regulation shifts the jurisdictional framework under both congressionally-established and international policy affecting the international shipping industry. It therefore falls squarely under the Supreme Court's "major questions" doctrine.  *See West Virginia v. Environmental Protection Agency,* 142 S. Ct. 2587, 2608-09, 213 L. Ed. 2d 896 (2022).  Under the doctrine, a "colorable textual basis" is not sufficient to overcome the presumption that "Congress intends to make major policy decisions itself, not leave those decisions to agencies" and, therefore, the agency must point to "clear congressional authorization" for the power it claims.  *Id.*  Defendant cannot meet that burden.

Hence, the Coast Guard cannot claim that it was investigating a U.S. crime when it detained the MARGUERITA and seized her crew.  To the extent it was authorized to investigate violations of the APPS, that authorization did not apply here.  And of course no statute authorizes the government to seize mere witnesses indefinitely without judicial process.

b.    **The confinement of Plaintiffs on the vessel was not lawful.**

---

[7] In every foreign vessel ORB case, the government focuses on high-seas conduct in order to show that the ORB was not properly "maintained."  In other words, the government's proof is exactly what it would be if the government were authorized to prosecute foreign vessels for high-seas discharges.  Thus, the only information federal employees sought from Plaintiffs was what the foreign crewmen observed on a foreign vessel while in foreign waters.

Defendant abandoned its earlier reliance on 19 U.S.C. § 1581(a) as justification for Plaintiffs' nine-day confinement on the vessel;[8] instead, it mistakenly argues CBP's supposed authority to revoke crewmember entry and shore passes authorized the confinement.

As summarized above, CBP granted each Plaintiff a D-1 or D-2 shore pass to enter the United States on July 7, 2017. *See* 8 CFR § 252.1(d).

By statute, immigration officers are expressly authorized to grant these shore passes, or temporary visas, to alien crewmen as long as they are not intending to immigrate. 8 U.S.C. § 1282(a). Once the temporary permit has been issued, however, the authority to revoke it is limited to just two sets of circumstances: If the officer "determines that an alien is not a bona fide crewman, or does not intend to depart on the vessel or aircraft which brought him," he or she may revoke the permit "and such crewman shall be removed from the United States … ." *Id.,* § 1282(b). These provisions work in conjunction with section 1287, which imposes a penalty on any person

> who shall knowingly sign on the vessel's articles, or bring to the United States as one of the crew of such vessel or aircraft, any alien, with intent to permit or assist such alien to enter or land in the United States in violation of law, or who shall falsely and knowingly represent to a consular officer at the time of application for visa, or to the immigration officer at the port of arrival in the United States, that such alien is a bona fide member of the crew employed in any capacity regularly required for normal operation and services aboard such vessel or aircraft … .

*Id.,* § 1287. Section 1282 is thus part of a legislative scheme that, on the one hand, generally allows foreign crewmen to come ashore while in port (as is the nearly universal custom) while, on the other hand, guarding against those who have *pretended* to be crewmembers to sneak into the country or otherwise evade its immigration laws.[9]

---

[8] *See* Order on Motion to Dismiss, ECF No. 61 at 23-24, Page ID # 782-783.

[9] The House Report explained that the purpose of the section was to "insure that members of the crews of the vessels or aircraft entering the ports or airports of the United States from foreign places will depart the United States, while at the same time, permitting the crewmembers to land temporarily for such periods of time as is necessary to

Section 1282(b) has a "narrow" applicability. *See Stanisic,* 395 U.S. at 74; *see also id.* at 78 (calling it a "provision of limited applicability"). Significantly, "[i]t does *not* apply to an alien crewman … *who enters on a 'D-2 permit' allowing him to depart on a different vessel,"* like Plaintiff Zak. *Id.* at 74 (emphasis supplied). And for those issued a D-1 permit, it applies only if they are not bona fide crewmen or do not intend to depart on the vessel that brought them. 8 U.S.C. § 1282(b).

"Bona fide crewman" is not defined in the statute. The common, dictionary meaning of *bona fide* is "neither specious nor counterfeit: genuine"; its synonyms are *actual* and *real. See, e.g.,* Webster's New World College Dictionary 158 (3d ed. 1997); www.merriam-webster.com/dictionary/bona%20fide. There is no evidence that Plaintiffs were not actual members of the MARGUERITA's crew, nor that government officials ever doubted their genuiness. By Defendant's own admission, its agents designated the entire crew as "mala fide,"[10] not because they were determined to be imposters or to be seeking to secrete themselves into the United States, but simply because "among the crew were persons who were potential participants in, or witnesses to, potential federal criminal violations" (ECF No. 158 at 22,

---

maintain normal operations in the conduct of foreign commerce." H. Rep. No. 1365, 82d Cong. 2d Sess., *reprinted in* 2 U.S. Code Cong. & Admin. News at 1653, 1722 (1952). The report added that such "permission is revocable if the alien is found not to be a bona fide crewman or does not intend to depart on the vessel on which he arrived or some other vessel." *Id.*

The Senate Judiciary Committee's report noted that alien crewmen had traditionally been granted shore leave "because of the necessity of freeing international commerce from unnecessary barriers and considerations of comity with other nations … ." S. Rep. No. 1515, 81st Cong., 2d Sess. at 546 (attached hereto as Exhibit E), quoted in *INS v. Stanisic,* 395 U.S. 62, 73, 89 S. Ct. 1519, 23 L. Ed. 2d 101 (1969). The Committee, however, was concerned by alien crewmen who deserted their ships and secreted themselves in the United States. *Id.* at 550. The Committee found: "The temporary 'shore leave' admission of alien seamen who remain illegally constitutes one of the most important loopholes in our whole system of restriction and control of the entry of aliens into the United States." *Id.* It therefore recommended that authority be given to immigration officers to revoke temporary permits "upon a satisfactory finding that an alien is not a bona fide crewman where the crewman was supposed to "depart on the same vessel on which he arrived" and require that he be removed from the country. *Id.* at 558.

[10] Nothing in the immigration laws or regulations authorizes CBP to designate anyone "mala fide" or even mentions that term. *See* 8 U.S.C. §§ 1 *et seq.*; 8 CFR §§ 1 *et seq.*

PageID# 6866).[11]  In other words, because the Coast Guard's sought to deny the crew their rights and liberties, the CBP agreed, falsely, to declare them to be phony crewmembers, and to detain them on blatantly false pretenses.  CBP officials simply and summarily *designated* the entire crew as "mala fide."

Defendant stresses that immigration officers are afforded "discretion" under section 1282(b).  But the statute grants discretion only *after* it is determined that an alien is falsely posing as a crewmember.  8 U.S.C. § 1282(b).  The officer does not have discretion (or it would be an abuse of discretion) to simply call designate as "mala fide" a genuine crewmember as a pretext for a warrantless arrest of an innocent person.  All the discretion in the world could not authorize an officer to say that black is white or that two plus two equals thirteen.  Moreover, if Congress had intended to give immigration officials that sort of discretion, it would not have required a *determination* that "an alien is not a bona fide crewman." Congress would have simply provided, "Immigration officers may revoke the conditional permit for whatever reason they deem reasonable at their sole discretion."  Section 1282(b) says nothing of the sort. *See United States v. Esperdy,* 188 F. Supp. 491, 496-97 (S.D.N.Y. 1960) (labelling a crewmember "mala fide" because he seeks asylum is improper).

The government perverted both the letter and intent of section 1282(b) to gain physical control of the ship's innocent crew without judicial process.  In accordance with the statutory goal of preventing sham crewmen to enter and stay in this country, the section requires that once

---

[11] Defendant's agents at all times knew that none of the crew could possibly be "participants" in a U.S. crime, because even under the Government's erroneous interpretation of the ORB "maintenance" provision, the only individual with responsibility for the maintenance of the ORB is the captain.  *See* 33 CFR 151.25(j).  No crewmember – not even the chief engineer who effectuated the improper high-seas discharges (and who was no longer on the vessel) – could have violated this regulation.  *See Fafalios,* 817 F.3d at 158-63.  As Judge Rich found, none of the Plaintiffs was ever a target of the federal investigation.  Furthermore, the Government knew before the vessel's arrival that Plaintiff Hornof's only involvement in the discharges was to discover them, document them, report them and put a stop to them.

it is determined that an alien is a phony crewman and his shore pass is revoked, "such crewman *shall* be removed from the United States… ."  *Id.* (emphasis supplied).  In this instance, the purpose of the revocation of the shore passes was not to remove phony crewmen from the United States but, to the contrary, to *detain bona fide crewmen in* the United States against their will.

Even if there were any statutory basis for Plaintiffs' shipboard incarceration, a "statute permitting indefinite detention of an alien would raise a serious constitutional problem." *Zadvydas v. Davis,* 533 U.S. 678, 690, 699 (2001); s*ee Nadarajah v. Gonzales,* 443 F.3d 1069, 1076-78 (9th Cir. 2006).  Throughout their imprisonment on the vessel, Plaintiffs were denied their liberty without due process of law, in violation of the Fifth Amendment to the United States Constitution.  Under Supreme Court jurisprudence, all persons within the territory of the United States are entitled to due process of law, including aliens.  *Wong Wing v. United States,* 163 U.S. 228, 238 (1896); *see also United States v. Valsys,* 524 U.S. 666, 671 (1998); *Langdon v. Plasencia,* 459 U.S. 21, 32-33 (1981); *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596 (1953).

The Fourth Amendment likewise protects foreign nationals like Plaintiffs.  *See INS v. Lopez-Mendoza,* 468 U.S. 1032 (1984).  The purpose of that amendment is "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and security of individuals."  *See United States v. Martinez-Fuerte,* 428 U.S. 543, 554, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976).  The detention of an alien in violation of the Fourth Amendment constitutes false imprisonment.  *See Velez v. United States,* 693 F. Supp. 51, 57-58 (S.D.N.Y. 1988).

The arrest and detention of a person as a potential witness is just as much an invasion of that person's security as if he had been arrested on a criminal charge.  *Bacon v. United States,* 449 F.2d 933, 942 (9th Cir. 1971); *Perkins v. Click,* 148 F. Supp. 2d 1177, 1183 (D.N.M 2001). The detention of witnesses for investigative purposes must be minimally intrusive.  *Lincoln v.*

*Scott,* 887 F.3d 190, 197 (5th Cir. 2018).  Police "have less authority to detain those who have

witnessed a crime for investigatory purposes then to detain criminal suspects." *Lincon v. Turner,*

874 F.3d 833, 845 (5th Cir. 2017); *see generally* 4 W. LaFave, Search and Seizure § 9.2(b) at 380

(6th ed. 2020).

Defendant misleadingly argues that constitutional claims are not cognizable under the

FTCA.  The tort of false arrest is well recognized in state law.  Any person accused of the tort

may raise the defense of justification.  The government has done so by contending that its actions

were lawful, which in this instance means Constitutional and authorized by statute.  For the

reasons outlined above and below, the Defendant's actions were neither.  No statute even

arguably authorizes the government to pretextually call bona fide crewmen mala fide, to contract

for human collateral or to seize passports for the purpose of detaining innocent persons without

judicial process, nor does the Constitution.  A defense lawyer doing any of those things would be

held liable for the state court tort of false arrest, and defendants have at least equal right to

material witness warrants.

### c.    The confinement of Plaintiffs on U.S. soil before the issuance of arrest warrants was unlawful.

After seizing the vessel and her crew on the pretext that entries in the ship's ORB made

on the high seas concerning discharges on the high seas (as discovered and reported by Plaintiff

Hornof and disclosed by the vessel operator) constituted violations of APPS, Coast Guard

officials forced the vessel operator to sign their Agreement on Security.  The Agreement on

Security required the ship operator to turn over to the government, at the operator's expense,

government-designated crewmembers, including Plaintiffs.  The agreement stated in part: "At

the request of the U.S. Coast Guard acting on behalf of the United States, the ships officer and

crewmembers listed [below] shall remain within the jurisdiction of the U.S. District Court -

District of Maine" until the prosecuting attorney "advises that their presence is no longer necessary." The so-called Agreement makes clear "no such ship's officer or crew will be allowed to remain onboard the Vessel when it departs."

In contravention of the so-called "Agreement" and of the Plaintiffs' rights, the government confiscated the crewmembers' passports and other immigration documents. Next, the officials involuntarily "paroled" the crewmembers into the United States, perverting a process meant to help refugees seeking asylum in this country. *See* 8 U.S.C. § 1182(d)(5). Defendant focuses on the legality of the "parole' process, relying on 8 U.S.C. § 1182(2)(5)(A). But that section allows the Attorney General (not the Coast Guard or CBP) to temporarily parole "any alien ***applying for admission to the United States***. The process is not intended to – and does not even arguably – authorize the Government to force innocent foreigners *into* this country for the purpose of extra-judicial detention.

Because Defendant has no justification for its extra-judicial detention of Plaintiffs, it insists that at all times before arrest warrants were sought, Plaintiffs were volunteers. The short answer is that the declarations of the Plaintiffs and attorneys Chalos make clear the plaintiffs were not volunteers. Those declarations plus the declaration of attorney Merrill make clear that government is and was well aware that most detained crewmembers, including these plaintiffs, are not volunteers. The declarations document the government refuses to deal with crewmembers attorneys (and refused to deal with these crewmembers' attorney) because the government knows vessel owners will force ashore crewmembers demanded as human surety when such is the price to get a vessel back to work at sea. The government's statement of facts documents that it demanded written proof the Plaintiffs' attorney was authorized to speak for

them.  Yet the government disingenuously contends it *assumed* MST had secured the Plaintiffs'

consent for the government to negotiate on behalf of the crew in its dealings with MST.

Defendant drafted the Agreement on Security to put the onus on the ship operator to

inform the government if any of the crew objected to surrendering his passport, but the

government's filings document that it knows ship's captains customarily maintain the passports

while at sea to facilitate port entries.  Accordingly, as the government's own assertions

document, the crew was never asked to surrender their passports – and they did not.  Plaintiffs,

more generally, never assented to the agreement.  Drawing reasonable inferences in favor of

Plaintiffs, it can easily be inferred that Defendant's agents knew the crewmembers did not

consent and so they crafted portions of the coerced Agreement on Security to create a fictious

narrative of voluntariness, as attorney Merrill's declaration explains.

Moreover, MST never indicated that the crewmembers had agreed to remain in the U.S.

Instead, as detailed above, MST's lawyer remined the government on August 1, 2017, that the

"seafarers [were] forced ashore . . . and . . . DETAINED in the US" (emphasis in original), that

"the interference with the rights and liberties of at least nine (9) crewmembers" was "out-of-

bounds" and that the government should not (as it now does) "go to court and argue that they are

in Portland voluntarily.  It is not true." *See* ASMF ¶ 44.

Defendant speciously suggests that Plaintiffs' willingness to cooperate was tantamount to

consent to detention.  Witnesses routinely agree (as the witnesses admittedly did) to provide

information, testify, and cooperate with governmental or judicial proceedings.  Those agreements

do not imply agreement to surrender all liberty, to be absent from family for months or years, or

to miss funerals, births, birthdays, and holidays.

Conversely, when each Plaintiff effected court filings to regain his freedom or otherwise signaled his desire to go home, he had not "changed his mind" about cooperating. Defendant mistakenly claims that as soon as it received notice of each Plaintiff's so-called change of heart, it immediately sought an arrest warrant. Mr. Zak filled a petition for writ of habeas corpus on July 14, 2017; Defendant's agents delayed three days before applying *ex parte* for a warrant and in the interim they confiscated his passport, forced him ashore and involuntarily paroled him into this Country. On August 5th, Mr. Hornof, through counsel, asked to go home as soon as possible; the government waited four days before seeking an ex parte warrant, falsely telling him in the interim that the grand jury could not take his testimony when he appeared to provide it. After the government refused to respond to written demands, Mr. Kordic and others filed a motion for the return of theirs passports and visas on August 9, 2017. The government waited twelve days, until August 21st, before seeking his arrest.

In short, Defendant kept Plaintiffs under distraint in the United States for substantial lengths of time before seeking warrants, knowing they did not consent to the confinement. Its officers had no legal basis for doing so. The Government has been found liable for false arrest of aliens for unlawful confinements as short as a few hours. *See, e.g., Adedeji v. United States,* 782 F. Supp. 688 (D. Mass. 1992); *Velez,* 693 F. Supp. at 58.

> **d.     The arrest of Plaintiffs pursuant to material witness warrants based on misleading affidavits was not lawful.**

As the Court earlier ruled (ECF No. 61 at 26-27, Page Id # 785-86), an arrest is unlawful and unconstitutional if it is made upon a warrant predicated on an affidavit that intentionally or recklessly misrepresents or omits material facts. *Burke v. Town of Walpole,* 405 F.3d 66, 81 (1st Cir. 2005); *Forrest v. Platucket Police Dep't,* 377 F.3d 52, 58 (1st Cir. 2004). Under the material witness statute, as infused by Fourth Amendment requirements, a warrant applicant must

establish probable cause that (a) the testimony of a person is material in a criminal proceeding" and (b) it would be impracticable to secure the presence of the person by subpoena. *See United States v. Awadallah,* 349 F.3d 42, 64 (2nd Cir. 2003); 18 U.S.C. § 3144.  To satisfy the "materiality prong," it must be shown that the witness's testimony is needed for the prosecution or defense of a U.S. crime.  Defendant's agents falsely claimed to have evidence that the vessel interests had violated APPS.  As demonstrated above, no violation of APPS took place.  Although Judge Torresen ruled otherwise in the criminal proceeding, Plaintiffs were not parties to that proceeding, and the Court is now free to revisit this issue.

As for the "impracticability prong," a showing that the witness would otherwise be unavailable is required.  *See, e.g., United Staes v. Basciano,* 763 F. Supp. 2d 303, 335 (E.D.N.Y. 2011) (showing was inadequate because witness was already in custody); *United States v. Ionia Management S. A.,* 2007 U.S. Dist. LEXIS 58016, 2007 WL 2325199 at *3 (D. Conn. Aug. 9, 2007) (showing inadequate in light of representation of witnesses' availability).  The impracticability showing is insufficient where, for example, facts do not show that the witness was a fugitive or would be likely to flee but showed merely that he was obstinately insisting on his right to refuse to appear before a grand jury and the agents had encountered difficulties in trying to serve him with a subpoena.  *See Arnsberg v. United States,* 757 F.2d 971, 974-77 (9th Cir. 1984); *see also Bacon v. United States,* 449 F.2d 933, 943-45 (9th Cir. 1971) (impracticability showing insufficient despite proof that witness "had personal contact with fugitives from justice," had money to facilitate escape, and appeared to wish to avoid apprehension).

The affidavits of Special Agent Root emphasized that each of the Plaintiffs lived overseas but deliberately omitted numerous material facts casting doubt on the need for their detention,

including the facts that (a) all the Plaintiffs had been thoroughly cooperative at all times and had

never refused to testify; (b) that Plaintiff Hornof had already been subpoenaed (informally) and

that he not only had agreed to appear but *had* appeared to testify on the very day Agent Root

then filed the request for Hornof's arrest – and that the government prevented his testimony so

that it could pretextually claim a dire need; (c) Plaintiff Kordic had agreed to testify before the

grand jury on August 22, 2017, one day after Agent Root requested Kordic's arrest; (d) witnesses

in APPS cases have a very strong incentive to testify due to the availability of awards of up to

fifty percent of any fine imposed under the statute, *see* 33 U.S.C. § 908(a); and (e) the United

States had treaties with the Plaintiffs' home countries requiring cooperation in obtaining the

testimony of residents who had been subpoenaed in criminal matters.  *See* ASMF, Exhibit B.

Additionally, as the Court has noted, the affidavits concealed the facts that the

government already held Plaintiffs in its custody by use of the extrajudicial devices of the

Agreement on Security and parole; that Root had confiscated their passports, making it

impossible for them to travel; that they were being monitored by CGIS on a daily basis; that it

therefore would have been extremely easy to subpoena them and assure their presence before the

grand jury; that they had petitioned the court for their freedom; and that the government was

opposing their petitions, which had not been acted upon.  The affidavits also failed to disclose

that Plaintiffs' and MST's counsel were diligently proposing and seeking to arrange pre-

indictment depositions and that it was the government that resisted that effort.

Defendant suggests that the arrest of Plaintiffs was the only way to guarantee their

availability.  But such an assertion proves too much, as there is always some risk a witness will

fail or refuse to appear and be difficult to find.  To hold that foreign visitors are uniquely

susceptible to arrest, simply because they are foreign visitors, would infringe on their right to

equal protection.  *See, e.g., Shugarman v. Dougall,* 413 U.S. 634, 641 (1973); *Graham v. Richardson,* 403 U.S. 365, 371 (1971); *Truax v. Raich,* 239 U.S. 33, 39 (1915).[12]

Agent Root's affidavits offer no proper, fact-based justification for Plaintiffs' arrest. Even if they had asserted that Plaintiffs were seeking to go home (as Defendant now does), this would scarcely raise the inference that Plaintiffs were refusing to testify or would not comply with subpoenas.  As noted above, cooperation with governmental and court proceedings is perfectly consistent with attending to home and family.

The government also misrepresented and omitted the actual history of seafarers' going to significant lengths to provide testimony.  The Declaration of Elaine Akers documents that her firm as represented over 100 seafarers who were allowed to go home over the government's objection, that all who were needed or requested for court proceedings either returned provided deposition testimony and that many returned but were never called.  Indeed, all three Plaintiffs returned to Maine for trial, only to find that a plea agreement had been submitted; and when that plea was rejected, they made arrangements to return to this country for trial a second time.

Defendant's agents had no compunction about depriving Plaintiffs of their liberty, because they had no regard for foreign seafarers or their rights and believed that nobody was going to be able to stop them.  They seized control of the crewmembers first by detaining the vessel and illegally revoking the crew's duly issued shore passes, then by arranging a forced exchange of the vessel for crewmen, then by confiscating passports, and finally (when some of the crew began challenging their actions in court) by misleading the magistrate into granting ex

---

[12] *See also Johnson v. Robison,* 415 U.S. 361, 364 n. 4, 94 S. Ct. 1160, 39 L. Ed. 2d 389 (1974) ("if a classification would be invalid under the Equal Protection Clause of the Fourteenth Amendment, it is also inconsistent with the due process requirement of the Fifth Amendment.").

parte arrest warrants.  All these actions were improper and constituted false arrest and false imprisonment.  At the very least triable issues of fact remain.

4. **Summary judgment should be denied on Plaintiffs' abuse of process claim.**

Abuse of process occurs when a defendant "(i) initiated or used a court document or process in a manner not proper in the regular conduct of proceedings, (ii) with the existence of an ulterior motive, and (iii) resulting in damage to the plaintiff." *Tanguay v. Asen,* 1998 ME 277 ¶ 5, 722 A.2d 49, 50.  As the First Circuit has recognized, "obtaining search and arrest warrants by means of false testimony is a proper basis for a claim of abuse of process… ." *Rucci v. United States Immigration & Naturalization Service,* 405 F.3d 45, 50 (1st Cir. 2005); *see also Davis v. United States,* 2010 U.S. Dist. LEXIS 7036, *54-56 (C.D. Cal. Jan. 28, 2010) ("Many courts… have recognized that an abuse of process claim may lie where an arrest or search warrant was improperly obtained.") (collecting cases).

As discussed above, the evidence shows that Special Agent Root, acting in concert with other law enforcement officers, used fraudulent affidavits to obtain arrest warrants against each of the Plaintiffs.  Hence, a trier of fact may reasonably find Defendant liable for abuse of process.

5. **Summary judgment should be denied on Plaintiffs' IIED claims.**

The elements of a claim for intentional infliction of emotional distress are that "(1) the defendant intentionally or recklessly inflicted severe emotional distress or certain or substantially certain that such distress would result from her conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so

severe that no reasonable person could be expected to endure it." *Argereow v. Weisperg,* 2018 ME 140, ¶ 27, 195 A.3d 1210.

As the First Circuit has recognized, the FTCA permits IIED claims, not because they are included in the law enforcement proviso but, rather, because there not excluded under section 2680(h) (or anywhere else in the FTCA) in the first place. *See Limone v. United States,* 579 F.3d 79, 92 (1st Cir. 2009). In *Limone,* the court affirmed judgment against the United States for IIED. It indicated that where FBI agents had colluded to arrest and imprison innocent people by concealing material facts concerning the reliability of an informant's evidence and then by stonewalling the victims' efforts to win their freedom, the government could be liable for IIED. *Id.* at 94-100. The court agreed that such conduct was extreme and outrageous. *Id.* at 99. Further, it was easy to infer that the FBI, using common sense, would have known "that its misconduct was likely to cause emotional distress." *Id.*

Here, too, law enforcement officers conspired with others[13] to arrest and confine innocent seafarers in violation of basic precepts of state law and due process and sought to obstruct each of their efforts to assert their rights and regain their freedom. This outrageous conduct was certain to cause Plaintiffs severe emotional distress, and it did so. Summary judgment is therefore inappropriate. *See Alexander v. United States,* 721 F.3d 418, 421, 425 (7th Cir. 2013) (IIED claims under FTCA were properly predicated on false evidence in probable-cause affidavit and other misleading conduct leading to plaintiff's arrest).

6. **The Discretionary Function Exception is inapplicable.**

Defendant has waived its discretionary function defense at least for summary

---

[13] Because IIED claims are not brought pursuant to the law enforcement proviso, they may be based on the actions of government agents not deemed investigative or law enforcement officers. *See Limone*, 579 F.3d at 92.

judgment purposes.  After discussing the exception in the abstract at some length, Defendant announces in its summary judgment motion: "The United States respectfully submits that the Court need not reach the discretionary function exception… ."  (ECF No. 158 at 18, Page ID # 6862).  Defendant abandons any argument as to how the confinement of Plaintiffs without warrants or the later procurement of warrants by means of fraudulent affidavits involved discretionary functions but instead relies on the assertions (rebutted above) that its actions were entirely lawful.

On the other hand, Defendant repeatedly alludes to the "discretion" with which Coast Guard and CBP officials ostensibly are vested.  In an abundance of caution, Plaintiffs briefly note that the exception is inapplicable here for a number of reasons.

First, the exception does not apply where, as here, tort claims are asserted under the law enforcement proviso.  Though some courts take a contrary position, the better view is that the law enforcement proviso supersedes the discretionary function exception.  *See, e.g., Nguyen v. United States,* 556 F.3d 1244, 1251-57 (11th Cir. 2009); *Paret-Ruiz v. United States,* 943 F. Supp. 2d 285, 290 (D.P.R. 2013); *Garey v. Langley,* 2021 U.S. Dist. LEXIS 172791, *40, 2021 WL 4150602 (E.D. Ark. Sept. 13, 2021); Note, *Tortious Constructions: Holding Federal Law Enforcement Accountable by Applying the FTCA's Law Enforcement Proviso over the Discretionary Function Exception,* 95 N.Y.U.L. Rev. 1943, 1977-78 (2020) ("the proper interpretation" is that the law enforcement proviso supersedes discretionary function exception).

This is so because the law enforcement proviso expressly states that for the acts of investigative or law enforcement officers, the sovereign immunity waiver of the FTCA "shall apply to ***any*** claim" for false imprisonment, false arrest, abuse of process, or other enumerated

torts.  28 U.S.C. § 2680(h) (emphasis supplied).[14]  To the extent of any conflict with the discretionary function exception, the proviso is much more specific, and specific provisions trump general ones.  *Nguyen,* 556 F.3d at 1253; *see Harry C. Crocker & Sons, Inc. v. OSHRC,* 537 F.3d 79, 84-85 (1st Cir. 2008).  In addition, the amendment containing the proviso was passed after the adoption of the discretionary function exception; and a later-enacted provision supersedes an earlier one.  *Nguyen,* 556 F.3d at 1253.  It is therefore clear that the discretionary function exception does not apply to "law enforcement' torts under section 2680(h).

Second, as the Court earlier concluded, even if the discretionary function exception applied, officers have no discretion to violate the Constitution.  *See Limone,* 579 F.3d at 101; *see also Reynolds v. United States,* 549 F.3d 1108, 1113 (7th Cir. 2008) (decision to make false statements in probable cause affidavit not discretionary); *Selvam v. United States,* 570 F. Supp. 3d 29, 48 (E.D.N.Y. 2021) (same).

---

[14] The legislative history supports the interpretation of the law enforcement proviso as applying to *all* such torts regardless of whether a discretionary function was involved.  The Senate Committee Report explained that the proviso

> would submit the Government to liability *whenever* its agents act under color of law so as to injure the public through searches and seizures that are conducted without warrants or with warrants issued without probable cause.  However, [the proviso] should not be viewed as limited to constitutional tort situations but would apply *in any case in which a Federal law enforcement agent committed the tort while acting within the scope of his employment or under color of Federal law.*

S. Rep. 93-588, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & News 2789, 2791 (emphasis supplied).  The language of this report "is categorical and unqualified."  *Sutton v. United States,* 819 F.2d 1289, 1296 (5th Cir. 1978).  No exception is made for the discretionary function doctrine.  *See id.*  Further, the Senate Committee Memorandum on No-Knock Legislation stated:

> It is not the intention of this amendment to allow any other defenses [not provided in Section 2680(h)] that may be available to individual defendants by state or federal law, custom or practice to be asserted [by] the government.

Senate Comm. on Gov't Operations, Memorandum on No-Knock Legislation, Aug. 28, 1973, quoted in *Sutton,* 819 F.2d at 1296.

Third, the government has not articulated any legal basis for law enforcement to contract with a private employer to detain its employees.  The bizarre practice is not a traditional or recognized method of law enforcement.

Fourth, "discretionary function" is an affirmative defense on which the sovereign has the burden.  *See Bunch v. United States,* 880 F.3d 938, 941 (7th Cir. 2018); *Merando v. United States,* 517 F.3d 160, 164 (3d Cir. 2008).  The strict standards for granting summary judgment are even more stringent where the moving party would have the burden of proof at trial, in view of the factfinder's prerogative to disbelieve affirmative evidence.  The evidence must be so powerful that no reasonable jury would be free to disbelieve it.  *See, e.g., Cockrell v. Shelby County School District,* 270 F.3d 1036, 1056 (6th Cir. 2001); *Edison v. Reliable Life Insurance Co.,* 664 F.2d 1130, 1131 (9th Cir. 1981); 11 Moore's Federal Practice § 56.13(1) (3d ed.).

Defendant has presented not proper affidavit or other evidence of any proper discretionary function.  It would make a mockery of the law enforcement proviso (not to mention the Constitution) if federal officers, at their pleasure, could incarcerate or contract for the detention of innocent people as a "discretionary function."

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion for Summary Judgment in its entirety.

Executed in Portland, Maine, this 31st day of August 2022.

 /s/ Edward S. MacColl
Edward S. MacColl

/s/ Marshall J. Tinkle
Marshall J. Tinkle
Attorneys for Plaintiffs

THOMPSON, MACCOLL & BASS, LLC, P.A.
15 Monument Square, 4th Floor
P.O. Box 447
Portland, ME  04112-0447
(207) 774-7600

<u>CERTIFICATE OF SERVICE</u>

I certify that, on the above date, I made due service of the above document by electronically filing the same using the Court's EM/ECF system.


/s/Edward S. MacColl