# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    )
**JAROSLAV HORNOF, et al.**    )
     )
     *Plaintiffs,*    )
     )
**v.**    )     **CASE NO.:  2:19-cv-00198-JDL**
     )
**UNITED STATES OF AMERICA, et al.**    )
     )
     *Defendants.*    )
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    )

## <u>DECLARATION OF JAROSLAV HORNOF</u>

Jaroslav Hornof, intending to be subject to the pains and penalties of perjuries makes the following sworn declaration and affidavit.

1. I am and always have been a citizen and resident of the Czech Republic.

2. In May 2017, I was a duly licensed Third Engineer, having dedicated my education and career to becoming a mariner.

3. I had attended college and worked hard to develop my skills.  I believe I was highly regarded as a technically sound marine engineer with good judgment, excellent work skills, and high integrity.

4. I believed I was destined to a successful career at sea.

5. At the time I was detained and currently I could and did earn much more at sea than I can earn at home.

6. At the time, my wife and I had one son and she was expecting our second child in late October.  I was deeply devoted to my family.

1

7. I agreed to serve on the Marguerita because the contract assured my return home before my wife's due date, and because the owner and manager agreed I could return home early if any need arose.

8. Most vessel owners and managers are flexible in assisting mariner's return home when emergencies arise.

9. I signed onto the vessel as she transited the Panama Canal with cargo that I understood had been loaded in Brazil and was destined for Vancouver, Canada.

10. Within days of boarding, I determined that the vessel's then Chief Engineer was ordering the discharge overboard of oily bilge waters in international waters.

11. From my investigation, including conversations with crewmembers involved, I believed all such discharges had occurred in international waters, far from the United States.

12. I knew the vessel was registered with the Republic of Liberia, that MARPOL applied to the vessel under Liberian law, and that the discharges therefore violated Liberian law implementing MARPOL, the set of international conventions designed to minimize pollution from vessels registered to signatories and to insure the efficient handling of investigations into such pollution.

13. From my training I knew that as the flag state for the vessel, Liberia was the "Administration" for purposes of MARPOL enforcement.

14. I approached the Chief Engineer and told him that his handling of bilge water was improper, that he was violating MARPOL and flag state law, that he was polluting the ocean, and that he had to stop.

15. The Chief Engineer insisted he was doing nothing wrong.  So I documented the misconduct and reported it to the Master or Captain of the vessel and to the MST, the

2

company responsible for managing the vessel.  The documentation included a written statement, video recordings of the operation, and samples I took of the bilge water being improperly discharged.

16. When the Marguerita arrived in Vancouver, Canada, a shoreside official from MST met with me onboard.  I explained my observations and shared the evidence I had gathered.  The MST official asked me to watch for and report any further discharge.  The MST official also told me that he would report the misconduct to flag and U.S. officials and that a detailed MARPOL audit would be conducted.  I did monitor for improper conduct after we left Vancouver, but there was none.  I was satisfied that my report and MST had put an end to the discharges.  It was also apparent from MST's reaction that they had not be aware of the discharges.

17. Although I was pleased my efforts appeared successful, I was concerned about reporting the matter to U.S. officials, because I had heard that the United States holds crewmembers of vessels that violate MARPOL for extended periods.  I did not want to be detained in any foreign country, especially with my wife expecting our second child.

18. The MST official assured me, however, that the company would make a full and complete disclosure to the United States of the results of the independent audit and that, as a result, there would be no need for the United States to hold any crew as witnesses.

19. The audit was conducted in Brazil.  I have read the report.  It generally confirms the information I had provided.

20. The vessel's next port of call after Brazil was Portland, Maine.  I now know that before our arrival lawyers for MST advised the Coast Guard that the audit in Brazil corroborated the report I had made and that they promised to provide the full report as soon as it was

completed.  (Because the emails were subsequently provided to me, I know MST's lawyer provided the report to U.S. officials promptly after he received the report on or about July 12, 2017.

21. When we arrived in Maine, U.S. customs officials gave all crewmembers formal papers, known as shore passes, admitting us to the United States and allowing us to go ashore.

22. Shortly thereafter Coast Guard officials came onboard.  They Captain arranged for me to be interviewed by them.

23. I now know that the officials who interviewed me had been told in advance of the audit in Brazil and of my report of the misconduct by the former chief engineer (he was discharged from the vessel and replaced in Brazil).  The officers who interviewed me, however, acted ask though they had no prior information about discharges.  They acted surprised by the events I described to them.  Because of their statements and behavior, I believed MST had deceived me – that it had not made any disclosure to the United States. It was clear the Coast Guard officials wanted me to believe they had no prior information whatsoever about any MARPOL issues associated with the Marguerita.

24. Over the course of the day and evening many government officials came onboard.  They all acted as though they had discovered a problem of which they had no prior notice.

25. Customs officials returned and revoked our shore passes.  We were required to return them.  No interpreters were provided at any time on the vessel.  It was very confusing. But I never heard any suggestion that I was not a genuine crew member or that there was anything I could do to regain my freedom.

26. We were detained onboard the vessel, required to report to the government twice a day and guards were posted at the vessel.

27. I and all other crewmembers onboard the Marguerita were genuine professional mariners who were carrying out our respective duties on the vessel;

28. No government official suggested to me that I had acted in bad faith in any way or at any time.

29. I understand the government has now asserted that I was believed or suspected to have acted in bad faith and that that belief or suspicion was the basis on which my entry and shore pass were revoked.

30. I believe the government's assertion – and nothing I did – is in bad faith.

31. We were detained involuntarily on the vessel through July 16, 2017.

32. At no time did I authorize either the government or MST to negotiate for my detention.

33. On or about July 16, 2017, approximately eight crew were told by the captain that the government required him and the rest of us to disembark the vessel and remain in the United States. We were given no choice in the matter. We were not asked to agree. We were told the government required us to get off the ship and stay in America. At some point, I learned the government and MST had signed a so-called "Agreement on Security" that purported to extend and change my contract. I never consented to the change or extension, nor did I consent (nor was I asked to consent) to being left in the United States

34. We were escorted by a Coast Guard agent to customs offices.

35. During the process none of us had the assistance of counsel. Mr. MacColl was required to wait outside.

36. Our passports were confiscated. We were not asked to let anyone else hold them. We were given no choice in the matter.

37. We were told we could not leave Maine and that officials would continue to take attendance every day.

38. I did not request or consent to be paroled into the United States, nor do I believe any other crewmember requested or consented to the process or arrangement. We were detained and we felt detained.

39. My English was limited, although the English of most of the other crewmembers, including plaintiffs Zak and Kordic was even more limited. I had no friends or relatives in area. Our lawyer tried to stay in touch with us, and even had us to his house for dinner once or twice, but with limited English and transportation – and because of my family circumstance and the uncertainty concerning when I would be allowed to go home – I was very distressed and anxious.

40. From reviewing emails, I know that over the next several weeks, our lawyer repeatedly asked the government for information concerning the basis on which our passports had been taken and who had them.

41. My understanding is that the government provided no meaningful response concerning who had the passports or why they had been confiscated.

42. I had cooperated throughout the investigation. To the best of my knowledge all other crewmembers cooperated as well. I continued to be available to answer questions, but none were posed. My lawyer scheduled meetings for us to meet with the government and answer questions, but the government cancelled those meetings.

43. On July 30, 2017, my wife told me that her mother had died; she asked that I get home as soon as possible. She is an only child, was responsible for making funeral and related

arrangements, was expecting our second child and taking care of our son.  It was a horribly stressful time for her, and I needed to be home supporting her.

44. Of course, I had provided all information I had.  So long as any proceeding did not occur while my wife was in labor, I would have returned to testify.  Indeed, after the Court ordered the government to let me go home, I returned for the scheduled trial of MST (although the trial did not go forward).

45. I was asked to appear and testify before a grand jury on August 9, 2017, along with two other crewmembers.  The other crewmembers both testified before the grand jury that day, but the government told my lawyer and then told me that the grand jury did not have time for my testimony. I assured the government lawyers I would cooperate but needed to get home to comfort and take care of my wife.

46. Although I had appeared to testify as requested, later that day I was told the government had obtained a warrant for my arrest.

47. When I was arrested, there was no basis to assert that my testimony could not be obtained without a warrant.  I had never refused to meet or provide information to the government. I provided the crucial evidence of the misconduct.  I had agreed to meet with the government yet again.  I agreed to appear and testify before the grand jury.  The government cancelled the meeting and grand jury testimony.  I made clear that I was and would be available to answer questions and provide testimony, but that I also needed to attend to my family.

48. I kept all my promises to the United States.  I requested to provide deposition testimony so that my testimony could be preserved.  From reviewing emails and our court filings, I

understood MST agreed to participate in depositions even before it was indicted, but that the government refused.

49. Through my lawyer and by my conduct and my statements when I appeared for grand jury testimony, I made clear that I was ready, willing, and available to provide testimony in any manner that might reasonably be required.  I met several times on the vessel with government officials; my lawyer told the government in July that he had secured MST's consent to participate in depositions with the crew and to waive issues about the admissibility of those depositions.  On the morning of August 7, 2017, the day before I agreed to and did first appear in court to testify before the grand jury, my attorney filed a motion asking the government to arrange my deposition; MST and its lawyers continued to cooperate in that process. It was important to me to get home promptly given my wife's pregnancy and the death of my mother-in-law.  The motion we filed on August 7, which reaffirmed that I had been cooperating and remained "willing to cooperate," is attached hereto as **EXHIBIT A**.  I was hoping the government would work with me to assure that I was home to comfort my wife and attend the birth of my second child. Instead the next day the government cancelled my grand jury testimony and secretly obtained a warrant for my arrest.

50. I consistently made it clear that I remained willing to cooperate and provide testimony in all proceedings, and I have done so.

51. On August 17, 2017, the government objected to my motion to be allowed to give a deposition and go home.  The objection and everything the government said and did made it clear that the government sought to hold me in this country until after MST was tried.  During this time my despair deepened.  I truly could not believe who I was being

treated.  My wife was despondent, grieving, and furious.  She could not believe that I was doing everything I could to get home to her and my family.

52. I appeared in Court twice.  The first time because I was arrested.  The second to ask the Court to schedule my deposition and to say whether I wanted to switch lawyers.  The interpreter that day interpreted in Slovak, not Czech.  So my understanding was not perfect, but I understood the government objected to me going home and wanted me to stay in America longer and miss the birth of my child.  Thankfully, the Court ordered my deposition over the government's objection, but the process and delay added greatly to my stress and to the stress of my entire family.

53. I gave my deposition over the government's objection in mid-September and the judge allowed me to go home.

54. After I gave my deposition, the government delayed returning my passport and then subpoenaed me to return to the United States for trial.  At first we were told the trial would be in 2017, but it was delayed until May of 2018.  Mr. Zak, Mr. Kordic, and I all returned for that trial in May, almost a full year after we were first detained.   After the Court rejected the plea agreement the government reached with MST, we were asked again to return for trial in October of 2018.  I made the necessary arrangements and was about to return when I was advised the trial was cancelled because of a second plea agreement between the government and MST.

55. I suffered great and severe emotional distress because of the way the United States government treated me and my fellow crewmembers.

56. That treatment made it impossible for me to preserve my relationship with my wife and my professional career.  Although as is common in my country my wife and I were never

formally married, we are husband and wife.  We have three beautiful sons and a wonderful family.  I had to choose my family over my career, my wife would never agree that I could return to sea if I can be held indefinitely in foreign countries when my family needs me even if I did nothing wrong.

57. I understand the government contends that every time the Marguerita arrived in any U.S. port before July 2017 with an inaccurate record book relating to the handling of bilge water that I uncovered, the vessel's owner and manager committed a crime under U.S. laws implementing MARPOL, even though there apparently was no evidence the government asked to or did review those records during any of those port calls.

58. By the same logic, MST would (or at least may) have committed crimes every time it entered ports in the many other countries the ship called on after the chief engineer began to bypass the pollution control equipment.

59. If America can arrest and hold me, it follows that each of those other countries can also arrest and hold me.

60. My wife was terrified by the realization that as a seafarer who did nothing wrong, I could be detained yet again and kept in a foreign country without any evidence or even allegation that I did anything wrong or that the country suffered any harm.

61. The turmoil I suffered ultimately made it clear to me that I had to abandon my entire professional career to hold my family together and save my self-respect.

62. The fact that my actions caused many crewmembers, including Mr. Zak and Mr. Kordic, to be detained in America and to lose their jobs because they, following their bosses' orders, participated in discharges they did not fully understand added further to my stress.

63. I have attended individual and couples' counseling to deal with the distress.

64. My symptoms include excessive alcohol consumption, substantial weight gain, depression, and anxiety.

65. The loss of my professional mariner career will cost me millions of dollars, but it was impossible for me to continue so long as foreign seafarers who did nothing wrong can be treated this way.

66. I respectfully submit that foreign seafarer should not be punished by port states – or anyone – for preventing and exposing high-seas misconduct.

67. Most seafarers are honorable people.  If port states ask them to return for future proceedings, treat them with respect, and pay the expenses, most seafarers would return, as the three of us did.

68. The facts set forth in this declaration are true.  They are based on my personal knowledge, except to the extent the declaration states that the assertions are based on information or beliefs described in the declaration.  To that extent, I believe the declaration is true.

Executed at Prague, Czech Republic this  22nd  day of August 2022.

_/s/ Jaroslav Hornof_____
Jaroslav Hornof

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

IN RE GRAND JURY PROCEEDINGS      *
MOTOR VESSEL MARGUERITA      *
     *     Case Number: 2:17-mj-00154-JHR
     *

**EMERGENCY MOTION OF JAROSLAV HORNOF FOR DISCHARGE FROM CONSTRUCTIVE DETENTION, TO TAKE DEPOSITION PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 15, AND FOR EXPEDITED BRIEFING AND HEARING**

NOW COMES Jaroslav Hornof, through counsel, and moves this Honorable Court to release him from constructive detention associated with the above-captioned grand jury proceedings, to order the government to return his passport, and, if necessary to secure his release, to order his deposition pursuant to Federal Rule of Criminal Procedure 15 – and for the Court to conduct expedited briefing and any necessary hearings with respect to this motion. Mr. Hornof, who deserves credit from all concerned for bringing to light the subject of this purported grand jury investigation and for cooperating with all investigations conducted to date, respectfully requests expedited consideration in light of the fact that his wife is expecting the Hornofs' second child and his mother-in-law died last Sunday, July 30, 2017. The circumstance visits great stress on both Mrs. Hornof and Mr. Hornof, the latter of whom the government has involuntarily detained in the United States for a full month, but who has received no subpoenas for testimony or other judicial process.

Although Mr. Hornof remains willing to cooperate with any investigation, he respectfully contends that his detention and the confiscation of his passport violate his rights under our Constitution (including the Fourth, Fifth and Sixth Amendments) and statutes, international law (including the law of the sea conventions and MARPOL), and any reasoned sense of human decency.

As the government has filed a motion in this matter relating to Mr. Hornof's attorney-client relationship and since he understands he is being held as a potential witness in this matter, he respectfully submits that the Court has jurisdiction to grant the requested relief. Mr. Hornof's personal plea to the Court is attached hereto as **EXHIBIT A**.

FACTUAL BACKGROUND

Mr. Hornof signed onto the *M/V Marguerita*, a vessel of Liberian registry, on May 12. Onboard he learned of improper discharges in international waters of oily bilge waters. The discharges violated Liberian laws promulgated pursuant to MARPOL, the series of international conventions governing pollution on the high seas to which the United States and Liberia are signatories. Under MARPOL, the Republic of Liberia is the "Administration" with respect to the *Marguerita*. Mr. Hornof promptly addressed the matter seeking to ensure the discharges would stop and the matter would be investigated, first with the vessel's former chief engineer, then (when the discharges did not stop) with her former master and the vessel's management company. By June 20, 2017 his efforts led to reports to various regulatory authorities, including MARPOL's "Administration," i.e. Liberia, the vessel's classification society (Lloyds), and (presumably because the vessel's operating company was under probation in the District of Minnesota) judicial and Department of Justice officials in the United States and the company's independent compliance monitor. Those reports in turn led to several investigations, including by the Administration[1] and, later, our government. Mr. Hornof has cooperated with all investigations whenever requested, including onboard investigations by Master Peter Demcak, who signed onboard at the end of May in Duke Point, Vancouver, Canada; a surprise audit

---

[1] As the "Administration," the Republic of Liberia has formally protested our government's detention of the vessel in Portland. That protest and its exhibits are attached hereto as **EXHIBIT B**. Exhibit 3 to the Liberian protest includes electronic correspondence from the vessel's operating company to Liberian and U.S. officials disclosing Mr. Hornoff's reports. The documents within Exhibit 3 demonstrate that Liberian officials promptly began their investigation, including by requesting and receiving copies of the vessel's oil record book and various documents created by Mr. Hornof, including electronic videos.

2

arranged by the vessel's operating company conducted in late June when the vessel arrived (via the Panama Canal) in Beleem, Brazil[2]; Liberian investigations, which appear to have begun immediately after the May 20 notices, and the Coast Guard's investigation after the vessel arrived in Portland, Maine on July 7, 2017 (the vessel's next port call after departing Brazil).

When the vessel arrived in Portland, Maine, U.S. Customs and Border Protections (the "CBP") granted Mr. Hornof and all crew members what are known as "D-1" and "D-2" visas. Mr. Hornof received a "D-1" visa, allowing him to go ashore. D-2 visas were issued to three other crew members scheduled to fly home from Portland on flights approved by the CBP. On the afternoon and evening of July 7, thirteen Coast Guard officials, including at least three officers from the Coast Guard's criminal division (Coast Guard Investigative Services), boarded the vessel, conducting interrogations of crew members that lasted into the early morning hours. Mr. Hornof cooperated fully.

After the Coast Guard officials left in the early morning hours of July 8, 2017, the CBP officials came back onboard. They revoked the crew's visas, insisting that they return their documents allowing them to go ashore and or fly home; those papers were replaced with new documents asserting that entry into the country was "denied." The crew, including Mr. Hornof,

---

[2] The day after the surprise audit was completed, the operating company's attorney sent a letter to the regional Coast Guard offices in Boston and Portland, explaining that Portland was the vessel's next port, that the audit had been completed and confirmed at least much of Mr. Hornof's report and that the full audit report would be provided. Counsel's letter is attached hereto as **EXHIBIT C**. The full audit report was issued July 11, 2017. That report, it's exhibits, and the electronic correspondence from the company attorney forwarding it to the Coast Guard on the morning of July 12 are attached hereto as Exhibit D. Attorney Chalos had closed his letter of June 28 as follows:

> Consistent with the goals and practices of our clients' environment protection policies and procedures, the incident has and continues to be given the highest priority and attention. We trust the foregoing is clear, but stand ready to promptly respond to any questions you may have.

In a footnote, attorney Chalos explained that "Portland, Maine is presently anticipated next U.S. port call for the M/V MARGUERITA, with an estimated date of arrival of July 7, 2017."

was thereafter detained onboard under guard.  He and all others were told they could not leave the vessel, and they were required to appear for attendance before CBP officials twice daily. Notwithstanding repeated requests, the CBP and the Coast Guard refused to explain the basis or legal authority for revoking the crew's visas, entry and permission to fly home.

In addition to detaining the crew, the Coast Guard detained the vessel (a detention that has since been protested by the MARPOL Administration) and insisted her owners and operator post bonds totaling ten million dollars and enter into a contract to leave approximately half her crew behind in Portland, Maine, threatening otherwise to arrest the crew as witnesses.

On the morning of July 14, two of Mr. Hornof's fellow crew members who had been issued valid D-2 visas for entry and flights home from Portland (but whose visas and flight approvals were thereafter revoked) petitioned this court for writs of habeas corpus.  In response, the government greatly reduced its demand for monetary security, but continued to insist that the company formally contract to leave Mr. Hornof and eight other crew members in Portland, Maine indefinitely.  The government asserted or implied that absent such an agreement it would arrest and jail Mr. Hornof and the others.  A copy of the Agreement on Security executed on behalf of the vessel and the Coast Guard is attached hereto as **EXHIBIT E**.

On July 16, Mr. Hornof and eight other crew members were "paroled" into the United States, without his request or consent.  The terms and meaning of "parole" were not explained to him, nor was he given any notice of any right to appeal.  Although the Agreement on Security provides that Mr. Hornof's employer would retain his passport and implies it would be returned to him three days after any request, the government instead confiscated his passport.  In light of the family emergency described above, he has asked the government to disclose the location of his passport and return it.  He has also requested that the government expedite any testimony it

needs or wants from him.  The government recently responded that it considers itself contractually entitled to consider Mr. Hornof's request for three days before responding.

Mr. Hornof has not been subpoenaed, although he believes he is being detained in the United States as a potential witness to this grand jury matter.

On July 17, seeking to moot fellow crew members' petition for writs of habeas corpus, the government sought and obtained ex parte arrest warrants against those two crew members. The application for those warrants falsely asserted that upon arrival of the vessel in Portland, Maine crew members had "presented" the vessel's oil record book and otherwise implied that crewmembers had attempted to conceal the earlier discharges on the high seas.  To the best of Mr. Hornof's knowledge, no crew member sought to conceal any such discharge or suggested that the oil record book was accurate.  Instead of being "presented," Coast Guard officials had requested the oil record book because of the pre-arrival disclosure, and Master Peter Demcak promptly pointed out to the Coast Guard the corrective entry made in the ORB, dated June 19, explaining that, in light of the information Mr. Hornof had provided, earlier entries in the record book were not reliable.

The corrective entry, a copy of which is attached hereto as **EXHIBIT F**, provided as follows:

> ON JUNE 19, 2017, A TYPE-WRITTEN NOTE FROM A MEMBER OF THE ENGINEERING DEPARTMENT WAS RECIVED (sic) BY THE VESSEL'S MANAGER IN ACCORDANCE WITH THE VESSEL'S SAFETY MANAGEMENT SYSTEM.  AND REPORTING REQUIREMENTS. THE NOTE ALLEGED THAT THE HANDLING OF VESSEL'S BILGE WATER HAD NOT BEEN ACCURATELY MEMORIALIZED IN THE OIL RECORD BOOK.  THE MATTER IS UNDER INVESTIGATION AND HAS BEEN REPORTED TO THE VESSEL'S FLAG ADMINISTRATION AND CLASIFICATION (sic) SOCIETY, ONE OR MORE ENTRY(S) IN THE OIL RECORD BOOK MAY BE INACCURATE AND/OR MISSING AND THE CONTENTS OF THE BOOK SHOULD NOT BE RELIED UPON AT PRESENT.

DISCUSSION

## I. Mr. Hornof Is Effectively Detained and in the Government's Custody Related to This Matter

As noted above, the government in this matter moved this Court to intervene in Mr. Hornof's attorney-client relationship, and the Court has scheduled an argument on that motion. Accordingly, the government has asked the Court to exercise jurisdiction over Mr. Hornof, and the Court has done or is doing so. Mr. Hornof asks the Court to exercise jurisdiction over this motion and to assist him in getting home to the family he loves and that suddenly needs him so desperately.

He notes, moreover, that the Court would have jurisdiction if he filed in a separate action a petition for a writ of habeas corpus as have three of his fellow crew members. Based on the facts outlined above, Mr. Hornoff would plainly satisfy the "custody" requirement for such a writ. The definition of those "in custody" has been expanded to include anyone "subject to restraints 'not shared by the public generally.'" *See Hensley v. Municipal Court*, 411 U.S. 345, 351 (1973); *Jones v. Cunningham*, 371 U.S. 236, 240 (1963). This extension "has likewise applied to habeas actions arising from immigration cases." *Galaviz-Medina v. Wooten*, 27 F.3d 487, 493 (10th Cir. 1994), *cert. denied*, 513 U.S. 1086 (1995); *see also Subias v. Meese*, 835 F.2d 1288 (9th Cir. 1987) (petitioner detained in Mexico by U.S. authorities was in custody for habeas corpus purposes). Indeed, the Supreme Court has long ago established that restraint pursuant to an exclusion or deportation order constitutes "custody" for purposes of federal habeas corpus jurisdiction. *See United States v. Jung Ah Lung*, 124 U.S. 621, 626 (1988); *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) ("An alien immigrant, prevented from landing by any such officer claiming authority to do so under an act of Congress, and thereby restrained of his liberty, is doubtless entitled to a writ of habeas corpus to ascertain whether the restraint is lawful."). Mr. Hornof was granted entry into the United States, but that right of entry was

revoked.  He was detained with no process on a vessel for over a week.  The government then forced him to enter this foreign land by coercing an agreement with his employer to abandon him here on threat that he would otherwise be arrested and jailed as a material witness.  The government then confiscated his passport (in direct contravention of the written agreement to which he is not a party) to ensure that he cannot leave, and the government may be preparing to carry out its threat to obtain a warrant for his arrest.

## II. Grand Jury Investigations are Not Criminal Proceedings Within the Meaning of the Material Witness Statute

The government has sought and obtained ex parte material witness arrest warrants against two of Mr. Hornof's fellow crew members for potential testimony in supposedly pending grand jury proceedings.  (One of those two witnesses was called; the other has not yet been called.)  Presumably the government may seek such a warrant against him.  Although Mr. Hornof is willing to cooperate, he respectfully submits that the material witness statute is not available with respect to grand jury proceedings.  The statute, 18 U.S.C. §3144, provides that a "judicial officer may order the arrest" of a person "if it appears from an affidavit filed by a party that the testimony of [the] person is material in a criminal proceeding" and if it is shown that it may be impracticable to secure the person's presence by subpoena.  Thus, the statute only applies to "criminal proceeding[s]" in which there is a "party" who makes the request.

Historically, grand jury investigations have not been considered criminal proceedings, which instead are understood to be commenced by the filing of a complaint or the return of an indictment.  *See Post v. United States*, 161 U.S. 583 (1896); *In re Vazquez-Botet*, 464 F.3d 54 (1st Cir. 2006); *in re United States*, 441 F.3d 44 (1st Cir. 2006); *United States v. Thompson*, 319 F.2d 665 (2d Cir. 1963); *Mulloney v. United States*, 79 F.2d 566 (1935).  *See also* Boyle, "*The Material Witness Statute Post September 11: Why It Should Not Include Grand Jury Witnesses*," 48 N.Y.L. Sch. L. Rev 13 (2004).

Far from engaging in "criminal proceedings," "[t]he grand jury, classically, is meant to be an independent check on the ability of the government to bring criminal charges against individuals." *In re United States*, 441 F.3d at 26-27.  Accordingly, rather than engaging in "criminal proceedings", the grand jury's function is to "protect[] citizens against unfounded prosecutions." *Id.* at 27.  Although the grand jury "has another role, as an investigatory and accusatory body," *id.*, the First Circuit has made clear the performance of that role is not a criminal (or even a judicial) proceeding.  Proceedings before the grand jury are not properly understood to be judicial proceedings because "[t]he federal grand jury 'has not been textually assigned' to any of the three branches of government." *Id.*, (*citing United States v. Williams*, 504 U.S. 36, 47 (1992).  The grand jury "is thus a 'constitutional fixture in its own right' and 'not an arm of the district court.'" *Id., citing Williams,* 504 U.S. at 47.   The grand jury remains "'at arm's length' from the judicial branch." *Id., citing United States v. Williams*, 504 U.S. at 47 *and Stern v. U.S. Dist. Court for the Dist. of Mass.*, 214 F.3d 4, 15 (1st Cir. 2000).  For these reasons the First Circuit explained that "it is doubtful that the grand jury falls within the definition of 'proceeding' as the word is used in the judicial recusal statute. *In re Vazquez-Botet*, 464 F.3d at 58 n. 6.  Ultimately the Court concluded that grand jury proceedings are indeed separate and apart from both "trial and pretrial [criminal] proceedings in the district court." *United States v. Vazquez-Botet*, 532 F.3d 37, 48 (1st Cir. 2008).

Following the September 11 attacks, judges in the Southern District of New York differed on whether the grand jury proceedings were "criminal proceedings" within the meaning of the material witness statute. **Compare** *United States v. Awadallah*, 202 F. Supp. 2d 55 (S.D.N.Y. 2002) [concluding after detailed discussion of the statute, its legislative and practical history that grand jury investigations are not 'criminal proceedings' within the meaning of the statute] **with** *In re Material Witness Warrant*, 213 F. Supp. 2d 287, 288 (S.D.N.Y. 2002)[holding

that the statute may be applied to witnesses before grand jury proceedings].  Understandably,

judges in New York were reluctant to free suspected terrorists believed to be associated with the

tragedy.  Under the circumstances, the Second Circuit sided with the more expansive

interpretation.  *United States v. Awadallah*, 349 F.3d 42 (2d Cir. 2003) [reversing S.D.N.Y

decision cited above].

Mr. Hornof respectfully submits that those decisions demonstrate primarily that difficult

cases make bad law.  That bad law cannot and should not be adopted consistent with First Circuit

precedent.

Applying the material witness statute even to actual criminal proceedings itself raises

difficult issues, as discussed in the several opinions of the Supreme Court in *Aschroft v. al-Kidd*,

563 U.S. 731 (2011).  The Court unanimously held that the attorney general was immune from

liability for allegedly using material witness statute to arrest a witness with respect to an actually

pending (i.e. indicted) terrorist case.  The witness, al-Kidd, sued the attorney general, alleging

that the government did not actually intend to call him at the trial (he was not called) and that the

attorney general had established a policy of allowing the government to apply for pretextual

material witness warrants for suspected terrorists.  The opinion of the Court stated expressly that

it was not deciding whether the warrant was proper because "the validity of the warrant . . . was

the premise of al-Kidd's argument." *Aschroft v. al-Kidd*, 563 U.S. at 740, n. 3.  And it explained

that al-Kidd's "separate Fourth Amendment and statutory claims against the FBI agents who

sought the warrants . . . are not before us" and had not been dismissed. *Id*.  Three concurring

opinions, however, raised serious concerns about the Fourth Amendment and due process limits

on use of the statute, even when a true criminal proceeding is pending.

Those concerns – and concerns expressed in the opinion of the Court – are magnified

where, as in this and prior OWS cases in Maine, the material witness statute is invoked in

purported grand jury proceedings, especially where the government arrests persons believed to have knowledge of *and* a role in alleged improper conduct.  For example, the opinion of the Court in *Aschroft* explained, "The Fourth Amendment was a response to the English Crown's use of general warrants, which often allowed royal officials to search and seize whatever and whomever they pleased while investigating crimes or affronts to the Crown." *Id.* at 20-21.  Such is exactly what the government sought to do in the last case in which this Court issued material witness warrants against crew members.  They were held for months while the government investigated the arrested "witnesses" and others.  No one was ever charged. *In re Grand Jury Proceedings*, No. 10-mj-57-P-JHR (D. Me. Apr. 16, 2010), slip op. (D. Me. Apr. 16, 2010).

In this case, the government's "agreement concerning security" purports to require MST to retain Mr. Hornof and others here while the government investigates whether anyone committed or aided and abetted an event or pollution or the possession or presentation of a false oil record book.  The government's recent letter (dated July 28) asking this Court to investigate counsel's relationship with Mr. Hornof asserts that the grand jury is also investigating crew members for interfering with the Coast Guard investigation.  The government provided no information for which crew members were being investigated, but the it seems likely the government intended to imply that some of the nine detained crew members are targets.  On the other hand, the government has asserted repeatedly to Mr. Hornof's attorney that *none* of the crew members is or is likely to become such a target.  Electronic correspondence containing those assurances are attached hereto as **EXHIBIT G**, including the following:

- Attorney Cashman's assertion at 2:29 p.m. on July 18, 2017 that, "Regarding the nine crewmembers, none of them have been designated a target and based on the facts as I know them, *I am not considering designating any of them as targets*"; and

- Mr. Cashman's assertion in the email on July 19, 2017 at 12:09 that, "Regarding possible immunity and criminal exposure for your clients, my current understanding is that each of the nine crewmembers acted on behalf of their employer and for the benefit, at least in part, of their employer. *At this time I do not have reason to believe*

*that any of the nine crewmembers' conduct exposes them to criminal liability…. I do not consider any of the nine crewmembers a target nor do I anticipate any of them being designated a target of this investigation*.

These circumstances demonstrate why grand jury matters are not "criminal proceedings," including within the meaning of the material witness statute – and why it would be unconstitutional to so apply the statute in any event.

Applying the material witness statute to a grand jury proceeding would require the district court to determine the scope of the grand jury's investigation and what matters were "material" to it – and to exercise discretion in deciding what witnesses to arrest and hold for the grand jury. Such an endeavor would be decidedly unfair to Mr. Hornof and the Court, since neither he nor the Court is in a position to evaluate what the grand jury is secretly investigating. And forcing or allowing the Court to assess what testimony is "material" to the grand jury investigation would also force the Court to intrude on the grand jury's independence from the judicial branch.

The process would also open up exactly the kind of abuse the government apparently is employing in this case: namely the ability of the government to arrest and "detain" as supposed witnesses persons whom the government suspects may have committed crimes. That process would allow (and is allowing) the government to detain suspects for months without probable cause for an arrest while it decides whether to charge them. The process would effectively turn *Terry* stops, i.e. brief investigatory sessions, into investigations in which the suspect is in custody for months while he is being investigated without having been charged or any showing of probable cause that he committed a crime. Such a prolonged arrest plainly requires probable cause directed at the suspect under the Fourth Amendment and constitutes a deprivation of liberty without due process in violation of the Fifth Amendment.

For the forgoing and the following reasons, the Court ought to rule that the material witness statute was not intended to, and cannot constitutionally, apply to witnesses in grand jury proceedings.

### III. If Asked, the Court Should Decline to Issue a Warrant for Mr. Hornof's Arrest as a Witness, Even if the Court Concludes a Grand Jury Matter is a "Criminal Proceeding"

Even when true criminal prosecutions have been initiated and are pending, "[j]udicial officers asked to issue material witness warrants [under 18 U.S.C. §3144] must determine whether the affidavit supporting the application shows that 'the testimony of a person is material in a criminal proceeding' and that 'it may become impracticable to secure the presence of the person by subpoena. *Even if these conditions are met, issuance of the warrant is discretionary*." *Ashcroft v. al-Kidd*, 563 U.S. 731, 748, n.2 (Ginsburg, J. concurring with JJ. Breyer and Sotomayor, citing the statute and noting that it provides that if the conditions are met the judicial officer "*may*" order the arrest).

For the many reasons set forth in this motion, if asked to issue a warrant for the arrest of Mr. Hornof, the Court should decline, both because such an arrest is not authorized by statute and because it would be a travesty.

Such an arrest would also be imprudent in light of the government's mistakenly broad view of its role in the worldwide enforcement of MARPOL. The matter purportedly under investigation is properly within the jurisdiction of the Administration under MARPOL, i.e. the Republic of Liberia, which has already protested our government's excesses in this matter.

### IV. The Court Should Order The Government to Take Mr. Hornof's Immunized Testimony Either Before the Grand Jury or by Deposition and the Return of His Warrant

Even though he believes his detention is wrongful, Mr. Hornof remains willing to testify and cooperate, although he respectfully asks that any testimony be given under immunity in light

of the government's inconsistent assertions about whether it is investigating or might charge the crew members.  Rule 15 of the Federal Rules of Criminal Procedure specifically provides that a material witness detained pursuant to section 3144 may file a written motion requesting that he be deposed.  F.R. Crim. P. 15(a)(2).  The Court may then order that the deposition be taken and may discharge the witness as soon as the deposition is concluded.  *Id.*  When a supposed material witness moves for a deposition under the rule, he must be released if his testimony can be adequately secured by deposition and further detention is not necessary to prevent a failure of justice.  *Torres-Ruiz v. United States District Court for the Southern District of California*, 120 F.3d 933, 935 (9th Cir. 1997); *In re Grand Jury Proceedings*, No. 10-mj-57-P-JHR (D. Me. Apr. 16, 2010), slip op. at 6 n. 5 (D. Me. Apr. 16, 2010).  The material witness need not demonstrate "exceptional circumstances" to effectuate his own deposition.  *United States v. Allie*, 978 F.2d 1401, 1404 n. 4 (5th Cir. 1992).  Even if a showing of exceptional circumstances were required, the humanitarian cost of prolonging detention of an alien material witnesses itself is an exceptional circumstance.  *United States v. Li*, No. 08-cr-2012, 2008 WL 4104062, *3 (E.D. Wis. Sept. 4, 2008).

The government must consider the rights of the material witness.  *United States v. Rivera*, 859 F.2d 1204, 1207 (4th Cir. 1988); *United States v. Cabrera-Ruiz*, No. C-09-8, 2009 U.S. Dist. LEXIS 25923, *6, 2009 WL 819901, *2 (S.D. Tex., Mar. 27, 2009).  There is no sound reason not to order Mr. Hornof's deposition be taken immediately, following which he should be free to leave.

## V.  Expedited Briefing and Hearings Are Warranted

Mr. Hornof was illegally held in custody for over a week after receiving a visa.  Before and during his illegal detention he nevertheless helped all concerned investigate and understand the relevant events, including the government.  Since being involuntarily paroled into the United

States, however, he has received no subpoena to testify. Tragically, his wife who is expecting their second child, lost her mother last Sunday and is having a devastatingly difficult time struggling without Mr. Hornof's support to deal with her pregnancy, the Hornofs' four year old son and the loss of her mother. Mr. Hornof respectfully asks that the Court and the government give his difficult circumstance expedited consideration and arrange for his prompt testimony by deposition.

If necessary later, he would return at the expense of the United States or any other party. But he respectfully asks that he be allowed to return home without undue delay.

Respectfully submitted this 7th day of August, 2017.

Edward S. MacColl, BRN #2658
Attorney for movant Jaroslav Hornof

Thompson, MacColl & Bass, LLC, P.A.
120 Exchange Street, 6th Floor
P.O. Box 447
Portland, ME 04112-0447
(207) 774-7600
emaccoll@thomport.com

### CERTIFICATE OF SERVICE

I certify that on August 7, 2017, I duly served on the United States the forgoing filing by transmitting a copy via email and hand delivering a paper copy to Assistant United States Attorney, Jonathan R. Chapman, as follows:

Jonathan R. Chapman, AUSA
United States Attorney's Office
100 Middle Street
Portland, ME 04101
jon.chapman@usdoj.gov

and by forwarding images of the filing to the following government counsel:

John Cashman, DOJ-*John.Cashman@usdoj.gov*
Shane Waller, DOJ-*Shane.Waller@usdoj.gov*

Edward S. MacColl

14