**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ) | |
| **JAROSLAV HORNOF, et al.**  ) | |
|  ) | |
|    *Plaintiffs,*  ) | |
|  ) | |
| **v.**  ) | **CASE NO.:  2:19-cv-00198-JDL** |
|  ) | |
| **UNITED STATES OF AMERICA, et al.**  ) | |
|  ) | |
|    *Defendants.*  ) | |
| . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ) | |

**PLAINTIFFS' MEMORANDUM OF LAW**
**PURSUANT TO ORDER DATED MARCH 10, 2023**

NOW COME plaintiffs, Jaroslav Hornof, Damir Kordic and Lucas Zak, and submit the following memorandum pursuant to the Court's order dated March 10, 2023 (ECF No. 185) addressing the Court's questions.

**BACKGROUND**

The following facts are especially germane to the Court's inquiry, including facts that become relevant given the questions posed and theories suggested by the Court:

The *M/V Marguerita* arrived in the Port of Portland on July 7, 2017. Starting weeks before the vessel's arrival, its owner, manager and attorney advised the Coast Guard that it had received and investigated and at least in part confirmed crew reports (specifically from Plaintiff Hornof) of improper high seas bilge discharges and of a corrective oil record book entry noting that prior ORB entries were not reliable.  Without requesting clarifying information or acknowledging the communications, various Coast Guard officials, including criminal investigators, boarded the vessel expecting to detain the vessel, confine the crew onboard, and negotiate an "Agreement on Security" under which crewmembers would be required to come

1

ashore as part of the "surety" in exchange for the vessel's release so that American officials could collect fines for foreign high-seas conduct and record keeping.  *See* Plaintiffs' Additional Statement of Material Facts ("ASMF"), ¶¶ 6-8, 21, 32-33.

However, before these Coast Guard officials boarded, U.S. Customs and Border Protection (CBP) personnel had boarded the vessel and granted the entire crew, including Plaintiffs, valid shore passes and either D-1 or D-2 permits.  *Id.,* ¶ 20.  Plaintiffs Hornof and Kordic were issued D-1 passes, permitting them to travel freely in the United States until the departure of the vessel, for up to twenty-nine days.  *See* Joint Statement of Facts ("JSF") ¶ 40, Stipulated Record Exhibit 13.  Plaintiff Zak, whose service on the vessel had ended, received a D-2 pass, enabling him to proceed to the Portland Jetport and fly back to his home in Slovakia on government-approved flights.  *See* ASMF ¶ 10; JSF ¶ 41.

Because the Coast Guard had no legal basis for confining foreign crewmen who had been given official permission to come ashore, it prevailed on the CBP to revoke their shore passes and detain the crew.  The summary judgment record includes relevant testimony demonstrating that CBP officials acted not to protect America's borders, but only to accommodate the Coast Guard's pre-planned criminal investigation and request.  Senior CBP official Keith Fleming testified the CBP revoked the entire crew's shore passes solely at the Coast Guard's behest.  *See* Deposition of Keith Fleming at 14, 19-20, 58 (Stipulated Record Exhibit 133, PageID # 6170, 6171, 6181).  At page 14, he testified as follows:

> We are -- as I mentioned earlier, we are really there to facilitate the request of the Coast Guard to withhold the clearance of the vessel and based on the request or the letter I got from Captain Baroody, you know, to contain the crew on board, I remand them back to the vessel so they could continue their investigation. CBP was never involved in any of this nor do I have any expertise in this.

At page 19 he elaborated:

> I received a call on the evening of the 7th from Captain Baroody who said that -- he advised that they had -- basically had probable cause to believe that there had been an environmental crime committed on the vessel.  He asked that we withhold Customs clearance on the vessel and the crewmen as they -- one, they were -- they didn't know exactly who they were going to be using for witnesses or need for witnesses. They needed time to sort that out to proceed with their investigation.

At page 20 he further clarified:

> So based on that request, I delegated to my staff that we would withhold clearance of the vessel and we would revoke the shore passes and remand the crew back to the vessel.

Finally, at page 58, Mr. Fleming explained again that CBP was merely accommodating and deferring to the Coast Guard:

> Q: You didn't attempt to make any determination that the Coast Guard had probable cause other than taking the word of the captain?
>
> A No, I take –
>
> Q You know him, he's an honorable guy, he's a senior guy, he says I have got probable cause, that's good enough for you, that's the way that worked, right?
>
> A Yes.[1]

In revoking the duly issued shore passes, the CBP officials compelled each crew member to hand them over.  PSF ¶ 54.  They offered no explanation.  ASMF ¶ 24.  They had no legitimate or immigration-related reason. Rather, the CBP officials either conspired with the Coast Guard agents or acted as their cat's paw.  *Id.,* ¶ 22.[2]

---

[1] Although this portion of the record was not cited in Plaintiffs' Additional Statement of Material Facts, Plaintiffs are now responding to contentions Defendant had never previously raised.  Eight months after filing its motion, Defendant is now seeking summary judgment, at the Court's invitation, based on new theories.  Plaintiffs are appropriately supplementing their factual submission to address these new theories.

[2] A "cat's paw" is a "titular decisionmaker" who acts as a conduit or rubber stamp for others.  *See Russell v. McKinney Hospital Venture,* 235 F.3d 219, 227 (5th Cir. 2000); *Harlow v. Potter,* 353 F. Supp. 2d 109, 115 (D. Me. 2005).  Liability will attach to those other persons, and their employers, when they act from improper motives and exert influence over the decisionmaker.  *See id.*; *see also Staub v. Procter Hospital,* 562 U.S. 411, 422, 131 S. Ct.

The officials then arranged for the confinement of the entire crew, including Plaintiffs, on board the vessel from July 8 through July 16, 2017.  *Id.,* ¶ 28.  The officials prohibited any of the crewmembers from leaving the vessel, posted a guard over them, and mustered them for the taking of attendance twice daily.  *Id.,* ¶ 29.

## ARGUMENT

**1.  8 U.S.C.A. § 1252(a)(2)(B)(ii) does not bar judicial review of the decisions to (a) revoke the D-1 shore passes to Plaintiffs Hornof and Kordic and (b) revoke the D-2 shore pass of Plaintiff Zak, or (c) remand the Plaintiffs to the vessel.**

**a.  The decision to revoke the D-1 shore passes is not exempt from review.**

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) provides that no court shall have jurisdiction to review –

> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this title to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 208(a).

Pub. L. No. 104-208, 110 Stat. 3009-546, codified as amended at 8 U.S.C. § 1252(a)(2)(B)(ii). The Supreme Court has interpreted this provision to mean that "Congress barred court review of discretionary decisions only when Congress itself set out the Attorney General's [or Secretary's] discretionary authority in the statute."  *Kucana v. Holder,* 558 U.S. 233, 247, 130 S. Ct. 827, 175 L. Ed. 2d 694 (2009).  That is, the statute does not bar jurisdiction over *all* discretionary decisions or actions.  *Aguilar v. U.S. Immigration & Customs Enforcement Division,* 510 F.3d 1, 20 (1ˢᵗ Cir. 2007); *Cho v. Gonzales,* 404 F.3d 96, 99-100 (1ˢᵗ Cir. 2005); *see Zhou v. Federal Bureau of Investigations,* 2008 DNH 115, 2008 U.S. Dist. LEXIS 46186, *4 (D.N.H. June 12, 2008).  Rather, it applies only to decisions or actions "the authority for which is *specified under*

---

1186, 179 L. Ed. 2d 144 (2011).  Cat's paw liability is invoked typically, but not exclusively, in employment discrimination cases.  *See id.*

*this subchapter* to be in the discretion of" the Attorney General or Secretary.  8 U.S.C. § 1252(a)(2)(B)(ii) (emphasis supplied).  Accordingly, courts must "engage in a precise reading of both the agency decision and the petition" to determine whether the jurisdictional bar applies. *Cho,* 404 F.3d at 100.  "If a statute does not explicitly specify a particular authority as discretionary, section 1252(a)(2)(B)(ii) does not bar judicial review of an ensuing agency action." *Aguilar,* 510 F.3d at 20.

Furthermore, even if a statute gives some discretion to an immigration officer, review will not be barred to the extent the officer's decision depends on "inquires guided by objective statutory criteria," because such decisions are not discretionary.  *See Cho,* 404 F.3d at 101, citing *Bernal-Vallejo v. INS,* 195 F.3d 56, 62 (1st Cir. 1999).

The question, then, is whether the statute allowing an immigration officer to revoke a temporary landing permit issued to a crewman endows the officer with unfettered discretion. Curiously, Defendant repeatedly argues that the statute authorizing the *issuance* of the landing permit, 8 U.S.C. § 1282(a), gives the officer discretion.  But that provision is irrelevant.  The CBP officials, after making the examination required by section 128/2(a), duly issued the landing permits to each *Marguerita* crewmember, including Plaintiffs.  No one is challenging that decision.  Assuming that the issuance of these permits was discretionary, it does not follow that their revocation was equally discretionary.  The revocation statute makes clear the discretion to revoke is conditional and limited, as follows:

> Pursuant to regulations prescribed by the Attorney General, any immigration officer may, in his discretion, ***if*** *he determines that an alien is not a bona fide crewman or does not intend to depart on the vessel or aircraft which brought him,* revoke the conditional permit to land which was granted such crewman under the provisions of subsection (a)(1), take such crewman into custody, and require the master or commanding officer of the vessel or aircraft on which the crewman arrived to receive and detain him onboard such vessel or aircraft, if practicable, and such crewman shall be removed from the

United States at the expense of the transportation line which brought him to the United States.

8 U.S.C. § 1282(b) (emphasis supplied).  By its unambiguous terms, the statute affords discretion to revoke only *after* it is determined that the permittee is *not* a bona fide crewman (or does not intend to depart on the vessel that brought him).  The determination that a purported crewmember is an imposter is a factual determination that, like any administrative decision, must have a demonstrable factual basis.  If Congress had intended to insulate the determination of a crewmember's phoniness from judicial review, it would have said, "if he determines, *in his discretion,* that an alien is not a bona fide crewman," but section 1282(b) says nothing of the sort.

By placing the initial responsibility to determine a crewmember's bona fides in immigrations officials, Congress did not render such determinations unreviewable.  Because virtually every immigration action involves a determination of one sort or another, such a reading (as the Third, Sixth and Eleventh Circuit have explained) would divest the courts of jurisdiction over every action covered anywhere in Title 8.  *K.Y. v. United States Attorney General,* 43 F.4th 1175, 1186 (11th Cir. 2022); *Berhane v. Holder,* 606 F.3d 819, 822 (6th Cir. 2010); *Soltane v. U.S. Dep't of Justice,* 381 F.3d 143, 148 n. 3 (3d Cir. 2004) (Alito, J.).  Even finding an *implied* discretion would not suffice; for section 1252(a)(2)(B)(ii) to apply, the discretion must be "specified" in the statute.  8 U.S.C. § 1252(a)(2)(B)(ii).  "To 'specify' that a decision belongs to the Attorney General's discretion requires more than a hint."  *K.Y., * 43 F.4th at 1186; *Berhane,* 606 F.3d at 821.  Rather, the term "'specify' means to 'name or state explicitly or in detail.'"  *Kucana,* 558 U.S. at 243 n. 10.

Furthermore, in granting conditional discretion, conditioned on a finding that the permittee "is not a bona fide crewman" (or does not intend to depart), section 1282(b) provides objective criteria to be followed.  By expressly granting discretion *if* , but only if, the

determination is made, the statute makes clear the immigration officials do not have discretion to simply declare an obvious and bona fide crewman is instead be an imposter.  Either a permittee is a genuine member of the ship's crew or he is not.  Congress certainly did not intend CBP officials to have discretion to declare that which is obviously true to be false, though that is exactly what the CBP did here – at the Coast Guard's request.

The legislative history confirms that Congress expected the officers to make reviewable, objective, honest findings concerning a crewman's genuiness before revocation of his landing permit.  Section 1282(b) originated in the 1950 immigration report of the Senate Judiciary Committee, containing the recommendation that "[a]uthority should be granted to immigration officers… upon a *satisfactory* finding that an alien is not a bona fide crewman, to revoke the permission to land temporarily" and require that he be removed from the country.  S. Rep. No. 1515, 81st Cong., 2d Sess. at 558 (previously submitted at PageID # 7515).

The First Circuit's opinion in *Cho, supra,* buttresses the conclusion that the revocation of the D-1 permits is not insulated from the judicial process.  There, the plaintiff had received conditional permanent residency based on marriage to a U.S. citizen.  *Cho,* 404 F.3d at 97.  After her divorce, she applied for a hardship waiver to remove the conditionality of her permanent residency.  *Id.*  The statute authorizing the Attorney General to grant such applications provided:

> The Attorney General, *in the Attorney General's discretion, may* remove the conditional basis of the permanent resident status for an alien… if the alien demonstrates that…
>
> (B) The qualifying marriage was entered into in good faith by the alien spouse …
>
> In acting under applications in this paragraph, the Attorney General shall consider any credible evidence relevant to the application.  The determination of what evidence is credible and the weight to be given that evidence *shall be within the sole discretion of the Attorney General*….

*Id.* at 98, citing 8 U.S.C. § 1186a(c)(4) (emphasis supplied).  The Attorney General (acting

through immigration officials) denied her application on the ground that she failed to establish

that she had married in good faith.  *Id.*

Notwithstanding the italicized statutory language granting discretion, the First Circuit

held that the Attorney General's denial was not exempted from judicial review under section

1252(a)(2)(B)(ii).  In determining the relevant "decision or action" under the statute, the court

declared it must examine "not simply the nature of the order itself" (i.e., denial of a hardship

waiver application) but, rather, the rationale underlying the order (i.e., refusal to find a good-

faith marriage).  *Id.* at 99-100.  The court explained the "sole discretion" language could not

apply to the determination of whether an applicant had shown her marriage was entered into in

good faith, which determination involved the tasks of "interpreting applicable background legal

questions and applying those standards to the evidence ultimately credited and deemed weighty."

*Id.* at 101-02.  It reasoned:

> Such a reading would broadly interpret the relevant statutory language, unnaturally we
> think, to yield an outlier enclave of administrative law in which the courts are stripped of
> their customary power to be the final word on the meaning of legal concepts imbedded in
> our immigration statutes.  Not surprisingly, the Supreme Court has cautioned against such
> outcomes.  *See INS* v. *St. Cyr,* 533, U.S. 289, 298, 150 L. Ed. 2d 347, 121 S. Ct. 2271
> (2001); *see also Montero-Martinez,* 277 F.3d at 1141.

*Id.* at 102.  The court overturned the decision, finding that the plaintiff had indeed satisfied the

"good faith" marriage requirement.  *Id.* at 104.

Here, the grant of discretion is far weaker than that in *Cho*.  The officer has no discretion

to revoke a landing permit unless the permit holder either (a) is not a bona fide crewman or (b)

does not intend to depart on the vessel that brought him.[3]  Any determination that these criteria

---

[3] Defendant suggests that these "categories of revocability" are not exclusive, citing *United States ex rel. Stellas v. Esperdy,* 366 F.2d 266, 269 (2d Cir. 1966).  *See* Defendant's Memorandum (ECF No. 186) at 6 n. 3.  The selective quotation from *Esperdy* is highly misleading.  The Second Circuit was not discussing revocation of a temporary D-1

have been met would be fully reviewable, for the reasons set forth in *Cho*.  Here, shore passes were revoked from every member of the *Marguerita*'s crew.  Any "determination" that the vessel had arrived with no bona fide crewmen would have been (or was) entirely disingenuous, and the government does not even argue that any such good faith determination was in fact made.  To whatever extent CBP officials claim they "determined" that the entire crew were mala fide crewmen, such a determination would have to be set aside, as in *Cho,* as lacking substantial evidence in the record and/or misapplying the law.  Indeed, as detailed at pages 2-3 above, the CBP admits it revoked the shore passes solely at the Coast Guard's request.  Plaintiffs note the vessel was allowed to sail with all crewmembers whose permits had been revoked (save only those held as human collateral under the Agreement on Security and one D-2 permittee who was eventually allowed to fly home) serving vital crew roles.

Besides the factual determination of crewman phoniness, section 182 imposes two additional preconditions before an immigration officer has discretion to revoke a D-1 permit.  First, the officer must act "[p]ursuant to regulations prescribed by the Attorney General."  8 U.S.C. § 1282(b).  Defendant has made no showing that the CBP officials acted in accordance with any such regulations.[4]  Second, the issuance of a D-1 landing permit is "subject to revocation *in subsequent proceedings* as provided in subsection (b) …."  *Id.,* § 1282(a) (emphasis supplied).  Here, there were no subsequent proceedings, whether formal or informal.  CBP agents simply confiscated the duly issued permits without explanation.

---

permit under section 1282(b) but, rather, the very different criteria for revoking a permanent landing permit (Form I-184) as set forth in a regulation, 8 C.F.R. § 252.4.  *See id.*  Of course, the court also was not addressing the IIRIIA, which would not be enacted for another thirty years.  Defendant has no other authority, and nothing in section 1282(b) remotely suggests, that revocation may be based on any other criteria not specifically stated in the statute.

[4] There is one regulation that simply paraphrases the latter part of section 1282(b) in the event of revocation, *see* 8 CFR § 252.2; but that could not be what Congress intended or the directive would be meaningless.

Finally, as explained below, the government lacks authority to revoke D-2 shore passes. That lack of authority confirms that the authority to revoke D-1 passes was intentionally limited to those crewmen fairly determined to be phony or who do not intend to leave. Thast authority to revoke is focused on and limited to those fairly determined to be trying to sneak into the country illegally. No such concern exists with respect to foreigners permitted to enter solely to depart via other transportation (whether they were genuine crewmen or not).

For all these reasons, the revocation of the D-1 permits based on an ostensible "mala fide crewmen" determination is not shielded form judicial oversight.

b.  **The statute does not bar judicial review of the revocation of Plaintiff Zak's D-2 permit.**

The analysis concerning the revocation of a D-2 permit is even more straightforward. Once a D-2 permit is issued, immigration officers have no authority, discretionary or otherwise, to revoke it. The revocation statute allows such officers to revoke only "the conditional permit to land which was granted such crewmen under the provisions of *subsection (a)(1)*" -- the subsection that authorizes a temporary landing permit (D-1) to a crewman that "intends to depart on the vessel or aircraft on which he arrived." No provision grants discretion to revoke a pass granted under subsection (a)(2), covering a temporary landing permit (D-2) for a crewman that intends to depart "on a vessel or aircraft other than the one on which he arrived." 8 U.S.C. § 1282 (emphasis supplied). Even Defendant acknowledges that section 1828(b) does not "explicitly" authorize revocation of D-2 permits. *See* Defendant's Memorandum at 6. Yet not merely explicit authorization but explicit *discretion* is the *sine qua non* of the jurisdiction-stripping statute. *See Kucana,* 558 U.S. at 243 & n. 10.

Lest there be any doubt, the issue is foreclosed by *INS v. Stanisic,* 395 U.S. 62, 74, 89 S. Ct. 1519, 23 L. Ed. 2d 101 (1969) (section 1282(b), a "provision of limited applicability," "does

not apply to an alien crewman … who enters on a 'D-2' permit allowing him to depart on a different vessel").[5]

Defendant fails to address or even cite *Stanisic,* instead relying on *Bao Tai Nian v. Older,* 683 F.3d 1227 (9th Cir. 2012).  That case, however, had nothing to do with revocation of a D-2 permit.  Defendant claims that "[a]part from [the plaintiff's] asylum proceeding, the Ninth Circuit declined to consider his petition for review."  *See* Defendant's Memorandum at 7.  Defendant is reading into the case a holding that is not there.  The only issue was whether the court had jurisdiction over a denial of the Plaintiff's "asylum only" petition under 8 C.F.R. § 208.2(c).  683 F.3d at 1228.  The court concluded it indeed had jurisdiction.  *Id.* at 1230.

Bereft of supporting authority, Defendant falls back on a policy argument, absurdly warning that withholding discretion to revoke D-2 permits "would mean an alien crewmember armed with a shore pass can evade accountability for himself or on others' behalf, whether for pollution, record keeping or marine safety violations, drug smuggling, human trafficking, or any federal crime."  Defendant's Memorandum at 7.  But alien crewmembers who have violated any U.S. laws are subject to arrest like everyone else.  And, of course, before issuing D-2 permits, CBP officials are required to do a background check.  If they then believe that the applicant may have committed a crime, they may, in their discretion, deny the shore pass.  Even if there were any merit to Defendant's implied argument that permit revocation is necessary to arrest foreign crewmembers for high-seas conduct, it falls to Congress, not the Court, to amend the statute.

### c.  The statute does not bar judicial review of the confinement of Plaintiffs on board the vessel associated with the improper shore pass revocation.

---

[5] *See also* S. Rep. No. 1515, *supra,* (PageID # 7515) at 558 (expressing intent that "[a]uthority should be granted to immigration officers *in a case where the alien crewman intends to depart on the same vessel on which he arrived,* upon a satisfactory finding that an alien is not a bona fide crewman, to revoke the permission to land temporarily, … and remove him from the country.") (emphasis supplied).

There is little for Plaintiffs to respond to with respect to their detention, as Defendant offered only a conclusory assertion on the point.  *See* Defendant's Memorandum at 8. Significantly, it was the Coast Guard, not CBP officials, who demanded the crewmembers' landing permits be revoked and they be detained.

Moreover, section 1282(b) does not grant immigration officials discretion to detain any crewmen on their vessel who has been granted a landing permit.  Instead the statute authorizes immigration officials, solely with respect to a holder of a D-1 permit who is not a bona fide crewman or does not intend to depart on the vessel that brought him, to "require the master or commanding officer of the vessel… to receive and detain him onboard such vessel…."  *Id.,* § 1282(b).

The sole reason for authorizing immigration officials to revoke the D-1 permits of those who are not bona fide crewmen or who do not intend to return, and to require the master to receive and detain them, is to fulfill the requirement that "such crewman shall be removed from the United States."  *Id.*  The clear purpose of the statute is to prevent persons, under the guise of crewmen seeking temporary shore leave, from illegally immigrating into the United States.  The actions of the CBP officials here, aiding the Coast Guard's plan to hold foreigners as substitute human collateral *inside* the United States, had the opposite purpose and effect of forcing innocent foreign seafarers into this country against their will.  The officials perverted the law they were entrusted to enforce.  The Court can and should review these unauthorized actions.

   2.  **The revocation of Plaintiffs' shore passes was not an immigration-enforcement-related action, was not separate from their detention onboard the vessel, and is readily analogous to private-person liability.  It is therefore actionable under the federal tort claims act.**

Helpful guidance on this issue is provided by *Liranzo v. United States,* 690 F.3d 78 (2d Cir. 2012).  There, the plaintiff, a United States citizen who had been convicted of a felony drug

possession charge, was detained by immigration officials who, believing he was a permanent resident alien, began removal proceedings against him.  *Id.* at 80.  He sued for false arrest and false imprisonment under the FTCA.  *Id.* The district court dismissed the complaint on the theory that immigration detentions have no private analogue.  *Id.* at 84.

The Second Circuit disagreed and reversed the judgment.  *Id.* at 98.  Among other cases, it relied on the Supreme Court's *Indian Towing* decision, which arose from the Coast Guard's operation of a lighthouse.  *See Indian Towing Co. v. United States,* 350 U.S. 61, 76 S. Ct. 122, 100 L. Ed. 48 (1955).  Although the operation of lighthouses was performed only by the government, that did not mean there was no private analogue.  *Id.* at 66-67.  It was insufficient for the government to say that the lighthouse operation was a uniquely governmental function, because "all Government activity is inescapably 'uniquely governmental' in that it is performed by the Government."  *Id.* at 67.  The "presence of identical private activity" was not required to find a private analogue, because the statutory phrase "under like circumstances" does not mean "under the same circumstances."  *Id.* at 64, 67.  The FTCA "extends to novel and unprecedented forms of liability."  *Id.* at 159.

The *Liranzo* court also discussed *United States v. Muniz,* 374 U.S. 150, 83 S. Ct. 1850, 10 L. Ed. 2d 805 (1963).  *See Liranzo,* 690 F.3d at 88.  In *Muniz,* the Supreme Court allowed an FTCA suit for personal injuries sustained during confinement in a federal prison, rejecting the assertion that "the relationship between the federal prisoner and his custodians" is "uniquely federal in character."  *See id.*  It concluded that, in the context of the federal prison system, "an analogous form of liability exists.  A number of States have allowed prisoners to recover from their jailers [and from the States] for negligently caused injuries."  *Muniz,* 374 U.S. at 159-60.

In accordance with these decisions, the Second Circuit explained that the fact that immigration detentions are "uniquely governmental" does not mean they have no private analogue for FTCA purposes. *Liranzo,* 690 F.3d at 94.  Where the government is the only entity that performs the actions complained of, courts are "require[d]… to look further afield" for a private analogue. *Id.,* quoting *United States v. Olson,* 546 U.S. 43, 46, 126 S. Ct. 510, 163 L. Ed. 2d 306 (2005). The court readily found an analogy with private persons making a "citizen's arrest." *Id.* at 94-95. The court distinguished *Akutowicz v. United States,* 859 F.2d 1122 (2d Cir. 1988) because, there, no detention had taken place; the only action complained of was the removal of the plaintiff's citizenship. *Liranzo,* 690 F.3d at 96. It also concluded that in *Caban v. United States,* 728 F.2d 68 (2d Cir. 1984), the court "never even considered the FTCA's private analogue requirement, as that issue was simply not before it on appeal." *Id.* at 93.

In numerous other cases, private analogues have been found for immigration officials' activities. For example, in *Mayorov v. United States,* 84 F. Supp. 3d 678, 697-701 (N.D. Ill. 2015), the court considered FCTA claims of negligence and false imprisonment arising from an immigration detainer issued against the plaintiff by ICE officers and analogized those claims to negligence by a private security contractor and a citizen's arrest. In *Avalos-Palma v. United States,* 2014 U.S. Dist. LEXIS 96499, 2014 WL 3524758, *12 (D.N.J. July16, 2014), the court analogized wrongful deportation by ICE agents to violations of a statutory duty by a private person with supervisory authority over the plaintiff. In *D.J.C.V. v. United States,* 605 F. Supp. 3d 571, 599-600 (S.D.N.Y. 2022), the court allowed claims for intentional and negligent infliction of emotional distress where immigration officials had separated a father from his minor child following illegal entry into the United States, noting "At the outset, the Government is correct that only the federal sovereign could separate D.C. and D.J.C.V. in the precise manner

alleged here.  But that does not control. … [T]he allegations here fall easily within New York law's definition of the causes of action of these torts, such that these could be pursued against a private party in like circumstances."[6]  *See also D'Alessandro v. United States,* 2022 U.S. Dist. LEXIS 76111 (W.D.N.Y. Apr. 26, 2022) (upholding FTCA claim of false imprisonment based on immigration detention and granting summary judgment for plaintiff); *Roe v. United States,* 2019 U.S. Dist. LEXIS 43124, *16 (S.D.N.Y. Mar. 8, 2019) (in FTCA suit arising from deportation of foreign national, court found "that each of Plaintiff's FTCA claims would be viable as tort claims against private citizens who disregarded or violated a statutory duty"); *Segura v. United States,* 418 F. Supp. 3d 605, 610 (E.D. Wash. 2019) (reasonably analogous private party conduct for CBP officers in like circumstances was that of a private security officer engaging in discriminatory conduct); *Watson v. United States,* 133 F. Supp. 3d 502 (E.D.N.Y. Sept. 29, 2015) (where ICE wrongfully detained plaintiff and denied him certificate of citizenship, plaintiff had FTCA claims); *Avalos-Palma v. United States,* 2014 U.S. Dist. LEXIS 96499, *33 (D.N.J. July 16, 2014) ("this court has found many cases analogizing false imprisonment through detention by immigration agents to detention by private citizens"); *Vasquez-Mentado v. Vuitron,* 2013 U.S. Dist. LEXIS 74398 (N.D.N.Y. May 28, 2013) (because border patrol agents lacked probable cause to arrest, plaintiff had FTCA claim for false imprisonment).

Here, the sole purpose of taking away the crew's landing permits was to aid the Coast Guard's desire to confine them.  CBP and Coast Guard officials thus colluded to commit the torts of false arrest and false imprisonment.  The essence of both torts is intentionally causing the

---

[6] In a plethora of cases, courts have allowed FTCA suits arising from immigration officials' enforcement of separation policies in enforcing border control.  *See, e.g., Nunez Euceda v. United States,* 2021 U.S. Dist. LEXIS 204200 (C.D. Cal. Apr. 27, 2021); *C.M. v. United States,* 2020 U.S. Dist. LEXIS 252691 (D. Ariz. Mar. 30, 2020); *A.P.F. v. United States,* 492 F. Supp. 3d 989, 996-97 (D. Ariz. 2020).

confinement of the plaintiff without proper authority. *See, e.g., Smith v. Heritage Salmon, Inc.,* 180 F. Supp. 2d 208, 220 (D. Me. 2002); *Borlawski v. Town of Windham,* No. CV-99-426, 2004 Me. Super. LEXIS 125, *12-13 (Me. Super. Ct., Cum. Cty., Mar. 26, 2004). These torts may be committed either by private individuals or by government actors, and through a limitless variety of means. *See Smith,* 180 F. Supp. 2d at 220. Of course, when the torts are perpetrated by law enforcement officers, such officers have tools and techniques at their disposal that are not available to the general public. For instance, they can use government facilities, government-issued forms and documents, and the badge of their office. But the use of these instruments, even if "uniquely governmental," does not make the analogy to private-party torts any less compelling. In this case, the focus should not be on whatever forms the CBP officials filled out but, rather, on what they intended to and did accomplish, which was the lengthy confinement of Plaintiffs and their coworkers to accommodate others (the Coast Guard), not to protect the border.

It may well be that only CBP officials are authorized to revoke temporary landing permits (though not D-2 permits); but, as the Supreme Court explained, such authority is quite limited. *See Stanisic,* 395 U.S. at 74, 78. As demonstrated above, CBP personnel lacked the authority to revoke Plaintiffs' permits under the circumstances here. Acting without authority and at the direction of other government officials with no arguable authority, their combined actions were not dissimilar to what a private person could do to bring about a false imprisonment. A private person could seize items of property – a wheelchair, for instance, or perhaps car keys or clothing – for the purpose of inhibiting a person's freedom of movement. The permit seizure is no different from confiscating Plaintiffs' passports – which Defendant also did, and which a civilian could do as well. Indeed, when private citizens directly take others' travel documents they have

private liability for the damage done. Similarly, a private person could ask a law enforcement or immigration official to detain a person for a reason unrelated the officials' genuine authority (as the Coast Guard did through the CBP here).  There can be no question that a private citizen would be liable if he successfully implored a CBP official to declare a bona fide crewman to be an impostor to facilitate the private person's financial gain.

Furthermore, it would be inappropriate to view the CBP actions in a vacuum.  They were part of an integrated effort to detain the plaintiffs without judicial process unrelated to immigration matters.  All these actions, taken together, tortiously deprived Plaintiffs of their freedom and render Defendant liable under the FTCA.

To label the revocations "an immigration enforcement-related action" in no way changes this conclusion.[7]  Any action by an immigration official under color of office can be called by that term. CBP personnel are charged with immigration enforcement.  As such, it is well settled that they are "law enforcement officers of the United States Government" within the meaning of section 2680(h) of the FTCA.  Congress amended the FTCA to expressly waive sovereign immunity for various tort claims, including false arrest and false imprisonment, against such officers.

The government mistakenly argues that CBP officials may simply declare genuine crewmen to be phonies, without meaningful explanation, to promote non-immigration objectives. The government could just as logically argue those officials have "discretion" to declare U.S. citizens with no vessel connections to be vessel stowaways and, to facilitate private gain, detain them on a vessel without judicial process.  But the existence of governmental authority and

---

[7] By the CBP's representative's own admission, the revocation had nothing to do with immigration enforcement.

discretion in certain circumstances does not authorize the violation of rights and the commission of clear torts in other circumstances.

## <u>CONCLUSION</u>

The provision of 8 U.S.C. § 1252(a)(2)(B)(ii) precluding judicial review of certain immigration actions specified by statute as discretionary did not apply to the challenged CBP actions, because such actions, under the circumstances shown here, were not authorized, let alone discretionary. If acts similar or analogous to such unauthorized actions had been committed by or on behalf of a private party, the private party would be liable under torts included in the FTCA's "law enforcement proviso."  Consequently, Plaintiffs' FTCA claims are not barred and should be tried on the merits. [8]

Executed in Portland, Maine, this 7th day of April 2023.

 /s/ Edward S. MacColl
Edward S. MacColl

/s/ Marshall J. Tinkle
Marshall J. Tinkle
**Attorneys for Plaintiffs**

THOMPSON, MACCOLL & BASS, LLC, P.A.
15 Monument Square, 4th Floor
P.O. Box 447
Portland, ME  04112-0447
(207) 774-7600

### CERTIFICATE OF SERVICE

I certify that, on the above date, I made due service of the above document by electronically filing the same using the Court's EM/ECF system.

/s/Edward S. MacColl

---

[8] Plaintiffs brought this action both to recover damages for wrongful acts that ended their careers and because, knowing that U.S. government officials have subjected many other seafarers to the same unlawful actions, they hope to deter such conduct. However, they have not sought class certification and do not represent anyone but themselves. Defendant has repeatedly inquired who is paying their counsel, insinuating that a third party may be funding this case or that some other agenda is at work.  To eliminate doubt, Plaintiffs state categorically that no third party has ever paid or offered to pay any remuneration to either themselves or their counsel in connection with this suit. Plaintiffs and their counsel brought this action because governmental actors wrongfully detained these innocent foreigners, warranting just compensation and an end to these extra-judicial, *ultra vires* detentions.