# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

JAROSLAV HORNOF, *et al.*,                )
                                          )
    *Plaintiffs,*                        )
                                          )
    v.                                  )          No. 2:19-CV-198-JDL
                                          )
UNITED STATES OF AMERICA,                 )
                                          )
    *Defendant.*                        )

## UNITED STATES' REPLY

## I.    Plaintiffs Mischaracterize Fact and Law

Plaintiffs persist in recycling enduring factual mischaracterizations from earlier pleadings that are neither true, nor relevant to the questions posed by the Court.  The United States will briefly address two of the more important items.  First, Plaintiffs contend that the Coast Guard "prevailed on the CBP," ECF No. 187 at 2, to revoke the temporary landing permits it had issued to the crew pursuant to 8 U.S.C. § 1282(a) without "legal basis," *id.*, and for "no legitimate or immigration-related reason," *id.* at 3, but rather for what they imply were "improper motives."  *Id.* n.2.  However, the testimony that Plaintiffs quote, *see id.* at 2-3, makes abundantly clear that the request to revoke Plaintiffs' landing permits supported a criminal investigation that had yielded "probable cause to believe that there had been an environmental crime committed on the vessel," *id.*, and indeed a crime had been committed.  *See United States v. MST Mineralien Schiffarht Spedition Und Transp. GmbH*, No. 2:17-CR-117-NT, 2018 WL 522764 (D. Me. Jan. 22, 2018).

Second, Plaintiffs imply that they were confined or detained in official custody by CBP, *id.* at 4, which is untrue.  As discussed in the United States' summary judgment memorandum, remand to their vessel was the natural consequence of revocation of their permits to land temporarily (or shore passes), nothing more.  It restored them to the situation they were in when

the *Marguerita* first arrived in Portland Harbor, before any permits to land had been issued.

## II. The CBP Decisions to Revoke Plaintiffs' Landing Permits and Remand Them to the *Marguerita* are Barred from Judicial Review

### A. Because the Issuance of Landing Permits Under Title 8, Section 1282(a), Is Discretionary, Their Revocation Is Made Unreviewable by Title 8, Section 1252(a)(2)(B)(ii)

Simply put, if U.S. Customs and Border Protection's (CBP) revocation of Plaintiffs' landing permits constitutes a "decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security," 8 U.S.C. § 1251(a)(2)(B)(ii), then the Court lacks jurisdiction to review the agency's action. The words "this subchapter" refer to "Subchapter II in Chapter 12 of Title 8 of the United States Code," which includes §§ 1151-1381. *Mansaray v. Barr*, 771 F. App'x 128, 129 (2d Cir. 2019); *see also Alaka v. Att'y Gen. of the United States*, 456 F.3d 88, 95 (3d Cir. 2006). The statute that pertains to conditional landing permits and which is at issue here, 8 U.S.C. § 1282, falls within "this subchapter."

The reach of 8 U.S.C. § 1252(a)(2)(B)(ii) extends to decisions "specified" by statute to be a matter of discretion. *See K.Y. v. U.S. Att'y Gen.*, 43 F.4th 1175, 1186 (11th Cir. 2022); *Berhane v. Holder*, 606 F.3d 819, 821 (6th Cir. 2010); *Alaka*, 456 F.3d at 95; *Soltane v. U.S. Dep't of Justice*, 381 F.3d 143, 146 (3d Cir. 2004). "[T]o 'specify' means 'to name or state explicitly or in detail.'" *Kucana v. Holder*, 558 U.S. 233, 243 n.10 (2010) (quoting Webster's New Collegiate Dictionary 1116 (1974)). Relevant here, 8 U.S.C. § 1282, at subsection (a), provides that "an immigration officer . . . may, *in his discretion*, grant the crewman a conditional permit to land temporarily pursuant to regulations prescribed by the Attorney General, subject to revocation in subsequent proceedings as provided in subsection (b)." 8 U.S.C. § 1282(a) (emphasis added). The words "in his discretion" are a statutory hallmark, identifying certain immigration-related actions

that Congress has legislatively shielded from judicial review.

Where both D-1 and D-2 landing permits are concerned, the broad "in his discretion" language at Section 1282(a) means that Section 1252(a)(2)(B)(ii) applies to and precludes review of the decision to grant and revoke Plaintiffs' landing permits. *See* ECF No. 186 (U.S. Mem.) at 5. Implicit in the power to grant is the power to revoke, and the discretionary authority to issue, or to refuse to issue, landing permits has always been regarded by CBP as carrying with it the necessary authority to revoke such permits. *See* CBP Vessel Inspection Guide (July 2012) at 24 (https://www.cbp.gov/sites/default/files/documents/vessel guide 4.pdf ) ("[a] CBP officer may revoke a crew member's conditional landing permit at any time subsequent to the initial inspection.").

Disagreeing, Plaintiffs say that subsection (a) of 8 U.S.C. § 1282 is entirely "irrelevant." ECF No. 187 (Pls.' Mem.) at 5. They focus instead on subsection (b), arguing that it limits immigration officials' authority to revoke landing permits. Specifically, where Hornof and Kordic's D-1 passes are concerned, Plaintiffs maintain that the statute affords discretion to revoke only after it is determined that the permittee is *not* a bona fide crewman or does not intend to depart on the vessel that brought him. *Id*. at 6. In discussing Zak's D-2 pass, Plaintiffs boldly declare that "[o]nce a D-2 permit is issued, immigration officers have no authority, discretionary or otherwise, to revoke it." *Id*. at 10.

What Plaintiffs fail to appreciate is that subsection (b) also bears the "in his discretion" stamp, providing that "any immigration officer may, *in his discretion*, if he determines that an alien is not a bona fide crewman, or does not intend to depart on the vessel or aircraft which brought him, revoke the conditional permit to land which was granted such crewman under the provisions of subsection (a)(1). . . ." 8 U.S.C. § 1282(b) (emphasis added). Both subsections, (a) and (b),

contain the same discretion-bestowing language, which remove decisions to grant, deny, or revoke a landing permit from judicial review.

###### B.     Federal Officials Designated Plaintiffs *Mala Fide*, Not "Imposters"

Plaintiffs argue that "[e]ither a permittee is a genuine member of the ship's crew or he is not," and state that "immigration officials do not have discretion to simply declare an obvious and bona fide crewman is instead be an imposter."  ECF No. 187 at 7.  This is factually incorrect. Federal officials never said that Plaintiffs were "imposters," but instead considered them to be *mala fide*, as CBP has come to use the term.  As discussed in the United States' memorandum supporting its motion for summary judgment, "CBP defines *mala fide* as '[b]ad faith, the exact opposite of *bona fide*.'"  ECF No. 158 at 6 n.3 (citing USSOF ¶ 50).  "CBP designates a crewman as '*mala fide*' when there is potential risk associated with his presence in the United States."  *Id*. (citing USSOF ¶ 51).  "Here, CBP considered the crew to be *mala fide* because of the potential that each could be a witness or target of the Coast Guard's ongoing investigation, which raises a question as to whether the crew was acting in good faith."[1]  *Id*. (citing USSOF ¶¶ 52-53).  Given the jurisdictional bar imposed by 8 U.S.C. § 1252(a)(2)(B)(ii), the United States respectfully submits that the Court does not have authority to review the agency's use of the term, which is part and parcel of review of the revocation of Plaintiffs' D-1 or D-2 landing permits.

Were the Court to consider the matter, however, it is apparent that Congress did not define the term "*bona fide*," and the agency's use of it is a permissible construction of 8 U.S.C. § 1282. When vessel crew are suspected of operating their ship in an illegal manner, CBP has a legitimate reason to regard them as *mala fide*, rather than *bona fide*, pending investigation.  *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 842–43 (1984) (if a statute

---

[1] Moreover, their status as potential perpetrators of, or material witnesses to, such criminal activity, created a likelihood that they would not be departing on the vessel on which they arrived.

is silent with respect to an issue, a court must assess whether the agency's construction is permissible).

Finally, the legislative history on which Plaintiffs rely offers no suggestion that Congress intended to make D-2 temporary landing permits irrevocable. It demonstrates only that Congress sought to streamline revocation of D-1 landing permits under a particular set of circumstances (*e.g.*, seamen trying to disappear into the United States), not curtail immigration officers' discretion under others (*e.g.*, seamen trying to avoid apprehension for criminal conduct or escape testifying against their employer in a criminal case):

> For a number of years, it has been generally recognized, both by Government officials and others, that the temporary "shore leave" admission of alien seamen who remain illegally constitutes one of the most important loopholes in our whole system of restriction and control of the entry of aliens into the United States. The efforts to apprehend those alien seamen for deportation are encumbered by many technicalities invoked on behalf of the alien seaman and create conditions incident to the enforcement of laws which have troubled authorities for years.

S. Rep. No. 1515 at 550 (available at ECF No. 174-1).

Plaintiffs' tortured interpretation of Section 1282 is no more than an attempt to reintroduce the sort of "technicalities invoked on behalf of the alien seamen," *id.*, that Congress was trying to eliminate.

### C.    Plaintiffs' Jurisprudence Is Readily Distinguishable

Plaintiffs cite several cases for the proposition that § 1252(a)(2)(B)(ii) "does not bar jurisdiction over *all* discretionary decisions or actions," ECF No. 187 at 4, which is true. As Plaintiffs note, in *Kucana,* 558 U.S. at 247, "the Supreme Court has interpreted this provision to mean that 'Congress barred court review of discretionary decisions only when Congress itself set out the Attorney General's [or Secretary's] discretionary authority in the statute.'" ECF No. 187 at 4. As set forth above, however, Section 1282 is just such a statute, one in which Congress

explicitly set out the Secretary's discretionary authority not once, but twice.  No case identified by Plaintiffs holds otherwise, and the United States is aware of no such authority.

K.Y., 43 F.4th 1175, and *Berhane*, 606 F.3d 819, both involve review of a Board of Immigration Appeals' (BIA) final order of removal and denial of asylum and protection under the United Nations Convention Against Torture.  These cases are two of many in which courts have found that the Attorney General's determination of what is a "particularly serious crime" pursuant to 8 U.S.C. §§ 1158(b)(2) and 1231(b)(3)(B)(ii) is not specified by those statutes "to be in the [Attorney General's] *discretion*."  *K.Y.*, 43 F.4th at 1186 (emphasis added).

Plaintiffs next look to *Soltane v. U.S. Dept. of Justice*, 381 F.3d 143, 148 n.3 (3rd Cir. 2004), in which an employer appealed the denial of its I-360 immigrant visa petition on behalf of a German national whom it had employed for four years as an R-1 nonimmigrant religious worker. The employer pursued the appeal through what was then the Administrative Appeals Unit of the Immigration and Naturalization Service (INS) to the district court and then the Third Circuit. Although no party had questioned either courts' jurisdiction, the Circuit concluded *sua sponte* that neither 8 U.S.C. §§ 1153(b)(4) nor 1101(a)(27)(C)(ii) included a specific reference to "discretion" in the relevant Attorney General's determinations.  *Soltane*, 381 F.3d at 147-48.  Like *K.Y.* and *Berhane*, *Soltane* has nothing to do with the grant, denial, or revocation of temporary landing permits under 8 U.S.C. § 1282.

Plaintiffs rely most heavily on *Cho v. Gonzales,* 404 F.3d 96, 99-100 (1st Cir. 2005), another case having absolutely nothing to do with temporary landing permits.  In *Cho,* a lawful resident alien appealed the BIA's denial of a hardship waiver of conditions on her residency.  The First Circuit analyzed 8 U.S.C. § 1186a(c)(4)(B), a statute with an interrelated series of provisions, only some of which were textually committed to the Attorney General's discretion.  Comparison

of Section 1282 and Section 1186a(c)(4)(B) shows them to be fundamentally different.  The latter involves a complicated process set forth in a statutory scheme, which can ultimately lead to permanent resident status.  It includes multiple avenues of appeal and bears little resemblance to the plenary determination of *bona fide* crewman status that is vested in the discretion of immigration officials by Section 1282(b).

Multiple INA statutes address when marriages are not *bona fide*, which means they were entered into for the purpose of "evading the immigration laws."  *See* 8 U.S.C. § 1154(c); *Zemeka v. Holder*, 989 F. Supp. 2d 122, 129 (D.D.C. 2013).  Under *Cho*, a Court can interpret "background legal questions" that affect whether a marriage is deemed *bona fide*.  *Cho*, 404 F.3d at 102.  By contrast, the *bona fide* crewman determination is unaccompanied by legal standards susceptible to judicial review.  *See Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005) (one indicia of an unreviewable discretionary statute under Section 1252(a)(2)(B)(ii) is where the agency's discretionary "judgment [is] unfettered by any statutory standard whatsoever").  Trying, as do Plaintiffs, to apply the First Circuit's highly contextual interpretation of Section 1186 to the wholly unrelated Section 1282 is an exercise the Circuit specifically cautioned against, instructing that "[t]he jurisdictional questions arising from that statutory provision are many and complex, and nothing we say here should be taken to dictate answers for problems beyond the one we are addressing."  *Id*.  Similarly, in *Zhou v. FBI*, 2008 WL 2413896 (D.N.H. June 12, 2008), the appellant was challenging the "Secretary's alleged failure to act on the application in a timely fashion," a legal issue that was found not to fall within the Secretary's discretion.

Finally, *INS v. Stansic*, 395 U.S. 62, 74 (1969), did not hold that revocation of temporary landing permits under what was then Section 252(b) of the INA was itself judicially reviewable.  Rather the petitioner in *Stansic* was seeking asylum under what was then Section 242, and that

was the decision or action that the Supreme Court found to be reviewable. *Cf. Dimitrijevski v. U.S. Atty. Gen.*, 363 F. App'x 710, 714 (11th Cir. 2010) ([A]n alien crewman who is not granted relief in an asylum-only proceeding may be removed without further proceedings.") (citing 8 U.S.C. § 1282(b)).

In summary, the cases to which Plaintiffs look for support deal with the determination of various immigration statuses that implicate substantial interests and for which extensive adjudicatory processes are provided by statute. Significantly, no appellate process whatsoever accompanies Section 1282 landing permit determinations. When a landing permit is revoked, there is no mechanism to appeal the decision. *See generally* 8 U.S.C. § 1282, 8 C.F.R. § 252.2; *see also* 8 U.S.C. § 1201(i) (providing "no means of judicial review" where the Secretary of State revokes a "visa or other documentation"). Most importantly, Plaintiffs have cited no case that calls into question Congress's express intent that determinations regarding issuance or revocation of temporary landing permits be left to the discretion of immigration officials.

### D.     Plaintiffs' Remand to the Vessel

The United States did not create the situation that led to Plaintiffs' weeklong stay on the *Marguerita* as it remained in port, nor did it set into motion events that led to their nine additional weeks in the United States, as they waited to testify. In particular, no federal official asked Plaintiffs to pursue seafaring occupations, or requested that they sign seaman's articles on the *Marguerita*, or encouraged the ship's chief engineer to regularly dump oily waste into the sea, or directed that the vessel call at a U.S. port. "[A] vessel's anchorage in a domestic port is the functional equivalent of the border." *United States v. Tilton*, 534 F.2d 1363, 1365 (9th Cir. 1976). CBP's remand of the crew to the *Marguerita* returned Plaintiffs and others to the vessel on which they had arrived.

III.   **Plaintiffs Have Not Established that Revocation of Their Temporary Landing Permits Was an Immigration-Enforcement-Related Action with a Private Party Analogue, Such that It Is Actionable under the FTCA**

The parties were asked to consider whether the revocation of shore passes has a private party analogue, separate and apart from Plaintiffs' post-revocation period onboard the vessel. With that understanding, the answer is unequivocally "no." Revocation of a shore pass is akin to processing an application for immigration benefits, as in *Bhuiyan v. United States*, No. 14-CV-00013, 2017 WL 2837023 (D. N. Mar. I. June 30, 2017), *aff'd*, 772 F. App'x 564 (9th Cir. 2019), denying a green card, as in *Saleh v. United States*, No. 12 Civ. 4598, 2013 WL 5429140, at *9 (S.D.N.Y. Sept. 27, 2013), denying an individual's naturalization application, as in *Omonivi v. Dep't of Homeland Sec*., No. 10 Civ. 1344, 2012 WL 892197, at *9 (S.D.N.Y. Mar. 13, 2012), or withdrawing an individual's citizenship, as in *Akutowicz v. United States*, 859 F.2d 1122, 1125 (2d Cir. 1988)). In these instances, no private party analogue has been found to exist and the same outcome is proper here.

Plaintiffs identify numerous cases, but none hold that CBP's issuance, denial, or revocation of temporary landing permits has a private party analogue.[2] Certainly, the principle that wrongful arrest or detention in official custody by federal law enforcement is deemed to have a private party

---

[2] Generally, their authorities support the proposition that individuals who are wrongly detained in official custody by CBP, INS, or other federal law enforcement agency can sue for false imprisonment or for similar torts. *See Liranzo v. United States*, 690 F.3d 78 (2d Cir. 2012) (plaintiff wrongly detained in an ICE detention center); *Mayorov v. United States*, 84 F. Supp. 3d 678 (N.D. Ill. 2015) (ICE erroneously issued immigration detainer for Plaintiff, resulting in his transfer to a higher security state prison and a longer term of confinement than he otherwise would have served); *D'Alessandro v. United States*, 2022 WL 2829748 (W.D.N.Y. April 26, 2022) (plaintiff confined in ICE facility pursuant to an immigration detainer); *Watson v. United States*, 133 F. Supp. 3d 502, 506 (E.D.N.Y. 2015) (plaintiff wrongly detained for two and a half years in a series of federal ICE detention facilities); *Vazquez-Mentado v. Buitron*, 2013 WL 2318638 (N.D.N.Y. May 28, 2013) (plaintiff erroneously arrested and briefly detained by federal agents at a Border Patrol Station); *Segura v. United States*, 418 F. Supp. 3d 605 (E.D. Wash. 2019) (plaintiff picked up at bus station and briefly held at a detention center). Plaintiffs also cite *United States v. Muniz*, 374 U.S. 150 (1963), wherein a plaintiff was injured by other inmates due to the negligence of a government employee during his otherwise lawful confinement. It too is inapposite.

analogue for the purposes of the FTCA is, as demonstrated by these cases, well accepted and not in dispute. *See, e.g.*, *Liranzo*, 690 F.3d at 83 ("government acknowledged that the FTCA explicitly permits claims for false imprisonment to be brought against the United States based on the acts of federal law enforcement agents") and at 96 (distinguishing that "in *Akutowicz*, there was no detention") (citing *Akutowicz* 859 F2d 1122 (2d Cir. 1988)).

But wrongful arrest or detention in official custody by federal law enforcement is not what is at issue here. The denial or revocation of temporary landing permits is not factually analogous to arrest or confinement. When Plaintiffs' landing permits were revoked, they were already back on board their vessel. They were not arrested or taken into United States custody by CBP. Revocation of their temporary landing permits did not put them in government custody, but rather relegated them to their employer's vessel, which by their own choice was their home and workplace while so employed. Their situation was restored to what it was upon their initial arrival at the United States border. Although Plaintiffs later surrendered to the Court for arrest pursuant to material witness warrants, and were released pursuant to conditions set by the Court, that was a separate and distinct action and is not the subject of the Court's present inquiry.

Plaintiffs also cite *Avalos-Palma v. United States*, 2104 WL 3524758 (D.N.J. 2014) and *Roe v. United States*, 2019 WL 1227940 (S.D.N.Y. 2019), cases in which plaintiffs sued for wrongful deportation by federal officials. Again, the cases are factually inapt. Here, Plaintiffs were not forcibly removed from the United States by federal officials and deported back to their home countries. Rather, permission for them to temporarily disembark their vessel was withdrawn.

In *Indian Towing Co. v. United States*, 350 U.S. 61 (1955), the Supreme Court found that operation of a lighthouse, although commonly conducted by the United States Coast Guard, is not

necessarily exclusively so. *Id.* at 66 (operation of private lighthouses is "not at all inconceivable") and 67 (lighthouse operation is not so "uniquely governmental" that "its kind has not at one time or another been, or could not conceivably be, privately performed."). The same is not true of issuance of temporary landing permits. As discussed above, that is a governmental function vested exclusively in the discretionary authority of United States immigration officials. No non-governmental person or entity is authorized to perform this function, nor anything close to it. *See id.* at 67 (FTCA was designed to "compensate victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable.").

Finally, Plaintiffs cite *D.J.C.V. v. United States*, 605 F. Supp. 3d 571 (S.D.N.Y. 2022), which involved the detention in federal custody of two noncitizens, a father and his minor child, after they illegally entered the United States. The father and child were separated. For precedential purposes, it is analogous to the detention cases distinguished above, as Plaintiffs do not contend that they were separated from each other.

## Conclusion

The Court asked whether CBP's interpretation of 8 U.S.C. § 1282, which led it to revoke Plaintiffs' temporary landing permits and the resulting remand to their vessel is judicially reviewable. The clear answer is that Congress, through 8 U.S.C. § 1252(a)(2)(B)(ii), made CBP's action under 8 U.S.C. § 1282 unreviewable. This straightforward conclusion of law remains in the face of the jurisprudence that Plaintiffs offer against it. Similarly, revocation of a shore pass is no different than processing an application for immigration benefits, denying a green card, denying an individual's naturalization application, or withdrawing an individual's citizenship. In each of these instances, no private party analogue has been found to exist. The same outcome is

appropriate here.  The United States respectfully reiterates its request that summary judgment be entered in its favor, dismissing Plaintiffs' remaining claims with prejudice.

Dated:  April 14, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DARCIE N. McELWEE
United States Attorney

JOHN G. OSBORN
Assistant United States Attorney
United States Attorney's Office
District of Maine
100 Middle Street
East Tower, 6th Floor
Portland, Maine 04101
(207) 780-3257
john.osborn2@usdoj.gov

*/s/ Michael A. DiLauro*
MICHAEL A. DiLAURO
Senior Admiralty Counsel
KALYNN E. HUGHES
Trial Attorney
MALINDA R. LAWRENCE
Trial Attorney
Aviation & Admiralty Litigation
Torts Branch, Civil Division
U.S. Department of Justice
(overnight courier)
175 N St., N.E., Ste. 8.1815
Washington, D.C. 20002
(mailing)
P.O. Box 14271
Washington D.C. 20044-4271
Telephone: (202) 616-4047/4060
Facsimile: (202) 616-4159
michael.dilauro@usdoj.gov
kalynn.e.hughes@usdoj.gov
malinda.r.lawrence@usdoj.gov
*Counsel for Defendant United States*