## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| JAROSLAV HORNOF, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **2:19-cv-00198-JDL** |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON SUMMARY JUDGMENT

Plaintiffs Jaroslav Hornof, Damir Kordic, and Lukas Zak filed this action against the United States of America, the United States Department of Justice, the United States Coast Guard, and the United States Department of Homeland Security (collectively, the "Government"), and nine federal officers (the "Individual Defendants").[1] The Individual Defendants moved to dismiss (ECF No. 21) the Plaintiffs' Amended Complaint (ECF No. 3) and the Government filed a Motion to Dismiss, or alternatively, for Summary Judgment (ECF No. 23).[2] The Court granted (ECF No. 61) the Individual Defendants' Motion to Dismiss, and granted in part the Government's motion, allowing the following claims to proceed under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C.A. §§ 2671-80 (West 2023): two false arrest

---

[1] Three of the Individual Defendants are federal prosecutors, four—including Special Agent Mark Root—are Coast Guard officers, and two are Customs officers.

[2] At the oral argument on February 13, 2020, the Government conceded that its summary judgment motion should be construed as a motion to dismiss, and the motion was treated as such in my Order, *see* ECF No. 61.

and false imprisonment claims; an intentional infliction of emotional distress claim; and an abuse of process claim arising from the alleged conduct of Special Agent Mark Root.  The Plaintiffs also seek declaratory relief on the surviving claims.

## I.  PROCEDURAL BACKGROUND

The Government moved for summary judgment on July 20, 2022 (ECF No. 158), and the Court heard oral argument on the motion (ECF No. 180) in November 2022.  On March 10, 2023, I requested additional briefing from the parties on two issues related to this Court's subject-matter jurisdiction (ECF No. 185).

Before turning to the material facts, I first address several disputes and deficiencies related to the parties' written submissions.

### A.    Late-Filed Witness Declarations

The Plaintiffs submitted, along with their written opposition to the summary judgment motion, the declarations of Attorney Bruce Merrill, *see* ECF No. 164-7, updated ECF No. 179, and Elaine Akers, *see* ECF No. 164-3.  Merrill's declaration is offered in support of the Plaintiffs' argument that the Government had, at the time of the events giving rise to the Plaintiffs' claims, a policy or practice of negotiating surety agreements in bad faith to intentionally detain foreign crewmembers without their consent.  This, the Plaintiffs contend, supports their position that the Government knew—or should have known—that the Plaintiffs did not voluntarily consent to disembarking their vessel and remaining in the United States.

The second declaration is that of Elaine Akers, who, according to her declaration, was previously employed as a full-time employee, and now works

part-time, as a paralegal and firm administrator at the offices of the Plaintiffs' attorneys' law firm, Thompson, MacColl & Bass, LLC, P.A.  Her declaration serves several apparent purposes.  First, it seeks to lay a foundation for various Exhibits.  Second, it seeks to show that foreign crewmembers, whose testimony is required in cases involving the International Convention for the Prevention of Pollution from Ships ("MARPOL") and the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C.A. §§ 1901-15 (West 2023), generally return for trial or willingly provide deposition testimony without being detained pursuant to material witness arrest warrants.  Third, it seeks to demonstrate that foreign crewmembers who are detained as material witnesses experience emotional distress and trauma.  Notably, neither Merrill nor Akers has been identified by the Plaintiffs as expert witnesses offering expert opinions.

The Government objects to the Court's consideration of both declarations, arguing that it is prejudiced by the fact that neither Merrill nor Akers was included in the Plaintiffs' pretrial witness disclosure list required by the Court's scheduling order,[3] and that the declarations were neither prepared nor disclosed by the Plaintiffs until after the close of discovery and after the Government moved for summary judgment.  The Government also challenges the declarations on substantive grounds,

---

[3]  The Government's objection, raised in its responsive filing, can fairly be treated as proper, despite the fact that the Government did not request to strike each factual assertion relying on these declarations for support.  *See Perez v. Volvo Car Corp.*, 247 F.3d 303, 314 (1st Cir. 2001) ("[W]hat is required to preserve a party's rights vis-à-vis an allegedly deficient affidavit [in the summary judgment context] is for the dissatisfied party to (a) apprise the trial court, in a conspicuous manner and in a timely fashion, that [it] considers the affidavit defective, and (b) spell out the nature of the ostensible defects clearly and distinctly.  Whether the dissatisfied party fulfills these requirements by means of a motion to strike or in some substantially equivalent way (say, . . . in a legal memorandum urging the granting of summary judgment notwithstanding the affidavit) is of little moment.").

arguing that "Attorney Merrill has defended shipowners in similar criminal prosecutions but had no personal involvement with this matter or the underlying criminal case involving [the vessel's owner and operator].  He was never counsel for Plaintiffs during their time in the United States.  Any knowledge he possesses is immaterial to the remaining causes of action in Plaintiffs' lawsuit."  ECF No. 172 at 1-2.  As to Akers's declaration, the Government argues that Akers does not have "first-hand knowledge sufficient to authenticate most, if not all, of the exhibits attached to [her declaration]."[4]  ECF No. 172 at 2.

The Plaintiffs have not offered reasons in their responsive filings that justify either the late disclosure of Merrill and Akers as witnesses or the late submission of their declarations.  Instead, following the oral argument on summary judgment, the Plaintiffs, without having sought leave of Court, submitted a Supplemental Memorandum (ECF No. 181) regarding the admissibility of Merrill's declaration and its relevance to their theory that the Government has a general practice of negotiating surety agreements in bad faith.

The Plaintiffs' late, unexplained production of the Merrill and Akers declarations does not comply with Fed. R. Civ. P. 26(a)(1)(A)(i), which requires a party to "provide to the other parties . . . the name . . . of each individual likely to have discoverable information—along with the subjects of that information—that the

---

[4] For example, the Government denies numerous statements asserted by the Plaintiffs because they rely on Akers's declaration, arguing, among other things, that her testimony "lack[s] foundation, [and] include[s] improper lay witness opinions" and that her testimony as to "what other seamen have done in 'similar cases' is not part of a case or controversy currently before the court, and it is immaterial to Plaintiffs' surviving causes of action."  ECF No. 172 at 47, ¶ 77.

disclosing party may use to support its claims or defenses."  A party is also required to supplement its disclosures promptly "if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A).  If a party fails to make timely disclosures, the "party is not allowed to use that information or witness to supply evidence on a motion."  Fed. R. Civ. P. 37(c)(1).  *See Santiago-Díaz v. Laboratorio Clínico Y De Referencia Del Este,* 456 F.3d 272, 276 (1st Cir. 2006) ("The baseline rule is that 'the required sanction in the ordinary case is mandatory preclusion.'" (quoting *Lohnes v. Level 3 Commc'ns, Inc.,* 272 F.3d 49, 60 (1st Cir. 2001))).

The Plaintiffs did not name Merrill or Akers  in their initial pretrial disclosures list, which was due, after various amendments to the scheduling order, no later than December 28, 2020.  The declarations were not submitted until August 31, 2022, well after the discovery deadline of January 14, 2022.[5]  In addition, the declarations were submitted more than one month after the Government moved for summary judgment, and more than two months after the Government submitted the Stipulated Record on June 28, 2022.

Moreover, the late-filed declarations are deficient.  Federal Rule of Civil Procedure 56(c)(4) requires that declarations used to support or oppose a motion for summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify

---

[5]  On January 12, 2022, the discovery deadline was extended until February 11, 2022, for unrelated limited purposes.  On February 14, discovery was extended again until March 14, 2022, for the limited purpose of deposing the Plaintiffs and the Plaintiffs' damages witness.

on the matters stated."  Courts may disregard inadmissible portions of declarations, keeping in mind that "personal knowledge is the touchstone."  *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001).  "[R]equisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise," *id.* at 316 (citing *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999)), and "[i]t is apodictic that an 'affidavit . . . made upon information and belief . . . does not comply with Rule 56(e),'" *Sheinkopf v. Stone*, 927 F.2d 1259, 1271 (1st Cir. 1991) (quoting *Automatic Radio Mfg., Inc. v. Hazeltine Research, Inc.*, 339 U.S. 827, 831 (1949)).  In assessing the record on summary judgment, the Court will "afford no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Rogan v. City of Bos.*, 267 F.3d 24, 27 (1st Cir. 2001)).

Merrill's declaration is based largely on his personal experience as an attorney representing crewmembers and vessel owners in MARPOL cases unrelated to this case.  For example, he states:

> I know the government's practice is to refuse to involve counsel for crewmembers or the crewmembers themselves in the negotiations for agreements on security or for the terms of their detention.  The government's practice is to negotiate exclusively with vessel interests for agreements require[ing] the crewmembers to disembark and stay in this country . . . even if the government knows the crewmembers have not authorized anyone but their counsel to discuss arrangements for the crewmembers to stay in this country.[6]

---

[6]  The Government argued that Merrill "cannot speak to what either the plaintiffs or the federal prosecutors in the plaintiffs' case knew or when they knew it."  ECF No. 183 at 2.  In support, the Government points specifically to the Plaintiffs' responses to paragraphs 65, 66, 68, 69, 70, 71, and 89

ECF No. 179 at 2, ¶5.  Merrill's declaration mentions a specific instance in which he represented clients who were held in custody for six months pursuant to an agreement and asserts his "confiden[ce] that if the crewmembers had not had competent counsel, they would have been held much longer."  ECF No. 179 at 4, ¶ 16. He also claims that he knows of other cases where "foreign crewmembers were held under agreements on security for a year or more, without ever being called as a witness in any proceeding and without ever appearing before any judicial officer." ECF No. 179 at 4, ¶ 17.  He does not offer facts that would establish whether his experience is representative of most or all MARPOL cases, or facts that suggest he has personal knowledge about the government's use of surety agreements beyond the cases in which he was involved.[7]

Merrill's declaration makes only two statements related specifically to this case, both of which appear to be based on information he obtained from the Government's filings, and not on his personal knowledge of the Plaintiffs or the particular circumstances here.[8]  The remainder of his declaration consists of little more than his opinions and conclusions regarding the Government's conduct in other, unrelated MARPOL cases involving surety agreements.[9]   In short, Merrill's

---

of the Government's Statement of Facts, *see*  ECF No. 159 and the Plaintiffs' additional statements of fact numbered 32, 41, 42, 50, 59, 62, 79, 83 and 84, *see* ECF No. 164.

[7]  For example, he states: "To the best of my knowledge, the government has never lost testimony it requested of any seafarer in any case in which I was involved."  ECF No. 179 at 5, ¶ 21.

[8]  *See, e.g.*, ECF No. 179 at 2-3, ¶ 8; 5-6, ¶ 26.

[9]  *See, e.g.*, ECF No. 179 at 1, ¶ 3; 2, ¶¶ 5-7; 3, ¶¶ 9-11.

declaration fails to show that he has personal knowledge of the events associated with this case and sets forth expert opinions for which his expertise has not been established.[10]

Akers's declaration fares no better. Akers represents that she was "intensively involved in the firm's representation of crew members of the M/V MARGUERITA and of the plaintiffs . . . including the gathering, receiving, organizing, sending, and filing of documents." ECF No. 164-3 at 1, ¶2. She also states that "[s]ince at least 2017, [she had] been extensively involved in helping the office represent foreign seafarers detained as material witnesses and as potential or actual defendants concerning events that occurred on the high seas." ECF No. 164-3 at 3, ¶13. The declaration largely consists of Akers's opinions and statements that she has heard foreign crewmembers and their families make about the effect that surety agreements had on them in other, unrelated and unnamed cases.[11]

In sum, receiving and considering the Merrill and Akers declarations at this late juncture would unfairly prejudice the Government. Neither individual was identified as a witness in this case, thus depriving the Government of the opportunity to depose them. And the declarations were untimely, filed long after the discovery

---

[10] The Plaintiffs rely solely on Merrill's declaration in support of two statements of fact, *see* ECF No. 164 at 33-34, ¶¶ 41, 42, and in support of numerous responses to the Government's statements of fact, *see* ECF No. 164 at 14-17, ¶¶ 65, 66, 68, 69, 71; 20, ¶ 89. Certain facts asserted by the Plaintiffs are supported both by citation to Merrill's declaration as well as to Akers's declaration or the Plaintiffs' May 2018 declarations. *See* ECF No. 164 at 16-17, ¶ 70; 32, ¶ 32; 48, ¶ 79; 49, ¶ 83. To the extent that the Plaintiffs have personal knowledge of these asserted facts, I address them on a case-by-case basis below.

[11] *See* ECF No. 164 at 48, ¶¶ 77-78, 80.

deadline had passed and the Government's Motion for Summary Judgment and supporting documents were submitted. More problematic still, neither individual has been shown to have personal knowledge of relevant evidence associated with the events giving rise to the Plaintiffs' claims. Accordingly, I will not consider the declarations or the facts asserted by the Plaintiffs which cite only to these declarations for support.[12]

## B.    Failures to Comply with Local Rule 56

The District of Maine's Local Rules require a party moving for summary judgment to file a short and concise statement of material facts. D. Me. Local R. 56(b). "The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." D. Me. Local R. 56(f); *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010). Each properly-supported fact "shall be deemed admitted unless properly controverted." D. Me. Local R. 56(f). An "opposing party shall admit, deny or qualify the facts by reference to the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by the rule." D. Me. Local R. 56(c). Although motions to strike are not permitted, a party requesting to strike a statement must also "admit, deny[,] or qualify the statement as provided in this rule."

---

[12] To the extent that the Plaintiffs rely on additional record citations, or the Exhibits attached to Akers's declaration that may be authenticated or capable of authentication at trial, *see Joseph v. Lincare, Inc.*, 989 F.3d 147, 155 n.4 (1st Cir. 2021), I will consider assertions of fact that rely on those supplemental citations on an individual basis.

D. Me. Local R. 56(e).  "In the event that a party opposing summary judgment fails to act in accordance with the rigors that such a rule imposes, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007).  Further, "[a] qualified response is not an appropriate vehicle for introducing new facts. Rather, the qualification should offer record citations that show that the statement must be modified in some way to be accurate—or explain why such citations are not available."  *Goldenson v. Steffens*, No. 2:10-cv-00440, 2014 WL 12788001, at *2 n.3 (D. Me. Mar. 7, 2014).

Here, the parties have fallen short of Local Rule 56's requirements in several respects.   The Plaintiffs' statements of material fact are frequently lengthy, unsupported by proper record citations,[13] or unsupported by the record citations provided.[14]  In their responses to the Government's statements of material fact, the Plaintiffs consistently failed to comply with Local Rule 56(c) because they did not

---

[13]  For example, the Plaintiffs' statements regarding alleged misrepresentations and omissions in Special Agent Root's affidavits, submitted in support of the material witness arrest warrants, consist of three numbered statements, each with numerous sub-points in a list format.  *See* ECF No. 164 at 35, ¶ 50 a- s; 39, ¶ 59 a-m; and 42, ¶ 62 a-o.  The Plaintiffs do not provide record citations for each sub-point, and instead offer generalized citations at the end of each list, many of which do not include page or paragraph numbers, resulting in the reader having to guess as to which citation supports which assertion.

[14]  For example, when characterizing the surety agreement negotiated between the Government and the vessel's owner and operator, the Plaintiffs stated that: "the government negotiated a bond for the release of the vessel but also insisted that Plaintiffs' employer (a) purport to extend unilaterally the expired employment contract of Zak . . ., (b) unilaterally extend the contracts of other crew members, including Hornof and Kordic, for as long as the government demanded, (c) oust the Plaintiffs and eight other crew members from the vessel before it was allowed to depart, leaving them behind in the United States, and (d) direct those crew members to assist the United States as instructed."  ECF No. 164 at 32, ¶ 30.  Though Plaintiffs purportedly rely on Akers's declaration and the Agreement itself, they do not directly cite paragraphs or page numbers in the Agreement, and their assertions are both argumentative and unsupported by the Agreement's plain language.

admit, deny, or qualify the Government's statement, relying instead on stand-alone requests to strike—of which there were sixty-five.[15]  After the Government replied to the Plaintiffs' objections (ECF No. 169) to specify the relevant rules of evidence that support the facts asserted and their admissibility, the Court allowed the Plaintiffs to file a memorandum in support of their requests to strike if they wished to preserve their objections (ECF No. 176).  In their subsequent memorandum, the Plaintiffs continued to assert eighty-nine objections or requests to strike (ECF No. 178), most of which again failed to comply with Local Rule 56(e) and failed to explain, per the Court's Order, why the Government's cited evidentiary support was deficient.[16]

The Government also ran afoul of the Local Rule.  In its responses to the Plaintiffs' opposing statements of fact, the Government asserted lengthy qualifications and denials, with factual narratives that did not directly admit, deny,

---

[15]  In addition to the sixty-five requests to strike that were submitted without admitting, denying, or qualifying the underlying statements, the Plaintiffs also requested to strike thirty-nine statements that they also denied or qualified.  Many of the Plaintiffs' initial requests to strike consisted of evidentiary objections—failure to authenticate, lack of foundation, and hearsay—that disregard current authority in this Circuit as to what evidence may be relied upon at the summary judgment stage.  *See Joseph v. Lincare, Inc.*, 989 F.3d 147, 155 n.4, 156 (1st Cir. 2021); *see also* Fed. R. Civ. P. 56(e) adv. committee's note to 2010 amendment.

[16]  For example, the Plaintiffs state: "Defendant cites a document for which no authentication, proper identification, or other evidentiary foundation is offered.  It is also irrelevant . . . . The documents are intentionally misleading.  MST provided the materials to every authority that requested the materials, including the vessel's flag state.  The Government knew the flag state requested follow-up information.  Trial evidence will show that the Government made a conscious decision not to request follow-up information because the Government preferred to claim (falsely) that upon the vessel's next arrival in the United States the Oil Record Book was 'presented' to the Coast Guard as though it were accurate . . . so that the Government could detain crewmembers onboard and then ashore by, to use the Government's words, 'folding' them 'into a security agreement,' all to leverage a large fine . . . ."  ECF No. 178 at 8, ¶ 30.  Again, the Plaintiffs have not admitted, denied, or qualified the statement in their request to strike, and failed to provide proper record support for their various assertions.

or qualify the accuracy or veracity of the Plaintiffs' stated facts.[17]  The Government

also offered argumentative and speculative responses lacking record citations.[18]

The Plaintiffs' and, to a lesser degree, the Government's, failures to comply

with Local Rule 56 unnecessarily complicated the Court's evaluation of the motion.[19]

---

[17]  For example, the Government denied the Plaintiffs' statement of fact that they "never consented to the confiscation of their passports."  ECF No. 164 at 33, ¶ 39.  The Government's denial states:

> Plaintiffs' passports were not confiscated until the Court ordered that they be surrendered as a condition of release.  Before then, the surety agreement specified that crewmember witnesses who were requested to and did remain in MST's employment in Portland would be asked to surrender their passports for safekeeping, and if they refused, the Coast Guard would be notified 72 hours before the passport was returned. Just prior to the agreement's execution, counsel for MST agreed that the passports relinquished for safekeeping would be best kept by CGIS as opposed to MST's shipping agent. The master of the vessel, who was responsible for holding the crew's passports, provided them to CBP officials.  CBP then gave the passports to Agent Root.  CBP had expressly conditioned its grant of temporary parole on the provision that the Coast Guard hold the parolees' passports.  This condition, however, did not negate the agreement's provision requiring that a crewmember's passport be returned within 72 hours of him requesting it.  Furthermore, there is no direct evidence showing how Plaintiffs felt while the master held their passports or when they were given to the government.  It was, however, the government's understanding that Plaintiffs agreed to stay in the United States under the provisions set forth in the surety agreement, except for Plaintiff Zak.  When Zak filed a habeas petition, it was clear that he wanted his passport and did not consent to stay like his fellow crewmen.  With his habeas hearing scheduled for July 17, 2017, Zak disembarked with the rest of the crewmember witnesses and his passport was presented to CBP with the others.

ECF No. 172 at 11-12, ¶ 39 (internal citations omitted).

[18]  For example, in qualifying the Plaintiffs' statement that they "truthfully indicated to government officials that they would come back to the District of Maine if they were allowed to go home," ECF No. 164 at 47, ¶ 67, the Government stated: "Plaintiffs' assertions of future intentions to return to the United States did not ensure their availability to testify at trial.  Nothing prevented them from changing their minds.  Factors beyond their control could also have prevented them from coming back." ECF No. 172 at 45, ¶ 67.

[19]  Relatedly, I find no merit in the Plaintiffs' request that the Court strike all or part of the Government's statement of facts on the ground that the Government "entice[d] them to enter into a Joint Stipulation of Facts consisting of 94 numbered paragraphs, ostensibly to streamline the summary judgment process, and then fil[ed] a Statement of Facts containing an *additional* 133 numbered paragraphs."  ECF No. 164 at 1.  The Court's procedural order limited the Government to 200 statements of material fact—with which the Government complied.  The procedural order also encouraged the parties to submit stipulated facts which, of course, requires parties to propose stipulated facts and confer.  The Government's actions were in keeping with the procedural order and offer no basis for the Plaintiffs' assertion that the Government improperly "enticed" the Plaintiffs to enter into stipulations of fact and then separately submitted a statement of facts.

*See Alsina-Ortiz v. Laboy*, 400 F.3d 77, 81 (1st Cir. 2005) ("Burying the district court in a mass of supposedly material contested facts, many irrelevant and many unsupported by citations, creates the very morass from which [a local summary judgment] rule aims to protect the district judge."). Thus, unless otherwise noted, I have not considered: (1) factual assertions that lack proper record citation; (2) statements of fact and responses that are excessively lengthy or argumentative; (3) responses or requests to strike made by either party that fail to admit, deny, or qualify the opposing party's statement of fact; and (4) responses made by either party that assert additional facts or argument beyond the scope of the opposing party's statement of fact. Having excised those parts of the record which fail to comply with Local Rule 56, the following facts are before the Court.

## II.  FACTUAL BACKGROUND

Plaintiffs Hornof, Kordic, and Zak were all crewmembers assigned to the engine room of the *M/V Marguerita*, a vessel owned by Reederei MS "Marguerita" GmbH & Co., and operated by MST Mineralien Schiffahrt Spedition und Transport, GmbH ("MST").[20]  The vessel was registered in the Republic of Liberia.  The Plaintiffs are neither U.S. citizens nor legal residents.  Hornof is a citizen of the Czech Republic, Zak is a citizen of the Slovak Republic, and Kordic is a citizen of Croatia.

---

[20] Although the owner and operator of the *M/V Marguerita* are separate entities, Reederei MS "Marguerita" GmbH & Co. and MST, respectively, I refer to them collectively as "MST" because, from the record, it appears that it was predominantly MST and its officials that were involved in the interactions with the crewmembers and the Government.

In 2017, the *M/V Marguerita*'s regular route included service to ports in Brazil, Canada, and Maine.  Hornof joined the vessel as it passed through the Panama Canal on its way from Brazil to Vancouver, Canada.   He was employed as the Third Assistant Engineer, pursuant to a contract with the vessel that commenced on May 12, 2017.  Zak was employed as a Wiper on the vessel pursuant to a contract that commenced on September 17, 2016, and which was later extended through July 7, 2017.  Kordic was employed as an Oiler on the vessel pursuant to an approximately six-month contract that began on April 11, 2017, and was subject to time adjustments.

All three Plaintiffs had prior experience working on vessels for extended periods of time without disembarking.  For example, "Hornof had spent as many as 35-40 consecutive days on board a vessel without disembarking," and he "did not always disembark from the vessels . . . when they called in port."  ECF No. 159 at 3, ¶¶ 6,7.  Zak's longest time on a vessel without disembarking was one month, and Kordic had spent as long as three months aboard a vessel without disembarking.

A.      **Discovery of Tampering with the Oil Filtration System**

"Beginning at some point unknown, but no later than September 2016, a senior member of the engineering department aboard the *M/V Marguerita* devised and implemented a system to bypass the vessel's oil filtering equipment," known as an Oil-Water Separator ("OWS"), and "improperly discharged machinery space bilge water which had not been processed through the OWS directly into the ocean."  ECF No. 151 at 3, ¶ 15.  By law, "all disposals or transfers of machinery space bilge water"

that are supposed to pass through the OWS must be recorded in a vessel's Oil Record Book ("ORB").  ECF No. 159 at 5, ¶ 18.

Soon after joining the vessel, Hornof discovered this bypass system.  Hornof also "discovered that the Chief Engineer was concealing a resultant incongruity in the [OWS operating] hours by pumping fresh water through the [OWS] instead of the bilge wastewater, to make it appear[] as though the OWS was being used properly and regularly."  ECF No. 151 at 4, ¶ 18.

## B.     Reporting the Bypass of the Oil Filtration System

Hornof documented his discoveries and confronted the Chief Engineer about the practices, who "dismissed Plaintiff Hornof's concerns."  ECF No. 151 at 4, ¶ 20. Hornof then reported the conduct to the vessel's Captain.  On May 24, 2017, the Captain told Hornof that "the Chief Engineer contended everything was 'absolutely correct and everything is recorded in [the] oil record book.'"  ECF No. 151 at 5, ¶ 22. After the Chief Engineer denied Hornof's allegations, Hornof reported the activities to an MST superintendent.

On June 19, 2017, an MST officer notified United States government officials, Liberian officials, and the Liberian ship registry that MST had received "an unsigned, one-paragraph type-written note from the Third Engineer alleging that the vessel's Chief Engineer had not accurately recorded the handling of the vessel's bilge water in the Oil Record Book.  As of this time, incomplete information has been received concerning the suspicious conduct and a comprehensive investigation into the

15

incident has been initiated by the vessel's Owner and Manager."[21]  ECF No. 151 at 5,

¶¶ 26, 27.  MST informed the officials that a third-party auditor would investigate

while the vessel was in Brazil.  MST provided the evidence compiled by Hornof,

including videos and notes, to the auditor, which investigated the matter from June

24 to June 26, 2017, in Brazil.  MST did not send copies of Hornof's evidence to the

United States government.

The audit report confirmed Hornof's allegations: the Chief Engineer admitted

that he had intentionally discharged bilge waste through the grey water system and

that "he conducted this operation most recently during transit from Duke Point,

Canada, on or about June 2, 2017."  ECF No. 159 at 8, ¶ 31.  At the time the last

discharge occurred, the vessel would have been en route from British Columbia to

Brazil via the Panama Canal.[22]  The audit also reported "a number of errors and

corrections" in the ORB.  ECF No. 159 at 9, ¶ 33.

On June 28, Attorney George Chalos—legal counsel for the *M/V Marguerita*'s

owner and operator—sent a letter to the Coast Guard that purported to be a

"Voluntary Disclosure" of the alleged violations of the vessel's environmental

compliance plan.  The letter stated that the auditor's preliminary findings "seem to

corroborate (at least in part) some of the allegations . . . learned from the Third

---

[21] MST was required to make this notification because they were "on probation in the United States for a previous unrelated pollution event" involving MST's 2016 conviction for violating the APPS in the Great Lakes.

[22] The Government's statement is deemed admitted for the purpose of summary judgment because of the Plaintiffs' failure to comply with Local Rule 56(e) in both their initial request to strike, *see* ECF No. 164 at 7, ¶ 32, and in their supplemental memorandum, *see* ECF No. 178 at 9, ¶ 32.  Moreover, the Plaintiffs' second request to strike, if treated as a qualification, is excessively argumentative and lacks any record citation.

Engineer" and that "[a] more robust report outlining the findings . . . and an Action Plan for any subsequent measures which may be taken is being prepared and will be provided. The Captain . . . has made an appropriate narrative entry in the [ORB] to fully, accurately and contemporaneously memorialize the situation." ECF No. 151 at 8, ¶ 35. No United States government official responded or requested additional information after receiving Chalos's email, and the United States did not attempt to coordinate with Liberian officials.

## C.     The Vessel's Arrival in Portland

The *M/V Marguerita* arrived in Portland, Maine, on July 7, 2017, and U.S. Customs and Border Protection ("CBP") officials boarded the vessel to complete crewmember paperwork. The Chief Engineer had been replaced and was no longer on board the vessel. CBP granted the Plaintiffs and other crewmembers temporary landing privileges: Hornof and Kordic received D-1 conditional landing permits (permission to go onshore temporarily while waiting to depart on the vessel on which they arrived, issued under 8 U.S.C.A. § 1282(a)(1) (West 2023); 8 C.F.R. § 252.1(d) (West 2023)), and Zak received a D-2 conditional landing permit (permission to land temporarily in the United States to depart via other means of transportation, issued under 8 U.S.C.A. § 1282(a)(2); 8 C.F.R. § 252.1(d)).[23] Zak expected to fly home to Slovakia the following day because his contract had expired and MST had purchased

---

[23]    Throughout this order, I refer to D-1 and D-2 permits issued under 8 U.S.C.A. § 1282 as "conditional landing permits." *See* 8 C.F.R. §§ 252.1 (referencing "conditional landing permit[s]") and 252.2 (entitled "Revocation of conditional landing permits").

17

an airline ticket for him, while Hornof and Kordic expected to continue their service on the vessel after a brief stopover.

Coast Guard officials boarded the vessel to conduct a Port State Control Inspection, which included inspecting the vessel's ORB along with its equipment and facilities.  An entry in the ORB, dated June 19, 2017, stated:

> On June 19, 2017, a type-written note from a member of the engineering department was received by the vessel's manager in accordance with the vessel's safety management system and reporting requirements.  The note alleged that the handling of vessel's bilge water had not been accurately memorialized in the Oil Record Book.  The matter is under investigation and has been reported to the Vessel's Flag Administration and Classification Society.  One or more entry(s) in the Oil Record Book may be inaccurate and/or missing and the contents of the book should not be relied on at present.

ECF No. 151 at 9-10, ¶45.  The vessel's master provided the contact information of the third-party auditor to Coast Guard officials after they inspected the ORB, but told the officials that they had to contact Chalos to receive the auditor's preliminary findings.

Based on its initial inspection, the Coast Guard concluded that it needed to conduct a more detailed inspection known as a "MARPOL examination."   ECF No. 159 at 12, ¶ 41.  Later on July 7, additional Coast Guard officials, including members of the Coast Guard Investigative Service ("CGIS"), boarded the vessel and began, as the Plaintiffs assert, to "interrogate" crewmembers concerning the bilge-waste discharges referred to in Chalos's Voluntary Disclosure letter.[24]   During his

---

[24] The parties dispute how many Coast Guard officials boarded the vessel after the initial inspection, and also dispute the characterization of the interviews with the crew.  Hornof's declaration, relied on by the Plaintiffs, asserts that the Coast Guard began "interrogating" the crewmembers without stating how many officials boarded.  The Government asserts that four uniformed officials initially arrived,

interview, Hornof recounted his discovery of the bilge water discharge system, played the video he had taken of the pumps and hoses used in the discharge operation, and showed officials the equipment used to bypass the OWS.

## D.    The Denial of Departure Clearance and Revocation of Shore Permits

As a result of the July 7 inspections, the Coast Guard requested that the *M/V Marguerita* and its crew be placed on a customs hold under 33 U.S.C.A. § 1908(e) (West 2023).   "[T]he [Coast Guard] notified the CBP Area Port Director that . . . inspectors had boarded the *Marguerita* and during the course of their inspection had developed probable cause to believe that criminal violations had occurred, and identified at least six persons whom they considered to be material witnesses."[25]  ECF No. 159 at 14, ¶ 47.   In response, CBP officials denied the vessel's departure clearance.   On July 8, CBP officials also revoked the Plaintiffs' conditional landing permits and replaced them with new Form I-95s that stated: "[p]ermission to land temporarily at all U.S. ports is refused."[26]  ECF No. 151 at 11 ¶¶ 54-56.   The shipping agent for the vessel was also given Form I-259 ("Notice to Detain, Remove, or Present Alien"), which notified the agent that the crew "was to be detained onboard the vessel

---

and that later "additional Coast Guard and affiliated personnel came aboard."  ECF No. 172 at 4-5, ¶ 21.  The Government also admitted that its investigations included "interviews" with the crew.  The actual number of Coast Guard personnel who boarded the vessel to conduct the MARPOL examination has not been shown to be material to the Court's analysis.  Viewing the record in the light most favorable to the Plaintiffs, I accept Hornof's characterization of his interaction with the Coast Guard, which is analyzed in further detail below, *see infra* pp. 51-53.

[25]  The Plaintiffs' request to strike and renewed request to strike this statement do not comply with Local Rule 56(e) or (f).  Even if viewed as a qualification or denial, the Plaintiffs' response does not directly qualify the Government's statement and is unsupported by a record citation.  Moreover, the document that the Plaintiffs object to on evidentiary grounds is relied upon in the Joint Stipulations of Fact submitted by the parties.  *See* ECF No. 151 at 11, ¶¶ 51, 53.  I therefore deem the fact admitted.

[26]  This is required by 8 C.F.R. § 252.1(g) when a conditional landing permit is refused.

due to the ongoing inspection." ECF No. 151 at 11-12, ¶¶ 57-58. With their conditional landing permits revoked, the Plaintiffs and other crewmembers were detained on board the ship and Zak was unable to fly home as planned.

After the permit revocation, each Plaintiffs' visa classification was designated as DOB(M), meaning "detained on board" and "mala fide," as were the visa classifications of the other crewmembers who had been identified as potential witnesses. ECF No. 151 at 12, ¶¶59-61. The Plaintiffs assert that "[t]he government did not disclose to Plaintiffs that it had declared them to be 'mala fide' crew members, nor did it provide any explanation or notice of their rights to appeal or protest that determination or their detention."[27] ECF No. 164 at 31, ¶ 24.

Attorney Edward MacColl boarded the vessel on July 8 and informed the Coast Guard that he was representing MST and the insurance underwriter. Subsequently, MST retained MacColl to represent nine *M/V Marguerita* crewmembers—including the Plaintiffs—who consented to his representation.

---

[27] The Government disputes this, stating that the Plaintiffs received notice of their status with the updated I-95s, which were marked with "M" for mala fide, and that "CBP explained to the crew and captain why they were being remanded to the vessel." ECF No. 172 at 5, ¶ 24. While this may constitute a genuine dispute of fact, I do not find it material to the ultimate issue of whether the Government's conduct in revoking the conditional landing permits was authorized. The Government also states that "when a shore pass is revoked, there is no appeal process. It is a privilege to land in the United States, not a right." ECF No. 172 at 5, ¶ 24. To the extent that this qualifies the Plaintiffs' assertion that they had no notice of their right to appeal, I accept the Government's qualification that the Plaintiffs did not have a right to appeal, which, at any rate, is immaterial to the resolution of the Plaintiffs' false arrest and imprisonment claims.

20

E.       **The Investigation and Surety Agreement**

The Plaintiffs remained on board the vessel "against their will after July 8 and through July 16, 2017."[28]   ECF No. 164 at 32, ¶ 28.   During this period, the Plaintiffs were subject to twice daily musters, could not leave the vessel, and did not have access to their passports.   On or about July 12, MST and U.S. government officials received a copy of the third-party auditor's report and the Coast Guard referred the matter to the U.S. Department of Justice for potential criminal prosecution.   The Coast Guard's investigation on board the vessel continued until July 15.

On July 14, the Coast Guard and MST negotiated and completed a surety agreement (the "Agreement"), as authorized by 33 U.S.C.A. § 1908(e).   The Agreement provided that MST would request that (1) the crewmembers who had been identified as potential witnesses surrender their passports, which would be held by MST, and (2) those crewmembers would disembark the vessel and remain in the District of Maine during the investigation.[29]   In addition, per the terms of the Agreement, once

---

[28] The Government denies this: "Plaintiffs were not permitted to land in the United States.  Without permission to land, they were unable to get off the *Marguerita* . . . ."  ECF No. 172 at 7, ¶ 28.  This does not effectively deny the Plaintiffs' assertion that they were held on board the vessel against their will; instead, it offers justification for holding the Plaintiffs on the vessel.  I deem the Plaintiffs' statement admitted.

[29] The Agreement provided, in relevant part, that the vessel's owner and operator "cannot exercise complete control over the [officers and crewmembers]" and that their authority is limited to:

> (a) requesting such ship's officers and crewmembers of the Vessel to surrender their passports to the Owner or Operator for safe keeping;
> (b) requesting such ship's officers and crewmembers of the Vessel to remain within the jurisdiction of the U. S. District Court - District of Maine;
> (c) providing such ship's officers and crewmembers of the Vessel with reasonable lodging, a meal allowance and health care coverage as provided in this Agreement; and
> (d) providing such ship's officers and crewmembers of the Vessel with reasonable transportation within the jurisdictions of the U. S. District Court -District of Maine, including transportation to all meetings with their attorneys and law enforcement personnel.

MST received the crewmembers' agreement that they would remain in the United States, MST was required to notify the Government if any crewmembers requested their passports, at which point MST was required to wait 72 hours before complying with the crewmember's request.  The Plaintiffs were not parties to, and never consented to or approved the Agreement, and they were not given a choice about their passports being held by the vessel's master or by the Coast Guard.  The Plaintiffs' counsel also demanded information about the status of their passports and the legal basis for the Coast Guard maintaining possession of them.[30]

On the same day that the Agreement was executed, Zak filed a petition for habeas corpus, pursuant to 28 U.S.C.A. § 2241 (West 2023), requesting that he be allowed to return home.  Three days after Zak's petition was filed, the Government executed a material witness arrest warrant, pursuant to 18 U.S.C.A. § 3144 (West 2023), and paroled Zak into the United States, with the condition that the Coast Guard retain possession of his passport.

## F.   Disembarkation and Parole

On July 15, the CGIS submitted Significant Public Benefit Parole ("SPBP") applications for the Plaintiffs to Immigration and Customs Enforcement ("ICE"), a

---

ECF No. 154-41 at 7-8.  The Agreement also specified that it is not binding on non-parties and preserves the right of crewmembers who are served with material witness warrants pursuant to 18 U.S.C.A. § 3144 (West 2023), [Fed.] R. Crim. P. Rule 15, and other federal laws.

[30] The Government denies the Plaintiffs' statements that they had demanded information about the status of their passports and the legal basis for holding them, arguing that the Plaintiffs had no personal knowledge of their attorney's efforts to obtain their passports or his communications with the Coast Guard, and thus reliance on their deposition testimony was improper.  I accept the Government's denial.  To the extent that this constitutes a disputed fact, it is immaterial to the Plaintiffs' claims.

temporary legal status allowing the Plaintiffs to remain in the United States during the investigation. On July 16 the Plaintiffs—including Zak, whose habeas corpus hearing was scheduled for July 17—were taken to the local CBP office and granted temporary parole while their SPBP applications were pending. MacColl accompanied them to the CBP office but was not permitted inside while the Plaintiffs' documents were processed.

Prior to disembarkation, the vessel's master was in possession of the Plaintiffs' passports, which the Agreement required MST to hold. When the Plaintiffs were paroled into the United States, CBP required that the Coast Guard maintain possession of their passports as a condition of release. The Plaintiffs were then taken to a local hotel, where CGIS checked on them once a day to ensure that they did not leave the jurisdiction. The Plaintiffs were not fluent in English and did not have friends or relatives in the United States. ICE approved the SPBP applications on July 28, 2017, which became effective on August 1, 2017.

The Plaintiffs allege that they (1) did not disembark "volitionally," (2) did not consent to being paroled into the United States, and (3) never "indicated to anyone that they consented to being placed in custody or detained in the United States." ECF No. 164 at 33, 46, ¶¶ 35-36, 63. The Government qualifies these assertions, stating that the Agreement explicitly required MST to ask the crewmembers whether they consented to remain in Portland during the investigation, and that "[t]here is no direct evidence showing how Plaintiffs responded when that request was made. It was, however, the government's understanding that they agreed to stay in the United

States, except for Plaintiff Lu[k]as Zak." ECF No. 172 at 9-10, 43, ¶¶ 35, 36, 63. Because the issue of the Plaintiffs' consent is ultimately immaterial to the resolution of their claims, I need not decide whether this constitutes a genuine dispute of fact.

## G.     Subpoenas and Testimony

On August 3, Attorney MacColl informed prosecutors that Hornof's mother-in-law had died and that Hornof "sought assurance that he could be allowed to return home no later than October 1, 2017." ECF No. 151 at 14, ¶ 73. On the same day, Hornof was informally subpoenaed to testify before a federal grand jury on August 9. On August 5, MacColl informed government officials that Hornof preferred to depart the United States "at the earliest possible time" and the next day requested the return of Hornof's passport.[31] ECF No. 151 at 14, ¶ 74. The prosecutor who received MacColl's request responded that "[w]e will act in accordance with [the Agreement's provision relating to passports] and will keep you advised as we progress to the Wednesday August 9, 7:45 [p.m.] deadline for the return of the passport." ECF No. 159 at 25, ¶ 98. Hornof, Kordic, and other crewmembers filed a motion for the return of their passports on August 9.

---

[31] It is disputed whether Hornof "was indeed initially willing to cooperate" with the investigation and then "changed his mind about voluntarily remaining in the United States," ECF No. 159 at 24, ¶ 94, or whether "he was always willing to cooperate *and* wished to go home. He never changed his mind. His need to go home simply became more pressing." ECF No. 164 at 21, ¶ 94. The Plaintiffs allege that they "truthfully indicated to government officials that they would come back to the District of Maine if they were allowed to go home." ECF No. 164 at 47, ¶ 67. Viewed in the light most favorable to the Plaintiffs, I accept the qualification that Hornof was always willing to cooperate and wished to return home as soon as possible. The Plaintiffs' statement that they truthfully indicated to the Government that they would return is deemed admitted.

On August 9, Hornof voluntarily appeared to testify before the grand jury but was told by government officials that there was no time for his testimony that day. On the same day, the Government filed and obtained a material witness arrest warrant for Hornof, supported by an affidavit from Special Agent Root.  On August 21, a material witness arrest warrant for Kordic was executed.[32]  Both warrants contained conditions of release similar to those imposed on Zak's release, including the requirement that Hornof and Kordic "surrender" their passports to the Coast Guard.[33]  Hornof and Kordic testified before the grand jury on August 22.  Later that day, the grand jury indicted the *M/V Marguerita*'s owner and operator on nine criminal counts, eight of which were for or related to APPS violations.

Also on August 22, the Plaintiffs moved to challenge the validity of the material witness warrants, alleging that their arrests were unlawful because the affidavits used to obtain the warrants contained false and misleading assertions, and moving to have their depositions taken pursuant to Fed. R. Crim. P. 15(a)(2).  U.S. Magistrate Judge John H. Rich III determined, without ruling on the lawfulness of the detention, that the Plaintiffs were "detained within the meaning of the material witness statute, 18 U.S.C.A. § 3144," and ordered that they be deposed within thirty days and permitted to depart the United States.  ECF No. 151 at 15, ¶ 85.  *See In re: Material*

---

[32]  The Plaintiffs allege that "[t]he application and Declaration of Special Agent Root were misleading and false," which the Government denies.  ECF No. 164 at ¶¶ 62, 59; ECF No. 169 at 28, 35.  I address this dispute further below.  *See infra* pp. 66-76.

[33]  The Plaintiffs' qualification of the Government's facts that Hornof and Kordic were required to surrender their passport and that the Coast Guard was authorized to hold their passports as a condition of release, lacks any record support and does not effectively dispute or qualify the assertion. I deem the fact admitted.

*Witness Lukas Zak, et al.*, 2019 WL 2162140, at *6-7 (D. Me. Nov. 19, 2017).  The depositions took place on September 11 and 12, 2017.

Following the depositions, the Government served the Plaintiffs with subpoenas to testify at the MST trial and moved to terminate the material witness warrants.   At an emergency hearing, Magistrate Judge Rich granted the Government's motion, without the Government's proposed conditions, and denied the Plaintiffs' request to vacate the trial subpoenas.  The Plaintiffs departed the United States on September 14; all three subsequently returned to the United States to testify in the criminal proceedings against MST.[34]

### III.  STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 92-93 (1st Cir. 2021).  "An issue is 'genuine' if it can 'be resolved in favor of either party,' and a fact is 'material' if it 'has the potential of affecting the

---

[34] The Government's statements of fact, ECF No. 159 at 28-33, ¶¶ 109-135, relate to MST's criminal proceedings and the Plaintiffs' testimony, as well as subsequent negotiations over the plea agreement and eventual whistleblower award to which the Plaintiffs were entitled.  The Government appears to include these statements to show that the Plaintiffs were, in fact, vital material witnesses to the APPS violations and that MST was ultimately found guilty of violating federal law.  The Plaintiffs' statements of fact, ECF No. 164 at 47, ¶¶ 71-73, relate to their return to the United States and MST's plea agreement.  The Plaintiffs appear to include these statements to show that they were acting in good faith and cooperated with the Government by returning.  Because I decline to revisit the issue of whether MST was found guilty of criminal violations, and because I previously concluded that the Plaintiffs were material witnesses in the investigation because they could corroborate the Government's documentary evidence of the illegal activities alleged, *see* ECF No. 61 at 29, these statements have no bearing on my analysis of the remaining claims on summary judgment and I do not address them further.

outcome of the case.'" *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (quoting *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016)).

To prevail, the moving party must "'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" *Ocasio-Hernández v. Fortuño-Burset*, 777 F.3d 1, 4-5 (1st Cir. 2015) (alteration in original) (quoting *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000)).  A party opposing summary judgment "bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" *Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 81 (1st Cir. 2019) (quoting *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003)).

If a nonmovant would bear the burden of proof at trial as to any essential factual element of a claim, "its failure to come forward with sufficient evidence to generate a trial[-]worthy issue warrants summary judgment for the moving party." *Ralar Distribs. Inc., v. Rubbermaid, Inc.* (*In re Ralar Distribs.*), 4 F.3d 62, 67 (1st Cir. 1993).  The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A court views the evidence in the light most favorable to the non-moving party when determining whether summary judgment should be granted. *Taite*, 999 F.3d at 92.  "Although we will draw all reasonable inferences in the nonmovant's favor, we will not 'draw *unreasonable* inferences or credit bald assertions, empty conclusions,

rank conjecture, or vitriolic invective.'" *Pina v. Children's Place*, 740 F.3d 785, 795 (1st Cir. 2014) (quoting *Cabán Hernández,* 486 F.3d at 8).

## IV.  LEGAL ANALYSIS

"The FTCA provides 'a limited congressional waiver of the sovereign immunity of the United States for tortious acts and omissions committed by federal employees acting within the scope of their employment.'" *Soto-Cintrón v. United States*, 901 F.3d 29, 33 (1st Cir. 2018) (quoting *Díaz-Nieves v. United States*, 858 F.3d 678, 683 (1st Cir. 2017)).  Although intentional torts are generally exempted from the FTCA's waiver of sovereign immunity, the statute "expressly allows actions for claims of 'assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution.'" *Solis-Alarcón v. United States*, 662 F.3d 577, 583 (1st Cir. 2011) (quoting 28 U.S.C.A. § 2680(h)).  To determine liability under the FTCA, courts look to local tort law.  *Soto-Cintrón*, 901 F.3d at 33.  I turn first to the Plaintiffs' false arrest and imprisonment claims.

False arrest under Maine law requires proof that a plaintiff was confined and that: "(1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the defendant had no privilege to cause the confinement." *Steeves v. City of Rockland*, 600 F. Supp. 2d 143, 184 (D. Me. 2009) (quoting *Borlawsky v. Town of Windham,* No. CV–99–426, 2004 WL 1433634, at *4 (Me. Super. Ct. Mar. 30, 2004)).  False imprisonment under Maine law occurs when an actor, without authority, "(1) intends to, and does in fact, confine another[,] (2) within boundaries

28

fixed by the actor, and (3) the victim is conscious of the confinement or is harmed by it." *Smith v. Heritage Salmon, Inc.,* 180 F. Supp. 2d 208, 220 (D. Me. 2002). "[I]n order to establish a tort claim of false arrest and false imprisonment 'the authority upon which [P]laintiff is confined must be unlawful.'" *Santoni v. Potter,* 369 F.3d 594, 603 (1st Cir. 2004) (quoting *Nadeau v. State,* 395 A.2d 107, 116 (Me. 1978)). *See also Jedzierowski v. Jordan,* 157 Me. 352, 353, 172 A.2d 636, 637 (1961) (observing that false arrest is one means of committing false imprisonment).

The Plaintiffs' false arrest and false imprisonment claims arise out of four distinct Government actions.  First, the Plaintiffs allege that they were subject to false arrest when the Government revoked their conditional landing permits, arguing that the Government did not have the authority or discretion under 8 U.S.C.A. § 1282(b) to designate the crewmembers as "mala fide" or to revoke Zak's D-2 permit. Second, they argue that they were falsely imprisoned when the Government "confin[ed] them . . .  on the vessel from July 8 through July 16, 2017, without warrants." ECF No. 163 at 9.  Third, they argue that they were falsely imprisoned "on U.S. soil without warrants from July 16, 2017[,] until arrest warrants were obtained as late as (in Plaintiff Kordic's case) August 21, 2017."  ECF No. 163 at 9. And fourth, they allege that they were detained "after *ex parte* arrest warrants had been procured by false and misleading affidavits."  ECF No. 163 at 9.

## A.     False Arrest and Imprisonment Claims Arising from the Revocation of Conditional Landing Permits

Before reaching the merits of the Plaintiffs' FTCA claims,[35] I first address a jurisdictional issue posed by the Immigration and Nationality Act ("INA"), 8 U.S.C.A. §§ 1101-1537 (West 2023), as amended by the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546 (1996).

### 1.  Jurisdiction under the INA

Title 8, section 1252(a)(2)(B)(ii), bars judicial review of "any . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." As I explain below, the statutory authority to revoke the Plaintiffs' conditional landing permits and to grant the Plaintiffs' parole arises under the subchapter that section 1252(a)(2)(B)(ii) references. *See El-Khader v. Monica,* 366 F.3d 562, 566 (7th Cir. 2004) ("[T]he plain language

---

[35] Generally the Court would turn to the discretionary function exception of the FTCA, which applies to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C.A. § 2680(a) (West 2023). "When a claim is covered by the discretionary function exception, it must be dismissed for lack of subject matter jurisdiction." *Kelly v. United States*, 924 F.2d 355, 360 (1st Cir. 1991). Here, however, the Government argues that it is unnecessary for the Court to reach the discretionary function exception because, among other things, the Plaintiffs will be unable to satisfy essential elements of their claims at trial. It is unsettled in the First Circuit whether the discretionary function exception can bar liability for the intentional torts enumerated in 28 U.S.C.A. § 2680(h) that arise from the conduct of law enforcement and investigative officers. Earlier in this case, I declined to resolve this issue because I concluded that the Plaintiffs' tort claims were predicated on alleged Fourth Amendment violations, and hence not subject to the discretionary function exception, *see* ECF No. 61 at 18-19. *See also Limone v. United States*, 579 F.3d 79, 101 (1st Cir. 2009) (explaining that the discretionary function exception does not "shield [government] conduct that transgresses the Constitution"). For reasons I will explain, I again conclude that I need not decide the issue because the Plaintiffs cannot satisfy essential elements of each of their tort claims.

of § 1252(a)(2)(B)(ii) bars courts from reviewing any discretionary decisions of the Attorney General made under the authority of sections 1151 through 1378 of Title 8 of the United States Code, which collectively constitute the subchapter that § 1252(a)(2)(B)(ii) references.").

For an agency action to be subject to the INA's jurisdictional bar, the authority for the action at issue must be statutorily specified to be in the Attorney General's discretion. *See Alsamhouri v. Gonzales*, 484 F.3d 117, 122 (1st Cir. 2007). To be "specified," the authority cannot be "merely assumed or contemplated [] to be in the Attorney General's discretion." *Kucana v. Holder*, 558 U.S. 233, 243 n.10 (2010). Whether discretion has been specified may be determined from the plain language of the statute. *See, e.g., El–Khader,* 366 F.3d at 567 ("[T]he discretionary nature of the decision is apparent from the plain language of the statute."); *cf. Bernardo ex rel. M & K Eng'g, Inc. v. Johnson*, 814 F.3d 481, 485-86 (1st Cir. 2016) (relying on statutory "language choices" to determine whether decisions authorized under 8 U.S.C.A. § 1155 are within the Secretary of Homeland Security's discretion).

If there is some doubt in the plain language as to whether a statutory eligibility determination is *specified* to be in the discretion of the Attorney General—for example, when a statute does not explicitly use the word "discretion"—such a determination is, nonetheless, generally unreviewable if, for example, it "calls upon [the Attorney General's] expertise" and the "judgment [is] unfettered by any statutory standard whatsoever." *Zhu v. Gonzales*, 411 F.3d 292, 294-95 (D.C. Cir. 2005) (explaining that the phrase "in the national interest" does not provide "a manageable

legal standard" upon which to review the Attorney General's discretionary determination); *cf. Bernardo*, 814 F.3d at 487 (rejecting the argument that the phrase "good and sufficient cause" imposed a "non-discretionary legal standard" that would "meaningfully curtail[]" the Secretary's discretion). However, even where there is an eligibility determination that is ultimately discretionary, the First Circuit has held that the INA does not bar judicial review of an underlying "legal question of [statutory] interpretation . . . as to whether an alien is *eligible* for consideration of relief."[36] *Cho v. Gonzales*, 404 F.3d 96, 100 (1st Cir. 2005) (quotation marks omitted). The INA's jurisdictional bar is also inapplicable when an eligibility determination underlying an ultimately discretionary decision rests on "objective factual determinations." *Bernal-Vallejo v. I.N.S.*, 195 F.3d 56, 60, 62 (1st Cir. 1999).

Here, whether the Attorney General's discretion to revoke the Plaintiffs' conditional landing permits is "meaningfully curtail[ed]," *Bernardo*, 814 F.3d at 487, and thus subject to judicial review depends on whether the phrase "not a bona fide crewman,"[37] as employed in 8 U.S.C.A § 1282(b), expresses a determination solely

---

[36] This Order uses the term "noncitizen" in lieu of "alien" unless quoting directly from statutory language or prior decisions, which has become common practice in this Circuit, *see, e.g., Bonilla v. Garland*, 23 F.4th 61 (1st Cir. 2022), as well as in the Supreme Court, *see, e.g., Patel v. Garland*, --- U.S. ---, 142 S. Ct. 1614 (2022), and in other circuits, *see Avilez v. Garland*, 69 F.4th 525, 527 n.1 (9th Cir. 2023).

[37] The Plaintiffs contend that the discretion to revoke permits is also limited by the language of "[p]ursuant to regulations prescribed by the Attorney General" in section 1282(a). This argument, raised for the first time in their additional briefing (ECF No. 187), does not merit extended discussion. I note only that the record evidence shows that CBP officials followed all relevant regulations—8 C.F.R. § 252.2—when they issued and revoked the shore passes: the officials revoked the permits, issued the Plaintiffs' new Form I-95s with the "detained on board" classification, and the shipping agent was given a Form I-259 requiring him to detain the crewmembers on board. The Plaintiffs have not meaningfully placed this issue in dispute.

within the Attorney General's discretionary authority, *see Bernardo*, 814 F.3d at 487, or is an "objective factual determination[]" amenable to judicial review, *Bernal-Vallejo*, 195 F.3d at 62.

For reasons I will explain, I conclude that the authority to revoke the Plaintiffs' D-1 and D-2 permits is not clearly specified to be in the discretion of the Attorney General and, thus, the decision is judicially reviewable.

Title 8, section 1282, provides as follows:

(a) Period of time

> No alien crewman shall be permitted to land temporarily in the United States except as provided in this section . . . . If an immigration officer finds upon examination that an alien crewman is a nonimmigrant under [the relevant statutory provision] and is otherwise admissible and has agreed to accept such permit, *he may, in his discretion, grant the crewman a conditional permit to land temporarily pursuant to regulations prescribed by the Attorney General, subject to revocation in subsequent proceedings* as provided in subsection (b) . . . .

(b) Revocation; expenses of detention

> Pursuant to regulations prescribed by the Attorney General, *any immigration officer may, in his discretion, if he determines that an alien is not a bona fide crewman*, or does not intend to depart on the vessel or aircraft which brought him, *revoke the conditional permit to land which was granted such crewman under the provisions of subsection (a)(1),* take such crewman into custody, and require the master or commanding officer of the vessel or aircraft on which the crewman arrived to receive and detain him on board such vessel or aircraft, if practicable, and such crewman shall be removed from the United States at the expense of the transportation line which brought him. . . . Nothing in this section shall be construed to require the procedure prescribed in section 1229a of this title to cases falling within the provisions of this subsection.

33

8 U.S.C.A. § 1282(a)-(b) (emphasis added). Subsection (a) explicitly confers discretion to immigration officials to issue or deny conditional landing permits. Subsection (b) refers to permits issued "under the provisions of subsection (a)(1)," as were Hornof's and Kordic's respective D-1 permits, but it is silent as to permits issued under subsection (a)(2), as was Zak's D-2 permit. Because the statute's plain language does not clearly specify that the authority to revoke a D-2 permit is at the Attorney General's discretion, the revocation of Zak's D-2 permit is not barred from judicial review.

As to Hornof's and Kordic's D-1 permits, there is no doubt that section 1282(b) unambiguously confers discretion to immigration officials[38] to revoke a crewmember's D-1 permit, take the crewmember into custody, return the crewmember to the custody of the master of the vessel to be detained on board, and issue a removal order. Moreover, there is no statutory standard against which the Court can objectively review the Attorney General's determination of "not a bona fide crewmember." Although 8 U.S.C.A. § 1101(a)(15)(D) defines "alien crewman" as one "serving in good faith," neither "bona fide" nor "mala fide" are statutorily defined terms.

What is less certain is whether the phrase "not a bona fide crewman" constitutes an objective factual determination—that must be made prior to the ultimately discretionary decision to revoke the permit—subject to judicial review. Limited authority on this issue suggests that crewmembers are considered "bona fide" if they are employed in good faith by the vessel on which they are aboard when they

---

[38]   The Attorney General may delegate authority to carry out the INA's functions related to immigration and naturalization of noncitizens.  8 U.S.C.A. § 1103(g)(1)-(2) (West 2023).

34

seek to enter the United States and if they intend to depart on the same.  *See, e.g.*, *United States ex rel U.S. Lines on Behalf of Colovis v. Watkins*, 170 F.2d 998, 999 (2d Cir. 1948); *United States v. DiSantillo*, 615 F.2d 128, 130-31 (3d Cir. 1980).  That limited authority does not conclusively resolve whether the same objective inquiry applies to determine if an individual is "*not a* bona fide crewman" or if, instead, that determination involves an immigration official making a discretionary judgment "unfettered by any statutory standard" that is not reviewable.  *Zhu*, 411 F.3d at 295.  At a minimum, one basis for revoking D-1 permits—that a crewmember does not intend to, or may not be able to, depart on the same vessel on which he arrived—is fairly treated as an objective factual determination.

Ultimately, I need not resolve this issue because, in the immigration law context, a court may "bypass[] enigmatic jurisdictional questions in circumstances in which precedent clearly adumbrates the result on the merits" when, as here, those questions are "freighted with uncertainty."  *Royal Siam Corp. v. Chertoff*, 484 F.3d 139, 143-44 (1st Cir. 2007).  In *Royal Siam*, the First Circuit declined to resolve the jurisdictional issue posed by section 1252(a)(2)(B)(ii) and instead proceeded to decide the merits, explaining: "On the one hand, the jurisdictional question is not only thorny but also a matter of statutory, not constitutional, dimension; and its proper resolution is uncertain.  On the other hand, the outcome on the merits is foreordained."  *Id.*  Here, the jurisdictional question is statutory in nature, presents a matter of uncertain first impression, and, for the reasons that I will address, the

Plaintiffs' false arrest and imprisonment claims arising from the D-1 permit revocations are "foreordained" on the merits.

Accordingly, I turn to the relevant elements of the Plaintiffs' false arrest and imprisonment claims arising from the permit revocation: whether the Government's conduct was authorized, and whether the Plaintiffs were actually confined by the revocation and remand to their vessel. *Smith*, 180 F. Supp. 2d at 220.

### 2. Immigration officials were authorized to revoke the permits and remand the Plaintiffs to the vessel

The plain language of section 1282(a) expressly confers discretion on immigration officials to grant, or refuse to grant, both D-1 and D-2 conditional landing permits. That unfettered discretion, considered together with section 1282(b)'s explicit provision regarding D-1 permits and expedited removal proceedings, and silence as to D-2 permit revocation, creates ambiguity as to whether the discretion to revoke these permits after they have been granted exists.

First, it is fairly implied that the authority to discretionarily grant a conditional permit includes the authority to revoke it, particularly in light of the broad discretion vested in the executive branch to enforce national borders. *See Arizona v. United States*, 567 U.S. 387, 394-95 (2012) (explaining the "broad, undoubted power" of the federal government "over the subject of immigration and the status of aliens" and specifically the "broad discretion exercised by immigration officials" in border enforcement and removal proceedings). And second, there is nothing in section 1282 indicating that discretion to revoke does not exist as to D-2 permits; the plain language of the statute merely suggests that a D-2 permit holder

36

who is subject to a post-revocation removal order is entitled to a hearing.  *See* 8 U.S.C.A. § 1282(b); 8 U.S.C.A. § 1229a (West 2023) (detailing removal proceedings). As I will explain, *see infra* p. 40, to construe the statute otherwise would lead to absurd results.  *See Greenwood Tr. Co. v. Com. of Mass.*, 971 F.2d 818, 825-26 (1st Cir. 1992) ("[D]eference to the plain meaning rule should not be unthinking or blind . . . when adherence to it would produce an absurd result or an unreasonable one plainly at variance with the policy of the legislation as a whole." (quoting *Massachusetts Fin. Servs., Inc. v. Sec. Inv'r Prot. Corp.*, 545 F.2d 754, 756 (1st Cir. 1976)).  Because the statute is ambiguous and a natural reading of its plain language would generate an unreasonable result, the Court may turn to traditional principles of statutory construction to resolve this ambiguity.  *Massachusetts Fin. Servs., Inc.*, 545 F.2d at 757 ("[A] court 'will resort to the legislative history and other aids of statutory construction only when the literal words of the statute create ambiguity or lead to an unreasonable interpretation.'" (quoting *Araya v. McLelland*, 525 F.2d 1194, 1195-96 (5th Cir. 1976)).

### (a)   Permit revocation

Section 1282(b)'s legislative history shows that the need for an expedited removal process for certain D-1 permit holders motivated Congress to enact it:

> In tightening up the immigration laws affecting crew members, *Congress was concerned with the sheer volume of seamen deserting ships and the need for "a summary type of deportation."*  At least while the vessel is still in a United States port, the master can be required to receive the deserter and take him back with a minimum of difficulty, and the statute so provides.  Congress thus established a statutory procedure to deal with a very narrow situation.

*U. S. ex rel. Kordic v. Esperdy*, 386 F.2d 232, 237 (2d Cir. 1967) (emphasis added) (citation omitted) (quoting S. Rep. No. 81-1515, at 555-56 (1950)).  "How narrow [the statute] is appears from a close reading of 8 U.S.C. § 1282(b); *the summary procedure and waiver of a formal hearing* apply only to landing permits which are issued to those crewmen intending to leave on the vessel on which they arrive."  *Id.* at 237 n.5 (emphasis added).  The legislative history thus suggests that Congress was concerned with addressing the specific problem of crewmembers on temporary shore leave unlawfully remaining in the United States, *i.e.*, D-1 permit holders only—*not* D-2 permit holders who, by definition, are not expected to return to their vessels and must show proof that they intend to depart via other means.  *See* 8 C.F.R. § 252.1(d).

The last sentence of section 1282(b) reinforces this understanding of Congress's intent: "Nothing in this section shall be construed to require the procedure prescribed in section 1229a of this title to cases falling within the provisions of this subsection." 8 U.S.C.A. § 1282(b).  The reference to section 1229a, which provides that noncitizens are generally entitled to a hearing when subject to orders of removal, *see* 8 U.S.C.A. § 1229a(a)(1), suggests that Congress intended for section 1282(b) to exempt D-1 permit holders subject to removal from this procedural safeguard.  Moreover, that reference in no way suggests that D-2 permits are irrevocable, as the Plaintiffs contend, or that either D-1 or D-2 permit holders are entitled to a hearing solely to challenge a permit's revocation.

The Board of Immigration Affair's (the "BIA") explication of section 1282(b) is consistent with interpreting the Congressional intent behind section 1282(b) as

limited. The BIA characterizes section 1282(b) as a "narrow exception" to the deportation procedures required for final orders of removal issued under section 1252(a)(1): "Section [1282](b) provides a specific procedure for the deportation of alien crewmen holding D–1 landing permits. The summary procedure set forth in [section 1282(b)] under which the conditional permit to land may be revoked and the alien deported without a hearing represents a narrow exception to the deportation procedures found in section [1252](b). It governs only the alien crewman whose D–1 permit is formally revoked prior to the departure of his vessel." *Matter of Di Santillo*, 18 I. & N. Dec. 407, 410 (B.I.A. 1983).

The CBP Vessel Inspection Guide (the "Guide") offers additional support for this construction of section 1282(b). The Guide states, without qualification, that any conditional landing permit may be revoked "at any time." U.S. Customs and Border Protection, *Vessel Inspection Guide* at 24 (July 2012), https://www.cbp.gov/document/guides/vessel-inspection-guide (last visited Aug. 31, 2023). The Guide does not differentiate between D-1 and D-2 permits, thus demonstrating that CBP, an agency charged with section 1282(b)'s enforcement, has interpreted it to authorize the revocation of both—without necessarily first determining that a crewmember is not bona fide.

The Plaintiffs' reading of the statutory scheme—that a D-2 permit, once issued, is irrevocable—contradicts section 1282's legislative history and its interpretation by an agency tasked with its enforcement. And as the Government contends, the Plaintiffs' interpretation would also generate "the type of absurd result that generally

is to be avoided in interpreting statutes." ECF No. 171 at 9 (citing *Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.*, 295 F.3d 68, 74 (1st Cir. 2002)). It would prevent, for example, immigration officials from revoking a D-2 permit even if they learn that the permit holder does not intend to depart on the alternate means of transportation. It would also mean that, in the event that a D-2 permit-holder is belatedly discovered not to be bona fide, and seeks to use the permit to unlawfully transit through the United States, immigration officials would nonetheless have no authority to revoke the permit and remand the individual to the vessel.

Further, the Plaintiffs' interpretation is unreasonable as to the revocability of D-1 permits—that, once issued pursuant to section 1282(a), a D-1 permit cannot under any circumstances be revoked absent a mala fide determination or a crewmember's lack of intention to depart, and not for any other purpose, including threats to national security. And it would undermine the unfettered discretion to refuse to issue a conditional landing permit for any reason that section 1282(a) plainly delegates to immigration officials.

Accordingly, the legislative history and agency interpretation of section 1282 support a construction of the statute which confers immigration officials with broad discretion—and therefore authority—to revoke D-1 and D-2 permits, notwithstanding more specific limitations on their discretion to expedite removal proceedings for D-1 permit holders.

### (b)   Remand to the vessel

The Government argues that the Plaintiffs' subsequent confinement on the vessel, or "remand" to the vessel, was authorized both by section 1282 and 8 C.F.R. § 252.1.  The Government has it half right.  As addressed below, the Plaintiffs' continued confinement aboard the vessel was authorized not by the discretion afforded to the Attorney General under section 1282(b) to remand noncitizen crewmembers to their vessels.  Rather, that authority was part and parcel with the Coast Guard's authority to order the master of a vessel and shipping agent to retain crewmembers' passports and detain them on board upon arrival at a port of entry. *See* 8 C.F.R. § 252.1(a), (d).

To summarize, based on general principles of statutory construction, both D-1 and D-2 permits are subject to revocation, even if the grounds for revocation do not rest on a "not a bona fide" crewmember determination.  Because of the broad discretion granted to immigration officials to issue or refuse such permits, the absence of meaningful statutory standards to review these decisions, and the CBP's interpretation of the statute and regulations governing conditional landing permits, I conclude that CBP was authorized to revoke the Plaintiffs' conditional landing permits, and accordingly, the Plaintiffs cannot satisfy an essential element of their false arrest claim arising from the revocation.  Even if CBP exceeded the scope of that authority, the Plaintiffs have not shown a trial-worthy issue that the permit revocations caused them to be unlawfully confined for purposes of a false arrest claim.

### 3. Plaintiffs were not unlawfully "confined" by the landing permit revocation

The Plaintiffs also assert that they were subject to false arrest when the Government revoked their conditional landing permits without authority to do so. To establish a claim of false arrest, the Plaintiffs must show that "the authority upon which [they were] confined [was] unlawful." *Santoni*, 369 F.3d at 603 (quoting *Nadeau*, 395 A.2d at 116). "To constitute an arrest there must be a confinement of another within the rule stated in [section] 36," Restatement (Second) of Torts, § 112, cmt. a (Am. Law. Inst. 1965), which defines "confinement" for the purpose of false imprisonment claims.[39]   Liability for false imprisonment arises when a plaintiff's "confinement within the boundaries fixed by the actor must be complete." *Id.* at § 36(1).   *See also  Smith*, 180 F. Supp. 2d at 220 (explaining that for a false imprisonment claim, such confinement must occur "within boundaries fixed" by the Government's conduct).

"Confinement can be effectuated by physical force, explicit or implicit threats of physical force, or even 'unspecified means of "duress.""' *Id.* (quoting *McCann v. Wal-Mart Stores, Inc.*, 210 F.3d 51, 53-54 (1st Cir. 2000)). These unspecified means may include a "false assertion of legal authority to confine." *McCann*, 210 F.3d at 53. *See also* Restatement (Second) of Torts, § 40(a) (Am. Law. Inst. 1965) ("[C]onfinement may be by submission to . . . other forms of duress, whenever the duress is sufficient

---

[39] Because false arrest is one means of committing false imprisonment, *see Jedzierowski*, 157 Me. at 353, 172 A.2d at 637, and under the Second Restatement the same principles of confinement apply to both false arrest and imprisonment, I rely on authority addressing both false arrest and imprisonment for the purpose of this analysis.

to make ineffective the consent which would otherwise be involved in the submission.").  As I will explain, the Government is entitled to summary judgment on this issue because the record cannot support a finding that the revocation of the Plaintiffs' permits resulted in their unlawful confinement, or that the Plaintiffs' detention on remand to the vessel was unauthorized.

First, there is nothing in the record to support a finding that the Plaintiffs disembarked the vessel and were physically "arrested" and remanded to the vessel as a result of the permit revocation.  Thus, no reasonable jury could find that the Government used physical force, or explicit or implied threats of force, to revoke the permits and remand the Plaintiffs to the vessel.  The parties have not asserted any statements of fact—disputed or otherwise—that would establish that the Plaintiffs went ashore between when their conditional landing permits issued and when they were revoked.  The parties' properly supported statements of material fact show only that, pursuant to 8 C.F.R. § 252.2, CBP officials (1) administratively revoked Plaintiffs' conditional landing permits; (2) issued the Plaintiffs new Form I-95s that classified them as detained on board and designated them as "mala fide"; and (3) gave the shipping agent a Form I-259 requiring him to detain the crewmembers on board. Accordingly, under the circumstances, revoking the Plaintiffs' permits was, effectively, no different than if immigration officials had simply exercised their discretion to refuse to issue conditional landing permits after examining the crewmembers upon arrival.  *See* 8 C.F.R. § 252.1(a).  In either case, the result is the same: noncitizen crewmembers were lawfully detained aboard the vessel for lack of

43

legal status to disembark.  The absence of any legal status to land—whether refused in the first instance or, as here, granted and revoked—precludes a finding of unlawful confinement for purposes of a false arrest claim.

Second, CBP's actions also did not amount to a "false assertion of legal authority," *McCann*, 210 F.3d at 53, or, as Plaintiffs contend, an abuse of authority. An immigration official tasked with enforcing national borders is not required to obtain the consent of a noncitizen seeking admission to the United States prior to revoking a conditional and temporary legal status.  *See Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.").  And as previously addressed, CBP officials utilized a valid process to revoke the Plaintiffs permits, *see supra* p. 43, resulting in the authorized detention of the Plaintiffs aboard their vessel as if they had never been granted the conditional privilege to land.  Moreover, the Plaintiffs have not cited any authority that requires immigration officials to satisfy a probable cause standard prior to exercising their discretionary authority to issue, deny, or revoke the temporary legal status of a noncitizen who has not entered the United States, even if it results in remand to the border.

Third, even if permit revocation required noncitizen consent, which it does not, the Plaintiffs were not "confined" within boundaries fixed by immigration officials. *See* Restatement (Second) of Torts § 36, cmt. b, illus. 8 (Am. Law. Inst. 1965) ("A

44

wrongfully prevents B from entering the United States.  A has not confined B, although B, in a sense, may be said to be confined within the rest of the habitable world.").  Here, the Plaintiffs arrived on a vessel, from which they had no right to disembark, and the Government was authorized to ensure that arriving noncitizens with no legal status remained at the port of entry.  Accordingly, there are no contested or admitted statements of fact that would allow a reasonable jury to find that the revocation of the Plaintiff's permits resulted in their unlawful confinement.  Instead, as I will later explain, *see infra* p. 51, the record demonstrates that the Plaintiffs' detention, on a vessel docked at a port of entry, was effectuated by the master of the vessel retaining their passports, and not by unauthorized Government conduct.

The Plaintiffs' argument that the revocation constituted an unreasonable seizure under the Fourth Amendment as a predicate for their state law claim also cannot stand.[40]  The Plaintiffs contend that "[t]he Fourth Amendment . . . protects foreign nationals like Plaintiffs," and that "detention of an alien in violation of the Fourth Amendment constitutes false imprisonment."  ECF No. 163 at 18.   The Government urges instead that the Court apply the standard set forth in *United States v. Verdugo-Urquidez,* 494 U.S. 259 (1990): Fourth Amendment protections only apply "once an alien has come into the United States and 'developed substantial connections with this country,'" and that "[w]hether an alien has developed

---

[40]   Although the Court has already dismissed the Plaintiffs' *Bivens* claims arising under the Fourth Amendment, and although the FTCA does not provide a cause of action for constitutional torts, *see Villanueva v. United States,* 662 F.3d 124, 127 (1st Cir. 2011), the Plaintiffs nonetheless argue that an unconstitutional seizure is a proper basis for their false arrest claim under Maine law, and that a statute permitting indefinite detention of a noncitizen would violate the Fourth Amendment.

substantial connections with the United States depends, in part, on if the alien's presence in this country is voluntary."[41]   ECF No. 158 at 16 (quoting *Verdugo-Urquidez,* 494 U.S. at 271).

As reflected in the parties' memoranda of law, the applicability of Fourth Amendment protections to noncitizens stopped at the border—or who, as here, have not entered the United States—is heavily debated.   At a minimum, it is well-established that noncitizens applying for admission to the United States or stopped at the border have significantly diminished privacy interests.   *See United States v. Montoya de Hernandez*, 473 U.S. 531, 539-40 (1985) ("Having presented herself at the border for admission . . . respondent was entitled to be free from unreasonable search and seizure.   But not only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." (citations omitted)).

Regardless of the degree to which Fourth Amendment protections attached to the Plaintiffs when they were issued conditional landing permits, the Plaintiffs' arguments lack merit.   To start, the Plaintiffs have not asserted statements of facts that would allow a reasonable jury to find that the permit revocation resulted in a

---

[41] There is good reason not to apply *Verdugo-Urquidez* as broadly as the Government proposes, which would foreclose Fourth Amendment protections from applying to foreign crewmembers who receive temporary landing permits or who are paroled into the United States.   *Verdugo-Urquidez* is oft-cited for the narrower proposition that the Fourth Amendment does not apply to extraterritorial searches and seizures where the challenging party is a noncitizen without a voluntary connection to the United States.   *See United States v. Cabezas-Montano*, 949 F.3d 567, 593-94 (11th Cir. 2020) (collecting cases). Other courts have read *Verdugo-Urquidez* to mean that Fourth Amendment protections do not apply based on physical presence alone.   *See, e.g.*, *Castro v. United States Dep't of Homeland Sec.*, 835 F.3d 422, 448 (3d Cir. 2016).

seizure, was "arbitrary," or "oppressive[ly] interfer[ed]" with the diminished right to privacy they held as noncitizens seeking admission to the United States.  ECF No. 163 at 18 (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976)).  Even if they had, it was not arbitrary or unreasonable for immigration officials, once informed that the Coast Guard had probable cause to believe that violations of federal law had occurred and that the crewmembers would be critical witnesses in the investigation, to revoke the conditional landing permits.   "In determining the reasonableness of the manner in which a seizure is effected, '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'"  *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quoting *United States v. Place,* 462 U.S. 696, 703 (1983)).  Here, that balance favors the Government.  The Government's strong interest in conducting a criminal investigation and ensuring that material witnesses who are not citizens would remain available to provide testimony outweighed the alleged "invasion" into the Plaintiffs' privacy resulting from the revocation of their landing permits, which were conditional, temporary, and not guaranteed as a matter of right.

To summarize, the Plaintiffs have not demonstrated that immigration officials lacked authority to revoke their permits or remand them to their vessel and, therefore, cannot satisfy an essential element of their false arrest and imprisonment claims.  Furthermore, the Plaintiffs have not satisfied the threshold determination of a false arrest and imprisonment claim under state law: that they were confined by

unauthorized force, threat, or by boundaries created by immigration officials.  And the Plaintiff's alleged constitutional theory for their state law claims is baseless. Accordingly, the Government is entitled to summary judgment on these claims.

## B.   False Arrest and Imprisonment Claims Arising From the Nine-Day Detention on the Vessel

After the Government revoked the Plaintiffs' conditional landing permits, it is undisputed that the Coast Guard intended to confine the Plaintiffs on board the vessel, that the Plaintiffs were aware of their confinement, and that they did not consent to the same.  Thus, the Plaintiffs' false arrest and imprisonment claims arising from the nine-day detention on board the vessel rest on whether the confinement was authorized or otherwise privileged.[42]

The Government asserts that detaining the Plaintiffs on the vessel was a lawful and reasonable exercise of authority because the Plaintiffs were restored to the "detention status" they held when they first arrived in port under 8 C.F.R. § 252.1, and that the nine-day duration "was necessary and reasonable under these particular circumstances."[43]  ECF No. 158 at 22.  The Plaintiffs respond that their detention

---

[42]  This claim is not subject to the jurisdiction-stripping bar of the INA because it arises from the Coast Guard's actions authorized by 8 C.F.R. § 252.1(a).  The INA's bar on judicial review does not apply to discretion authorized by regulation as opposed to statute.  *See Kucana*, 558 U.S. at 248 ("If Congress wanted the [INA's] jurisdictional bar to encompass decisions specified as discretionary by regulation along with those made by statute, moreover, Congress could easily have said so."); *Alsamhouri v. Gonzales*, 484 F.3d 117, 122 (1st Cir. 2007) (holding that section 1252(a)(2)(B)(ii) "does not limit [a court's] jurisdiction when an immigration [official] exercises discretion that is not specified anywhere in the statutory subchapter, but rather derives entirely from regulations promulgated by the Attorney General under the statute").

[43]  The Government no longer relies on 19 U.S.C.A. § 1581(a) (West 2023) to justify the nine-day detention on board the vessel.  The Government has also abandoned its reliance on 14 U.S.C.A. § 522(a) (West 2023), which permits the Coast Guard to "make inquiries, examinations, . . . seizures, and arrests . . . for the prevention, detection, and suppression of violations" of federal law and to make arrests when "it appears that a breach of the laws of the United States rendering an individual liable to arrest is being, or has been committed, by any individual."

was an unauthorized abuse of discretion under section 1282.  Alternatively, they argue that even if the investigation and initial detention were statutorily authorized, their prolonged confinement violated the Fourth Amendment.

For reasons I will explain, the Plaintiffs have not shown a trial-worthy issue as to the nine-day detention on board the vessel during the investigation because their confinement was authorized by 8 C.F.R. § 252.1(a).  They also have not shown that the duration or conditions of their confinement constituted an unreasonable seizure under the Fourth Amendment.

### 1.  Authority to detain Plaintiffs aboard the *M/V Marguerita*

Upon arriving in Portland on the *M/V Marguerita*, the crewmembers were detained on board the vessel pursuant to 8 C.F.R. § 252.1(a), which requires that "[a]ll persons employed in any capacity on board any vessel . . . arriving in the United States *shall be detained on board* the vessel . . . *by the master or agent* . . . until admitted or *otherwise permitted to land* by [a Government official]."  The Plaintiffs were not permitted to leave the vessel before their conditional landing permits issued and possessed no other lawful status upon which to enter the United States.  At that point the vessel's master had their passports, which the parties agree is typical while a vessel remains in port.

When the Plaintiffs' conditional landing permits were revoked, they were remanded to the vessel while the Coast Guard investigated potential violations of the APPS.[44]  The Government asserts that, after the permit revocation, the crewmembers

---

[44]  The Plaintiffs argue, for a variety of reasons, that the investigation was unauthorized.  As I explained in the Order on the Motion to Dismiss, *see* ECF No. 61 at 10, 27-28, in the criminal

"retained their access within and ability to move about the vessel as they wished. They worked, moved about the ship, and did all the things they normally would when not working."[45]  ECF No. 159 at 16, ¶ 54 (citations omitted).  The Plaintiffs deny this and state that they "were detained and they felt detained."  ECF No. 164 at 12, ¶ 54. Although this denial may truthfully express the Plaintiffs' feelings about their situation—and it is clear they were required to remain on board their ship by being prevented from leaving it—it does not genuinely dispute that the crewmembers were free to move around the vessel as they would if they were at sea or had just arrived in port.

The Government also asserts that the only difference between the Plaintiffs' time on the vessel upon arrival and the nine-day detention was the twice-daily mustering.  The Plaintiffs dispute this characterization of their confinement by adding that they "were placed under guard for nine days,"  ECF No. 164 at 13,  and

---

proceeding against the vessel's owner and operator, Judge Nancy Torresen rejected the arguments that the vessel had not violated any federal law, and the owner and operator were ultimately convicted of two federal crimes.  *See United States v. MST Mineralien Schiffahrt Spedition Und Transp. GmbH,* No. 2:17-cr-117-NT, 2018 WL 522764, at *4-5 (D. Me. Jan. 22, 2018).  I decline to revisit the issue in these proceedings.

[45]  The Plaintiffs request to strike the Government's assertion, stating that:

The [Government's] cited testimony does not support the allegation and is conclusory. It is also irrelevant and incorrect.  Prior to the revocation of their shore passes, the Plaintiffs were not under guard, nor subject to Governmental mustering.  Moreover, the relevant comparison is to the liberty they enjoyed before they were (falsely and groundlessly) declared "mala fide" crewmen as a pretext for revoking their admission to the United States and detaining them so that the Government could fold them into [human] surety.

ECF No. 178 at 15 (second alteration in original).  To the extent that this constitutes a denial as well as a request to strike, the Plaintiffs' response is argumentative and lacks record support, and I decline to consider it.

that the detention was different because "[a] guard was posted over the crew."[46]   ECF No. 164 at 32, ¶ 29.   While the parties disagree as to whether, as Plaintiffs allege, a guard was posted on or near the ship, this fact has not been shown to be material. Regardless of whether there was a government officer or officers "posted at the vessel" or near the vessel, the Plaintiffs' detention on board the vessel resulted from their employer, the vessel's master, maintaining possession of their passports.   The Plaintiffs otherwise had no legal right or privilege to disembark the vessel after the revocation of their shore permits.

The Plaintiffs also have not demonstrated a genuine dispute of material fact that the *conditions* of their detention on board the vessel differed from their initial authorized detention before their conditional landing permits issued.   The Government asserts that "[a]t all times, the Coast Guard treated Plaintiffs respectfully.   The Coast Guard behaved professionally and had friendly demeanors. They never threatened, yelled at, touched, physically assaulted, or forcibly restrained Plaintiffs."   ECF No. 159 at 17, ¶ 63.   The Plaintiffs deny this statement of fact, but

---

[46] The Government contends that "there is no evidence that a guard was posted over the crew but for Plaintiffs' declarations, which simply say, without foundation, 'guards were posted at the vessel.'"   ECF No. 172 at 7, ¶ 29.   The evidentiary basis for Plaintiffs' assertion that a guard or guards were posted is three declarations from the Plaintiffs filed in support of their opposition to summary judgment.   The Government made a blanket objection to these declarations, which were submitted electronically and written in English, because the Plaintiffs do not speak English and had previously required translators at their depositions.   Unlike the Plaintiffs' earlier declarations, the three challenged declarations do not have an accompanying translation/native language text.   However, the 2010 Amendment to Fed. R. Civ. P. 56 clarified that a formal affidavit in support of summary judgment under Rule 56(c)(4) is no longer required, so long as a written unsworn declaration in compliance with 28 U.S.C.A. § 1746 (West 2023) is submitted.   Fed. R. Civ. P. 56(e) adv. committee's note to 2010 amendment.   Because I conclude that the Plaintiffs' factual assertions regarding a guard or guards being present at the vessel is not material, I assume, without deciding, that the three declarations are, as represented by Plaintiffs' counsel, the sworn statements of the individual Plaintiffs.

the portion of Hornof's deposition testimony they cite in support of their denial, *see*

ECF No. 164 at 14, ¶ 63, largely supports the Government's asserted fact:

> Q: So when you say "interrogate". . .were they mean to you, did they raise their voices, did they threaten you?
>
> A: No, but it was kind of – I felt a lot of discomfort during the whole period because they called me at 2:00 a.m. when I sleep, and they asked me to come somewhere and show me some paperwork while I'm sleepy and want to explain what it is.  So it was very uncomfortable.  And also there were no translators available, interpreters, so everything was done in a foreign language for me. . . .
>
> Q: Okay.  Did they – did they raise their voices with you?
>
> A: If a person is wearing a uniform, the other person has a natural respect to the uniform. So there is no need to raise voices.

ECF No. 154-140 at 39:4-40:3.  Further, Hornof confirmed that he was treated with

respect, and that the officials did not threaten or physically assault him:

> Q: Do you feel, though, that they treated you with respect?
>
> A: Yes.
>
> Q: Did they threaten you?
>
> A: No.
>
> Q: Did they physically assault you in any way?
>
> A: No.

ECF No. 154-140 at 40:4-11.  Hornof also testified that the crewmembers were not

physically confined to any particular part of the vessel;

> Q:  Were you able to move around the ship as you normally did when you were at sea?
>
> A: On the ship, yes.  But we were not allowed to leave the ship.

Q: Okay. But were you confined to any part of the ship, like locked in your stateroom or anything like that?

A: No.

Q: Okay.  And were you physically restrained in any way when you were on board the ship in Portland?

A: Not physically restrained but the situation on board of the ship was very tense because the crew had no idea what was going on.  They thought I caused something so – so the air was kind of thick.

ECF No. 154-140 at 41:3-18.

Accordingly, the Plaintiffs have not demonstrated a trial-worthy issue as to whether the nine-day confinement on the vessel meaningfully differed from their initial detention upon arriving at the port of entry.  Because the Coast Guard is authorized to require a vessel master or shipping agent to detain foreign crewmembers on board a vessel at the port of entry until the vessel departs, or until the crewmembers secure new conditional entry permits following the revocation of the original permits, a reasonable jury could not find, on this record, that the Plaintiffs' detention was unauthorized.

### 2.  Duration of Plaintiffs' detention was reasonable

Based on the summary judgment record, a reasonable jury could not find that the Plaintiffs' nine-day detention was, under the circumstances, so unreasonable as to constitute a Fourth Amendment violation actionable under Maine state law.[47]  The

---

[47]  The Plaintiffs' argument that a statute authorizing unlimited detention of noncitizens would violate the Fourth Amendment is irrelevant here, as the plain language of the Coast Guard regulations requiring that a vessel master detain his foreign crew upon arrival and until the crew obtain legal status to disembark does not "authorize" unlimited detention.  *See* 8 C.F.R. §§ 252.1-252.2.  Moreover, the Plaintiffs were not without remedy and could have challenged the legality or length of detention via a writ of habeas corpus, as Zak did, *see* ECF No. 154-81.

vessel master—who retained the Plaintiffs' passports upon their arrival in port until the Government's investigation concluded—was required, by law, to ensure that foreign crewmembers did not disembark, both pursuant to 8 C.F.R. § 252.1 and under orders from the shipping agent in receipt of the Form I-259 to detain the crew.

With respect to whether the duration of the underlying investigation was reasonable, the Plaintiffs have not asserted any facts as to this issue.  Instead, Plaintiffs raise only conclusory arguments about the lawfulness of the APPS investigation—arguments that this Court has already rejected, *see United States v. MST Mineralien Schiffarht Spedition Und Transp. GmbH*, No. 2:17-cr-117-NT, 2018 WL 522764, at *4-5 (D. Me. Jan. 22, 2018).  They appear to fall back on the plausibility of their allegations at the pleading stage, where I concluded that the Government had not met its burden in support of "its position that the Plaintiffs' alleged pre-warrant detention was reasonable under the Fourth Amendment."  ECF No 61 at 25. Although the Plaintiffs had the benefit of the Court construing all of their allegations as true at the motion-to-dismiss stage, their burden at summary judgment requires them to assert material facts supported by appropriate record citations that are more than speculative or conjectural theories. *Tropigas de P.R., Inc*, 637 F.3d at 56.  They have not done so here.  At best, the Plaintiffs' assertions warrant concluding that they were detained on the vessel during the Coast Guard's investigation—a detention which, as previously explained, was authorized and lawful.  They otherwise have not asserted facts that would permit a jury to conclude that the investigation was

54

unreasonable or longer in duration than other, similar APPS investigations, or that the Coast Guard unnecessarily prolonged the investigation.

Accordingly, there is no triable issue of fact as to the Plaintiffs' false arrest and imprisonment claims arising from their detention on board the vessel.   The Government is entitled to summary judgment on the false arrest and imprisonment claims premised on these actions.

## C. False Arrest and Imprisonment Claims Arising from Grant and Conditions of Significant Public Benefit Parole

After MST and the Government executed the Agreement, the Government applied for significant public benefit parole for each crewmember who had been identified as a material witness.   Significant public benefit parole "is a temporary measure generally used to provide a legal mechanism for informants, witnesses, criminals, and defendants to assist with ongoing investigations, prosecutions or testify as witnesses in proceedings." *Milardo v. Kerilikowske*, No. 3:16-MC-00099 (VLB), 2016 WL 1305120, at *2 (D. Conn. Apr. 1, 2016) (quotation marks omitted). *See* 8 U.S.C.A. § 1182(d)(5)(A) (West 2023) (conferring the Attorney General "discretion [to] parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for . . . significant public benefit any alien applying for admission to the United States").

The Plaintiffs assert false arrest and imprisonment claims arising from their parole, contending that the Government knew or reasonably should have known that they did not consent to remain in the United States and that the Government unlawfully confined them without their consent by applying for parole and imposing

conditions on their stay in the State of Maine before seeking material witness warrants. The Government counters that the Coast Guard reasonably relied on MST's representation in the Agreement that the crewmembers willingly consented to participate in the investigation and that the Government sought material witness warrants when each Plaintiff "no longer consented to remain in the United States." ECF No. 158 at 25. The Government also argues that imposing reasonable conditions on parolees, as 8 C.F.R. § 212.5(d) (West 2023) authorizes, is a lawful exercise of discretion under the applicable statute, section 1182(d)(5)(A) and its implementing regulation.

Although the INA's jurisdictional bar applies to section 1182(d)(5)(A), I again decline to resolve the jurisdictional issue presented because, as I will explain, the merits of the Plaintiffs' claims are "foreordained" and cannot survive summary judgment.[48] *Royal Siam*, 484 F.3d at 143-44.

### 1. Grant of parole

As previously explained, section 1182(d)(5)(A) confers broad discretion to the Attorney General to parole noncitizens into the United States on a "case-by-case" basis. Section 1182(d)(5)(A) does not define "significant public benefit," which gives the Attorney General "discretion to fill in the gaps."[49] *Florida v. United States*, No.

---

[48]  As previously noted, the INA's bar on judicial review would not apply to the Government's imposition of reasonable conditions on the Plaintiffs' parole, pursuant to 8 C.F.R. § 212.5 (West 2023), because it does not apply to discretion conferred by regulation. *See supra* note 42.

[49]  Contrary to the Plaintiffs' contention that "officials involuntarily 'paroled' the crewmembers into the United States, perverting a process meant to help refugees seeking asylum in this country," ECF No. 163 at 20, there are various types of parole, including "port of entry parole," which "applies to a wide variety of situations and is used at the discretion of the supervisory immigration inspector, usually to allow short periods of entry.'" *Succar v. Ashcroft*, 394 F.3d 8, 15 n.7 (1st Cir. 2005) (quoting

3:21cv1066-TKW-EMT, 2022 WL 2431414, at *9 (N.D. Fla. May 4, 2022).  Here, the Plaintiffs have not genuinely disputed that there was an ongoing criminal investigation in which the Government had probable cause to believe that federal laws had been violated and that the Plaintiffs were material witnesses in that investigation.  The Government often utilizes significant public benefit parole to secure testimony from noncitizens—who otherwise would not have legal status to be in the United States—in criminal proceedings.  Noncitizens generally seek parole as a form of discretionary relief, thereby negating the issue of consent.  At any rate, nothing in section 1182(d)(5)(A) requires that the Government first obtain the noncitizens' consent before paroling them under the statute.  Moreover, the statute has been interpreted to permit the Attorney General to parole foreign crewmembers into the United States when they  (1) have been granted or denied conditional landing permits, or (2) seek to exchange a D-1 permit for a D-2 permit.  *See, e.g.*, *Kordic*, 386 F.2d at 234-35 ("[U]nder 8 U.S.C. § 1182(d)(5), the Attorney General may 'parole' any alien—including a crew member—into the United States for emergent reasons or for reasons deemed strictly in the public interest." (quotation marks omitted)).

Plaintiffs also argue that their confinement was unlawful because section 1182(d)(5)(A) "allows the Attorney General (not the Coast Guard or CBP) to temporarily parole only "any alien *applying for admission to the United States*," which they allege they were not.  ECF No. 163 at 20.  Their argument is unpersuasive for

---

Dep't of Homeland Sec., Office of Immigration Statistics, *2003 Yearbook of Immigration Statistics* 83 at 190).  Other types of parole include "humanitarian parole, granted in instances of medical emergency; [and] public interest parole, granted for aliens participating in legal proceedings."  *Id.*

two reasons.  First, the Attorney General may delegate authority to carry out the INA's functions related to immigration and naturalization of noncitizens, including the power to grant significant public benefit parole.  8 U.S.C.A. § 1103(g)(1)-(2) (West 2023); *see supra* note 38.  The Attorney General has delegated this authority to the Secretary of Homeland Security, *see* 8 C.F.R. § 212.5(a); pursuant thereto, the Secretary and local immigration enforcement officials may detain a noncitizen in custody or grant parole and impose reasonable conditions on that parole, 8 C.F.R. § 212.5(b).  Second, it was proper for immigration officials to treat the Plaintiffs as "aliens applying for admission."  8 U.S.C.A. § 1182(d)(5)(A).  "An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission."  8 U.S.C.A. § 1225(a)(1).  "'Applying for admission' is a term of art in the INA.  It refers to the alien's presence at the border of the United States, not to her or his subjective wish to come here." *Xiao v. Reno*, 837 F. Supp. 1506, 1562 (N.D. Cal. 1993), (citations omitted), *aff'd sub nom*. *Wang v. Reno*, 81 F.3d 808 (9th Cir. 1996).

Thus, the Government was authorized to exercise its discretion to apply for significant public benefit parole for the Plaintiffs, based on their status as potential material witnesses in a criminal investigation, who could fairly be classified as "aliens applying for admission" within the meaning of the INA.  Accordingly, the Plaintiffs cannot satisfy an essential element of their false arrest and imprisonment claims

arising from their confinement in Maine pursuant to the Government's application for and grant of parole.

### 2.  Conditions on parole imposed

The Government was also authorized to impose reasonable conditions on the Plaintiffs' parole.  Immigration officials may grant parole "under such terms and conditions . . . as [the official] may deem appropriate."  8 C.F.R. § 212.5(c).  This includes imposing reasonable conditions on release, such as "requir[ing] reasonable assurances that the alien will appear at all hearings and/or depart the United States when required to do so."  8 C.F.R. § 212.5(d).  The regulation expressly provides that immigration officials may require reasonable agreements from noncitizens parolees to periodically report their whereabouts.  *See* 8 C.F.R. § 212.5(d)(3).

Here, the Plaintiffs had to surrender their passports to officials as a condition of release on parole.  The Plaintiffs were then taken to a local hotel, and CGIS checked on them once a day to ensure that they did not leave the jurisdiction.  The Plaintiffs have not shown that any of these conditions were unauthorized or unreasonable.  Maintaining possession of the Plaintiffs' passports and conducting daily check-ins to ensure that the Plaintiffs remained in Maine and would appear to testify are precisely the types of "reasonable assurances" contemplated by the regulation.

The Plaintiffs also have not generated a trial-worthy issue that the parole conditions, once authorized, became unlawful or unconstitutional due to the Government's alleged delay in seeking material witness warrants.  They contend that the Government waited four days after Hornof requested his passport to seek a

warrant, and twelve days between the time Kordic filed a motion for the return of his passport (August 9) and the date of his arrest warrant (August 21).[50]    The Government contends, as to Hornof, that the Agreement allowed the Government 72 hours to seek a warrant following his request.  As to Kordic, the Government explains that the prosecutors did not interpret the Motion to Return Property filed by Plaintiffs' counsel as "an explicit announcement" that Kordic was unwilling to remain in the United States, but instead viewed the motion "as a wholesale effort by counsel to short circuit the criminal case."  ECF No. 171 at 13-14 n.7.  Thus, the Government asserts that Kordic did not formally request his passport until Plaintiff's counsel expressly requested its return on August 18, 2017.

The Agreement allowed the Government 72 hours to return a crewmember's passport or to seek a material witness warrant.  The Plaintiffs were not parties to the Agreement, however, the Government acted in accordance with the terms it negotiated with MST by seeking material witness warrants upon receipt of the Plaintiffs' request for the return of their passports.[51]    Moreover, although the Government took longer than 72 hours to issue the warrants for Hornof and Kordic, during this period, the Plaintiffs remained paroled into the United States with

---

[50]  The Plaintiffs also argue that the Government waited three days before applying for a warrant after Zak filed a writ of habeas corpus.  Because the terms of the Agreement granted the Government 72 hours before returning the crewmembers' passports or seeking a warrant, I do not address this delay further.

[51]  Notably, Chalos granted the Coast Guard permission to hold the crewmembers' passports.  After Chalos signed the Agreement on behalf of MST, the Coast Guard inquired whether CGIS—and later Special Agent Root—should hold the Plaintiffs' passports.  Chalos responded: "[i]t would be a dream come true if CGIS could hold the passpor[ts].  I have requested this a million times (namely because they have a good safe and established procedures for keeping evidence, etc) . . . as opposed to an agent with an unknown capacity and ability for this sort of thing."  ECF No. 154-46 at 2.

reasonable conditions imposed on their confinement, as authorized by section 1182(d)(5)(A) and regulations pursuant thereto. Thus, the Plaintiffs' confinement during the time it took for the warrants to issue resulted from the Government's lawful authority to parole the Plaintiffs and monitor their location.

The four-day period to issue a warrant for Hornof was nothing more than a de minimis delay under the terms of the Agreement. While the twelve-day period to issue a warrant for Kordic—viewing the timeline in the light most favorable to the Plaintiffs—far exceeded the 72-hour deadline of the Agreement, he remained lawfully detained in the Government's custody pursuant to his parole status for that period. *See Samirah v. O'Connell*, 335 F.3d 545, 547 (7th Cir. 2003) ("Although a paroled alien has 'liberty to roam the country,' the law considers him legally detained at the border within the government's custody until his immigration status is determined." (quoting *Chavez-Rivas v. Olsen,* 207 F.Supp.2d 326, 328 (D.N.J. 2002))); *see also Kordic*, 386 F.2d at 235 ("[E]ven though physically in the country, [a parolee] is not regarded as having 'entered' and thus has not acquired the full protection of the Constitution.").

Moreover, the Plaintiffs have not shown that the duration of their parole or the conditions imposed on their parole were an "arbitrary and oppressive interference with their privacy interests" in violation of the Fourth Amendment. *Martinez-Fuerte*, 428 U.S. at 554. Relatedly, Plaintiffs have offered no support for their argument that, as noncitizens subject to a legally recognized custodial status—by which they are considered "legally detained at the border," *Samirah*, 335 F.3d at 547-48—they were

subject to an unlawful invasion of rights guaranteed by the Fourth Amendment. Thus, the Plaintiffs have not raised a trial-worthy issue that their confinement became unlawful at a certain point after they requested their passports.

To the extent that the Plaintiffs' requests for their passports could be treated as requests for the termination of their parole status, the outcome is the same. Terminating a noncitizen's parole is at the discretion of immigration officials when they determine that the "public benefit" of the parole no longer exists. "[S]uch parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith . . . be returned to the custody from which he was paroled . . . ." 8 U.S.C.A. § 1182(d)(5)(A). *See also* 8 C.F.R. § 212.5(e)(2)(i) ("[When] in the opinion of one of the [local immigration officials] . . . neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole."). Here, the Government was in the midst of conducting a criminal investigation in which the Plaintiffs were material witnesses when the Plaintiffs asked for their passports back. The Plaintiffs had not yet been deposed or been able to testify before a grand jury—through no fault of their own—and thus, the "public benefit" of the Plaintiffs' parole in the United States had not yet been fulfilled.

Accordingly, the fact that their parole—which lawfully confined the Plaintiffs in Maine subject to various conditions—was "prolonged" or "delayed" while the

Government sought arrest warrants, does not create a triable issue of fact. To the extent that the Plaintiffs believe they were misled as to their status when they were asked to disembark from the vessel, denied possession of their passports, or otherwise misinformed about the terms of the Agreement, the record might support potential claims against MST, but not against the Government.[52]

For these reasons, the Government's decision to parole the Plaintiffs into the United States and impose reasonable conditions on their stay in Maine was lawful, which precludes the Plaintiffs' false arrest and imprisonment claims arising from the pre-warrant period of confinement. Therefore, the Government is entitled to summary judgment on the false arrest and imprisonment claims premised on these actions.

**D.    False Arrest and Imprisonment Claims Arising from the Post-Warrant Confinement**

When the Plaintiffs requested the return of their passports—and, in Zak's case, filed a habeas petition—the Government sought material witness arrest warrants pursuant to 18 U.S.C.A. § 3144, each supported by an affidavit signed by Special Agent Root (each a "Root affidavit" and, collectively, the "Root affidavits").[53] The

---

[52] For example, Hornof's declaration states: "On or about July 16, 2017, approximately eight crew were told by the captain that the government required him and the rest of us to disembark the vessel and remain in the United States. We were given no choice in the matter. We were not asked to agree. We were told the government required us to get off the ship and stay in America." ECF No. 164-5 at 5, ¶ 33. There are no other facts asserted as to what the crewmembers were told or whether their consent was obtained. Viewed in the light most favorable to the Plaintiffs, the undisputed facts indicate that the captain of the *M/V Marguerita*—not the Government—may have misrepresented the terms of the agreement to the Plaintiffs.

[53] Special Agent Root drafted and signed three, mostly identical affidavits in support of each warrant application, with minor discrepancies pertinent to the specific role and the potential material knowledge of each crewmember, as well as specific information gained from the Coast Guard's interviews with each crewmember. The affidavits supporting the warrant applications for Hornof and

Plaintiffs argue that their detention following the execution of these warrants was unlawful and unconstitutional because they were supported by affidavits which, the Plaintiffs argue, intentionally or recklessly misrepresented or omitted material facts, thus undermining the Magistrate Judge's probable cause determination. The Government counters that the arrests were lawful exercises of valid authority and conditionally privileged as a matter of law.[54]

> The material witness arrest warrant statute provides:
>
> If it appears from an affidavit filed by a party *that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena*, a judicial officer may order the arrest of the person. . . . No material witness may be detained because of inability to comply with any condition of release if the testimony of such witness can adequately be secured by deposition, and if further detention is not necessary to prevent a failure of justice. Release of a material witness may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to the Federal Rules of Criminal Procedure.

18 U.S.C.A. § 3144 (emphasis added).  If an affidavit supporting a warrant shows that a witness's testimony is material—the "materiality prong"—and that it may become impracticable to secure the witness's presence by subpoena—the "impracticability prong"—then the arrest warrant is deemed valid.[55]  *See, e.g., United States v.*

---

Kordic included slightly more detail regarding the third-party audit and the letter sent by MST's attorney in June 2017.  Those affidavits also included a few additional details regarding the *M/V Marguerita*'s ports of call prior to the Coast Guard's inspection, and additional details as to the Coast Guard's inspection of the ORB.

[54]  Even if the decision to seek material witness arrest warrants is the type of government conduct contemplated by the discretionary function exception to the FTCA, the exception does not apply because the Plaintiffs' tort claims are predicated on a Fourth Amendment violation.  *See Limone*, 579 F.3d at 101.

[55]  In my Order on the Defendants' Motion to Dismiss, I considered both the materiality prong and the impracticability prong of the arrest warrants and concluded that the Plaintiffs' testimony was clearly material to corroborate the Government's documentary evidence.  Despite my earlier

*Awadallah*, 349 F.3d 42, 76 (2d Cir. 2003) (Straub, J., concurring); *Arnsberg v. United States*, 757 F.2d 971, 976-77 (9th Cir. 1985).

As to the impracticability prong of the probable-cause determination underlying the material witness arrest warrants, the Plaintiffs argue that the Root affidavits omitted important facts about, among other things, their cooperation with the investigation, their promises to return to testify, their parole status, and the fact that they were not in possession of their passports and were monitored daily by CGIS. This argument is unpersuasive because (1) the Plaintiffs failed to properly support their assertions, and (2) the Root affidavits were sufficient to support the Magistrate Judge's impracticability finding, even when accounting for the alleged omissions and misrepresentations.

### 1.  Plaintiffs' failure to support their statements of fact

As explained previously, the Plaintiffs' statements of fact pertaining to the alleged misrepresentations and omissions in the Root affidavits do not comply with Local Rule 56.  *See supra* note 13.  To reiterate, Plaintiffs cite various records at the end of these asserted facts but do not support each individual statement of fact therein (of which there are dozens), thus requiring the Court to wade through the listed citations and determine which citation supports which fact.  *See* D. Me. Local R. 56(f) ("An assertion of fact set forth in a statement of material facts shall be

---

conclusions, the Plaintiffs now attempt to resuscitate the "materiality prong" of their argument that the Government "false[ly] claimed to have evidence that the vessel interests had violated APPS" and that "no violation of APPS took place."  Plaintiffs, in effect, are inviting the Court to revisit the issue without providing any new reason to do so.  ECF No. 163 at 23.  I decline the invitation.  Accordingly, I focus solely on the "impracticability prong" of the inquiry.

followed by a citation to the specific page or paragraph of identified record material supporting the assertion."). Furthermore, many of their assertions are conclusions of law, not statements of fact, more appropriately included in a memorandum of law. *See, e.g.*, ECF No. 164 at 36, ¶ 50(f) (asserting that 33 C.F.R. § 151.25(k) is "the only provision in the regulations that prescribes a requirement for the length of time an ORB must be maintained"); ECF No. 164 at 40, ¶ 59(g) (same).

Even if one overlooked the deficiencies in the Plaintiffs' statements of fact, disputed or not, they have not generated a trial-worthy issue regarding the impracticability prong. In my analysis that follows, I consider only those statements relevant to the impracticability prong in assessing the validity of Plaintiffs' arrest warrants.[56]

## 2. The alleged omissions and misrepresentations do not undermine the Magistrate Judge's probable-cause determination

An arrest warrant may be invalidated if a government official intentionally or recklessly omits or misrepresents material facts from an affidavit. *Awadallah*, 349 F.3d at 64. "A misrepresentation or omission is intentional when 'the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth.'" *Id.* (quoting *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000)). "Reckless disregard for the truth in the submission of a warrant application may be established where an officer 'in fact entertained serious

---

[56] The statements pertinent to the affidavit supporting Zak's warrant are at ECF No. 164 at 35-37, ¶ 50(a)-(s). Of those statements, only ¶ 50(l)-(r) are relevant to the impracticability-prong analysis. The statements pertinent to the affidavit supporting Hornof's warrant and relevant to the impracticability prong are at ECF No. 164 at 39, ¶ 59(a)-(c); 41, ¶ 59(j)-(l). The statements pertinent to the affidavit supporting Kordic's warrant and relevant to the impracticability prong are at ECF No. 164 at 45, ¶ 62(l)-(n).

doubts as to the truth of the allegations' or where 'circumstances evinc[ed] obvious reasons to doubt the veracity of the allegations' in the application." *Burke v. Town of Walpole*, 405 F.3d 66, 81 (1st Cir. 2005) (quoting *United States v. Ranney,* 298 F.3d 74, 78 (1st Cir. 2002)).  However, "'recklessness may be inferred where the omitted information was critical to the probable cause determination.'"  *Id.* at 81-82 (quoting *Golino v. New Haven,* 950 F.2d 864, 871 (2d Cir. 1991)).  These misrepresentations or omissions violate the Fourth Amendment only if they are material to the magistrate judge's probable cause determination.  *Id.* at 82.  To determine the materiality of misrepresentations and omissions, a court must "'excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the "corrected" warrant affidavit would establish probable cause.'"  *Id.* (quoting *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000)).

Here, nothing in the summary judgment record would allow a reasonable jury to infer that Special Agent Root *intentionally* misrepresented or omitted facts.  Likewise, no reasonable jury could conclude, on this record, that Special Agent Root entertained serious doubts about the truth of the information in the affidavits such that any alleged misrepresentations or omissions could be inferred as reckless.  As to the other omissions and misrepresentations asserted by the Plaintiffs, for reasons I explain, they have not shown that these would undermine the Magistrate Judge's ultimate determination that it would have become impracticable to secure the Plaintiffs' testimony by subpoena, nor have they meaningfully challenged the Magistrate Judge's probable cause finding.

### (a)   The asserted omissions and misrepresentations

Specific to the warrant for Zak, the Plaintiffs assert that the application and the relevant Root affidavit omitted the facts that Zak had filed a habeas petition, agreed to cooperate with the investigation, and never refused to testify.[57]   As to the warrant for Hornof, the Plaintiffs assert that the application and affidavit (1) "affirmatively asserted that an arrest warrant was necessary to secure [his] appearance and testimony," ECF No. 164 at 39, ¶ 59(a), and (2) omitted the details of his cooperation and ongoing willingness to cooperate.   They also assert that the affidavit minimized the "strong evidence" pertaining to Hornof's cooperation.   ECF No. 164 at 41, ¶ 59(j).   As to the warrant for Kordic, the Plaintiffs assert that the affidavit omitted that he agreed to testify and was already scheduled to testify before a grand jury, and that it misrepresented his willingness to cooperate.

The Government disputes that the affidavits were either misleading or false,[58] emphasizing that Special Agent Root specified that the affidavits were "submitted for

---

[57]   They also assert that "mariners employed in the shipping industry must frequently return to the United States and would naturally fear arrest and other reprisal upon such return if they violated a U.S. subpoena" and that APPS investigation witnesses have "strong incentives" to return to testify due to the potential whistleblower award.   ECF No. 164 at 37-38, ¶ 50(q)-(r).   The Government denies this, arguing that there is no direct evidence of Plaintiffs' assertion and that Special Agent Root would not have had personal knowledge of such information and, thus, could not have properly included it in an affidavit based on personal knowledge.   This dispute of fact is not material to the ultimate question of whether the omitted facts, when added to the affidavits, would undermine the probable-cause determination.   Even if it were material, the Plaintiffs have not shown that Special Agent Root had personal knowledge or evidence of this fact, nor would the assertion bear on the Magistrate Judge's determination of whether, under the circumstances, Plaintiffs' testimony may have become impracticable to secure by subpoena.

[58]   Similar to the Plaintiffs' statements of fact regarding the affidavit, the Government also runs afoul of complying with Local Rule 56 in its denials and qualifications.   Many go beyond the scope of the statement being disputed, and some are overly argumentative and lack record citations.   I have overlooked these deficiencies in determining whether there is a trial-worthy issue as to the unlawfulness of the Plaintiffs' post-warrant confinement.

the limited purpose of establishing probable cause to obtain a warrant and not every fact learned was included."  ECF No. 172 at 23, ¶ 50(l); 25, ¶ 50(o); 27, ¶ 50(s); 32, ¶ 59(i), (j); 43, ¶ 62.  The Government objects to many of the Plaintiffs' characterizations pertaining to the affidavits, denying that any of the Plaintiffs were "detained pursuant to the surety agreement" and qualifying that their passports were "not seized" until the Magistrate Judge ordered the Coast Guard to hold them as a condition of release under the warrants.[59]  ECF No. 172 at 24-25, ¶ 50(m)-(n).  The Government also asserts that although the affidavits did not use the word "cooperate" to describe the Plaintiffs' cooperation with the investigation, that they nonetheless included details about the assistance they had provided.  For example, each Root affidavit identified the subject Plaintiff as providing helpful information about the discharge operations during interviews with Coast Guard officials.

Turning to each category of purported omissions, I conclude that although the Root affidavits could have more fully detailed the circumstances of Plaintiffs' confinement in the District of Maine, the facts offered by the Plaintiffs, if included in these affidavits, would not have undermined or altered the Magistrate Judge's probable cause determination.  Accordingly, the Plaintiffs have not demonstrated a genuine dispute of material fact as to the lawfulness of the warrants supporting their arrests as material witnesses.

---

[59]  Notably, Special Agent Root was already in possession of the passports pursuant to the parole conditions following the departure of the vessel's master.

#### (b)  Foreign citizenship

The Plaintiffs contend that even though they were foreign citizens, they did not pose a flight risk because they were confined to the District of Maine and did not possess their passports.   Ordinarily, foreign citizenship and non-residence are sufficient to establish the probable cause impracticability determination because "the government's subpoena power [is] basically ineffectual" in foreign countries.  *United States v. Matus-Zayas*, 655 F.3d 1092, 1099−100 (9th Cir. 2011) (internal quotation marks omitted).   Barring sufficient guarantees that a noncitizen crewmember does not pose a substantial flight risk, foreign citizenship is enough to satisfy the impracticability prong of the probable cause determination.

The magistrate judge's analysis in *United States v. Ionia Management S.A.* is instructive as to whether the Plaintiffs' foreign citizenship was sufficient to satisfy the impracticability prong of the probable cause determination.   No. 03:07CR134 (JBA), 2007 WL 2325199 (D. Conn. Aug. 9, 2007), *objections overruled*, 499 F. Supp. 2d 166 (D. Conn. 2007).   In *Ionia Management S.A.*, the magistrate judge found that the impracticability prong had not been satisfied because, although the "witnesses are foreign nationals who would be outside the subpoena power of this Court if they left the United States," the trial was set to begin three days later, all eight witnesses were "present in Connecticut and ha[d] agreed to remain here under the subpoenas already issued to them," and the crew members' attorney had "represented at the hearing that the witnesses' availability through the end of August is unchanged."  *Id.* at *3.

Although the magistrate judge in *Ionia* determined, based on the factual circumstances presented to her, that the crewmembers' foreign citizenship was not sufficient to satisfy the impracticability requirement, the same cannot be said here. In this case, no trial date had been set and it was not clear how long the Plaintiffs would have had to remain to testify when the Government sought the material witness warrants.[60] Further, the Plaintiffs had not yet been subpoenaed to testify at trial. Moreover, had Special Agent Root provided a more fulsome explanation of the Plaintiffs' circumstances, his affidavits would have explained that the Plaintiffs' counsel had repeatedly indicated to the Government that the Plaintiffs desired to depart the United States as soon as possible for pressing personal reasons. And had the affidavits included the facts that Zak had filed a habeas petition and that the other Plaintiffs had formally requested their passports on the day that the Government sought arrest warrants, those facts would have further supported the Magistrate Judge's finding that the Plaintiffs posed substantial flight risks. Thus, the Magistrate Judge's impracticability determination was not undermined by the exclusion of this information from the affidavits.

### (c)  The Plaintiffs' cooperation with the investigation

The Plaintiffs also allege that the Magistrate Judge's probable-cause determination would have been undermined if the affidavits had fully detailed the Plaintiffs' cooperation with the investigation. *See United States v. Black Elk Energy Offshore Operations LLC*, No. 15-0197, 2015 WL 13664063, at *1 (E.D. La. Dec. 23,

---

[60]  Although Hornof and Kordic had agreed to testify before a grand jury, and indeed had appeared to testify on August 9, no formal subpoenas had been issued.

2015) (citing <em>United States v. Feingold</em>, 416 F. Supp. 627 (E.D.N.Y. 1976) (explaining that the impracticability may be established "when a material witness . . . exhibits an unwillingness to cooperate with the Government."). The record, viewed in light most favorable to the Plaintiffs, demonstrates that they had exhibited willingness to cooperate in the investigation. However, even if the affidavits had included a more detailed account of the Plaintiffs' cooperation, including their willingness to comply with informal subpoenas to testify before the grand jury, that cooperation alone does not mean that it would be possible to secure the Plaintiffs' testimony at trial if, as foreign citizens, they later refused to honor a subpoena to appear and return to the United States.

The Plaintiffs allege that the affidavits supporting the warrants for Zak and Hornof indicated that they "would not be subject to compulsory process" if they returned to their home countries but omitted the fact that their home countries had signed treaties requiring "cooperation in obtaining testimony in criminal matters." ECF No. 164 at 37, ¶ 50(p); 41, ¶ 59(l). In support of their assertion that Zak and Hornof could be required to return, the Plaintiffs offer copies of treaties between the United States and the Czech Republic and the Slovak Republic as exhibits to their opposition to summary judgment (ECF No. 164-2). They fail, however, to identify any provision in either treaty under which Zak or Hornof could be *compelled* to return to the United States to provide testimony pursuant to a subpoena, and cite no authority whatsoever to support the assertion that Kordic's return could be compelled.

Thus, viewed in the light most favorable to the Plaintiffs, the Root affidavits provided solid support for a finding of impracticability by the Magistrate Judge because the Plaintiffs were foreign citizens who had communicated their desire to leave the United States, and who otherwise had no ties to the United States. The fact that the Plaintiffs are displeased with the Root affidavits' characterization of the extent of their cooperation, without evidence that the affidavits recklessly or intentionally omitted or misrepresented their involvement, does not raise a trial-worthy issue. Even if the affidavits had referenced these treaties, as the Plaintiffs contend they should have, the Magistrate Judge had a basis to conclude that the Plaintiffs were foreign citizens who could not be compelled to return to testify once they regained possession of their passports.

### (d)  Location of the Plaintiffs' passports and conditions of parole

The Plaintiffs also argue that the Root affidavits omitted details about the location of their passports[61] and the conditions of their parole, which, they contend, undermines the Magistrate Judge's finding of probable cause. However, even with the addition of these details, the record still would have supported the Magistrate Judge's findings in support of his probable-cause determination: namely, that the Plaintiffs posed a flight risk and that it could soon become impracticable to secure

---

[61]  While the Plaintiffs are correct that the affidavits themselves did not specify that they did not have their passports, the warrant applications explicitly stated that "[t]here is currently no legal prohibition for this foreign national witness to leave the United States, *once [the crewmember] regains possession of his passport.*" ECF No. 154-107 at 5, ¶ 5 (emphasis added). Thus, the Magistrate Judge was informed and had reason to know, at the time he made the probable cause determination, that the Plaintiffs could not immediately depart the United States because they did not have their passports, and nonetheless found the impracticability prong to be satisfied.

their presence via subpoena.  Moreover, if the Root affidavits had described the terms of the Agreement—including the requirement that the vessel's master maintain possession of the crewmembers' passports—the Magistrate Judge would have then been informed that the Plaintiffs could request the return of their passports and the Government would be forced to comply with the request or seek warrants within 72 hours.  If the Government had not sought warrants, the Coast Guard would have been required to return the Plaintiffs' passports, enabling them to depart the United States within 72 hours.

Likewise, even if the Root affidavits had more fully explained the Plaintiffs' parole status and monitored confinement in the District of Maine, the Magistrate Judge nonetheless would have had reason to know that the Plaintiffs' parole—a temporary legal status granted at the discretion of the Attorney General—could be revoked or terminated at any time, which would result in the immediate removal of the Plaintiffs from the United States.  Although their parole was lawful, it was merely a legal status that allowed them to remain in the United States without being detained in physical custody; it was temporary and did not guarantee that the Plaintiffs' appearance could be secured by subpoena, nor would it ultimately prevent the Plaintiffs from departing the country if it were terminated.  Thus, while inclusion of these facts in the Root affidavits would have more fully detailed the circumstances of the Plaintiffs' confinement, their exclusion does not undermine the Magistrate Judge's probable-cause determination.

### (e)   Promises to return to testify

Finally, even if the Root affidavits had detailed the Plaintiffs' assurances that they intended to return to the United States to testify, promises to return are insufficient to defeat a probable cause determination.[62]  In *In re M/V JOANNA*, the court, in nearly identical circumstances, reiterated its finding of impracticability and observed that,

> With regard to the witnesses' willingness to return, the court is sympathetic to their promises and the experience of counsel with other witnesses in other cases, but once the witnesses are beyond the jurisdiction of this court, there is simply no way to enforce their return.  The court remains convinced that it is impracticable to secure the presence of the witnesses by subpoena.

No. 21-mc-592, 2021 WL 2514687, at *11 (E.D. La. June 18, 2021).  Here, although the Plaintiffs contend that there would have been incentive to return to the United States to testify due to the possibility of a whistleblower fee in the APPS criminal proceeding, there is no evidence showing that Special Agent Root had personal knowledge of such incentive—let alone personal knowledge of facts suggesting that these Plaintiffs specifically would have been incentivized to return.  Accordingly, while foreign crewmembers may truthfully and in good faith indicate that they will return to testify at trial, there is no guarantee that the Government will be able to depose them or offer their testimony at trial once they depart the United States.

---

[62]  Again, the Plaintiffs attempt to resurrect an argument I rejected at the motion to dismiss stage, *see* ECF No. 61 at 31 n.12, by asserting that their truthful promises to return, if included in the Root affidavit, would have undermined an impracticability finding.  As I previously concluded, because foreign residency and citizenship ordinarily satisfy the impracticability prong, "[t]he Plaintiffs' alleged promises to appear do not bear on the legal effect of subpoenas served in foreign countries and therefore do not negate the Magistrate Judge's finding of impracticability."  ECF No. 61 at 31 n.12.  I reiterate my conclusion here.

Thus, the facts that the Plaintiffs assert were misrepresented or omitted from the Root affidavits do not undermine the Magistrate Judge's probable-cause determination—which rested on a finding that securing the Plaintiffs' presence by subpoena after they left the United States may be impracticable. That is not to say that all noncitizens with critical testimony to a criminal investigation, present in the United States, could be subject to an arrest warrant solely because of the remote potential that they might one day depart. Under the circumstances presented here, however, the combination of the Plaintiffs' foreign citizenship, their expressed desire to leave the country, their lack of connection to the United States, and their attempts to terminate their parole and request their passports under the Agreement, if fully detailed in the affidavits, was more than sufficient to support a finding of impracticability—and a probable cause finding therefrom.

Accordingly, the Government is entitled to summary judgment on the Plaintiffs' false-imprisonment claims arising from their arrest and confinement pursuant to the material witness warrants.

## E.  Abuse-of-Process Claim

In support of their abuse-of-process claim, the Plaintiffs allege that Special Agent Root acted in concert with other law enforcement officers and "used fraudulent affidavits to obtain arrest warrants." ECF No. 163 at 26. The Government argues that "the affidavits were used properly, i.e., to help the prosecution win its motions for material witness warrants." ECF No. 158 at 30. The Government also argues that "[t]here is simply no evidence that Special Agent Root signed the affidavits for any purpose other than assisting the prosecution in acquiring material witness

warrants to ensure Plaintiffs were available to testify before a grand jury or at trial." ECF No. 158 at 30.

Although the FTCA generally precludes claims arising out of abuse of process, it permits such claims arising from acts or omissions of federal "investigative or law enforcement officers." 28 U.S.C.A. § 2680(h). "[A]buse of process claims arise when litigants misuse individual legal procedures, such as discovery, subpoenas, and attachment, after a lawsuit has been filed." *Advanced Const. Corp. v. Pilecki*, 2006 ME 84 ¶ 23, 901 A.2d 189 (citing *Pepperell Tr. Co. v. Mountain Heir Fin. Corp.*, 1998 ME 46 ¶ 14 n.8, 708 A.2d 651). "Maine law has identified two elements necessary to sustain an abuse of process claim: '1) a use of the process in a manner not proper in the regular conduct of the proceedings and, 2) the existence of an ulterior motive.'" *OfficeMax Inc. v. Sousa*, 773 F. Supp. 2d 190, 240 (D. Me. 2011) (quoting *Grace v. Yarnall,* 346 F. Supp. 2d 222, 224 (D. Me. 2004)); *see also Simon v. Navon*, 71 F.3d 9, 15 (1st Cir. 1995) ("The two basic elements of abuse of process are a bad motive, and the use of a legal process for an improper, collateral objective.").

A plaintiff may demonstrate an abuse of process if he "can show an improper use of process for an immediate purpose *other than that for which it was designed and intended*." *OfficeMax Inc.,* 773 F. Supp. 2d at 240 (emphasis added) (quoting Restatement (Second) of Torts § 682 (Am. Law. Inst. 1977)). "Regular use of process, such as filing a law suit, cannot constitute abuse, even if a decision to act or a decision not to act, was influenced by a wrongful motive." *Tanguay v. Asen*, 1998 ME 277, ¶ 5, 722 A.2d 49. "Evidence of bad motive alone is insufficient: 'although wrongful motive

77

in the context of abuse of process claim may be inferred from an improper act, the reverse is not true.'" *Shapiro v. Haenn*, 222 F. Supp. 2d 29, 48 (D. Me. 2002) (quoting *Simon*, 71 F.3d at 16)).

Even in the light most favorable to the Plaintiffs, the record would not allow a reasonable jury to find that Special Agent Root submitted the affidavits for any purpose other than the exact purpose for which they were submitted—the arrest of the Plaintiffs, who had corroborating testimony vital to the Government's case, as material witnesses.  There is no factual support in the record to infer that Special Agent Root sought to achieve some other improper purpose beyond advancing the Government's criminal investigation by ensuring that the Plaintiffs would remain in the United States where they could be deposed and/or testify in criminal proceedings against MST.  The Court will not speculate as to other improper and, on this record, unsupported alleged motivations.

Thus, the Government is entitled to summary judgment on the abuse-of-process claim because the Plaintiffs cannot establish an essential element of their claim: that Special Agent Root offered affidavits for an improper or collateral purpose.

## F.  Intentional Infliction of Emotional Distress ("IIED") Claim

The Plaintiffs contend that they suffered severe emotional distress as a result of the Government's conduct.  To survive summary judgment, the Plaintiffs must present facts that tend to show that "(1) 'the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such

distress would result from the defendant's conduct'; (2) 'the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community'; (3) 'the actions of the defendant caused the plaintiff's emotional distress'; and (4) 'the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.'" *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 25, 48 A.3d 774 (quoting *Lyman v. Huber,* 2010 ME 139, ¶¶ 16, 21-23, 10 A.3d 707 (alterations omitted)).  Even if the alleged harm suffered is "distressing," the Plaintiff "must show that the distress caused would be unbearably severe to an ordinarily-sensitive plaintiff." *Id.* at ¶ 26.

To prevail on an IIED claim under Maine law, the Plaintiffs must show not only that they suffered severe distress, but also that the conduct was extreme and outrageous and "exceed[s] all possible bounds of decency."  *Id.* at ¶ 25.  "The determination of whether the facts alleged are sufficient to establish that the defendant's conduct is 'so extreme and outrageous to permit recovery' is a question of law for the court to decide." *Argereow v. Weisberg*, 2018 ME 140, ¶ 27, 195 A.3d 1210 (quoting *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 16, 711 A.2d 842).  "Mere allegations, or conjecture unsupported in the record, are insufficient" to survive summary judgment. *Barros-Villahermosa v. United States*, 642 F.3d 56, 58 (1st Cir. 2011) (quoting *Rivera-Marcano v. Normeat Royal Dane Quality A/S,* 998 F.2d 34, 37 (1st Cir. 1993)).

79

Section 2680(h) is broad enough to encompass some intentional infliction of emotional distress claims. *Limone v. United States*, 579 F.3d 79, 92 (1st Cir. 2009). However, IIED claims only fall within the scope of section 2680(h) if they "rest[] on proof of" a false arrest, false imprisonment, abuse of process, or another "specifically enumerated tort." *Id.* If a plaintiff fails to establish an element of the enumerated tort, then his IIED claim does not "arise[] out of" that tort for purposes of section 2680(h), even if it is based on the same conduct that gave rise to the separate enumerated tort claim. *Id.* at 92−93. Because I conclude that the Plaintiffs cannot establish essential elements of their claims for false arrest, false imprisonment, and abuse-of-process, and thus do not survive summary judgment, their IIED claim premised on that alleged tortious conduct also fails.

Even if I were to consider the merits of this claim, Plaintiffs' conclusory allegations are insufficient to stave off summary judgment. First, they allege that they "suffered severe emotional distress because of [their] treatment by U.S. law enforcement officers." ECF No. 164 at 47, ¶ 74. Second, they allege that they "felt unable to return to sea, because of the risk and fear [they] could again be detained in a foreign port."[63] ECF No. 164 at 48, ¶ 75. And finally, they allege that each "suffered substantial loss of income due to leaving his maritime career." ECF No. 164 at 48, ¶ 76.

---

[63] The Government denies this, asserting that "[t]here is no evidence beyond Plaintiffs' testimony [in their declarations] that supports their claims that the risk and fear of being detained in a foreign port kept them from returning to sea." ECF No. 172 at 46, ¶ 75. For the reasons explained as to my view of the Plaintiffs' declarations submitted in support of their opposition to summary judgment, *see supra* note 46, I do not accept the Government's denial on those grounds.

As to the Government's alleged extreme and outrageous conduct, the Plaintiffs assert that officials "unconscionably treated Plaintiffs as human collateral or chattel." ECF No. 164 at 49, ¶ 84.   I afford no evidentiary weight to these conclusory allegations.   *Tropicas de P.R., Inc.*, 637 F.3d at 56.   Moreover, the allegations that the Plaintiffs feared being detained in the future and thus chose not to pursue their maritime careers, do not, as a matter of law, constitute "emotional distress [that is] so severe that no reasonable person could be expected to endure it."   *Argereow*, 2018 ME 140, ¶ 27, 195 A.3d 1210 (quoting *Curtis v. Porter*, 2001 ME 158, ¶ 10, 784 A.2d 18).

Relying on *Limone*, the Plaintiffs also argue that the Government, using common sense, would have known that its conduct was likely to cause emotional distress:   "[L]aw enforcement officers conspired with others to arrest and confine innocent seafarers in violation of basic precepts of state law and due process and sought to obstruct each of their efforts to assert their rights and regain their freedom. This outrageous conduct was certain to cause Plaintiffs severe emotional distress, and it did so." ECF No. 163 at 27.   However, the extreme nature of the government's misconduct in *Limone*—which the First Circuit characterized as "egregious" and "a callous disregard for the [plaintiffs'] rights," resulting in the plaintiffs' wrongful conviction and lengthy imprisonment— is easily distinguished from the conduct at issue here.[64]  *Limone*, 579 F.3d at 83.

---

[64]   In *Limone*, FBI agents intentionally withheld exculpatory information during a murder-for-hire investigation, and subsequently engaged in a protracted scheme to protect the identities of the actual culprits and frame the plaintiffs as scapegoats, leading to the wrongful conviction of the plaintiffs— three of whom were sentenced to death and one of whom received a life sentence.  *Limone*, 579 F.3d at

It was no doubt distressing and a significant hardship on the Plaintiffs to have been detained on board the vessel for nine days, and then be subject to parole and monitoring in the District of Maine without any firm indication as to when they would be allowed to depart the United States.  However, there is no factual basis in the summary judgment record supporting a finding that the Government's conduct was "extreme and outrageous" and "exceed[ed] all possible bounds of decency," *Lyman,* 2010 ME 139, ¶ 16, 10 A.3d 707 (quoting *Curtis*, 2001 ME 158, ¶ 10, 784 A.2d 18)—the standard required for liability under Maine law.  Accordingly, the Government is entitled to summary judgment on this claim because the Plaintiffs' evidence does not raise a triable factual issue as to the Government's liability for the intentional infliction of emotional distress claim.

---

86, 94-96.  Some of the defendant FBI agents also attempted to interfere with the commutation petitions filed by the plaintiffs who received death sentences.  *Id.*  Two of the plaintiffs died in prison. *Id.* at 86.  Concluding that the plaintiffs had established a claim for intentional infliction of emotional distress, the lower court explained:

> Framing innocent men for a capital crime, prolonging their suffering for decades while they made futile attempt after attempt to win their freedom, thwarted at every turn— these are acts beyond all bounds of decency.  Perverting the system of justice they had sworn to uphold—that has no place in a civilized community.  The plaintiffs—who knew themselves to be innocent—were wrongfully convicted.  Three were told that they were to be executed, another that he would live the rest of his natural born life behind bars.  There is no way to describe that kind of horror than as so severe and of such a nature that no reasonable person could be expected to endure it.

*Limone v. United States*, 497 F. Supp. 2d 143, 227 ((D. Mass. 2007), *aff'd on other grounds*, 579 F.3d 79 (1st Cir. 2009).

## V. CONCLUSION

The Government's Motion for Summary Judgment (ECF No. 158) is **GRANTED.**

**SO ORDERED.**

**Dated this 31st day of August, 2023.**

/s/ **Jon D. Levy**
**CHIEF U.S. DISTRICT JUDGE**